1  Matthew D. Carlson (State Bar No. 273242)
2  Carlson Legal Services
   100 Pine Street, Suite 1250
3  San Francisco, California 94111
   Telephone: (415) 817-1470
4  Email: mcarlson@carlsonlegalservices.com

5

6  Attorney for Plaintiff

7

8                    **UNITED STATES DISTRICT COURT**

9                    **NORTHERN DISTRICT OF CALIFORNIA**

10

11                   **SAN FRANCISCO DIVISION**

12

   PATRICK COTTER, on behalf of himself and all       **Case No.:**
13 others similarly situated,
                                                       **COMPLAINT FOR: (1) VIOLATION**
14                                                     **OF THE CALIFORNIA UNFAIR**
                                                       **COMPETITION (CAL. BUS. & PROF.**
15               Plaintiff,                            **CODE § 17200, *et seq.*; (2) FAILURE**
                                                       **TO FURNISH ACCURATE WAGE**
16        v.                                           **STATEMENTS (CAL. LAB. CODE §**
                                                       **226); (3) CONVERSION; AND (4)**
17 LYFT, INC., and DOES 1 through 10, inclusive,       **REIMBURSEMENT (CAL. LAB.**
                                                       **CODE § 2802)**
18               Defendants.
                                                       **CLASS ACTION**
19

20

21

22

23

24

25

26

27

28

                              COMPLAINT - 1

Plaintiff Patrick Cotter (hereafter "Plaintiff"), by and through his attorney, brings this action on behalf of himself and all others similarly situated against Defendants Lyft, Inc. (hereafter "Lyft") and Does 1-10 (hereafter "Doe Defendants") (collectively, "Defendants").

## I. NATURE OF THE ACTION

1. Lyft is a San Francisco-based ride-sharing business. Through its "Lyft Platform" software implemented in the Lyft mobile phone application, Lyft provides a means to enable a person who seeks transportation to a destination via automobile ("Rider(s)") to be picked up by a nearby person who is willing to transport the Rider to his or her destinations via automobile ("Driver(s)").

2. This is a national class action that challenges Lyft's policy of misclassifying its Drivers as "independent contractors" unprotected by the California Labor Code. Because Drivers are in fact Lyft employees, this action also challenges Lyft's policy of taking 20% of gratuity payments given by Riders to Lyft's Drivers, an illegal practice under California Labor Code § 351, which prohibits an employer from taking any amount of gratuity given to an employee. This action also challenges Lyft's practice of failing to provide its Drivers with wage statements that accurately reflect, for example, their hours worked or rates of pay in violation of California Labor Code § 226, as well as Lyft's practice of failing to reimburse its Drivers for mileage costs in violation Cal. Lab. Code § 2802.

3. Lyft has numerous Drivers in California, Washington, Illinois, Massachusetts, Indiana, Minnesota, Georgia, and the District of Columbia. It has plans to expand to New York and additional markets, including international markets, in the near future.

## II. JURISDICTION

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) (the Class Action Fairness Act of 2005 ("CAFA")) because the amount in controversy exceeds the value of $5 million, exclusive of interest and costs, because the class contains 100 or

1   more putative class members, and because at least one putative class member (i.e., a

2   Driver in Chicago, Illionis) is diverse from Lyft, a corporation with its principal place of

3   business in California.

4   5.   Plaintiff is informed and believes that the average gratuity payment made by a Rider to a

5        Lyft Driver is $15, and that a total of approximately 1.5 million rides have been provided

6        by Lyft Drivers to date. Accordingly, potential class-wide liability for Lyft's policy of

7        taking 20% of gratuity payments given by Riders to Lyft Drivers is approximately $4.5

8        million to date. Plaintiff is further informed and believes that Lyft's failure to provide its

9        thousands of Drivers with accurate wage statements may subject Lyft to liability of at

10       least $2,000,000 to date. Additionally, Plaintiff is informed and believes that Lyft Drivers

11       have collectively suffered substantial unreimbursed mileage costs incurred as a result of

12       transporting Riders a total of approximately 4.5 million miles to date. Plaintiff will also

13       be permitted to recover attorney's fees if he is successful in this action.

### III. VENUE

6.   This Court is the proper venue for this matter pursuant to 28 U.S.C. § 1391 because a

     substantial part of the events giving rise to Plaintiff's claims and the claims of putative

     class members occurred in the Northern District of California. Specifically, Lyft took

     gratuities given by Riders to Plaintiff and putative class members at Lyft's principal place

     of business in San Francisco, California. Lyft's policies of failing to provide properly

     itemized wage statements and failing to reimburse Lyft Drivers for mileage costs were

     also implemented in San Francisco, California.

### IV.  THE PARTIES

7.   Plaintiff Patrick Cotter is a citizen of California, domiciled in San Francisco. Plaintiff

     provided services as a Lyft Driver starting in September, 2012. Plaintiff's employment

     with Lyft was terminated in January, 2013.

8.  Defendant Lyft, Inc. is a Delaware corporation with its headquarters and principal place of business in San Francisco, CA. Lyft's accounting, human resources, and all other departments are located in its San Francisco, CA headquarters.

