Matthew D. Carlson (State Bar No. 273242)
Carlson Legal Services
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 817-1470
Email: mcarlson@carlsonlegalservices.com

Shannon Liss-Riordan (*Pro Hac Vice*)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone: (617) 994-5800
Email: sliss@llrlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| PATRICK COTTER and ALEJANDRA MACIEL, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>      v.<br><br>Lyft, Inc.,<br><br>             Defendant. | **Case No.: 3:13-cv-04065-VC**<br><br>**Hon. Vince Chhabria**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY**<br><br>Hearing date: January 29, 2015<br>Time: 10:00 a.m.<br>Courtroom: 4 |

1
2

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................1

II. STATEMENT OF FACTS ..................................................................................1

    A.  General Background .................................................................................1

    B.  Plaintiffs' Work With Lyft.......................................................................2

        1.  Lyft Retains the Right to Control *Whether* and *When* Drivers Work for Lyft. ....2

            a.  Lyft Retains the Right to Terminate its Relationship with Drivers at any Time, for Any or No Reason, Without Explanation. ........................2

            b.  Lyft Is Capable of Shutting Down the Lyft Platform at Any Time.........3

            c.  Lyft's "Passenger Rating"...............................................................3

            d.  Lyft's "Hours System" and Its Supply and Demand Models .................3

            e.  Lyft's "Reliability Rating".................................................................5

        2.  Lyft Dictates *How* Drivers Perform Their Work Through its Driver "Guide," "Rules of the Road," and Online "FAQs." ...........................................6

            a.  Lyft's "Guide" and "Rules of the Road" ..................................6

            b.  Lyft's FAQs ....................................................................................7

            c.  Other Controls on the Manner and Means of Drivers' Work for Lyft......9

            d.  Lyft's Control Over Drivers' Work Is Consistent With Its Goal of Promoting the Lyft "Brand.".................................................................10

        3.  Lyft Dictates *Who* Drivers Are Permitted to Pick Up........................11

        4.  A Lyft Driver's Job Function Is Indistinct from Lyft's Business......................11

5.   Drivers Are Not Required to Have Any Special Skill Above and Beyond that Required to Obtain a Driver's License. ....................................... 12

6.   Lyft Provides Drivers With Instrumentalities Essential To Their Job. ............... 12

7.   Drivers Are Paid According to Lyft's Non-Negotiable Formula. ..................... 12

8.   Lyft Engages in Other Behavior Evidencing an Employer-Employee Relationship With Its Drivers. ............................................................... 13

9.   Lyft's Guide and FAQs Are Not Mere "Suggestions." ..................................... 13

10. Lyft Actively Monitors Whether Drivers Work for Competitors and Retains the Right to Terminate Drivers Who Do So. .......................................... 14

E.    Lyft Does Not Comply with California Wage Laws With Respect to Its Drivers. ......................................................................................................... 15

III.    LEGAL STANDARD ........................................................................................ 15

IV.    ARGUMENT ...................................................................................................... 16

A.    The Undisputed Evidence Shows Drivers Provide Services For Lyft. ..................... 16

B.    Plaintiffs Were Independent Contractors Under Both the Common Law Test of Employment and the Industrial Welfare Commission Definition of Employment. ................................................................................................... 17

1.   Plaintiffs Were Misclassified By Lyft As Independent Contractors Under The Common Law Test of Employment. .......................................... 17

a.   The undisputed facts show that Lyft retains control over the manner and means of Drivers' work. .............................................................. 18

b.   Lyft's relationship with its Drivers bears the "secondary indicia" of an employment relationship. ......................................................... 18

2.   Plaintiffs Were Misclassified Under the IWC Definition of Employment. ......... 24

IV.    CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Aguilar v. Zep Inc.*, 2013 WL 5615688 (N.D. Cal. Oct. 10, 2013) ........................... 16

*Air Couriers Int'l v. Employment Dev. Dep't*, 150 Cal. App. 4th at 923 (2007) ........................ 22

*Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981 (9th Cir. 2014) ............ 16, 18, 23

*Antelope Valley Press v. Poizner*, 162 Cal. App. 4th 839 (2008)............................... 23

*Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522 (2014) ............................ 18, 21, 22

*Dynamex Operations W., Inc. v. Superior Court*,
    2014 WL 5173038 (Cal. Ct. App. Oct. 15, 2014) .................................................. 25

*Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1 (2007)........................ 22, 23

*Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*,
    249 F.3d 1132 (9th Cir. 2001) .............................................................. 16

*Futrell v. Payday California, Inc.*, 190 Cal. App. 4th 1419 (2010)............................... 25

*Gonzalez v. Workers' Comp. Appeals Bd.*, 46 Cal. App. 4th 1584 (1996)........................ 22, 23

*Guitierrez v. Carter Bros. Sec. Servs., LLC*,
    2014 WL 5487793 (E.D. Cal. Oct. 29, 2014) .................................................. 18

*JKH Enterprises, Inc. v. Dep't of Indus. Relations*,
    142 Cal. App. 4th 1046 (2006) ............................................................ 20, 21, 22

*Martinez v. Combs*, 49 Cal. 4th 35 (2010) ......................................................... 16, 24

*Narayan v. EGL, Inc.*, 616 F.3d 895 (9th Cir. 2010) ............................................... 16, 22

*Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071 (9th Cir.2011)........................................ 15

*Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093 (9th Cir. 2014) ............................... 21, 24

*S.G. Borello & Sons, Inc. v. Department of Industrial Relations*,
    48 Cal.3d 341 (1989) ...................................................................... 18, 19

*Santa Cruz Transp., Inc. v. Unemployment Ins. Appeals Bd.*,
    235 Cal. App. 3d 1363 (Ct. App. 1991) ..................................................... 19

*Truesdale v. Workers' Comp. Appeals Bd.*, 190 Cal. App. 3d 608 (Ct. App. 1987) .................24

*Yellow Cab Coop., Inc. v. Workers' Comp. Appeals Bd.*,
   226 Cal. App. 3d 1288 (Ct. App. 1991) .................................................16, 17, 18, 19

**Statutes**

Cal. Bus. & Prof. Code § 17200, *et seq.* ...............................................................2, 15

Cal. Lab. Code § 226 ............................................................................................2

Cal. Lab. Code § 2802 .......................................................................................2, 15

Cal. Lab. Code § 351 ...........................................................................................15

Cal. Lab. Code § 1194 ......................................................................................2, 15

Wage Order 9 .................................................................................................2, 15

**Rules**

Fed.R.Civ.P. 56(a) ..............................................................................................15

## I.     INTRODUCTION

Defendant Lyft, Inc. ("Lyft") touts itself as merely a "tech" company that, for a fee, provides technology that allows people seeking an automobile ride to "match" with someone willing to provide that ride. In fact, Lyft is a transportation company that retains a tremendous amount of control over *every* aspect of its Drivers' work. It dictates *when and if* its Drivers can work in order to meet Lyft's supply and demand models. It dictates *how* its Drivers act while driving, by, for example, telling Drivers how they must interact with passengers and telling Drivers how frequently and to what extent they must clean their vehicles. It dictates *who* Drivers can choose as Riders by punishing Drivers who decline rides or who cancel previously accepted rides.  It retains the right to terminate Drivers for any reason, including, for example, failure to meet Lyft's "community standard." This remarkable degree of control makes sense: Lyft's foremost objective is to present to Riders a consistent brand identity. Lyft can only ensure a consistent brand by requiring its Drivers to act in accordance with its standards.