9.  Plaintiff does not know the true names and capacities, whether individual, partners, or corporate, of Defendants Does 1-10, and for that reason sues Does 1-10 under fictitious names. Plaintiff is informed and believes that Does 1-10 are owners and/or parent companies of Lyft, Inc. Does 1-10 have a unity of interest and ownership with Lyft such that the separate personalities of Lyft and Does 1-10 did not and do not exist. Specifically, Does 1-10 substantially own Lyft and dominate the management of Lyft. Does 1-10 commingle their assets with the assets of Lyft, and divert assets from Lyft to themselves to avoid creditors. Lyft is undercapitalized and has no regular board meetings. Does 1-10 failed to maintain an arm's length relationship with Lyft. If the acts of Lyft are treated as the acts of Lyft alone, an inequitable result will follow because Lyft may be unable to satisfy a judgment in favor of the putative classes.

## V. FACTUAL ALLEGATIONS

10. As described above, Lyft is a San Francisco-based ride-sharing business that uses its "Lyft Platform" software to "match" an individual who needs a ride (a Rider) with someone willing to provide a ride (a Driver).[1]

11. Lyft's business works as follows: The Lyft Platform is implemented in an application that must be downloaded to an iPhone or Android-based cellular phone by all Drivers and any prospective Rider. If a prospective Rider is in need of a Driver, the Rider uses the application to request a ride from a Driver in the Rider's geographical vicinity. All available Lyft Drivers in the vicinity are informed of the request via the Lyft application.

---

[1] Plaintiff is one of many Lyft Drivers throughout the United States, and accordingly the term "Driver" or "Drivers" as used herein is a term intended to encompass all Lyft Drivers, including Plaintiff.
[2] Plaintiff is informed and believes that Lyft's policies that underlie this action began in May, 2012. Given the

The first Lyft Driver to accept a request is then "matched" with the Rider, and proceeds to pick up the Rider and transport him or her to his or her destination.

12. Lyft expects its Drivers to accept all incoming requests from Riders unless the Driver is in the process of transporting another Rider at the time of a request.

13. Drivers can receive requests whenever they indicate via the Lyft application that they are available to provide rides.

14. Lyft prohibits its Drivers from transporting Riders more than 60 miles from the origin of the ride.

15. Drivers and Riders were and are required to agree to the Lyft's Terms of Services ("TOS") as a prerequisite to utilizing the Lyft Platform.

16. Lyft's uniform TOS provides that the agreement is governed by the laws of the State of California without regard to choice of law principles.

17. Lyft's uniform TOS and all policies therein were drafted, created, implemented, and carried out in the state of California.

18. Lyft's compensation structure for its Plaintiff and all Drivers is set forth in Lyft's uniform TOS. Pursuant to the uniform TOS, a Rider may give a gratuity payment to a Driver at the conclusion of the ride.

19. The decision whether to pay a gratuity and the amount of the gratuity is in the Rider's sole discretion.

20. Drivers are prohibited from requesting compensation from Riders or from receiving any compensation or consideration for providing a ride to Riders other than the amount (if any) of the gratuity payment.

21. If a Rider elects to pay a gratuity to a Driver, the full amount of the gratuity is charged to the Rider's authorized credit card immediately following completion of such election.

22. The gratuity payment is then processed by a third party vendor, and Lyft subsequently takes an "administrative fee" of twenty percent of the gratuity payment.

23. Lyft transfers the balance of the gratuity payment the Driver's account.

24. California Labor Code § 351 prohibits an employer from taking <u>any</u> portion of a gratuity given to its employee(s).

25. However, Lyft misclassifies its Drivers as "independent contractors" rather than employees protected by the California Labor Code, including California Labor Code § 351.

26. In fact and pursuant to California law, all Lyft Drivers are properly considered employees for the following reasons:

    a. Pursuant to Lyft's uniform business model, Drivers provide a service (i.e., transporting Riders) that benefits Lyft;

    b. Pursuant to Lyft's uniform TOS, Lyft retains the right to terminate Drivers for any or no reason, without explanation, at any time;

    c. Pursuant to Lyft's uniform TOS, Lyft retains the right to terminate Drivers if, in Lyft's discretion, the Driver behaved in a way that could be regarded as inappropriate;

    d. Pursuant to Lyft's uniform TOS, Lyft takes a 20% administrative fee from gratuities given to Drivers by Riders, regardless of the amount of the gratuity. Accordingly, Lyft has an incentive to control the means and manner of the Drivers' service;

    e. Pursuant to Lyft's uniform business model, Drivers do not engage in a business distinct from Lyft's business; rather, Drivers' services are the primary or sole source of income for Lyft;

    f. Pursuant to Lyft's uniform TOS, Lyft does not require Drivers to possess any skill above and beyond that necessary to obtain a normal driver's license;

g.  Pursuant to Lyft's uniform business model, Drivers' tenure with Lyft was for an indefinite period of time;

h.  Pursuant to Lyft's uniform business model, Lyft provides Drivers with the only instrumentality by which a Driver can perform services for Lyft, namely Lyft's software;

i.  Pursuant to Lyft's uniform TOS, Lyft does not require Drivers to invest in any equipment or materials required for his or her services; rather all Drivers must already own or have the legal right to operate a vehicle in good operating condition before he or she can work as a Lyft Driver. All Drivers must also already be named on an insurance policy covering the Driver's vehicle before he or she can work as a Lyft Driver;

j.  Pursuant to Lyft's uniform policy, Drivers must place a large pink mustache provided by Lyft on the front of the Driver's vehicle while the Driver is in the course of transporting a Rider;

k.  Pursuant to Lyft's uniform TOS, Lyft prohibits Drivers from setting rates of pay for their services; rather, pursuant to Lyft's uniform TOS, Lyft permits only payment in the form of gratuity;