Nonetheless, Lyft has classified its Drivers, including Plaintiffs Patrick Cotter and Alejandra Maciel, as "independent contractors" not subject to California's wage and hour laws.

For the above reasons, and for the reasons discussed in detail below, the Court should hold that Plaintiffs were, as a matter of California law, Lyft employees.

## II.     STATEMENT OF FACTS

### A.     General Background

The California Public Utilities Commission ("CPUC") identifies Lyft as a "peer-to-peer transportation platform" that "provid[es] transportation services for compensation." (Req. for Jud. Not., Exh. A, at p. 40.) Through a mobile phone application (the "Lyft Platform"), individuals who seek a ride ("Rider(s)") are matched with a nearby person who is willing to transport the Rider to his or her destination via automobile ("Driver(s)"). (Carlson Decl., **Exhibit A**, Declaration of Komal Kirtikar, Lyft's "Director of Support" at ¶ 2.) Lyft became operational in May of 2012. (Carlson Decl., **Exhibit B**, excerpts from the transcript of the

deposition of Evan Goldin ("Goldin dep.") at 14:21-24.)

Plaintiffs and putative class members are current and former Lyft Drivers. (Dkt. No. 55, Third Amended Complaint.) Plaintiffs contend that Lyft misclassified them and all other Lyft Drivers in California as independent contractors, and that they are instead employees entitled to the full amount of gratuities left to them by Riders, minimum wage, properly itemized wage statements, and reimbursement of expenses for mileage. *Id.*

Plaintiffs' statutory claims are brought pursuant to Cal. Bus. & Prof. Code § 17200, *et seq.* (failure to remit gratuities); Cal. Lab. Code §§ 1194, 1197, 1997.1, and Wage Order 9 (failure to pay minimum wage); Cal. Lab. Code § 226 (failure to furnish accurate wage statements); and Cal. Lab. Code § 2802 (failure to reimburse for work-related expenses). *Id.* Plaintiffs' minimum wage and reimbursement claims are also separately pled as violations of Cal. Bus. & Prof. Code § 17200. *Id.* Plaintiffs additionally assert a common law conversion claim arising from Lyft's failure to remit gratuities. *Id.* All claims are premised on the theory that Plaintiffs were wrongly classified as independent contractors while working for Lyft. *Id.*

**B.     Plaintiffs' Work With Lyft**

Patrick Cotter worked for Lyft from early September 2012 to January 30, 2013. (Carlson Decl., **Exhibit C**, excerpts from the transcript of the deposition of Patrick Cotter ("Cotter dep.") at 108:15-18; 115:11-116:22.). Alejandra Maciel worked for Lyft from August 2, 2013 to September 13, 2013. (Carlson Decl., **Exhibit D**, excerpts from the transcript of the deposition of Alejandra Maciel ("Maciel dep.") at 71:25-72:4; 120:17-121:20.) While driving for Lyft, all Drivers, including Plaintiffs, have been subject to the following Lyft practices:

**1.     Lyft Retains the Right to Control *Whether* and *When* Drivers Work for Lyft.**

**a.     Lyft Retains the Right to Terminate its Relationship with Drivers at any Time, for Any or No Reason, Without Explanation.**

Pursuant to Lyft's non-negotiable Terms of Service ("TOS"), Lyft retains the right to "terminate" Drivers "at any time, for any or no reason, without explanation." (Carlson Decl.,

**Exhibit E**, 9/10/12 TOS (Cotter TOS version 1) at LYFT000071; **Exhibit F**, 11/12/2012 TOS (Cotter TOS version 2) at LYFT000091; **Exhibit G**, 1/25/2013 TOS (Cotter TOS version 3) at LYFT000109; **Exhibit H**, 4/30/2013 TOS (Maciel TOS) at LYFT00146; (Carlson Decl., **Exhibit I**, excerpts from the transcript of the deposition of Komal Kirtikar ("Kirtikar dep.) at 37:19-38:1, 77:4-11 (stating that "[a] driver can be deactivated for anything"); *see also* (Kirtikar dep. at 28:6-29:7, 30:21-31:23; 33:13-34:8.) (stating TOS are non-negotiable).) Similarly, Drivers do not work for Lyft for a finite, predetermined duration, but rather retain on on-going relationship with Lyft until termination by one party. (Kirtikar dep. at 38:15-39:7.)

### b. Lyft Is Capable of Shutting Down the Lyft Platform at Any Time.

Pursuant to Lyft's TOS, Lyft retains the right to shut down the Lyft Platform entirely, thereby precluding Drivers from driving for Lyft at all. (Exh. E at LYFT000079-LYFT000080; Exh. F at LYFT000098-LYFT000099; Exh. G at LYFT000117; Exh. H at LYFT000153.)

### c. Lyft's "Passenger Rating"

Following each ride, Riders rate Drivers on a scale of one to five stars (the "Passenger Rating"). (Kirtikar dep. at 82:7-84:17.) When a Driver's Passenger Rating falls below what Lyft considers its "community standard," the Driver is warned and, if the Driver's Passenger Rating does not improve, the Driver is terminated. *Id.* Lyft retains the discretion to adjust the community standard as it sees fit. *Id.* For example, Plaintiff Maciel was "warned" that she was not meeting Lyft's community standard twice, told how she should modify her interactions with passengers, and ultimately terminated for not meeting Lyft's community standard. (Carlson Decl., **Exhibit J**, Maciel_0028-0029; Maciel_0043; Maciel_0081.)

### d. Lyft's "Hours System" and Its Supply and Demand Models

Initially, Drivers were permitted to drive for Lyft on a given day via two methods: they could fill out their availability a week before they intended to drive and have hours "approved" by Lyft, or (2) they could reserve hours during the same week they intended to drive. (Goldin dep. at 25:23-26:3.) In addition to these two methods, beginning in early 2013, Drivers were

able to log on to "driver mode" without having the particular hour approved or reserving the hour. (Kirtikar dep. at 61:1-62:4.)

Each of these methods was regulated by Lyft to ensure that the supply of Drivers on the road met the demand of Riders. (Goldin dep. at 39:4-40:12; Carlson Decl., **Exhibit K**, LYFT000766 (email stating "[w]e [Lyft] match supply and demand"); Carlson Decl., **Exhibit L**, LYFT000383 (email stating "we [Lyft] have caps on hours that we'll limit the number of drivers on the road").

In order to determine who is permitted to drive when there is a forecasted oversupply of Drivers, Lyft uses the aforementioned Passenger Rating, as well as its "Acceptance Rate" – defined as the percentage of ride requests actually accepted by a driver of the total number of requests received – as a "tie-breaker."  (Goldin dep. at 22:24-24:4 (describing Acceptance Rate tiebreaker; Carlson Decl., **Exhibit M**, at LYFT000260 (email to Mr. Cotter stating he was "approved to drive" during certain hours); Kirtikar dep. at 49:13-51:23 (describing Passenger Rating "prioritization").) Additionally, and specifically with respect to the third method described above, Drivers are not permitted to log on to driver mode if, in Lyft's discretion, there are too many Drivers on the road. (Kirtikar dep. at 62:5-62:12; *see also* Carlson Decl., **Exhibit N**, Cotter_0249.) Drivers are automatically logged out of driver mode at the beginning of a given hour if that hour has already been "reserved" by a sufficient number of drivers. (Kirtikar dep. at 64:6-20; Carlson Decl., **Exhibit O**, Cotter_0248.) Lyft is capable of adjusting its supply caps downward at any time. (Kirtikar dep. at 62:23-63:1.)