l.  Pursuant to Lyft's uniform TOS, Lyft requires its Drivers to consent to receiving email communications and text messages from Lyft, which include message notification emails, emails or text messages informing Drivers of potential available Riders, and emails or text messages informing Drivers of Lyft's promotions. Drivers are required to pay for receiving these text messages at the rate applied by the Driver's mobile phone service provider;

m. Pursuant to Lyft's uniform policy, Drivers must undergo a two hour training session during which:

    i. Drivers are told to greet Riders with a "fist pound;"

    ii. Drivers are told how to interact and converse with Riders;

    iii. Drivers are told they must obey all aspects of the California Vehicle Code;

  n. Pursuant to Lyft's uniform policy, Drivers' vehicles are evaluated for aesthetic purposes, including cleanliness, and Drivers' vehicles must pass this appearance evaluation in order for Drivers to work for Lyft;

  o. Pursuant to Lyft's uniform TOS, Lyft retains the right to shut down the Lyft Platform and the Lyft application, thereby retaining the right to prevent Drivers from picking up Riders;

  p. Pursuant to Lyft's uniform TOS, Lyft, at its sole discretion, may make available promotion offers to Riders without consulting with its Drivers;

  q. Pursuant to Lyft's uniform policy, Drivers are not permitted to transport Riders more than 60 miles; and

  r. Pursuant to Lyft's uniform policy, Drivers are expected to accept all Rider requests unless the Driver is transporting another Rider.

27. Despite the fact that Drivers are, in fact, Lyft employees, Lyft nevertheless takes 20% of the gratuity given by Drivers to Riders as an "administrative fee."

28. Under California law, Lyft is not permitted to take any portion of the gratuity given by Drivers to Riders (i.e., the "administrative fee") because such voluntary payments are sole property of Lyft Drivers.

29. Despite the fact that Drivers are, in fact, Lyft employees, Lyft nevertheless failed to provide its Drivers with itemized wage statements showing the information required by California Labor Code § 226.

30.  Despite the fact that Drivers are, in fact, Lyft employees, Lyft nevertheless failed to reimburse its Drivers for the mileage costs they necessarily incurred because Lyft Drivers must used automobiles to transport Riders.

## VI. CLASS ACTION ALLEGATIONS

**Plaintiff's Claims for Conversion and Pursuant to Cal. Bus. & Prof. Code § 17200, *et seq*.**

31.  Plaintiff's claim for conversion and his claim pursuant to Cal. Bus. & Prof. Code § 17200, *et seq*. are brought on behalf of himself and all others similarly situated pursuant to the class action mechanism set forth in Federal Rule of Civil Procedure 23.

32.  This putative class is defined as:

> "All individuals who worked or currently work as Lyft drivers." [2]

33.  Plaintiff hereafter refers to this putative class as the "Gratuity Class."

**A.  ASCERTAINABILITY**

34.  It is administratively feasible to determine the members of the Gratuity Class through Lyft's records because Lyft maintains all Drivers' personal information, including contact information.

**B.  NUMEROSITY**

35.  Lyft previously announced that its Drivers provided transportation on 1,000,000 separate occasions. While Plaintiff is unaware of the exact number of Lyft Drivers, he is informed and believes that there are thousands of Drivers geographically dispersed throughout the United States. Given Lyft's intent to reach new markets in the near future, including New York, and particularly given Lyft's rapid expansion in the last several months, Plaintiff expects that the size of the Gratuity Class will increase significantly during this litigation.

//

---

[2] Plaintiff is informed and believes that Lyft's policies that underlie this action began in May, 2012. Given the statutes of limitations on Plaintiff's claims for conversion (three years) and pursuant to Cal. Bus. & Prof. Code § 17200, *et seq*., (four years), no temporal limitation on the class definition is required.

**C.   COMMONALITY**

36.   Members of the Gratuity Class share common issues of fact, including:

a.   Whether, pursuant to Lyft's uniform business model, Drivers provide a service (i.e., transporting Riders) that benefits Lyft;

b.   Whether, pursuant to Lyft's uniform TOS, Lyft retains the right to terminate Drivers for any or no reason, without explanation, at any time;

c.   Whether, pursuant to Lyft's uniform TOS, Lyft retains the right to terminate Drivers if, in Lyft's discretion, the Driver behaved in a way that could be regarded as inappropriate;

d.   Whether, pursuant to Lyft's uniform business model, Drivers do not engage in a business distinct from Lyft's business; rather, Drivers' services are the primary or sole source of income for Lyft;

e.   Whether, pursuant to Lyft's uniform TOS, Lyft does not require Drivers to possess any skill above and beyond that necessary to obtain a normal driver's license;

f.   Whether, pursuant to Lyft's uniform business model, Drivers' tenures with Lyft are for an indefinite period of time;

g.   Whether, pursuant to Lyft's uniform business model, Lyft provides Drivers with the only instrumentality by which a Driver can perform services for Lyft, namely Lyft's software;

h.   Whether, pursuant to Lyft's uniform TOS, Lyft does not require Drivers to invest in any equipment or materials required for his services; rather all Drivers must already own or have the legal right to operate a vehicle in good operating condition before he or she can work as a Lyft Driver.