Thus, because of Lyft's supply and demand models, Drivers are warned that they may not be able to drive at all in a given hour or given week. (Goldin dep. 40:5-12; *see also* Carlson Decl., **Exhibit P**, LYFT001784 (Lyft website explaining why a driver did not receive any hours in a particular week); *see also* Carlson Decl., **Exhibit Q**, LYFT000941 (chat log stating that  "currently we don't have enough drivers to fulfill passenger demand, so this should not affect the overall number of hours that individual drivers are seeing. And top rated drivers like

yourself (star, acceptance + reliability ratings) receive priority for hours..."); *see also* Carlson Decl., **Exhibit R**, LYFT000878 (sample Lyft hours reservation page showing certain hours "[c]losed for pickup" *see also* Carlson Decl., **Exhibit S**, LYFT001781 (Lyft website explaining that hours "greyed out" on the Lyft website are "fill[ed] up with the maximum number of drivers...which means you cannot pick them up.").) Indeed, Plaintiff Cotter testified that he was unable to drive during certain hours even though he wanted to. (Cotter dep. at 160:13-161:20.)

Not only is Lyft's Acceptance Rating used as a "tie-breaker," but Lyft also informs Drivers if and when their Acceptance Rating falls below Lyft's standards. (Kirtikar dep. at 76:6-77:3.) If a Driver's acceptance rate falls below Lyft's standards, that driver is subject to termination. (Kirtikar dep. at 77:4-11; Carlson Decl., **Exhibit T**, at LYFT001734 ("if your acceptance rating drops well below the community standard, you will receive an email [] letting you know. After a third email, your driver account will be deactivated.")

### e.       Lyft's "Reliability Rating"

Additionally, Lyft retains the discretion to use its so-called "Reliability Rating" as a method of assigning hours to Drivers. (Goldin dep. at 32:4-11) The Reliability Rating is calculated by Lyft as the percentage of hours spent in driver mode versus the number of hours reserved.  (Goldin dep. at 24:19-25:2.) Lyft tracks this rating and reports it to Drivers in order to encourage Drivers to drive the hours that they reserved. (Goldin dep. at 30:21-31:2.) Though Lyft claims it has never used the Reliability Rating as a method of assigning hours to Drivers, it stills tracks the ratings for Lyft's internal use and is capable of calculating that rate for use as it sees fit. (Goldin dep. at 34:17-35:11.) Lyft also tells Drivers that it assigns hours based in part on Reliability Ratings. (Carlson Decl., **Exhibit U**, at LYFT001578.) Lyft informed and continues to have the ability to inform Drivers of their Reliability Ratings, *id.*; *see also* Carlson Decl., **Exhibit V**, LYFT000265-LYFT000266 (weekly driving report for Plaintiff Cotter showing Acceptance and Reliability Rates; Carlson Decl., **Exhibit W**, Maciel_0026-0027 (weekly driving report for Plaintiff Maciel showing Acceptance and Reliability Rates); Carlson

Decl., **Exhibit X**, LYFT000993, LYFT000865-LYFT000866, LYFT000908 (emails to Drivers stating that failure to drive reserved hours affects their reliability rating); Carlson Decl., **Exhibit Y**, LYFT001581 (Lyft web page explaining that failing to drop hours 24 hours in advance negatively affects reliability rating).)

> **2.    Lyft Dictates *How* Drivers Perform Their Work Through its Driver "Guide," "Rules of the Road," and Online "FAQs."**

> **a.    Lyft's "Guide" and "Rules of the Road"**

Beginning, at the latest, in December 2012 until on or about July 19, 2013, Lyft distributed to all Drivers, including Plaintiff Cotter, a "guide" that documented how Lyft expected Drivers to conduct themselves while driving for Lyft. (Kirtikar dep. at 120:3-16; Carlson Decl., **Exhibit Z**, LYFT000038-LYFT000041; *see also* Cotter dep. at 49:21-23, 157:22-158:10)  Included in this guide were Lyft's "Rules of the Road," described as "rules to live by while giving a Lyft." *Id.* These "rules" included:

- "Phone should always be mounted and plugged into charger"
- "No talking on the phone (unless it's the passenger)"
- "Pull over (safely) at the location where ride is requested, not down the block."
- "You should be the only non-passenger in the car. (no friends, children or pets can ride along with you)"
- "Greet every passenger with a big smile and fist bump"
- "Keep your car clean on the inside and outside"
- "Keep your seats and trunk clear for use by your passengers"
- "Do not request tips."
- "Do not accept cash."
- "Go above and beyond with good service such as helping passengers with luggage or holding an umbrella for passengers when it's raining."

The guide reiterates that Drivers must "[m]ake sure your Carstache is on whenever you're driving for Lyft" and to "[a]lways welcome passengers with a friendly fist bump and a smile." *Id.* The Lyft guide also directed Drivers to offer their Riders a phone charge, and ask

what kind of music the Rider wished to listen to. *Id.* Per Lyft's guide, Drivers were prohibited from using their discretion in choosing the route to the Rider's destination. *Id.* Rather, they were required to first ask their Rider if he or she had a preferred route and, if not, use a navigation system, even if the Driver thought he or she knew where he or she was going. *Id.* Lyft also set a "maximum trip distance" of 60 miles. *Id.*

### b.  Lyft's FAQs

On or about July 19, 2013, Lyft transitioned from providing Drivers with its "Guide" and "Rules of the Road" to posting online answers to "frequently asked questions" ("FAQs"). (Carlson Decl., **Exhibit AA** at LYFT001332; *see also* Carlson Decl., **Exhibit BB**, Lyft's Second Amended Response to Plaintiff Patrick Cotter's Interrogatories, Set Three.) These FAQs were distributed to Drivers when Plaintiff Maciel drove for Lyft. *Id.* Lyft uses the FAQs to "train" its Drivers, Exh. V, and Drivers are expected to use FAQs "as much as possible." (Kirtikar dep. at 151:9-12.) Drivers are directed to the FAQs as part of the process of signing up to by a Lyft Driver. (Goldin dep. at 21:12-21.) Lyft intends that Drivers will consult the FAQs as a resource. (Carlson Decl., **Exhibit CC**, excerpts from the deposition transcript of William Hartman ("Hartman dep.") at 12:18-13:3.)

Lyft's relevant FAQ web pages include the following directives:

- Question: "Can I answer personal calls when a passenger is in my car?" Answer: "do not take personal calls while driving...[a] phone call-free ride creates a friendlier and more welcoming environment for passengers" (Carlson Decl., **Exhibit DD**, LYFT001493.)

- Question: "Can I ask for my passenger for their phone number or other contact information?" Answer: "No. As a driver, you should never ask for the contact information of a passenger." (Carlson Decl., **Exhibit EE**, LYFT001495.)

- Question: "Can I pick someone up if a passenger hails me without using the Lyft app?" Answer: "you can only pick up passengers matched through the Lyft app. You can never be hailed from the street." (Carlson Decl., **Exhibit FF**, LYFT001496.)

- Question: "Can I smoke in my car?" Answer: "Smoking inside Lyft cars is against our community rules...[i]f a passenger reports that your car smells like

smoke, your account will be disabled." (Carlson Decl., **Exhibit GG**, LYFT001498.)

- Question: "Can I switch between two cars that I own?" Answer: "No, you can only have one Lyft-approved car at a time." (Carlson Decl., **Exhibit HH**, LYFT001500.)

- Question: "Can passengers request a specific driver?" Answer: "No, it is not possible to request a specific driver." (Carlson Decl., **Exhibit II**, LYFT001507.)