i. Whether, pursuant to Lyft's uniform TOS, all Drivers must already be named on an insurance policy covering the Driver's vehicle before he or she can work as a Lyft Driver;

j. Whether, pursuant to Lyft's uniform policy, Drivers must place a large pink mustache provided by Lyft on the front of the Driver's vehicle while the Driver is in the course of transporting a Rider;

k. Whether, pursuant to Lyft's uniform TOS, Lyft prohibits Drivers from setting rates of pay for their services;

l. Whether, pursuant to Lyft's uniform TOS, Lyft permits only payment in the form of gratuity;

m. Whether, pursuant to Lyft's uniform TOS, Lyft requires its Drivers to consent to receiving email communications and text messages from Lyft, which include message notification emails, emails or text messages informing Drivers of potential available Riders, and emails or text messages informing Drivers of Lyft's promotions;

n. Whether, pursuant to Lyft's uniform TOS, Drivers are required to pay for receiving these text messages at the rate applied by the Driver's mobile phone service provider;

o. Whether, pursuant to Lyft's uniform policy, Drivers must undergo a two hour training session during which:

    i. Drivers are told to greet Riders with a "fist pound;"

    ii. Drivers are told how to interact and converse with Riders;

    iii. Drivers are told they must obey all aspects of the vehicle code;

p. Whether, pursuant to Lyft's uniform policy, Drivers' vehicles are evaluated for aesthetic purposes, including cleanliness;

q. Whether, pursuant to Lyft's uniform policy, Drivers' vehicles must pass this appearance evaluation in order for Drivers to work for Lyft;

r. Whether, pursuant to Lyft's uniform TOS, Lyft retains the right to shut down the Lyft Platform and the Lyft application;

s. Whether, pursuant to Lyft's uniform TOS, Lyft, at its sole discretion, may make available promotion offers to Riders without consulting with its Drivers;

t. Whether, pursuant to Lyft's uniform TOS, Drivers are not permitted to transport Riders more than 60 miles;

u. Whether, pursuant to Lyft's uniform policy, Drivers are expected to accept all Rider requests unless the Driver is transporting another Rider; and

v. Whether, pursuant to Lyft's uniform TOS, Lyft takes a 20% administrative fee from gratuities given to Drivers by Riders, regardless of the amount of the gratuity.

37. Members of the Gratuity Class share common issues of law, including:

a. Whether members of the Gratuity Class were misclassified by Lyft as independent contractors under California law;

b. Whether Lyft unlawfully took as "administrative fees" gratuities given to members of the Gratuity Class in violation of Cal. Lab. Code § 351; and

c. Whether Lyft's conduct in violating of Cal. Lab. Code § 351 is an unlawful business practice pursuant to Cal. Bus. & Prof. Code § 17200, *et seq*.

38. The common issues of law can be answered with proof common to members of the Gratuity Class, including:

a. Lyft's TOS, to which Lyft and all Drivers must agree;

b. Lyft's policies and practices applicable to all Drivers, including policies that tend to show Drivers are in fact employees rather than independent contractors;

c. Lyft's policies or practices concerning its "administrative fee;" and

d. All other facts common to the Gratuity Class alleged above.

**D.    TYPICALITY**

39.    Plaintiff's claims are typical of the claims of all members of the Gratuity Class. First, Plaintiff, like all members of the Gratuity Class, was misclassified by Lyft as an independent contractor.

40.    Second, Plaintiff, like all members of the Gratuity Class, was harmed by Lyft's policy of taking an "administrative fee" from gratuities given by Riders to Drivers.

**E.    ADEQUACY**

41.    Plaintiff is a member of the Gratuity Class and will fairly and adequately represent and protect the interests of the members of the Gratuity Class. Plaintiff has no conflicts of interests with members of the Gratuity Class.

42.    Counsel for Plaintiff is competent and experienced in litigating employment-based class actions, including actions based on alleged misclassification.

**F.    PREDOMINANCE**

43.    Common questions of law and fact predominate over individual issues in this action for several reasons. First, the issue of misclassification can be resolved with proof of Lyft policies applicable to all Drivers in the Gratuity Class, including but not limited to the Lyft's uniform TOS. Second, the issue of Lyft's liability under Cal. Lab. Code § 351 can be established as to all members of the Gratuity Class with proof that Lyft takes an "administrative fee" from every gratuity given by a Rider to a Driver.

44.    Additionally, Lyft, and all Drivers throughout the United States, have agreed to be subject to California law for all disputes relating to Lyft's TOS, including its

compensation policy and therefore the instant dispute. Regardless of the choice of law provision in the TOS, California law, including Cal. Bus. & Prof. Code § 17200, *et seq.* and applicable misclassification law, applies to Drivers in California and all other states because Lyft's unlawful conduct took place and continues to take place in California.

**G.  SUPERIORITY**

45.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. First, because of the relatively small monetary value of the claims asserted by members of the Gratuity Class, most if not all members of the Gratuity Class would likely find the cost of individually litigating their claims against Lyft to be prohibitive. Additionally, many members of the Gratuity Class may be unaware that they have legal recourse against Lyft for the conduct alleged herein.

46.  Second, Plaintiff is informed and believes that there is no other similar litigation pending in state or federal court.

47.  Third, it is desirable to concentrate this litigation in this forum because Lyft's misconduct took place and continues to take place in San Francisco.

48.  Fourth, Plaintiff does not anticipate any difficulties in managing a relatively straight-forward class action such as this one.

**VII. CLASS ACTION ALLEGATIONS**

**Plaintiff's Claim Pursuant to Cal. Lab. Code § 226**

49.  Plaintiff's claim for inaccurate wage statements pursuant to Cal. Lab. Code § 226 is brought on behalf of himself and all others similarly situated pursuant to the class action mechanism set forth in Federal Rule of Civil Procedure 23.