- Question: "Do I have to keep my phone mounted?" Answer: "Yes, you must keep your phone mounted at all times while Lyfting." (Carlson Decl., **Exhibit JJ**, LYFT001534.)

- Question: "Do I have to put the mustache on my grill?" Answer: "Yes, you should *always* wear your 'stache on the grill!" (Carlson Decl., **Exhibit KK**, LYFT001536.) (Emphasis in original.)

- Question: "Do I need to clear the clutter from my seats and trunk?" Answer: "The inside of your car should be 100% clear at all times...[y]our trunk should also be cleared out" (Carlson Decl., **Exhibit LL**, LYFT001543.)

- Question: "How can I delight my passengers?" Answer: "Read your passengers' mood when they first get in your car – if they're higher energy, strike up a conversation. If they're on the quiet side, it's okay to respect their privacy. It's a good idea to always have music you love playing, and offer for your passenger to DJ." (Carlson Decl., **Exhibit MM**, LYFT001569; *see also* Carlson Decl., **Exhibit NN**, LYFT001654 (instructions to "keep[] it positive."))

- Question: "How can I integrate music into my Lyft experience?" Answer: "Make sure you always have music playing when your passenger gets into your car." (Carlson Decl., **Exhibit OO**, LYFT001571.)

- Question: "How can I keep my phone and passengers phones charged?" Answer: "Make sure to keep your phone charging most of the time...[m]ake sure to offer your passengers a charge when they get into your car." (Carlson Decl., **Exhibit PP**, LYFT001573.)

- Question: "I've arrived at the pickup location and my passenger is not showing up. What should I do?" Answer: "First, call the passenger. If 5 minutes have passed, call one more time." (Carlson Decl., **Exhibit QQ**, LYFT001641.)

- Question: "What are Lyft's standards for keeping my car clean?" Answer: "Having a clean car is a key part of the Lyft experience...[w]ash and vacuum your car at least once a week." (Carlson Decl., **Exhibit RR**, LYFT001705.)

- Question: "When should I use navigation?" Answer: "You should always use navigation to get to your passenger." (Carlson Decl., **Exhibit SS**, LYFT001768.)

- Question: "When should I wear my mustache?" Answer: "Always wear your Mustache anytime you're Lyfting." (Carlson Decl., **Exhibit TT**, LYFT001770.)

- Question: "Where is the proper place to wear my mustache?" Answer: "Your grill is the proper location" (Carlson Decl., **Exhibit UU**, LYFT001774.)

- Question: "What is the maximum distance of a Lyft ride?" Answer: "the maximum trip distance is 60 miles."  (Carlson Decl., **Exhibit VV**, LYFT001741.)

- Question: "How do I pull my car over safely when I pick up my passenger?" Answer: "if a passenger asks you to pick them up at a busy intersection and you can't sit and wait, give them a call and ask them how long it may take for them to come out. You can either circle the block or wait somewhere else until they call to confirm that they are outside. If the passenger says they are going to be more than 5-10 min [sic], ask them 'No problem, I can definitely wait for you – do you mind if I start the Lyft?'" (Carlson Decl., **Exhibit WW**, LYFT001596.)

When Lyft launched its online FAQs in the summer of 2013, Lyft also started requiring Drivers to watch training videos, which inform Drivers of Lyft's "Hours System" and which mirror many of the above FAQs. (Hartman dep. at 31:19-23; Carlson Decl. at ¶ 77.)

      c.      **Other Controls on the Manner and Means of Drivers' Work for Lyft**

Drivers are required to use a year 2000 or newer four-door vehicle while driving for Lyft. (Kirtikar dep. at 20:16-21:14.) They are not permitted to use a vehicle while driving for Lyft that "would look like a professional service like a town car." (Kirtikar dep. at 159:3-13.) In addition, Drivers are prohibited from transporting Riders with any vehicle other than the vehicle they registered with Lyft. (Kirtikar dep. at 116:17-117:3.) Nor are Drivers able to hire subcontractors or employees of their own to drive for Lyft. (Hartman dep. at 48:23-49:9.)

Per Lyft's TOS, Drivers are prohibited from accepting cash as compensation for a Lyft ride or negotiating his or her pay from a Rider. (Exh. E at LYFT000069-LYFT000070; Exh. F at LYFT000089-LYFT000090; Exh. G at LYFT0000107; Exh. H at LYFT000144.) Similarly, Drivers are prohibited from negotiating their rate of pay from Lyft; rather they receive 80% (or sometimes more) of Riders' payments. *Id.* Lyft therefore unilaterally determines the amount of payments Drivers will receive. *Id.*

//

####     d.     Lyft's Control Over Drivers' Work Is Consistent With Its Goal of Promoting the Lyft "Brand."

Testimony from one of Lyft's persons most knowledgeable, as well as documents produced by Lyft, reveal the reason that Lyft so tightly controls its Drivers' work: a desire to consistently promote Lyft's "brand." Lyft's requirement that Drivers offer Riders a phone charge is to promote the brand.  (Kirtikar dep. at 96:12-19.) Its policy against having another non-Rider in the vehicle is to promote the brand. (Kirtikar dep. at 99:4-99:13.) Its requirement that Drivers keep their vehicles clean is to promote the brand. (Kirtikar dep. at 101:19-102:8.) Its policy against having pets in Drivers' vehicles is to promote the brand. (Kirtikar dep. at 97:14-19.) Its prohibition against asking Riders for contact information is to promote the brand. (Kirtikar dep. at 107:2-14.) Lyft's Acceptance Rating performance metric – and its use of the metric to give Drivers with higher Acceptance Ratings preference as to when they work – is in place to ensure that Riders are able to get a ride and be exposed to the Lyft "experience." (Kirtikar dep. at 81:19-82:6.) Lyft's Passenger Rating exists so "there is an accountability...for drivers to be as great as they can be for passengers." (Kirtikar dep. at 82:7-83:3.)

Lyft's internal correspondence and correspondence with its Drivers reinforces this testimony:  Lyft's requirement that Drivers greet Riders with a "fist bump" is essential to Lyft's "brand icon." (Carlson Decl., **Exhibit XX**, LYFT001035.) Its requirement that Drivers place a pink mustache on the grill of their vehicle is in place so that Drivers "give their car more personality and demonstrate their participation in the Lyft movement" – and Lyft requires Drivers to specifically place the mustache on their grill because "consistency of brand is key." (Carlson Decl., **Exhibit YY**, LYFT001033.) Lyft trains its Drivers on how to provide a "Perfect Lyft" by, for example, telling Drivers to "gag[e] [sic] if the passenger wants to chat or not (ask 1-2 questions, and if they aren't very responsive, let ride be a quiet one)." (Carlson Decl., **Exhibit ZZ**, LYFT000406-LYFT000407.) Drivers are trained to "be humble and make the conversation about the passenger" and to "steer clear of sharing any clashing opinions." *Id.* They are trained to "[a]lways ask passengers if they have preferred routes" and to "[s]ound like

a native." *Id.* Lyft actually *instructs* its Drivers to be "creative" because "Lyft is all about creativity." (Carlson Decl., **Exhibit AAA**, LYFT000390-LYFT000391.) Drivers are screened for personality traits such as "creepy, not a jerk, not negative, had clear communication" before they begin working for Lyft. (Kirtikar dep. at 125:13-126:22; *see also* Carlson Decl., **Exhibit BBB**, LYFT000171.)