50.  This putative class is defined as:

"All individuals who worked or currently work as Lyft drivers from January 1, 2013, through the present." [3]

51. Plaintiff hereafter refers to this putative class as the "Wage Statement Class."

**A.  ASCERTAINABILITY**

52. It is administratively feasible to determine the members of the Wage Statement Class through Lyft's records because Lyft maintains all Drivers' personal information, including contact information.

**B.  NUMEROSITY**

53. Lyft previously announced that its Drivers provided transportation on 1,000,000 separate occasions. While Plaintiff is unaware of the exact number of Lyft Drivers, he is informed and believes that there are thousands of Drivers geographically dispersed throughout the United States. Given Lyft's intent to reach new markets in the near future, including New York, and particularly given Lyft's rapid expansion in the last several months, Plaintiff expects that the size of the Gratuity Class will increase significantly during this litigation.

**C.  COMMONALITY**

54. Members of the Wage Statement Class share common issues of fact, including:

     a.  Whether, pursuant to Lyft's uniform business model, Drivers provide a service (i.e., transporting Riders) that benefits Lyft;

     b.  Whether, pursuant to Lyft's uniform TOS, Lyft retains the right to terminate Drivers for any or no reason, without explanation, at any time;

     c.  Whether, pursuant to Lyft's uniform TOS, Lyft retains the right to terminate Drivers if, in Lyft's discretion, the Driver behaved in a way that could be regarded as inappropriate;

---

[3] The temporal limitation on this class is based on the January 1, 2013 amendment of Cal. Lab. Code § 226 to state "An employee is deemed to suffer injury for purposes of this subdivision if the employer fails to provide a wage statement."

d.   Whether, pursuant to Lyft's uniform TOS, Lyft takes a 20% administrative fee from gratuities given to Drivers by Riders, regardless of the amount of the gratuity;

e.   Whether, pursuant to Lyft's uniform business model, Drivers do not engage in a business distinct from Lyft's business; rather, Drivers' services are the primary or sole source of income for Lyft;

f.   Whether, pursuant to Lyft's uniform TOS, Lyft does not require Drivers to possess any skill above and beyond that necessary to obtain a normal driver's license;

g.   Whether, pursuant to Lyft's uniform business model, Drivers' tenures with Lyft are for an indefinite period of time;

h.   Whether, pursuant to Lyft's uniform business model, Lyft provides Drivers with the only instrumentality by which a Driver can perform services for Lyft, namely Lyft's software;

i.   Whether, pursuant to Lyft's uniform TOS, Lyft does not require Drivers to invest in any equipment or materials required for his services; rather all Drivers must already own or have the legal right to operate a vehicle in good operating condition before he or she can work as a Lyft Driver.

j.   Whether, pursuant to Lyft's uniform TOS, all Drivers must already be named on an insurance policy covering the Driver's vehicle before he or she can work as a Lyft Driver;

k.   Whether, pursuant to Lyft's uniform policy, Drivers must place a large pink mustache provided by Lyft on the front of the Driver's vehicle while the Driver is in the course of transporting a Rider;

l.   Whether, pursuant to Lyft's uniform TOS, Lyft prohibits Drivers from setting rates of pay for their services;

m. Whether, pursuant to Lyft's uniform TOS, Lyft permits only payment in the form of gratuity;

n. Whether, pursuant to Lyft's uniform TOS, Lyft requires its Drivers to consent to receiving email communications and text messages from Lyft, which include message notification emails, emails or text messages informing Drivers of potential available Riders, and emails or text messages informing Drivers of Lyft's promotions;

o. Whether, pursuant to Lyft's uniform TOS, Drivers are required to pay for receiving these text messages at the rate applied by the Driver's mobile phone service provider;

p. Whether, pursuant to Lyft's uniform policy, Drivers must undergo a two hour training session during which:

    i. Drivers are told to greet Riders with a "fist pound;"

    ii. Drivers are told how to interact and converse with Riders;

    iii. Drivers are told they must obey all aspects of the vehicle code;

q. Whether, pursuant to Lyft's uniform policy, Drivers' vehicles are evaluated for aesthetic purposes, including cleanliness;

r. Whether, pursuant to Lyft's uniform policy, Drivers' vehicles must pass this appearance evaluation in order for Drivers to work for Lyft;

s. Whether, pursuant to Lyft's uniform TOS, Lyft retains the right to shut down the Lyft Platform and the Lyft application;

t. Whether, pursuant to Lyft's uniform TOS, Lyft, at its sole discretion, may make available promotion offers to Riders without consulting with its Drivers;

u. Whether, pursuant to Lyft's uniform TOS, Drivers are not permitted to transport Riders more than 60 miles;

v. Whether, pursuant to Lyft's uniform policy, Drivers are expected to accept all Rider requests unless the Driver is transporting another Rider; and

w. Whether, pursuant to Lyft's business model, Drivers were not and are not provided with wage statements that comply with Cal. Lab. Code § 226.

55. Members of the Wage Statement Class share common issues of law, including:

a. Whether members of the Wage Statement Class were misclassified by Lyft as independent contractors under California law; and

b. Whether Lyft unlawfully failed to provide members of the Wage Statement Class with wage statements that comply with Cal. Lab. Code § 226.

56. The common issues of law can be answered with proof common to members of the Wage Statement Class, including:

a. Lyft's TOS, to which Lyft and all Drivers must agree;

b. Lyft's policies and practices applicable to all Drivers, including policies that tend to show Drivers are in fact employees rather than independent contractors;

c. Lyft's policies or practices (or lack thereof) concerning wage statements for its Drivers; and

d. All other facts common to the Wage Statement Class alleged above.