### 3. Lyft Dictates *Who* Drivers Are Permitted to Pick Up.

As noted above, Lyft tracks Drivers' Acceptance Ratings and retains the right to use Acceptance Ratings to determine whether Drivers would be approved to drive in a particular hour in the event of an oversupply of drivers. (*See* § III(B)(1)(d), *supra*.) Thus, Lyft's Acceptance Rating mechanism prohibits Drivers from declining passengers without the possibility of negative consequence. *Id.*

In addition, Lyft tracks Drivers' "Cancellation Rating" – the percentage of times a Driver cancels a Lyft ride after initially accepting the ride – and Drivers with a high rate of cancellations are subject to termination. (Kirtikar dep. at 159:15-160:12; Hartman dep. at 16:7-17:4; *see also* Carlson Decl., **Exhibit CCC**, LYFT001349 (email stating "be a little more strict about refusing passengers. Don't make it sound so easy. We want them to take everyone.").)

Further, Drivers are required to use the Lyft platform to pick up passengers and are not permitted to pick up Riders who attempt to hail them from the street (Kirtikar dep. at 112:23-113:2; 155:4-156:4; *see also* Exh. FF.) Similarly, Riders are unable to request a ride from a specific Driver. (Kirtikar dep. at 90:16-23; *see also* Carlson Decl., **Exhibit DDD**, LYFT001507.) Drivers also unable to receive requests for rides if they are outside their "coverage area." (Carlson Decl., **Exhibit EEE**, at LYFT001625.)

### 4. A Lyft Driver's Job Function Is Indistinct from Lyft's Business.

Despite Lyft's position that it is not a transportation company, but rather a "peer-to-peer transportation platform," the CPUC has determined that Lyft "provid[es] transportation services for compensation." (Req. Jud. Not., Exh. A.) And, Per Lyft's TOS, a Lyft Driver's sole

job function is to carry out that transportation. (Exh. E at LYFT000068; Exh. F at LYFT000088; Exh. G at LYFT000106; Exh. H at LYFT000143.) Additionally, Lyft's sole source of income is the fee it takes from Riders' payments for Drivers' service. (Goldin dep. at 52:21-24; *see also* Carlson Decl., **Exhibit FFF**, Lyft's Responses to Requests for Admission at RFA #4.)

### 5. Drivers Are Not Required to Have Any Special Skill Above and Beyond that Required to Obtain a Driver's License.

The sole skill Drivers must have in order to work for Lyft is the ability to obtain a standard driver's license. (Kirtikar dep. at 110:22-111:13.) Lyft has no formal education requirements, *id.*, nor does Lyft require a driver to have any professional driving experience. (Hartman dep. at 55:7-9.)

### 6. Lyft Provides Drivers With Instrumentalities Essential To Their Job.

Drivers are unable to provide Lyft rides without access to the Lyft-provided Lyft Platform through their mobile phones. (Kirtikar dep. at 112:23-113:2; 155:4-156:4.) Lyft also provides Drivers with, at minimum, a phone mount and a phone charger. (Carlson Decl., **Exhibit GGG**, LYFT000225.) Lyft also provides its Drivers with contingent liability coverage, excess liability coverage, contingent comprehensive and collision coverage, and excess uninsured/underinsured motorist coverage. (Exh. E at LYFT000070-LYFT000071; Exh. F at LYFT000090-LYFT000091; Exh. G at LYFT000108; Exh. H at LYFT000145; Kirtikar dep. at 115:9-116:8.) Additionally, Lyft provides Drivers with a pink Lyft "carstache" that Drivers are instructed to place on the grill of their vehicles, and which is intended to both promote Lyft's brand and to help Riders identify their Drivers. (Hartman dep. at 63:18-64:2.)

### 7. Drivers Are Paid According to Lyft's Non-Negotiable Formula.

At all relevant times, Drivers have been paid according Lyft's non-negotiable formula in its TOS, pursuant to which Drivers receive 80% or more of Rider payments. (Exh. E at LYFT000069-LYFT00070; Exh. G at LYFT000089-000090; Exh. H a LYFT000107; Exh. I at

LYFT000126.) All Drivers are paid on a weekly basis via direct deposit. (Goldin dep. at 67:7-12.) Lyft advertises that Drivers are paid at an hourly rate. (Hartman dep. at 60:23-61:14.)

### 8.    Lyft Engages in Other Behavior Evidencing an Employer-Employee Relationship With Its Drivers.

Lyft maintains a tremendous amount of information regarding the minutiae of its Drivers' work, including detailed pay records, the number of hours each driver spends in "driver mode," and the total number of miles driven by each Driver. (Carlson Decl., **Exhibit HHH**, stipulation re: phased discovery at ¶ 1; *see also* Carlson Decl., **Exhibit III**, Cotter_0001 (showing hours spent in driver mode); Carlson Decl., **Exhibit JJJ**, Cotter_0008 (showing total miles driven).) Lyft tells its Drivers that it "is always monitoring what's going on on the platform," and that, "Unless you log out of driver mode, we're always going to know where you are." (Carlson Decl. at ¶ 76.)

Lyft also reimburses its Drivers for tolls, Goldin dep. at 67:17-68:7, and Lyft internally describes Drivers' hours of work as "shifts." (Carlson Decl., **Exhibit KKK**, LYFT000022, LYFT000026 (Lyft "desk tickets.").)  Lyft admits that this terminology implies "ongoing employment." (Kirtikar dep. at 138:14-139:11.)

### 9.    Lyft's Guide and FAQs Are Not Mere "Suggestions."

Lyft's conclusory testimony that its Guide and FAQs are mere "suggestions" are belied by the text of the instructions themselves:  they are not phrased as suggestions – they are imperatives. (*See* § III(B)(2), *supra*.) Moreover, and consistent with the language in Lyft's Guide and FAQs, when Lyft is made aware that a Driver is operating in a manner inconsistent with its Guide or FAQs, Lyft has both internal discussions about the breach of protocol and, in many instances, tells the Driver to correct his or her behavior.

For example, Lyft deactivates Drivers who accept cash for their rides. (Carlson Decl., **Exhibit LLL**, LYFT001337.) It reprimands Drivers who do not keep their cellular phones in the Lyft-provided phone mount. (Carlson Decl., **Exhibit MMM**, LYFT001128.) Lyft instructs

Drivers to ask a passenger for their preferred route, and, if not, to use their GPS. (Carlson Decl.,
**Exhibit NNN**, LYFT000375).) Lyft "coaches" Drivers to have what it considers an acceptable
demeanor while driving. (Carlson Decl., **Exhibit OOO**, LYFT000345-LYFT000348,
LYFT000789-LYFT000790.) Lyft tells Drivers that having a non-Rider in the vehicle is "not
acceptable" and gives "warnings" to that effect. (Carlson Decl., **Exhibit PPP**, LYFT000008.)
Lyft tells Drivers it is unacceptable for their vehicles to smell like cigarette smoke, that Drivers
must be friendly, or at a minimum "quiet," and that cars cannot be scratched. (Carlson Decl.,
**Exhibit QQQ** at LYFT000344.) If Lyft is told that a Driver failed to put the Lyft mustache on
the front of his or her vehicle, the Driver is reprimanded. (Kirtikar dep. at 41:24-42:8.)

Likewise, Lyft's "performance" team instructs Drivers who are not rated highly by
Riders to "[p]ick up as close to the passenger's request locations as possible," "say hello with a
smile and a fistbump," "[a]sk your passengers if they have preferred routes, or use navigation
to make the fastest trip," "[s]tay cool and positive while driving," "[o]ffer a phone charge or let
them DJ. If they seem up for conversation, ask about their day or find your common interests,"
and "[m]ake sure you and your car are clean and welcoming, from inside and out." (Carlson
Decl., **Exhibit RRR**, Maciel_0028-0029.)