**D. TYPICALITY**

57. Plaintiff's claims are typical of the claims of all members of the Wage Statement Class. First, Plaintiff, like all members of the Wage Statement Class, was misclassified by Lyft as an independent contractor.

58. Second, Plaintiff, like all members of the Wage Statement Class, never received a wage statement that complied with Cal. Lab. Code § 226.

//

**E.     ADEQUACY**

59.     Plaintiff is a member of the Wage Statement Class and will fairly and adequately represent and protect the interests of the members of the Wage Statement Class. Plaintiff has no conflicts of interests with members of the Wage Statement Class.

60.     Counsel for Plaintiff is competent and experienced in litigating employment-based class actions, including actions based on alleged misclassification.

**F.     PREDOMINANCE**

61.     Common questions of law and fact predominate over individual issues in this action for several reasons. First, the issue of misclassification can be resolved with proof of Lyft policies applicable to all Drivers, including but not limited to the Lyft TOS. Second, the issue of Lyft's liability under Cal. Lab. Code § 226 can be established with proof that Lyft never provided wage statements to its Drivers.

62.     Additionally, Lyft, and all Drivers throughout the United States, have agreed to be subject to California law for all disputes relating to Lyft's TOS, including its compensation policy and therefore the instant dispute. Regardless of the choice of law provision in the TOS, California law, including Cal. Lab. Code § 226, *et seq.* and applicable misclassification law, applies to Drivers in California and all other states because Lyft's unlawful conduct took place and continues to take place in California.

**G.     SUPERIORITY**

63.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. First, because of the relatively small monetary value of the claims asserted by members of the Wage Statement Class, most if not all members of the Wage Statement Class would likely find the cost of individually litigating their claims against Lyft to be prohibitive. Additionally, many members of the Wage Statement Class may be unaware that they have legal recourse against Lyft for the conduct alleged herein.

64. Second, Plaintiff is informed and believes that there is no other similar litigation pending in state or federal court.

65. Third, it is desirable to concentrate this litigation in this forum because Lyft's misconduct took place and continues to take place in San Francisco.

66. Fourth, Plaintiff does not anticipate any difficulties in managing a relatively straight forward class action such as this one.

## VIII. CLASS ACTION ALLEGATIONS

### Plaintiff's Claim for Reimbursement Pursuant to Cal. Lab. Code § 2802

67. Plaintiff's claim for reimbursement under Cal. Lab. Code § 2802 is brought on behalf of himself and all others similarly situated pursuant to the class action mechanism set forth in Federal Rule of Civil Procedure 23.

68. This putative class is defined as:

"All individuals who worked or currently work as Lyft drivers." [4]

69. Plaintiff hereafter refers to this putative class as the "Reimbursement Class."

## A. ASCERTAINABILITY

70. It is administratively feasible to determine the members of the Reimbursement Class through Lyft's records because Lyft maintains all Drivers' personal information, including contact information.

## B. NUMEROSITY

71. Lyft previously announced that its Drivers provided transportation on 1,000,000 separate occasions. While Plaintiff is unaware of the exact number of Lyft Drivers, he is informed and believes that there are thousands of Drivers geographically dispersed throughout the United States. Given Lyft's intent to reach new markets in the near future, including New

---

[4] Plaintiff is informed and believes that Lyft's policies that underlie this action began in May, 2012. Given the statutes of limitations on Plaintiff's claims for reimbursement (three years), no temporal limitation on the class definition is required.

York, and particularly given Lyft's rapid expansion in the last several months, Plaintiff expects that the size of the Gratuity Class will increase significantly during this litigation.

## C. COMMONALITY

72.    Members of the Reimbursement Class share common issues of fact, including:

    a.   Whether, pursuant to Lyft's uniform business model, Drivers provide a service (i.e., transporting Riders) that benefits Lyft;

    b.   Whether, pursuant to Lyft's uniform TOS, Lyft retains the right to terminate Drivers for any or no reason, without explanation, at any time;

    c.   Whether, pursuant to Lyft's uniform TOS, Lyft retains the right to terminate Drivers if, in Lyft's discretion, the Driver behaved in a way that could be regarded as inappropriate;

    d.   Whether, pursuant to Lyft's uniform TOS, Lyft takes a 20% administrative fee from gratuities given to Drivers by Riders, regardless of the amount of the gratuity;

    e.   Whether, pursuant to Lyft's uniform business model, Drivers do not engage in a business distinct from Lyft's business; rather, Drivers' services are the primary or sole source of income for Lyft;

    f.   Whether, pursuant to Lyft's uniform TOS, Lyft does not require Drivers to possess any skill above and beyond that necessary to obtain a normal driver's license;

    g.   Whether, pursuant to Lyft's uniform business model, Drivers' tenures with Lyft are for an indefinite period of time;

    h.   Whether, pursuant to Lyft's uniform business model, Lyft provides Drivers with the only instrumentality by which a Driver can perform services for Lyft, namely Lyft's software;

i. Whether, pursuant to Lyft's uniform TOS, Lyft does not require Drivers to invest in any equipment or materials required for his services; rather all Drivers must already own or have the legal right to operate a vehicle in good operating condition before he or she can work as a Lyft Driver.