Plaintiff Cotter was terminated for using a substitute vehicle. (Carlson Decl., **Exhibit
SSS**, Cotter_0036.) Plaintiff Maciel was "warned" that it was "not acceptable" to have her
husband in the car while she was working for Lyft (Exh. PPP.) She was ultimately terminated
for falling below Lyft's community standards. (Exh. J.)

Thus, as Lyft admits, its "community standards," including those standards in its Guide
and FAQ web pages, were promulgated so that Drivers would adhere to them, Kirtikar dep. at
151:9-12, and its arguments to the contrary are belied by the facts.

### 10.   Lyft Actively Monitors Whether Drivers Work for Competitors and Retains the Right to Terminate Drivers Who Do So.

Lyft "discourage[s]" its drivers from working for Lyft's primary competitor, Uber,

while they are working for Lyft. (Kirtikar dep. at 119:12-119:24) It also has a "Secret Ops team" that monitors whether Drivers are also driving for Uber. (Carlson Decl., **Exhibit TTT**, LYFT000739-LYFT000740.) Lyft believes that when its Drivers also work for Uber, it degrades the Lyft "experience." (Kirtikar dep. 118:10-119:24.) Thus, as Lyft admits that Drivers "can be deactivated for anything," Lyft also retains the right to terminate Drivers that it discovers are also driving for Uber. (Kirtikar dep. at 77:4-11.)

**E.    Lyft Does Not Comply with California Wage Laws With Respect to Its Drivers.**

In the event that the Court determines that Plaintiffs were misclassified as independent contractors, there is no dispute that Lyft has violated California wage laws: Lyft admits that it never reimbursed Plaintiffs for expenses incurred for mileage in violation of Cal. Lab. Code § 2802 and Cal. Bus. & Prof. Code § 17200. (Exh. GGG at RFA # 9.) Lyft also admits that it never provided Plaintiffs with accurate, itemized wage statements, in violation of Cal. Lab. Code § 226. (*Id.* at RFA #7.) Lyft admittedly took from Plaintiffs a portion of the voluntary payments, or gratuities, given to them by Riders, in violation of Cal. Lab. Code § 351 and Cal. Bus. & Prof. Code § 17200, and which constitutes a common law conversion. (*Id.* at RFA #8; *see also* Goldin dep. at 82:6-19.) Finally, Lyft admits that it did not pay wages to Plaintiffs in violation of Cal. Lab. Code §§ 1194, 1197, 1997.1, and Wage Order 9, and Cal. Bus. & Prof. Code § 17200, instead compensating them exclusively with gratuities. (*Id.* at RFA #6.)

### III.    LEGAL STANDARD

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1075 (9th Cir.2011); Fed.R.Civ.P. 56(a). When parties submit cross-motions for summary judgment, each motion is considered on its merits, and the court must determine, for each side, whether a judgment may be entered in accordance with Rule 56. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132,

1136 (9th Cir. 2001). Employees may prove their status as employees on a motion for summary judgment. *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 987 (9th Cir. 2014).[1]

Where a plaintiff's claims are premised on the theory that he or she was misclassified as independent contractor, courts must apply a burden-shifting framework: once the plaintiff comes forward with evidence that he or she provided services for an employer, the employee has established a prima facie employer-employee relationship. *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010). Once the employee establishes this prima facie case, the employer has the burden of proving that the presumed employee was an independent contractor. *Id.*

## IV.   ARGUMENT

California employers are required to comply with the requirements of California wage and hour law, including both the California Labor Code and relevant Wage Orders[2] set forth by the Industrial Welfare Commission ("IWC"). In a wage and hour action, an employer-employee relationship may exist pursuant to either the common law definition of employment, or the IWC's definition of employment. *Martinez v. Combs*, 49 Cal. 4th 35, 69 (2010).

As discussed herein, the uncontroverted facts show that (1) Plaintiffs provided services for Lyft, and (2) that no reasonable trier of fact could determine that Plaintiffs were not Lyft's employees under either the common law or IWC tests of employment.

**A.    The Undisputed Evidence Shows Drivers Provide Services For Lyft.**

In *Yellow Cab Coop., Inc. v. Workers' Comp. Appeals Bd.*, 226 Cal. App. 3d 1288 (Ct. App. 1991), a California court of appeal determined that an applicant for workers' compensation "performed service" for Yellow Cab because all Yellow Cab drivers "provide an indispensable 'service' to Yellow; the enterprise could no more survive without them than it

---

[1] A plaintiff is permitted to move for summary judgment as to a defendant's liability only. *E.g.*, *Aguilar v. Zep Inc.*, 2013 WL 5615688, at *4 (N.D. Cal. Oct. 10, 2013) (granting summary judgment as to liability only with respect to employee's statutory reimbursement claim). Per the parties' stipulation, discovery regarding damages has not yet commenced and, therefore, Plaintiffs move now for summary judgment as to liability only.

[2] The relevant Wage Order is Wage Order 9, applicable to the transportation industry. Cal. Code Regs. tit. 8, § 11090.

could without working cabs." *Id.* at 1294. In so holding, the court rejected Yellow Cab's argument that its business was "merely leasing vehicles," finding instead that Yellow Cab "cultivated the passenger market by soliciting riders, processing requests for service through a dispatching system, distinctively painting and marking the cabs, and concerning itself with various matters unrelated to the lessor-lessee relationship." *Id.* at 1297. The Court also emphasized evidence that "drivers were instructed in 'service' and 'courtesy,' i.e., 'being properly presented in our dress, keeping the cabs clean, going on calls that we were sent on and being courteous and helpful to the public.'" *Id.* at 1293.

Here, Lyft, like Yellow Cab, contends that it merely provides the software necessary to connect Drivers and Riders. This position has already been rejected by the CPUC, which determined that Lyft is a transportation company, and with good reason: Lyft's "mission" is providing "peer-to-peer service of rides." (Kirtikar dep. at 81:19-82:6.) In order to fulfill this "mission," Lyft contracts with the Drivers who provide rides. Lyft's *sole* source of income is its "administrative fee," which is generated exclusively by the rides provided by Drivers. Lyft could not survive without its Drivers, just like Yellow Cab could not survive without its drivers.

Moreover, Lyft, like Yellow Cab, participates in the cultivation of the passenger market. Its business model is premised on promoting its brand to Riders. Lyft processes its Rider requests through the Lyft Platform – effectively identical to a dispatch system. Like Yellow Cab marked its cars, Lyft distinctively marks Drivers' cars with a large pink mustache. Lyft tells its Drivers, in detail, how to interact with the public.

These undisputed facts show that Plaintiffs performed services for Lyft, and therefore the burden shifts to Lyft to prove that Plaintiffs were independent contractors.

**B.   Plaintiffs Were Independent Contractors Under Both the Common Law Test of Employment and the Industrial Welfare Commission Definition of Employment.**

   **1.   Plaintiffs Were Misclassified By Lyft As Independent Contractors Under The Common Law Test of Employment.**

Under the common law, "[t]he principal test of an employment relationship is whether

the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 531-32 (2014) (citing *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d 341, 350 (1989)). "[W]hen evaluating the employer's right to control, what matters is how much control the hiring entity retains the right to exercise, not how much control that entity actually exercises." *Guitierrez v. Carter Bros. Sec. Servs., LLC*, 2014 WL 5487793, at \*4 (E.D. Cal. Oct. 29, 2014) (*citing Ayala*, 59 Cal. 4th at 533).