j. Whether, pursuant to Lyft's uniform TOS, all Drivers must already be named on an insurance policy covering the Driver's vehicle before he or she can work as a Lyft Driver;

k. Whether, pursuant to Lyft's uniform policy, Drivers must place a large pink mustache provided by Lyft on the front of the Driver's vehicle while the Driver is in the course of transporting a Rider;

l. Whether, pursuant to Lyft's uniform TOS, Lyft prohibits Drivers from setting rates of pay for their services;

m. Whether, pursuant to Lyft's uniform TOS, Lyft permits only payment in the form of gratuity;

n. Whether, pursuant to Lyft's uniform TOS, Lyft requires its Drivers to consent to receiving email communications and text messages from Lyft, which include message notification emails, emails or text messages informing Drivers of potential available Riders, and emails or text messages informing Drivers of Lyft's promotions;

o. Whether, pursuant to Lyft's uniform TOS, Drivers are required to pay for receiving these text messages at the rate applied by the Driver's mobile phone service provider;

p. Whether, pursuant to Lyft's uniform policy, Drivers must undergo a two hour training session during which:

    i. Drivers are told to greet Riders with a "fist pound;"

    ii. Drivers are told how to interact and converse with Riders;

iii.  Drivers are told they must obey all aspects of the vehicle code;

q.  Whether, pursuant to Lyft's uniform policy, Drivers' vehicles are
evaluated for aesthetic purposes, including cleanliness;

r.  Whether, pursuant to Lyft's uniform policy, Drivers' vehicles must pass
this appearance evaluation in order for Drivers to work for Lyft;

s.  Whether, pursuant to Lyft's uniform TOS, Lyft retains the right to shut
down the Lyft Platform and the Lyft application;

t.  Whether, pursuant to Lyft's uniform TOS, Lyft, at its sole discretion, may
make available promotion offers to Riders without consulting with its
Drivers;

u.  Whether, pursuant to Lyft's uniform TOS, Drivers are not permitted to
transport Riders more than 60 miles;

v.  Whether, pursuant to Lyft's uniform policy, Drivers are expected to accept
all Rider requests unless the Driver is transporting another Rider; and

w.  Whether pursuant to Lyft's uniform policy, Drivers are not reimbursed for
necessary and reasonable mileage costs.

73.  Members of the Reimbursement Class share common issues of law, including:

a.  Whether members of the Gratuity Class were misclassified by Lyft as
independent contractors under California law;

b.  Whether mileage costs incurred by Lyft Drivers are "necessary and
reasonable" business expenditures; and

c.  Whether Lyft unlawfully failed to reimburse Drivers for mileage costs in
violation of Cal. Lab. Code § 2802.

74.  The common issues of law can be answered with proof common to members of the
Reimbursement Class, including:

a.  Lyft's TOS, to which Lyft and all Drivers must agree;

b. Lyft's policies and practices applicable to all Drivers, including policies that tend to show Drivers are in fact employees rather than independent contractors;

c. The common nature of all Drivers' employment responsibilities (i.e., transporting Riders via automobile);

d. Lyft's policies or practices concerning mileage reimbursement; and

e. All other facts common to the Gratuity Class alleged above.

**D.  TYPICALITY**

75. Plaintiff's claims are typical of the claims of all members of the Reimbursement Class. First, Plaintiff, like all members of the Reimbursement Class, was misclassified by Lyft as an independent contractor.

76. Second, Plaintiff, like all members of the Reimbursement Class, was harmed by Lyft's policy of failing to pay Drivers for mileage costs.

**E.  ADEQUACY**

77. Plaintiff is a member of the Reimbursement Class and will fairly and adequately represent and protect the interests of the members of the Reimbursement Class. Plaintiff has no conflicts of interests with members of the Reimbursement Class.

78. Counsel for Plaintiff is competent and experienced in litigating employment-based class actions, including actions based on alleged misclassification.

**F.  PREDOMINANCE**

79. Common questions of law and fact predominate over individual issues in this action for several reasons. First, the issue of misclassification can be resolved with proof of Lyft policies applicable to all Drivers in the Gratuity Class, including but not limited to the Lyft's uniform TOS. Second, the issue of Lyft's liability under Cal. Lab. Code § 2802 can be established as to all members of the Gratuity Class with proof that Lyft does not

pay for mileage expenses incurred by any Lyft Drivers, and proof that all Drivers' mileage costs are necessarily incurred as a direct result of their employment with Lyft.

80. Additionally, Lyft, and all Drivers throughout the United States, have agreed to be subject to California law for all disputes relating to Lyft's TOS, including its compensation policy and therefore the instant dispute. Regardless of the choice of law provision in the TOS, California law, including Cal. Lab. Code § 2802 and applicable misclassification law, applies to Drivers in California and all other states because Lyft's unlawful conduct took place and continues to take place in California.

81. Further, Lyft has no policy in place that allowed or allows any Driver to request reimbursement for mileage.

**G.    SUPERIORITY**

82. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. First, because of the relatively small monetary value of the claims asserted by members of the Reimbursement Class, most if not all members of the Reimbursement Class would likely find the cost of individually litigating their claims against Lyft to be prohibitive. Additionally, many members of the Reimbursement Class may be unaware that they have legal recourse against Lyft for the conduct alleged herein.

83. Second, Plaintiff is informed and believes that there is no other similar litigation pending in state or federal court.

84. Third, it is desirable to concentrate this litigation in this forum because Lyft's misconduct took place and continues to take place in San Francisco.

85. Fourth, Plaintiff does not anticipate any difficulties in managing a relatively straight forward class action such as this one.