### a. The undisputed facts show that Lyft retains control over the manner and means of Drivers' work.

As the California Supreme Court emphasized just this year, "[p]erhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.'" *Ayala*, 59 Cal. 4th at 531; *see also Alexander*, 765 F.3d at 988 (9th Cir. 2014) ("The right to terminate at will, without cause, is strong evidence in support of an employment relationship.")

Here, per Lyft's TOS and its admissions, Lyft retains the right to terminate its relationship with its Drivers for any reason, thus vesting Lyft with the fullest extent of the right to control. Lyft's right to terminate is unrestricted for a reason: it needs full discretion and ability to protect its brand from a Driver who does not "play by the rules." It happened to Mr. Cotter, who was terminated for using a substitute vehicle. It happened to Ms. Maciel, who was terminated because she did not meet Lyft's "community standards" and who was "warned" because she had her husband in the car while driving for Lyft.

With respect to Lyft's control over the manner and means of Plaintiffs' work, *Yellow Cab*, *supra*, is instructive. In *Yellow Cab*, the court determined that "by means both direct and indirect, Yellow controlled various aspects of the work." *Yellow Cab*, 226 Cal. App. 3d at 1298. Yellow Cab drivers were instructed on matters of behavior toward the public and keeping their

cabs clean. *Id.* They were given "general rules of good driving behavior." *Id.* They had adverse action taken against them for refusing a call from dispatch, which was "apparently designed to coerce drivers into accepting assignments." *Id.* If drivers violated the "rules" they "could be 'written up.'" *Id.* Leases could also be terminated based on write-ups or complaints by passengers, and, as the court noted, "[l]iability to discharge for disobedience or misconduct is strong evidence of control." *Id*. Additionally, Yellow Cab controlled drivers' hours by assigning shifts so that it could lease each cab to more than one driver in one day. *Id*. The Court also found significant "the prohibition on driving cabs for other companies." *Id*. In conclusion, the Court found that Yellow "had an obvious interest in the driver's performance *as drivers*. To protect that interest, it treated them as employees." (Emphasis in original.)

Here, Lyft instructs Drivers how to maintain their vehicles and how to interact with the public pursuant to its "Guide" and "FAQs." It terminates Drivers based on specific Rider complaints and terminates Drivers who do not meet its community standard. *See also Santa Cruz Transp., Inc. v. Unemployment Ins. Appeals Bd.*, 235 Cal. App. 3d 1363, 1372 (Ct. App. 1991) ("failure to maintain good public relations as a specific reason for termination...is an unquestionable control upon [applicant's] behavior as a taxicab driver.") It controls when and if Drivers are able to work – or whether they are able to work at all – through its  "Hours System" and its supply and demand models, which gives Lyft full discretion to pick and choose when Drivers are permitted to drive.[3] It punishes Drivers who do not accept rides or who cancel rides after accepting them. It discourages Drivers from driving for Uber at the same time they are driving for Lyft and retains the right to take adverse action against Drivers who do. It prohibits Drivers from hiring employees to drive in the Driver's place, and from using substitute vehicles. Moreover, Lyft requires Drivers to use Lyft-approved vehicles that do not resemble

---

[3] To the extent Drivers are able to pick between shifts that Lyft *does* make available, this fact does not preclude a finding of employee status. *Borello*, 48 Cal. at 347 (finding sharecroppers employees even though "[t]hey may set their own hours").

"commercial" vehicles and which must have four doors. In sum, like Yellow Cab, Lyft has an obvious – and admitted – interest in the Drivers' performance – the protection of its "brand." And, like Yellow Cab, to protect that interest, Lyft treats Drivers as employees.

Moreover, Lyft retains all *necessary* control of the work. In *JKH Enterprises, Inc. v. Dep't of Indus. Relations*, 142 Cal. App. 4th 1046 (2006), a court of appeal held that

> By obtaining the clients in need of the service and providing the workers to conduct it, JKH retained all necessary control over the operation as a whole. Under *Borello*, and similar to its facts, these circumstances are enough to find an employment relationship for purposes of the Workers' Compensation Act, even in the absence of JKH exercising control over the details of the work and with JKH being more concerned with the results of the work rather than the means of its accomplishment.

*Id.* at 1064-1065. In reaching this conclusion, the court noted that the drivers' function, pick-up and delivery of papers or packages and driving in between, did not require a high degree of skill, and that the functions were the "integral heart" of JKH's courier service business. *Id.*

Here, it is Lyft that obtains the Rider-clients in need of a ride – the Lyft Platform pairs Drivers with Riders, and Drivers are unable to provide Lyft rides without using the Lyft Platform  – and it is Lyft that provides the Driver-workers to give those rides. Under *JKH*, this fact alone is sufficient to find an employment relationship.

### b. Lyft's relationship with its Drivers bears the "secondary indicia" of an employment relationship.

While the extent of the hirer's right to control the work is the foremost consideration in assessing whether a common law employer-employee relationship exists, courts also consider "secondary indicia" of employment status, including (i) whether the one performing services is engaged in a distinct occupation or business; (ii) whether the work is usually done under the direction of the principal or by a specialist without supervision; (iii) the skill required; (iv) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (v) the length of time for which the services are to be performed;

(vi) the method of payment, (vii) whether the work is a part of the regular business of the principal; and (viii) whether or not the parties believe they are creating the relationship of employer-employee. *Ayala*, 59 Cal. 4th at 532. Each of these factors weighs in Plaintiffs' favor:

> i.  *Drivers are not engaged in a business distinct from Lyft's business while working for Lyft.*

Individuals are not engaged in a "distinct business" when their work is "the basis for" the putative employer's business. *JKH Enterprises, Inc.*, 142 Cal. App. 4th at 1054. Additionally, even where drivers are actually *required to form their own distinct businesses* as a condition of a purported independent contractor relationship, that is not be enough for this factor weigh favor of the employer. *Ruiz*, 754 F.3d at 1103-04 (finding drivers employees as a matter of law even though "[p]laintiffs ultimately had the ability to expand their businesses by hiring more employees, operating multiple trucks, and making managerial decisions regarding the employment and performances of the employees hired").

Here, as described above, Drivers are the basis for Lyft's business because Lyft could not exist without its Drivers' service. Drivers are prohibited from hiring employees or subcontractors to drive for Lyft and therefore cannot expand their "business." They are required to use only one vehicle at a time while driving for Lyft that cannot resemble a "commercial" vehicle. Plaintiffs provided services to Lyft's customers – not their own customers: Riders pay Lyft, who then remits payment to Drivers. They are not permitted to cultivate a client base of Lyft Riders because they are prohibited from asking passengers from contact information and can only be hailed through the Lyft Platform.  Under *Ruiz*, this factor weighs in Plaintiffs' favor.

> ii.  *Ordinary driving is not work performed by a "specialist."*

In *Ruiz*, *supra*, the Ninth Circuit held that where a company does not require its drivers to have any special driving or work experience, but rather to simply have a driver's license, sign a work agreement, and pass a background test, this factor weighs in favor of an employer-employee relationship because the driver cannot be considered a "specialist." *Ruiz*, 754 F.3d at

1104 (citing *Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 12 (2007)).

Here, Drivers are not required to have any skill beyond that necessary to obtain an ordinary driver's license. Lyft has no minimum education requirements, nor any requirement that a Driver take special driving classes. Lyft does not require any particular work experience. Rather, Lyft simply requires Drivers to have a driver's license and pass a background check. Lyft Drivers are even less "specialized" than the *Ruiz* drivers, as those drivers' work required installation of appliances upon delivery. This factor, therefore, weighs in Plaintiffs' favor.