<u>**IX.  FIRST CLAIM**</u>

**Violation of Business & Professions Code § 17200, *et seq.***

**Arising from Violation of Cal. Lab. Code § 351**

86.  Plaintiff, on behalf of himself and members of the Gratuity Class, realleges and incorporates by reference the allegations in the preceding paragraphs as if fully alleged herein.

87.  Pursuant to California law, Lyft was and/or is the employer of Plaintiff and members of the Gratuity Class.

88.  Lyft unlawfully collected, took, or received a portion of the gratuities paid, given, or left by Riders to or for Drivers despite the fact that the full amount of the gratuities paid, given, or left by Riders to or for Drivers was the sole property of the Drivers.

89.  Lyft's unlawful taking of gratuities constitutes an unlawful business practice prohibited by California Business & Professions Code § 17200, *et seq*. and is independently actionable under California Business & Professions Code § 17200, *et seq*.

90.  As a result of Lyft's unlawful conduct, Plaintiff and members of the Gratuity Class suffered economic losses in the amount of the administrative fees deducted from the gratuities given to them by Riders and are entitled to restitution in that amount.

## X.  SECOND CLAIM

### Violation of Cal. Lab. Code § 226

91.  Plaintiff, on behalf of himself and members of the Wage Statement Class, realleges and incorporates by reference the allegations in the preceding paragraphs as if fully alleged herein.

92.  Pursuant to California law, Lyft was and/or is the employer of Plaintiff and members of the Wage Statement Class and purposefully misclassified Plaintiffs and members of the Wage Statement Class as independent contractors.

93.  Lyft unlawfully failed to provide Plaintiff and members of the Wage Statement Class with accurate itemized wage statements in writing showing gross wages earned, total hours worked, deductions, net wages earned, pay period, the name of the employee and

the last four digits of his or her social security number, the legal name of the employer, and all applicable hourly rates.

94. Plaintiff and members of the Wage Statement Class "suffered injury" as defined in Cal. Lab. Code § 226 (as amended effective January 1, 2013) because they were not provided with a complete and accurate wage statement.

95. The injuries suffered by Plaintiff and members of the Wage Statement Class were as a result of Lyft's knowing and intentional failure to comply with Cal. Lab. Code § 226(a).

96. Accordingly, Plaintiff and each member of the Wage Statement Class are entitled to recover fifty dollars for the initial pay period in which a violation of § 226 occurred, and one hundred dollars for each violation of § 226 in a subsequent pay period, not to exceed a penalty of four thousand dollars per member of the Wage Statement Class.

## XI.  THIRD CLAIM

### Conversion

97. Plaintiff, on behalf of himself and members of the Gratuity Class, realleges and incorporates by reference the allegations in the preceding paragraphs as if fully alleged herein.

98. Pursuant to California law, Lyft was and/or is the employer of Plaintiff and members of the Gratuity Class.

99. Plaintiff and members of the Gratuity Class had a right to possess the full amount of gratuities given to them by Riders. Such gratuities are considered property under California Law. *See* Cal. Lab. Code § 351.

100. Lyft wrongfully and illegally took from Plaintiff and members of the Gratuity Class a portion of the gratuities given to Plaintiff and members of the Gratuity Class by Riders as an "administrative fee."

101. Plaintiff and members of the Gratuity Class suffered economic harm in the amount of the "administrative fees" taken from the gratuities given to them by Riders.

## XII. FOURTH CLAIM

### Violation of Cal. Lab. Code § 2802

102. Plaintiff, on behalf of himself and members of the Reimbursement Class, realleges and incorporates by reference the allegations in the preceding paragraphs as if fully alleged herein.

103. Pursuant to California law, Lyft was and/or is the employer of Plaintiff and members of the Reimbursement Class.

104. Plaintiff and members of the Reimbursement Class incurred mileage costs;

105. Such mileage costs were incurred because Plaintiff and members of the Reimbursement Class are Lyft Drivers and were therefore required to use their automobiles to transport Riders;

106. Such mileage costs were incurred necessarily in order for Plaintiff and members of the Reimbursement Class to perform their job duties as automobile Drivers for Lyft.

107. Accordingly, Plaintiff and each member of the Reimbursement Class are entitled to reimbursement at the applicable IRS rate because Lyft had no specific agreement with its Drivers concerning reimbursement for mileage costs.

### PRAYER FOR RELIEF

108. Plaintiff, on behalf of himself and the members of each putative class, prays for relief as follows:

   a.    Certification of this action as a class action as described above;

   b.    Designation of Plaintiff as representative of the each putative class;

   c.    Designation of Plaintiff's Counsel as Class Counsel for each putative class;

   d.    Restitution pursuant to Plaintiff's claim under Cal. Bus. & Prof. Code § 17200, *et seq.*;

e.      In the alternative to restitution pursuant to Plaintiff's claim under Cal. Bus. & Prof. Code § 17200, *et seq*., compensatory damages pursuant to Plaintiff's conversion claim;

f.      Penalties pursuant to Cal. Lab. Code § 226;

g.      Reimbursement pursuant to Cal. Lab. Code § 2802;

h.      Pre-judgment and post-judgment interest pursuant to Cal. Civ. Code § 3287;

i.      Attorneys' fees as provided by Cal. Code. Civ. P. § 1021.5 and Cal. Lab. Code § 226, or as provided by the parties' agreement, if any; and

j.      Costs as provided by Cal. Code Civ. P. § 1021 or as provided by the parties' agreement, if any.


Dated: September 3, 2013            Carlson Legal Services

By:     /s/                     
          Matthew D. Carlson
          Attorney for Plaintiff