> iii. *Drivers are not required to have any skill except the ability to drive in order to work for Lyft.*

Along with control, "the skill which is required in the occupation is often of almost conclusive weight." *Ayala*, 59 Cal. 4th at 539. In the driving context, this factor weighs in favor of employee status where drivers are "not required possess any special license beyond a normal driver's license, and no skills beyond the ability to drive." *Narayan*, 616 F.3d at 903 (citing *Gonzalez v. Workers' Comp. Appeals Bd.*, 46 Cal. App. 4th 1584, 1592 (1996) (distinguishing between truckers who require a special driver's license and must learn special driving skills from individuals who deliver newspapers in cars).

Here, like the drivers in *Narayan* and those in *Ruiz*, Drivers are not required to have any skill beyond the ability to drive. This factor also weighs in Plaintiffs' favor.

> iv. *Lyft provides Drivers with the instrumentalities essential to perform their work.*

The fact that a driver uses his or her own vehicle and automobile insurance does not preclude a finding of employment status. *Air Couriers Int'l*, 150 Cal. App. 4th at 938; *Narayan*, 616 F.3d at 902 (noting that drivers owned their own trucks or vans, but company required that they affix company logos to the outside of their vehicles); *see also JKH Enterprises*, 142 Cal. App. 4th at 1065 (drivers' use of their own cars did not preclude employee status) and *Estrada*, 154 Cal. App. 4th at 24-25 (finding drivers to be employees even though drivers supplied their

own vehicles and noting that requiring an employee to use his or her own vehicle is consistent with an employer-employee relationship).

Here, Drivers provide their own vehicles and insurance. However, Lyft provides extra insurance coverage, phone chargers, phone mounts, and, most significantly, the Lyft Platform, without which Drivers cannot work for Lyft. Indeed, a Driver's investment in his or her vehicle is dwarfed by Lyft's investment in the Lyft Platform. Lyft also provides Drivers with a pink mustache that must be placed on the Drivers' grill. The mustache is effectively a uniform – Lyft requires it in order to promote its brand, and also to identify Drivers to the Riders they pick up – which weighs in favor of a finding of employee status. *Alexander*, 765 F.3d at 987.

> v.      *Drivers' work for Lyft is not for a predetermined duration.*

A "true independent contractor relationship" exists for a "finite time of service." *Gonzalez v. Workers' Comp. Appeals Bd.*, 46 Cal. App. 4th 1584, 1594 (1996). Such examples cited by California courts are "plumbing work, tax service, or the creation of a work of art for a building's lobby." *Antelope Valley Press v. Poizner*, 162 Cal. App. 4th 839, 855 (2008).

Here, per Lyft's TOS, Drivers work for Lyft for an indefinite period of time. They are not hired to perform a discrete task, but rather retain on on-going relationship with Lyft until the relationship is terminated. This factor, therefore, also weighs in Plaintiffs' favor.

> vi.      *Drivers are paid by Lyft on a weekly basis pursuant to Lyft's non-negotiable formula.*

Where a driver is paid on a weekly basis at a non-negotiable rate – even if that payment is based on the number of jobs completed – it is indicative of an employer-employee relationship. *Estrada*, 154 Cal. App. 4th at 7 (drivers paid weekly at rates set by FedEx; rates based in part on "formula" including a rate for packages handled).

Pursuant to Lyft's non-negotiable formula in its TOS, during the relevant time period, Drivers have received 80% or more of Rider payments. Lyft pays its Drivers on a weekly basis, not after each ride. Lyft advertises that its Drivers earn hourly rates of pay, and uses direct

deposit to remit payments to Drivers. Therefore, this factor also weighs in Plaintiffs' favor.

<em>vii.   Drivers' work is a regular part of Lyft's business.</em>

Drivers are considered a "regular part of the principal's business" when a company cannot be in business without them. *Ruiz*, 754 F.3d at 1105 ("Without drivers, Affinity could not be in the home delivery business.")

Here, as described above, Lyft is in the business of providing rides to people that want them. It could not be in this business without its Drivers. Indeed, its only source of income is derived from Drivers' service. Accordingly, this factor also weighs in Plaintiffs' favor.

<em>viii.   The parties' subjective beliefs regarding their relationship must be disregarded in light of the parties' actual conduct.</em>

Although the parties' beliefs regarding their relationship may weigh in Lyft's favor, the basis for this belief is because of the labels set forth in Lyft's TOS. Under these circumstances, courts have held that the parties' subjective belief regarding their relationship is to be *ignored* because their actual conduct establishes a different relationship. *Ruiz*, 754 F.3d at 1105; *see also Truesdale v. Workers' Comp. Appeals Bd.*, 190 Cal. App. 3d 608, 617 (Ct. App. 1987) (the reality of the relationship between the parties, not the parties' understanding, is of primary importance in determining whether there exists an employer-employee relationship).

Notwithstanding the labels applied by Lyft to its relationship with Drivers, the parties' actions, described above, evidence an employer-employee relationship. Moreover, the fact that Lyft monitors every aspect of Drivers' work, reimburses Drivers for tolls, and internally describes Drivers' hours of work as "shifts," suggests its beliefs are inconsistent with its labels.

**2.     Plaintiffs Were Misclassified Under the IWC Definition of Employment.**

In addition to the uncontroverted facts establishing a common law employer-employee relationship, the uncontroverted facts also evidence an employment relationship pursuant to the three alternative definitions set forth by the IWC:  "(a) to exercise control over the wages, hours or working conditions, or (b) to suffer or permit to work, or (c) to engage, thereby creating a common law employment relationship." *Martinez*, 49 Cal. 4th at 64 (2010). The

IWC definition "provide[s] an employee-centric test gauged to mitigate the potential for employee abuse in the workplace." *Dynamex Operations W., Inc. v. Superior Court*, 2014 WL 5173038, at *6 (Cal. Ct. App. Oct. 15, 2014). This test is extremely broad and more likely to lead to the conclusion that a worker is an employee than is the common law test. *Id.* at *7.

As described above, Plaintiffs' evidence shows Lyft exercised control over Drivers' wages, hours, or working conditions, and created a common law employment relationship. However, the remaining *Martinez* test – "to suffer or permit to work" – is a separate and especially "employee-centric" test, which requires only evidence that an alleged employer "**had the power to either cause [the worker] to work or prevent [the worker] from working**." *Futrell v. Payday California, Inc.*, 190 Cal. App. 4th 1419, 1434 (2010) (emphasis added).

There is no dispute that Lyft retains the power to terminate Drivers at any time, for any or no reason. There is no dispute that Lyft has the power to shut down the Lyft Platform at any time, thus preventing Drivers from working at any time. There is no dispute that Lyft has the power to assign hours based on its supply and demand models, thereby retaining the power to prevent Drivers from working. Thus, the evidence conclusively shows that Lyft had the power to cause or prevent Drivers from working. Under both the IWC and common law tests of employment, Plaintiffs were, therefore, wrongly classified as independent contractors.

## IV.   CONCLUSION

The undisputed evidence shows that, in order to create the best possible experience for Lyft Riders, Lyft controls every significant aspect of its Drivers' work and retains the right to terminate Drivers for whatever reason it choses. The undisputed evidence regarding the secondary indicia of employee status also weighs heavily in Plaintiffs' favor. Accordingly, the Court should rule that Lyft misclassified Plaintiffs as independent contractors as a matter of law.

Dated: December 1, 2014              Carlson Legal Services

By: ___/s/_Matthew D. Carlson_____
                                                 Matthew D. Carlson
                                                 Attorney for Plaintiffs