THOMAS M. MCINERNEY, State Bar No. 162055
tmm@ogletreedeakins.com
CHRISTOPHER M. AHEARN, State Bar No. 239089
chris.ahearn@ogletreedeakins.com
ALEX SANTANA, State Bar No. 252934
alex.santana@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
Steuart Tower, Suite 1300
One Market Plaza
San Francisco, CA  94105
Telephone:     415.442.4810
Facsimile:     415.442.4870

Attorneys for Defendant LYFT, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| PATRICK COTTER and ALEJANDRA MACIEL, on behalf of himself and all others similarly situated,<br><br>                 Plaintiff,<br><br>        v.<br><br>LYFT, INC. and DOES 1 through 10, inclusive,<br><br>                 Defendant. | Case No. 3:13-cv-04065-VC<br><br>**DEFENDANT LYFT, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFFS PATRICK COTTER AND ALEJANDRA MACIEL; OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Complaint Filed:  September 3, 2013<br>Trial Date:          None Set<br>Judge:               Hon. Vince Chhabria<br><br>Hearing Date:     January 29, 2015<br>Hearing Time:    10:00 a.m.<br>Location:           Courtroom 4<br>Judge:               The Hon. Vince Chhabria |

## <u>TABLE OF CONTENTS</u>

I.      PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ................... 1

II.     THE UNDISPUTED FACTS SHOW PLAINTIFFS WERE NOT LYFT
        EMPLOYEES ........................................................................................... 2

        A.      Lyft Does Not Employ Drivers.  It Operates a Ride-Sharing
                Platform that Enables Drivers and Riders to Arrange Transportation. ........... 3

        B.      Plaintiffs Controlled the Manner and Means By Which They Took
                Part In The Ridesharing Community ............................................................. 4

                1.      Plaintiffs Determined the Dates and Times When They
                        Accessed the Lyft Platform as Drivers. ................................................. 4

                2.      Plaintiffs Determined Which Ride Requests They Would
                        Accept. ................................................................................................. 7

                3.      Plaintiffs Determined the Areas in which to Drive. ............................ 8

                4.      Lyft Did Not Dictate What Routes Cotter and Maciel Were
                        to Take. ................................................................................................. 8

                5.      Lyft Did Not Dictate To Plaintiffs What They Should Wear. ............. 9

        C.      The Terms of Service Do Not Reflect An Employer-Employee
                Relationship With Respect to Other Important Aspects of the
                Parties' Relationship ........................................................................................ 9

                1.      Plaintiffs Supplied the Primary Instrumentalities. ............................ 9

                2.      Plaintiffs Were Paid by Lyft Riders on a Per-Ride Basis ................. 10

                3.      The Parties' Believed They Were Engaged In An
                        Independent Contractor Relationship. .............................................. 10

        D.      The CPUC Has Specifically Declined to Deem Lyft an Employer ............. 11

III.    LEGAL ARGUMENT .......................................................................... 12

        A.      Plaintiffs Were Not Employees of Lyft. ..................................................... 12

                1.      The Primary Factor: Lyft's Lack of Control over Plaintiffs. ........... 13

                2.      The Secondary Factors Also Weigh Against Employee
                        Status. ................................................................................................ 19

                        (a)     Whether the one performing services is engaged in a
                                distinct occupation or business. .......................................... 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(b)     Whether the work is usually done under the direction of the principal or by a specialist without supervision ............................................................... 20

(c)     Whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work. ........................................ 21

(d)     The length of time for which the services are to be performed. .......................................................... 21

(e)     The method of payment, whether by the time or by the job. ................................................................ 22

(f)     Whether or not the work is part of the regular business of the principal. ....................................... 22

(g)     Whether or not the parties believe they are creating the relationship of employer-employee. .............................. 23

B.     Plaintiffs' Claims Fail As A Matter Of Law Because They Were Not Employees. ................................................................. 23

C.     Plaintiffs Did Not Provide Services to Lyft. .................................. 24

D.     Plaintiffs' Motion for Summary Judgment Fails Because Cotter and Maciel's Evidence Largely Consists of Inadmissible Hearsay. .................. 24

DEFENDANT LYFT, INC.'S MEM. OF P&A ISO MSJ AND OPPOSITION TO PLAINTIFFS' MSJ

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

4
*Alexander v. FedEx Ground Package Syst., Inc.*,
   Nos. 12-17458, 12-17509, 2014 WL 4211107 (9th Cir. Aug. 27, 2014) ........................*passim*

5

*Ali v. U.S.A. Cab Ltd.*,
6   176 Cal.App. 4th 1333 (2009) ...................................................................................... 12, 13

7   *Arena v. Delux Transp. Serv., Inc.*,
   3 F.Supp.3d 1 (E.D.N.Y. 2014) .................................................................................... 15, 16
8

9   *Arnold v. Mutual of Omaha Ins. Co.*,
   202 Cal.App.4th 580 (2011) ................................................................................ 14, 18, 23
10

11   *Ayala v. Antelope Valley Newspapers, Inc.*,
   59 Cal. 4th 522 (2014) ................................................................................... 12, 18, 19

12   *Baltazar v. Yates*,
   Case No. 04-00274-VBF (CW), 2010 WL 2195979
13   (C.D. Cal. Apr. 28, 2010) (Woehrle, J.) ............................................................................ 15

14   *Beaumont-Jacques v. Farmers Group, Inc.*,
15   217 Cal. App. 4th 1138 (2013) .....................................................................................*passim*

16   *Bowerman v. Field Asset Serv., Inc.*,
   No. 13-cv-00057-WHO, 2014 WL 4676611 (N.D. Cal. Sept. 17, 2014) ............................... 17
17

18   *Chaouni v. Dial 7 Car*,
   105 A.D.3d 424, 963 N.Y.S.2d 27 (1st Dep. 2013) ............................................................ 16

19   *Cristler v. Express Messenger Sys., Inc.*,
20   171 Cal.App.4th 72 (2009) .............................................................................................. 12

21   *Em''rs Ins. Of Wausau v. Granite State Ins. Co.*,
   330 F. 3d 1214 (9th Cir. 2003) ...................................................................................... 14
22

23   *Estrada v. FedEx Ground Package*,
   154 Cal.App.4th 1 (2007) ............................................................................................... 17

24   *FDIC v. New Hampshire Ins. Co.*,
25   953 F.2d 478 (9th Cir. 1991) .......................................................................................... 25

26   *Fowler v. Varian*,
   196 Cal. App. 3d 34 (1987) ............................................................................................. 20

27   *Garside v. Osco Drug, Inc.*,
28   895 F.2d 46 (1st Cir. 1990) ............................................................................................. 25

*Grant v. Woods*,
   71 Cal.App.3d 647 (1977) ...................................................................................... 12

*Harris v. Vector Mktg. Corp.*,
   656 F.Supp.2d 1128 (N.D. Cal. 2009)............................................................... 19, 20

*Hennighan v. Insphere Ins. Solutions, Inc.*,
   No. 13-cv-00638-WHO, 2014 WL 1600034
   (N.D. Cal. Apr. 21, 2014) ............................................................. 17, 21, 22, 23

*Kubinec v. Top Cab Dispatch, Inc.*,
   Case No. SUCV-201203082BLS1, 2014 WL 3817016
   (Super. Ct. Mass. June 25, 2014)........................................................... 23, 24

*Martinez v. Ridehsare Port Mgmt. LLC*,
   No. BC451293, 2012 WL 6553494 (Cal. Super. Aug. 7, 2012) ........................... 15

*Prachasaisoradej v. Ralph's Grocery Co.*,
   42 Cal.4th 217 (2007) ....................................................................................... 23

*Rabanal v. Rideshare Port Mgmt. LLC*,
   No. B239708, 2013 WL 6020340 (Cal. App. 2 Dist. Nov. 14, 2013).............................*passim*

*Rosales v. El Rancho Farms*,
   2011 WL 6153276 (E.D. Cal. Dec. 12, 2011) ...................................................... 14

*S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*,
   48 Cal. 3d 341 (1989) ............................................................... 13, 18, 19, 22

*Saleem v. Corp. Transp. Grp. Ltd.*,
   No. 12-cv-08450, 2014 WL 4626075 (S.D.N.Y. Sept. 16, 2014) .............................. 15, 21, 22

*SCIF v. Brown*,
   32 Cal.App.4th 188 (1995) .................................................................................. 23

*State v. Continental Ins. Co.*,
   88 Cal.Rptr.3d 288 (2009) .................................................................................. 14

*Tieberg v. Unemp't Ins. App Bd.*,
   2 Cal.3d 943 (1970) ............................................................................................ 12

*Turner v. City and County of San Francisco*,
   892 F. Supp. 2d 1188 (N.D. Cal. 2012) (Chen, J.) ............................................... 14

*Varisco v. Gateway Science & Eng'g*,
   166 Cal.App.4th 1099 (2008).............................................................................. 22

*Yellow Cab Coop., Inc. v. Workers' Comp. Appeals Bd.*,
   226 Cal. App. 3d 1288 (1991) .................................................................... 20, 24

*Yellow Taxi Co. of Minneapolis v. NLRB*,
  721 F.2d 366 (D. D.C. 1983) ...................................................................................... 17, 20

**STATUTES**

California Labor Code

  § 226 .......................................................................................................................... 24

  § 266 .......................................................................................................................... 24

  § 350 .......................................................................................................................... 23

  § 351 .......................................................................................................................... 23

  § 1194 .................................................................................................................... 23, 24

  § 1197 .................................................................................................................... 23, 24

  § 1197.1 ...................................................................................................................... 24

  § 2802 .......................................................................................................................... 24

  § 17200 .................................................................................................................. 23, 24

**OTHER AUTHORITIES**

Federal Rules of Civil Procedure

  Rule 56 ...................................................................................................................... 1, 12

  Rule 56(a) .................................................................................................................... 12

  Rule 56 (b) .................................................................................................................. 12

  Rule 56(c) .................................................................................................................... 12

  Rule 56(c)(2) .............................................................................................................. 25

  Rule 56(c)(4) .............................................................................................................. 25

Federal Rule of Evidence 802 ...................................................................................... 25

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:  PLEASE TAKE NOTICE**

**THAT** on January 29, 2015, at 10:00 a.m., in Courtroom 4 of this Court, located at 450 Golden Gate Avenue, 17th Floor, San Francisco, California, or as soon thereafter as the matter can be heard, Defendant Lyft, Inc. ("Lyft") will, and hereby does, move the Court pursuant to Rule 56 of the Federal Rules of Civil Procedure for an Order granting its Motion for Summary Judgment.

By this Motion, Lyft requests that the Court enter judgment in its favor, and against Plaintiffs Patrick Cotter and Alejandra Maciel (collectively, "Plaintiffs"), on all of Plaintiffs' causes of action. There is no genuine issue of material fact and Lyft is entitled to judgment.  By this paper, Defendant Lyft, Inc. also opposes Plaintiffs' Motion for Summary Judgment.

## I.        PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

Defendant Lyft, Inc. ("Lyft") is an online mobile application-based technology company that maintains an innovative peer-to-peer ridesharing platform.  The Lyft platform provides a means to enable persons who seek transportation to certain destinations ("riders") to find persons driving to or through those destinations ("drivers").  Like all other riders and drivers seeking access to the ridesharing community, plaintiffs Patrick Cotter ("Cotter") and Alejandra Maciel ("Maciel") (collectively, "Plaintiffs") received a license to use the Lyft platform upon entering into a user agreement, or Terms of Service ("TOS") with Lyft.  The TOS expressly states that Lyft is not the employer for the riders or drivers accessing the Lyft platform, and that Lyft does not control their driving activities.  Rather, Lyft's business is to maintain an on-line platform, making it possible for riders and drivers to freely arrange transportation by automobile with other members of the community. Riders pay drivers for the services provided through a third-party payment processor and Lyft receives revenue from the processor in the form of administrative fees based on such payments.  The services that Lyft provides include, as part of maintaining the platform, monitoring compliance with the TOS and managing access to the platform to help maintain an acceptable level of trust and safety among members of the ridesharing community.

Provided that riders and drivers accessing the platform comply with the licensing agreement (which imposes some fairly reasonable restrictions designed to help ensure the use of the platform only for legitimate purposes) and do not pose a safety risk to members of the community, they are free to

manage all aspects of their use of the platform on their own, including when and where to access the platform, whether to accept or decline a ride, and what driving routes to take.  Notwithstanding their status as licensee platform users (riders and drivers), Plaintiffs claim in their Third Amended Complaint ("TAC") (Dkt. 55) that because they accessed the platform as drivers, they were employees of Lyft. Following from this theory, and from the notion that the payments made from riders to drivers constitute wages, plaintiffs claim that Lyft improperly reduced their payments for rides (which plaintiffs mischaracterize as "gratuities") through administrative fees, failed to pay them an hourly minimum wage and failed to reimburse them for expenses they incurred during the time they provided rides to individuals through their use of the Lyft platform.  In addition, Plaintiffs claim that Lyft failed to issue them accurate itemized wage statements.  Underlying each of the claims is the argument that Lyft improperly contracted with Cotter and Maciel as independent contractors rather than employing them as employees.  However, the undisputed facts, based largely on the TOS and the sworn testimony of Cotter and Maciel, show that Cotter and Maciel were not employees of Lyft.

Pursuant to the TOS and their own testimony, Plaintiffs controlled the manner and method in which they used the Lyft platform as drivers.  Indeed, Plaintiffs stated at their depositions that they alone determined when to access the Lyft platform, the length of time they spent on the Lyft platform, the geographic areas from which to accept ride requests, and whether to accept any ride request at all. Cotter and Maciel further stated that they had virtually no contact with Lyft personnel once they were granted access to the Lyft platform, and that they were required to attend no meetings with Lyft personnel beyond an initial orientation and car inspection.  Plaintiffs also admit that they provided the instrumentalities for completing rides (their vehicles and their smart phones) and that they earned money through payments made by riders on a per project basis.

This motion pertains only to the claims of Patrick Cotter, who accessed the Lyft platform as a driver from September 2012 to January 2013, and Alejandra Maciel, who accessed the Lyft platform as a driver from August 2013 to September 2013.

## II.   THE UNDISPUTED FACTS SHOW PLAINTIFFS WERE NOT LYFT EMPLOYEES

Drivers seeking access to the Lyft platform must agree to the Lyft TOS which specify that the contractual relationship between Lyft and individuals accessing the platform, including drivers, does

1    not create an employment relationship.  (Deposition of Komal Kirtikar ("Kirtikar Depo."), 25:20-

2    26:15).[1]  Cotter testified that he accessed the Lyft platform as a driver for a limited period of time

3    between September 2012 and January 2013.  (Deposition of Patrick Cotter ("Cotter Depo."), 108:15-

4    18; 109:21-111:1, Ex. 6, 115:11-117:18).[2]  Prior to accessing the Lyft platform, Cotter agreed to and

5    accepted the Lyft TOS dated July 11, 2012.  (*See* Declaration of Komal Kirtikar dated December 22,

6    2014 ("Second Kirtikar Decl."), ¶ 3, Ex. A; Cotter Depo., 80:12-82:4, Ex. 2).  Pursuant to the terms of

7    the July 11, 2012 TOS, Lyft retained the right to amend the TOS by posting the amended terms.

8    (Second Kirtikar Decl., ¶ 3, Ex. A at 1).  Lyft amended the TOS on four occasions during the time

9    Cotter accessed the Lyft platform as a driver.  (Second Kirtikar Decl., ¶¶ 4-7, Exs. B-E).  Through his

10    continued use of the Lyft platform, Cotter agreed to and accepted each version of the TOS in effect

11    during this time period.  (*Id*.).

12         Plaintiff Maciel accessed the Lyft platform as a driver for a one-month period between August

13    and September 2013.  (Deposition of Alejandra Maciel ("Maciel Depo."), 71:25-72:4; 120:17-121:20,

14    Ex. 19).[3]  Like Cotter, Maciel also agreed to and accepted a later version of the Lyft TOS, dated April

15    30, 2013, prior to accessing the Lyft platform.  (Second Kirtikar Decl., ¶ 8, Ex. F; Maciel Depo., 57:1-

16    59:11, Ex. 1).

17           **A.**    **Lyft Does Not Employ Drivers.  It Operates a Ride-Sharing Platform that**
18               **Enables Drivers and Riders to Arrange Transportation.**

19         Pursuant to the TOS that Plaintiffs agreed to, the Lyft Platform provides a means to enable

20    persons who seek transportation to certain destinations ("Riders") to be matched with persons driving

21    to or through those destinations ("Drivers").[4]  The TOS also state that, "LYFT DOES NOT PROVIDE

22    TRANSPORTATION SERVICES, AND LYFT IS NOT A TRANSPORTATION CARRIER." (*Id*.)

23         The Lyft Platform is implemented in one of two substantially similar applications, either of

24    which may be used by a Lyft rider or driver to access the Lyft platform.  (Declaration of Komal

25    Kirtikar dated June 27, 2014 ("First Kirtikar Decl."), ¶ 2).[5]  One application is designed to run on the

---

[1] Relevant portions of the Kirtikar Deposition are attached to the Santana Decl., ¶ 3, Ex. B.
[2] Relevant portions of the Cotter Deposition are attached to the Santana Decl., ¶ 4, Ex. C.
[3] Relevant portions of the Maciel Deposition are attached to the Santana Decl., ¶ 5, Ex. D.
[4] Second Kirtikar Decl., Ex. A at 1-2; Ex. B at 1; Ex. C at 2; Ex. D at 1-2; Ex. E at 1-2; Ex. F at1-2.
[5] See Santana Decl., ¶ 2, Ex. A (true and correct copy of the "First Kirtikar Declaration").

DEFENDANT LYFT, INC.'S MEM. OF P&A ISO MSJ AND OPPOSITION TO PLAINTIFFS' MSJ

iOS operating system. *Id.* The other application is designed to run on the Android operating system. *Id.* If a rider is in need of a ride, the rider uses the application downloaded on his or her phone to request a ride. *Id.* The platform then notifies one specific driver, who may choose to accept, decline, or ignore the ride request. *Id.* If the driver accepts the ride, he or she is "matched" with the rider and may proceed to pick up the rider and provide the ride. *Id.* The driver may also cancel his or her acceptance while *en route* to pick up the rider. *Id.* The driver may also cancel his or her acceptance upon meeting the rider and prior to commencing the ride. *Id.* If the driver declines or ignores the ride request and a certain amount of time passes, the ride request is then transmitted to another driver, if one is available. *Id.* The same process and options apply to the second driver as the first in the above example, as would be the case for any third driver, and so on. *Id.* If the driver cancels his or her acceptance of the ride request after accepting a ride, the ride is cancelled and the rider must initiate a new ride request in order to get a ride. *Id.*

After commencing a ride, a driver may proceed to transport the rider to his or her intended destination. *Id.* The driver may also terminate the ride while en route to the rider's destination, at the driver's discretion, and require that the rider leave his or her vehicle. *Id.* Also, if dropping the rider off at his or her intended destination would, in the driver's discretion, violate the law, would be unsafe, or would otherwise be inappropriate or improper in the driver's judgment, he or she may end the ride at any time. *Id.* At no point in time has Lyft ever owned or leased vehicles so that it could provide transportation services. *See* Second Kirtikar Decl., ¶ 2. To the contrary, drivers provide their own vehicles. (*Id.*; Maciel Depo., 50:17-52:5; Cotter Depo., 72:19-75:2, 86:18-87:5).

**B.      Plaintiffs Controlled the Manner and Means By Which They Took Part In The Ridesharing Community.**

**1.      Plaintiffs Determined the Dates and Times When They Accessed the Lyft Platform as Drivers.**

The TOS that Plaintiffs agreed to make it clear that Lyft did not set the dates and times that Plaintiffs accessed the Lyft platform as drivers. Each version of the TOS that Plaintiffs agreed to states that ***drivers*** determine whether or not to offer rides through the Lyft platform. (Second Kirtikar Decl., ¶ 8, Ex. F at 2) ("It is up to the driver or vehicle operator to decide whether or not to offer a ride to a rider contacted through the Lyft Platform, and it is up to the rider to decide whether or not to accept a

ride from any driver contacted through the Lyft Platform. . . Any decision by a user to offer or accept transportation once such user is matched through the Lyft platform is a decision made in such user's sole discretion.")[6]   None of the relevant TOS versions contain any language that required Cotter and Maciel to log on to the Lyft platform for specific periods of time or at all.  *Id.*  Moreover, the TOS never provided that Lyft set schedules for Plaintiffs.

Plaintiffs testified that, consistent with the TOS, they chose the dates and times during which they accessed the Lyft platform.  Maciel testified that she set her own schedule for when she accessed the Lyft platform and that she had full control over the hours she chose to provide driving services to riders so long as they were within the hours the platform was up and running.  (Maciel Depo., 73:21-75:17; 103:7-16). It was Maciel's preference to provide rides in the evenings because she was busy during daytime hours with her work as a musician and with other commitments.  (Maciel Depo., 80:24-81:22).  Maciel also testified that she could access the platform even if she had not reserved hours in advance.  (Maciel Depo., 77:23-78:6; 114:15-18).  Finally, Maciel stated that she could adjust her reserved hours as she saw fit.  (Maciel Depo., 112:23-113:5).

Like Maciel, Cotter testified that he chose the hours he wished to drive by reserving space for himself on the Lyft platform in advance.  (Cotter Depo., 51:19-23, 146:3-147:8).  Cotter determined which hours to reserve based on his availability and the availability of space for drivers on the Lyft platform.  (*Id.*)  Cotter reserved hours on the Lyft platform around his employment with Facebook and his other personal activities.  (Cotter Depo., 147:9-148:7).  Cotter admits that Lyft did not require him to work specific hours and that he was not obligated to drive the hours he reserved for himself on the Lyft platform.  (Cotter Depo., 51:19-23, 146:3-147:8).  Indeed, Cotter testified that if he reserved hours but then later chose to not access the platform as a driver, then he would simply not drive despite the fact that he had reserved time.  (Cotter Depo. 147:22-148:7).

In contrast to their deposition testimony and the explicit language of the TOS, Plaintiffs argue in their motion that Lyft controlled "whether and when" Cotter and Maciel accessed the Lyft platform.  However, there is simply no evidence to support this, as it never occurred.  Indeed, Plaintiffs do not point to a single instance where Lyft required them to provide any service to any rider at any particular

---

[6] *See also* Second Kirtikar Decl., Ex. A at 2; Ex. B at 1-2; Ex. C at 2; Ex. D at 2; Ex. E at 2.

1   time.  Plaintiffs instead argue that Lyft dictated the manner and means by which Plaintiffs offered rides

2   by virtue of the fact that the TOS permit Lyft to shut down the entire Lyft platform, affecting all users.

3   (Pltfs' MSJ, 3:10-13).[7]  Plaintiffs' reference to a "shut down" of the platform is nothing more than a

4   statement in the TOS advising users that, "Lyft and the Services may be temporarily unavailable from

5   time to time for maintenance or other reasons."[8]  Plaintiffs fail to present any reasoned argument for

6   how or why regular maintenance on the on-line platform would somehow transform Lyft into an

7   employer simply because the platform would not be available at every possible moment that Plaintiffs

8   might have sought to offer rides.

9           Plaintiffs separately argue that an hours reservation system that was made available to drivers

10  during the time that Plaintiffs offered rides on the Lyft platform was actually used to dictate Plaintiffs'

11  hours of work.  (Pltfs' MSJ, 3:23-5:13).  In reality, the hours reservation system was a tool that Lyft

12  made available in the early days of the San Francisco ridesharing community to avoid an oversupply of

13  drivers on the platform at any particular time.  (Kirtikar Depo., 52:2-53:9, 61:1-65:6).  Drivers were

14  permitted to reserve space for themselves on the platform at their own discretion but they could also

15  elect to not reserve hours and simply access the platform whenever they wanted to.  (Id.; Deposition of

16  Evan Goldin ("Goldin Depo."), 37:5-38:22[9]; Maciel Depo., 77:23-78:4, 112:23-113:5; Cotter Depo.,

17  147:22-148:7).  Indeed, Plaintiffs' own testimony contradicts their argument that the hours reservation

18  system was a means of dictating hours to them.  Plaintiffs admit that they were not required to reserve

19  hours in advance in order to access the Lyft platform; rather, they could simply log onto to platform as

20  they saw fit to see if space was available for additional drivers.  (Maciel Depo., 77:23-78:4).  Plaintiffs

21  were aware that they were not bound by any hours that they reserved for themselves on the platform.

22  Maciel testified that she adjusted her reserved hours as needed and Cotter testified that he would simply

23  not log on for reserved hours if he chose not to.  (Maciel Depo., 112:23-113:5; Cotter Depo., 147:22-

24  148:7).

25          Also without merit is the Plaintiffs' argument that Lyft's use of several metrics in conjunction

26  _____
    [7] As is discussed below in section III.C., Plaintiffs did not properly authenticate the vast majority
27  of the items that they submitted in support of their motion for summary judgment.  As such, most
    of Plaintiffs' exhibits are inadmissible hearsay and may not be considered as evidence in support of
28  their motion.
    [8] Second Kirtikar Decl., Ex. A at 7-8; Ex. B at 7; Ex. C at 12; Ex. D at 11; Ex. E at 12; Ex. F at 11.
    [9] Relevant portions of the Deposition of Evan Goldin are attached to the Santana Decl., ¶ 5, Ex. E.

DEFENDANT LYFT, INC.'S MEM. OF P&A ISO MSJ AND OPPOSITION TO PLAINTIFFS' MSJ

with the hours reservation platform created an employer-employee relationship.  (Pltfs' MSJ, 3:14-6:5).

The metrics identified by Plaintiffs (passenger rating, acceptance rate and reliability rating) are tools for

ensuring that drivers and riders have the best experience possible and limit instances where individuals

improperly interfere with the efficient functioning of the Lyft platform in violation of the TOS.

(Kirtikar Depo., 55:8-17, 80:2-84:17, 136:24-138:11).  Indeed, the TOS that Plaintiffs agreed to

prohibit individuals accessing the platform from interfering or disrupting the ridesharing services.[10]

This provision in the terms of service is intended, at least in part, to prevent drivers from simply

logging on to the platform indefinitely and not accepting rides, thus delaying the process by which

passengers can get a ride, and by which ride requests are transmitted to the next driver in a queue, who

legitimately intends to be available to give rides.  (Kirtikar Decl., ¶ 9).  In the same way that a company

like eBay rightfully restricts certain activity on its platform without creating an employment

relationship, Lyft does the same.  Such a restriction is especially necessary here where, as Plaintiffs

both admit, drivers choose when to access the platform and are never required to offer rides on the

platform at any particular point in time by any Lyft representative. (Maciel Depo., 77:23-78:4, 112:23-

113:5; Cotter Depo., 147:22-148:7; Kirtikar Decl., ¶ 9).  Moreover, acceptance ratings and reliability

ratings are irrelevant to Plaintiffs, who admitted that they determined when to access the Lyft platform,

and whose deactivations were due, respectively, to (1) violating the terms of service by using a non-

inspected vehicle (a violation of the CPUC's rulings) to give rides; and (2) low ratings given by

passengers, not Lyft.  (Maciel Depo., 94:14-95:2, 121:23-122:5; Cotter Depo., 113:20-114:10, 114:21-

117:18).  Plaintiffs' Req. for Judicial Notice, Doc. 71, filed 12/01/14 ("Pltfs' RJN") Exh A, at 73(¶5).

### 2.   Plaintiffs Determined Which Ride Requests They Would Accept.

Drivers accessing the Lyft platform have the unfettered ability to choose which rider requests to

accept.[11]  Plaintiffs incorrectly argue that Lyft subjects drivers to negative consequences for refusing to

accept ride requests.  (Pltfs' MSJ, at 11:7-12).  However, in advancing this argument, Plaintiffs ignore

the plain language of the TOS that Cotter and Maciel accepted, which contain no such provision.  The

agreements between Plaintiffs and Lyft do not require drivers to accept any particular ride request, and

it is undisputed that drivers have the unfettered ability to decline any particular ride request.

---

[10] Second Kirtikar Decl., Ex. A at 3-4; Ex. B at 3-4; Ex. C at 7; Ex. D at 6; Ex. E at 6-7; Ex. F at 6.
[11] See Second Kirtikar Decl., Ex. A at 2; Ex. B at 1-2; Ex. C at 2; Ex. D at 2; Ex. E at 2; Ex. F at 2.

Plaintiffs' argument is also in conflict with the testimony they provided at their depositions. Both Maciel and Cotter testified that they maintained complete control over whether to accept rides. (Maciel Depo., 78:23-79:4; Cotter Depo., 132:14-17, 149:22-150:2). Similarly, both Maciel and Cotter testified that they were not disciplined by Lyft and their access to the Lyft platform was not removed as a result of refusing to accept offered rides while in driver mode. (Maciel Depo., 172:6-14, 175:1-4; Cotter Depo., 188:25-189:20). Both Cotter and Maciel were well aware of the fact that they could use their own judgment in deciding whether to accept any particular ride request. For example, Maciel testified that she could block ride requests by particular riders at her discretion. (Maciel Depo., 95:20-96:3). Cotter testified that one reason to not accept a ride request would be if other drivers had given the rider a low star rating which was an indicator that the rider was not an ideal passenger. (Cotter Depo., 132:14-133:11).

### 3. Plaintiffs Determined the Areas in which to Drive.

As with the determination of which ride requests to accept, Cotter and Maciel also determined the areas in which they drove and accepted ride requests. The TOS did not require Plaintiffs to provide services in any specific region within the coverage area that the ridesharing community operated in during 2012 and 2013. Indeed, Maciel testified that she herself determined the geographical area that she drove in so long as it was within a 60-mile radius of San Francisco. (Maciel Depo., 178:1-12). Maciel further testified that she had the option of driving in other parts of California if she chose to do so. (Maciel Depo., 178:16-23). As with Maciel, Cotter testified that he also controlled the geographic area in which he drove and accepted ride requests. Cotter testified that it was up to him to choose not to accept ride requests if he did not want to drive to a particular location. (Cotter Depo., 132:14-17, 149:22-150:2).

### 4. Lyft Did Not Dictate What Routes Cotter and Maciel Were to Take.

Lyft did not participate in the determination of routes that drivers took when providing rides to Lyft riders. Plaintiffs point to no aspect of their respective TOS that required them to determine routes in a particular manner dictated to them by Lyft. In practice, the determination of routes is left to riders if they express a particular route preference. (Kirtikar Depo. at 43:5-49:8 & Exh. 12). Otherwise, drivers are free to select their own route and Lyft exercises no control over driver navigation. *Id.* As

1  part of driver orientation, Lyft familiarizes drivers with the use of GPS software for navigation (to the

2  extent they are not already familiar with it as a matter of common sense).  (Kirtikar Depo. at 158:9-20).

3  Lyft has recommended that drivers may find the "Waze" application helpful for the determination of

4  routes because the application provides live information on accidents and road blockages.  (Cotter

5  Depo., 58:3-59:24; Maciel Depo., 98:5-99:14).  Both Cotter and Maciel testified that use of the Waze

6  application was not mandatory and that they instead chose to use Google maps on-line application

7  when choosing their own routes.  (Maciel Depo., 98:16-99:14, 165:6-166:4; Cotter Depo., 59:25-

8  60:19).

9  **5.    Lyft Did Not Dictate To Plaintiffs What They Should Wear.**

10  Plaintiffs erroneously argue in their motion that Lyft supposedly "tightly controls" the work of

11  individuals accessing the platform as drivers out of a "desire to consistently promote Lyft's 'brand.'"

12  (Pltfs' MSJ, at 10:1-15).  Plaintiffs point to little evidence to support this dramatically overstated

13  argument, which is inconsistent with the undisputed record.  The TOS, which govern the terms of

14  drivers' access to the platform, are devoid of any reference to the projection of such a "brand" image.

15  (Cotter Depo., Ex. 2; Maciel Depo., Ex. 1).  Indeed, Plaintiffs testified that they were never required to

16  wear any particular uniform or to adhere to any set of personal grooming standards when accessing the

17  Lyft platform as drivers. (Maciel Depo., 54:25-55:5; Cotter Depo., 141:11-16).  This is consistent with

18  Lyft's lack of control over the manner and means by which Plaintiffs provided rides to others through

19  the ridesharing community.

20  **C.    The Terms of Service Do Not Reflect An Employer-Employee Relationship**
**With Respect to Other Important Aspects of the Parties' Relationship.**

21

22  **1.    Plaintiffs Supplied the Primary Instrumentalities.**

23  Cotter and Maciel provided the primary instrumentalities for the driving services they provided

24  to riders on the Lyft platform.  Indeed, Maciel and Cotter each provided the vehicle they used for their

25  respective driving activities.  (Maciel Depo., 31:8-16, 46:6-12, 51:1-7; Cotter Depo., 72:1-74:19).

26  Cotter and Maciel also provided their own mobile phones for access to the Lyft platform.  (Maciel

27  Depo., 97:19-24; Cotter Depo., 53:10-18).  As such, Cotter and Maciel supplied the two basic items

28  needed to provide driving services to riders through the Lyft platform: 1) the instrumentality necessary

for providing the transportation services (the vehicle); and 2) the device needed for arranging and communicating with riders (the mobile phone).

Lyft also provided Cotter and Maciel with three ancillary items.  These were a pink mustache, a car charger and a cell phone holder.  (Cotter Depo., 53:19-57:8).  Lyft has never mandated the use of any of these items, although placing the mustache on one's car was suggested for a period of time in Lyft's history.  (Kirtikar Depo. at 41:5-42:12).  Plaintiffs advance the argument that Lyft provides the instrumentalities and tools that were used by the Plaintiffs in providing rides due to the fact that Lyft created the platform that makes the ridesharing community possible and because Lyft provided the Plaintiffs with contingent liability coverage.  (Pltfs' MSJ, 13-23).  Neither the platform nor the existence of insurance transports riders to their destination.  Rather, automobiles operated by the Plaintiffs, transported riders.  Further, the contingent liability coverage is simply a requirement of the California Public Utilities Commission, regardless of whether Lyft drivers are employees or independent contractors.  *See* Pltfs. RJN at 67, 72-75.

## 2.    Plaintiffs Were Paid by Lyft Riders on a Per-Ride Basis.

Plaintiffs admit that they did not receive an hourly wage for the driving services they provided to Lyft riders.  (Maciel Depo., 22:5-21; 173:6-17; Cotter Depo., 187:11-12).  Instead, Plaintiffs received payments from Lyft riders on a per-ride basis.  (Maciel Depo., 136:4-137:12, Cotter Depo., 136:6-21, 137:19-138:6, 167:2-5).  Lyft provided riders with recommended amounts for rides provided but riders ultimately determined the full amount of the payment – not an additional amount deemed a "gratuity." (Maciel Depo., 137:2-4; Cotter Depo., 137:19-138:6, 176:17-19).[12]  Indeed, Maciel testified that the payments she received from riders were not gratuities and that she did not have any complaints about her payments.  (Maciel Depo., 149:4-150:10).

## 3.    The Parties' Believed They Were Engaged In An Independent Contractor Relationship.

The TOS contains a clear expression of the parties' belief that they were entering an independent contractor relationship, not an employer-employee relationship, at the time that Cotter and Maciel were granted access to the Lyft platform.  The TOS contain a provision stating that the

---

[12] Second Kirtikar Decl., Ex. A at 2; Ex. B at 2; Ex. C at 2-3; Ex. D at 2-3; Ex. E at2-3; Ex. F at2-3.

Case No. 3:13-cv-04065-VC
DEFENDANT LYFT, INC.'S MEM. OF P&A ISO MSJ AND OPPOSITION TO PLAINTIFFS' MSJ

contracting parties, "are independent contractors, and no agency, partnership, joint venture, employee-employer or franchisor relationship is intended or created by this Agreement." (Cotter Depo., Ex. 2 at 9; Maciel Depo., Ex. 1 at 13).[13] The TOS also specifically provide that Lyft disclaims any actual control over the provision of driving services.[14] Tellingly, Cotter and Maciel admit that they did not consider Lyft to be their employer. Cotter admits that while he listed his other employers on his LinkedIn profile, including those for part-time jobs, he did not list Lyft as an employer. (Cotter Depo., 62:20-64:25). Moreover, on the resume that Cotter submitted to Lyft when he applied for a position with Lyft as a Driver Community Manager, Cotter described driving for Lyft as a hobby and not as a form of employment. (Santana Decl., ¶ 7, Exs. F and G). Maciel also admits that during the time she accessed the platform as a driver, she did not have a supervisor at Lyft, that she did not have to report to anyone at Lyft and that she was never subjected to any discipline by Lyft. (Maciel Depo., 105:25-106:24).

**D.**     **The CPUC Has Specifically Declined to Deem Lyft an Employer**

Plaintiffs make much of the notion that the California Public Utilities Commission ("CPUC") has deemed Lyft to be a transportation services provider. (Pltfs' MSJ, 11:25-27, 17:10-13). However, the CPUC specifically declined to rule on the employment status of drivers. (Pltfs' RJN, Ex. A at 67) ("We will not, however, meddle into their business model by forcing TNCs to designate each driver an employee or contractor. Again, our role is to protect public safety, not to dictate the business models of these companies.") Like the CPUC, other administrative agencies from the State of California have similarly refused to find that individuals accessing a ridesharing platform as drivers are employees of the companies maintaining the platform. Notably, a Labor Commissioner from California's Department of Industrial Relations, Division of Labor Standards Enforcement, recently dismissed the claims of a driver who used another ridesharing platform, Uber, on the grounds that the driver, "performed services as an independent contractor of [Uber], and not as a bona fide employee." *See* Lyft's Request for Judicial Notice ("Lyft RJN"), Ex. A at 3.

---

[13] Second Kirtikar Decl., Ex. A at 9; Ex. B at 9; Ex. C at 15; Ex. D at 14; Ex. E at 14; Ex. F at 13.
[14] Second Kirtikar Decl., Ex. A at 2, 7; Ex. B at 2, 7; Ex. C at 2, 12-13; Ex. D at 2, 11-12; Ex. E at 2, 12-13; Ex. F at 2, 11-12.

### III.   <u>LEGAL ARGUMENT</u>

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment.  A motion should be granted if there is "no genuine issue as to any material fact" and if the "movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(c).  A partial summary judgment may also be granted as to particular claims.  Fed. R. Civ. Proc. 56(a), (b).  While "the existence of an employment relationship is a question for the trier of fact," it "can be decided by the court as a matter of law if the evidence supports only one reasonable conclusion."  *Beaumont-Jacques v. Farmers Group, Inc.*, 217 Cal. App. 4th 1138, 1142-43 (2013)

### A.   <u>Plaintiffs Were Not Employees of Lyft.</u>

"An independent contractor is defined as 'any person who renders service for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished."  *Cristler v. Express Messenger Sys., Inc.*, 171 Cal.App.4th 72, 77 (2009) (citing Cal. Labor Code § 3353).  The "primary test of an employment relationship is whether the 'person to whom service is rendered has the right to control the manner and means of accomplishing the result desired[.]'"  *Ali v. U.S.A. Cab Ltd.*, 176 Cal.App. 4th 1333 (2009) (quoting *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989)); *see also Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 533 (2014) (holding that what matters under the common law is "how much control the hirer retains the *right* to exercise") (emphasis in original).  Written agreements (such as the Terms of Service here, pursuant to which Lyft disclaims nearly all control over its drivers) are a significant factor in assessing the right to control.  *Grant v. Woods*, 71 Cal.App.3d 647, 653 (1977); *Tieberg v. Unemp't Ins. App Bd.*, 2 Cal.3d 943, 952 (1970).  Also, the mere suggestion as to detail is not enough but, rather, plaintiffs must show a complete or authoritative control in order to establish the existence of an employer-employee relationship.  *See Ali*, 176 Cal.App.4th at 1347 ("A worker is an independent contractor when he or she follows the employer's desires only in the result of the work, and not the means by which it is achieved.") (citing *Varisco v. Gateway Science & Eng'g*, 166 Cal.App.4th 1099, 1103 (2008)).  The Ninth Circuit recently described this analysis as whether the company retained "all *necessary* control" in the agent's means of accomplishing the desired result.  *Alexander v. FedEx Ground Package Syst., Inc.*, Nos. 12-17458, 12-

1   17509, 2014 WL 4211107, at *9 (9th Cir. Aug. 27, 2014) (emphasis in original).

2   California courts have articulated a list of additional factors to be considered, including (a)

3   whether the one performing services is engaged in a distinct occupation or business; (b) the kind of

4   occupation, with reference to whether, in the locality, the work is usually done under the direction of

5   the principal or by a specialist without supervision; (c) the skill required; (d) whether the principal or

6   the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e)

7   the length of time for which the services are to be performed; (f) the method of payment, whether by

8   the time or by the job; (g) whether or not the work is part of the regular business of the principal; and

9   (h) whether or not the parties believe they are creating the relationship of employer-employee.  *Ali*, 176

10  Cal.App.4th at 1347-48 (citing *Borello*, 48 Cal.3d at 350).[15]  Some other factors are "logically

11  pertinent" to a determination of whether an individual is an independent contractor or employee.

12  *Borello*, 48 Cal. 3d at 355. These factors include, "the alleged employee's opportunity for profit or loss

13  depending on his managerial skill[,]" and "the alleged employee's investment in equipment or materials

14  required for his task[.]"  *Id.*

15  The factors are not applied mechanically as separate tests but are "intertwined" and "'their

16  weight depends often on particular combinations.'"  *Id.* "[E]ven 'if one or two of the individual factors

17  might suggest an employment relationship, summary judgment is nevertheless proper when…all of the

18  factors weighed and considered together as a whole establish that [plaintiff] was an independent

19  contractor and not an employee.'"  *Beaumont-Jacques*, 217 Cal.App.4th at 1147 (quoting *Arnold v.

20  Mutual of Omaha Ins. Co.*, 202 Cal.App.4th 580, 590 (2011)).

### 1.   The Primary Factor: Lyft's Lack of Control over Plaintiffs.

22  Because Plaintiffs have conceded that Lyft exercised no direct control over their activities while

23  driving on the platform, the main thrust of their argument goes to purported influences and incentives

24  created by Lyft's management of the platform, such as establishing quality standards and monitoring

25  and recording drivers' acceptance of rides and the times when they of the platform.  This is not

26  "control" that gives rise to an employment relationship.  An enterprise "'may retain a broad general

[15] The Ninth Circuit articulated as an additional factor whether the company has the right to terminate the agent at will.  *Alexander*, 2014 WL 4211107 at **6, 12.  This is typically addressed in the above factor (e) relating to the length of time for which services will be performed and the Lyft will address it in that section.

power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract – including the right to inspect, the right to make suggestions or recommendations as to details of the work, [and] the right to prescribe alterations or deviations in the work'" – without changing the relationship from independent contractor to employee.  *Beaumont-Jacques*, 217 Cal.App.4th at 1143 (quoting *McDonald v. Shell Oil Co.*, 44 Cal.2d 785, 790 (1955)); *Rosales v. El Rancho Farms*, 2011 WL 6153276, at *14-*16 (E.D. Cal. Dec. 12, 2011) (Defendant was not plaintiffs' employer even through its personnel trained them, inspected their work, and supervised them to ensure that they were performing their work according to specifications because supervision for the purpose of quality control is "collateral, indirect control" that does not create a joint employer relationship).  In *Beaumont-Jacques*, the court rejected the appellant's contention that she was misclassified as an independent contractor because it found that she "exercised meaningful discretion" as to the means of how she performed her work, including "determining her own day-to-day hours, including her vacations; on most days, fixing the time for her arrival and departure at her office and elsewhere, including lunch and breaks … paying for her costs … deducting those costs as a business expense in her personal tax returns; and, identifying herself as self-employed in those returns."  *Id.* at 1144-45.

Similarly, in *Arnold v. Mut. of Omaha Ins. Co.*, 202 Cal.App.4th 580, 589 (2011), the court found that an insurance agent was an independent contractor when she "used her own judgment" in determining whom she would solicit, the time, place, and manner in which she would solicit, and the amount of time she spent soliciting.  Also relevant was the fact that she simultaneously worked as an agent for other companies, her work performance was not evaluated or supervised, and she had to pay for her own workspace and telephone services.  *Id.*  Given the latitude afforded to the plaintiff, the court found the company "had no significant right to control the manner and means by which [she] accomplished the results of the services she performed as one of [the company's] soliciting agents."  *Id.* In *Rabanal v. Rideshare Port Mgmt. LLC*, No. B239708, 2013 WL 6020340 (Cal. App. 2 Dist. Nov. 14, 2013),[16] a strikingly similar case to Plaintiffs', the Court of Appeal affirmed summary

---

[16] The Court may consider unpublished California appellate decisions as persuasive authority.  *See Em''rs Ins. Of Wausau v. Granite State Ins. Co.*, 330 F. 3d 1214, 1220 n. 8 (9th Cir. 2003) (disagreed with on other grounds by *State v. Continental Ins. Co.*, 88 Cal.Rptr.3d 288, 309 & n.10 (2009)); *see also Turner v. City and County of San Francisco*, 892 F. Supp. 2d 1188, 1202 n. 3

judgment for the defendant, finding that the plaintiffs – van drivers or operators who primarily transported riders to and from their residences and various airports or cruise ship terminals – were independent contractors.  The Court of Appeal could have been describing this case when it summarized the grounds for finding that the plaintiffs were independent contractors:

> Here, it is undisputed that plaintiffs independently determined how to perform their jobs. They decided when they wanted to work and whether they wanted to obtain fares from [] dispatch, or drive loops, or solicit fares from other transportation networks… Moreover, plaintiff could determine the order of, and the routes for, pickup and drop-off and need never communicate these decisions to RPM. . . . There were no set hours or schedules. RPM's 'participation is limited to offering the assignments and paying … upon proof of delivery.' . . . . In sum, RPM acted as a broker by providing a service to its customers and its control was limited to the results of plaintiffs' work, namely picking up and dropping off passengers, not how those results were achieved.

*Id.* at *7 (citations omitted).[17]

The independence, discretion and flexibility afforded to plaintiffs are widely recognized as the hallmarks of independent contractor status.  In *Saleem v. Corp. Transp. Grp. Ltd.*, No. 12-cv-08450, 2014 WL 4626075, at *8 (S.D.N.Y. Sept. 16, 2014), the court held that drivers who contracted with a "'black car' business that provides ground transportation services" were independent contractors under both the FLSA's economic realities test and New York's "degree of control test," which, similar to California, addresses "the degree of control exercised by the purported employer over the results produced or the means used to achieve the results."  Similar to the instant case, the drivers signaled their availability to work by "booking in" to a "dispatch device," were notified of potential transportation jobs through the device, and had the discretion to accept or reject the jobs. *Id.* at *6. In finding that the drivers were independent contractors, the court emphasized that (1) they were free to set their own schedule and take vacations and they wished, deciding for themselves when to provide services, and (2) "were free to – and frequently did – work for other car services and provide transportation to private customers." *Id.* at **10, 15-16. The court in *Arena v. Delux Transp. Serv., Inc.*, 3 F.Supp.3d 1 (E.D.N.Y. 2014) similarly held that a taxi driver was an independent contractor when

---

(N.D. Cal. 2012) (Chen, J.); *Baltazar v. Yates*, Case No. 04-00274-VBF (CW), 2010 WL 2195979 *11 n. 8 (C.D. Cal. Apr. 28, 2010) (Woehrle, J.).

[17] *See also Martinez v. Ridehsare Port Mgmt. LLC*, No. BC451293, 2012 WL 6553494 (Cal. Super. Aug. 7, 2012) ("A business model where independent contractor drivers and "brokers" of assignments work together to provide transportation services is well accepted under the law.") (citing *SCIF v. Brown*, 32 Cal.App.4th 188, 195-196, 202-203 (1995)).

"he set his own schedule, and adhered to it at his discretion without any consequence[,]" and there was no requirement "to drive a minimum number of days or hours over a particular period of time." *Id.* at 11. Further, while the plaintiff "was given guidelines on how to interact with customers, fill out forms, and even dress there is no evidence that he was managed or supervised on an ongoing basis, or that he or any other driver was penalized for not adhering to any of these guidelines. *Id.; see also Chaouni v. Dial 7 Car*, 105 A.D.3d 424, 963 N.Y.S.2d 27 (1st Dep. 2013).

Plaintiffs, however, attempt to liken themselves to the FedEx drivers the Ninth Circuit concluded were employees in the *Alexander v. FedEx Ground Package Syst., Inc.*, 2014 WL 4211107 (9th Cir. Aug. 27, 2014) decision. Instead, *Alexander* provides a powerful contrast to the lack of control exercised by Lyft over the drivers using its platform in virtually every aspect of the relationship, as follows:

- **Geographic Region and Task Selection:** FedEx told its drivers where in their service area to deliver packages and the drivers had "no control over which packages they deliver." *Alexander*, 2014 WL 211107 at *10. Here, Cotter and Maciel determined where to work, and had complete control over whether to pick up riders. They could choose to pick up no riders at all. (Maciel Depo., 178:1-23 and Cotter Depo., 132:14-17; 149:22-150:2).

- **Schedule:** FedEx drivers "must deliver packages every day that FedEx is open for business, and must deliver every package they are assigned each day," and "FedEx can and does control the times its drivers can work." *Alexander*, 2014 WL 211107 at **1, 7. In this case, Cotter and Maciel set their own schedule and could choose not to work the schedule they set based on their sole discretion. (Maciel Depo., 73:21-75:17; 77:23-78:6; 103:7-16; 112:23-113:5; 114:15-18 and Cotter Depo., 51:19-23; 146:3-147:8).

- **Hours Worked:** FedEx "'structures drivers' workloads to ensure that they work between 9.5 and 11 hours every working day." *Alexander*, 2014 WL 211107 at *2. Quite the opposite is the case here, Cotter and Maciel determined for themselves how many hours they wanted to access the Lyft platform and could work any number of hours they elected. (Maciel Depo., 77:23-78:6; 112:23-113:5; 114:15-18; Cotter Depo., 51:19-23, 146:3-148:7).

- **Supervision:** FedEx "driver's managers may conduct up to four ride-along performance evaluations each year, 'to verify that [the driver] is meeting the standards of customer service' required by the OA. Managers are supposed to observe and record small details about each step of a delivery, including whether a driver uses a "dolly or cart" to move packages, demonstrates a "sense of urgency," and "[p]laces [his or her] keys on [the] pinky finger of [his or her] non-writing hand" after locking the delivery vehicle. After finishing a ride-along evaluation, managers are supposed to give immediate feedback to drivers about the quality of their work." *Alexander*, 2014 WL 211107 at *2. Here, there was no supervision from Lyft. Plaintiffs each attended only one brief in-person meeting with Lyft personnel, which Cotter himself described as "superficial" and which involved a visual inspection of the Plaintiffs' vehicles. (Cotter Depo., 39:3-46:13; Maciel Depo., 31:8-16; Kirtikar Depo., 20:16-21:7, 23:1-25:8).

- **Control over vehicles:** All FedEx vehicles had to be painted "FedEx white," a specific shade of Sherwin–Williams paint, or its equivalent," "must be marked with the FedEx logo," "have specific dimensions," "contain shelves with specific dimensions," and "FedEx dictates the

DEFENDANT LYFT, INC.'S MEM. OF P&A ISO MSJ AND OPPOSITION TO PLAINTIFFS' MSJ

vehicles' dimensions, including the dimensions of their 'package shelves' and the materials from which the shelves are made." *Alexander*, 2014 WL 211107 at **3, 7. Lyft did not require any specific type of vehicle, color, logo, label or layout of Plaintiffs' vehicles. Lyft merely encouraged, but did not require, the pink mustache. (Kirtikar Depo., 20:16-21:7, 23:1-25:8).

- **Necessary equipment:** "FedEx offers a 'Business Support Package,' which provides drivers with uniforms, scanners, and other necessary equipment. FedEx deducts the cost of the equipment from drivers' pay. Purchase of the package is ostensibly optional, but more than 99 percent of drivers purchase it. The scanners that drivers must use to send delivery information to FedEx are not readily available from any other source." *Alexander*, 2014 WL 211107, at *4. This is yet another major disparity. Plaintiffs supplied their own car and needed only to download the Lyft application – for free – on their own smartphones. (Maciel Depo., 31:8-16, 46:6-12, 51:1-7, 97:19-24; Cotter Depo., 53:10-18; 72:1-74:19).

- **Personal appearance:** FedEx required uniforms and grooming standards and the Ninth Circuit observed, "FedEx controls its drivers' clothing from their hats down to their shoes and socks," and requires drivers to be "'clean shaven, hair neat and trimmed [and] free of body odor," which the Court found to be "clearly constituting control over its drivers." *Alexander*, 2014 WL 211107, **4, 6. In stark contrast, here, Plaintiffs' personal appearance was entirely up to them and they admit that they were never required to wear any particular uniform or to adhere to any set of personal grooming standards when accessing the Lyft platform as drivers. (Maciel Depo., 54:25-55:5; Cotter Depo., 141:11-16)

All of the indicia of control FedEx exercised over its riders – dispositive to the Ninth Circuit – are therefore entirely absent from the relationship between Lyft and Plaintiffs.[18] As this Court recently held in *Bowerman v. Field Asset Serv., Inc.*, No. 13-cv-00057-WHO, 2014 WL 4676611, at *8 (N.D. Cal. Sept. 17, 2014):

> Where a plaintiff 'used her own judgment in determining … the time, place, and manner in which she would [work], and the amount of time she spent working'; the 'appointment was nonexclusive and she in fact [worked] for other companies'[;] where the manager did not 'evaluate her performance and did not monitor or supervise her work['; and training was voluntary, there is no significant control.

*Bowerman*, 2014 WL 4676611, at *8 (citing *Arnold*, 202 Cal.App.4th at 589). "An individual who determines his own hours and break times 'on most days' exercises 'meaningful discretion.'" *Hennighan v. Insphere Ins. Solutions, Inc.*, No. 13-cv-00638-WHO, 2014 WL 1600034, at *10 (N.D. Cal. Apr. 21, 2014) (citing *Beaumont-Jacques*, 217 Cal.App.4th at 1145); *see Yellow Taxi Co. of Minneapolis v. NLRB*, 721 F.2d 366, 374-78 (D. D.C. 1983) (drivers' ability to choose hours of work, freedom to reject dispatch calls, ability to work independently for other clients without the company's knowledge, and unobtrusive dress code precluded a finding that the company had a

---

[18] The *Rabanal* decision distinguished the van drivers/operators from an earlier FedEx state court decision, *Estrada v. FedEx Ground Package*, 154 Cal.App.4th 1 (2007), because, *inter alia*, unlike FedEx the defendant in *Rabanal* did not control "every exquisite detail of the drivers' performance" and, unlike the FedEx drivers, the drivers in *Rabanal* did "not have an assigned work schedule from which they could not deviate." *Rabanal*, 2013 WL 6020340, at *8.

1    right to control the drivers).

2         Plaintiff's argument that the "acceptance" and "reliability" ratings given to drivers amount

3    to an exercise of control misses the point.  (Pltfs' MSJ, 4:9-6:5).  First, neither of the ratings

4    materially impacted Cotter or Maciel's decision as to when and under what circumstances to access

5    the platform.  Rather, they both testified that they could and did use the platform whenever it suited

6    their purposes.  (Maciel Depo., 73:21-75:17; 77:23-78:6; 80:24-81:22; 103:7-16; 114:15-18)

7    (Cotter Depo., 51:19-23, 146:3-148:7).

8         Plaintiffs cite to *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522 (2014) for the

9    propositions that:  (1) the test of an employment relationship is whether the principal has the "right

10   to control the manner and means of accomplishing the result desired," and (2) that the right to

11   discharge without cause is of paramount importance because this gives the principal the "means of

12   controlling the agent's activities."  (Pltfs' MSJ 17:28-18:2, 18:10-15).  The *Ayala* case, however, is

13   not dispositive here.  *Ayala* is a class certification decision, and the court emphasized that "the

14   merits of the complaint are not before us."  *Ayala*, 59 Cal.4th at 527.  Further, the *Ayala* court

15   recognized that the parties' course of conduct is relevant to determining independent contractor vs.

16   employee status. *Ayala*, 59 Cal.4th 535 (internal citations omitted); *see also Borello*, 48 Cal.3d at

17   351-353 (the right to control test "is not necessarily the decisive test") ("common law principles

18   are *not* dispositive of the employment relationship) ("the nature of the work, and the overall

19   arrangement between the parties, must be examined").

20        Here, even operating under the *Ayala* court's admonition that a trial court should focus on

21   the parties' written agreement, the TOS do not give rise to an employment relationship.  In arguing

22   that the TOS do establish such a relationship, Plaintiff's point only to the clause giving Lyft and the

23   drivers the right to end their relationship at any time.  (Pltfs MSJ, 2:23-3:9).  However, such an

24   agreement is not dispositive – in fact many commercial and independent contractor relationships

25   are not for a specific term and are mutually terminable at any time.  *See Beaumont-Jacques v.*

26   *Farmers Group, Inc.*, 217 Cal. App. 4th at 1147; *Arnold v. Mut. Of Omaha Ins. Co.*, 202 Cal. App.

27   4th at 584 ("Either party could terminate the contract with or without cause through written notice

28   to the other").  The versions of the TOS applicable to Plaintiffs further demonstrate the lack of an

employment relationship, as follows:

- Lyft specifically relinquishes the type of control alleged by Plaintiffs. Indeed, the TOS provide that the decision to offer or accept a ride once a rider and driver are matched on the platform is at the user's sole discretion. (Second Kirtikar Decl., Exs. A-F at 2). The TOS also provide that individuals accessing the platform are "solely responsible" for their "interactions with other users" and that Lyft has no control over actual transportation provided using the platform.[19]

- Payments from riders to drivers were voluntary, consisting of donations, at the riders' sole discretion.[20]

- To the extent any control is given to Lyft in the agreement, it is minimal and related mainly to ensuring that the platform is used in a lawful manner, to protect Lyft's intellectual property rights, and to avoid fraud and abuse on the platform.[21]  Further, many such items are simply meant to comply with requirements of the California Public Utilities Commission.  *See* Pltfs' RJN, Exh. A at 72-75 (ordering Lyft, for example, to maintain insurance coverage, do vehicle inspections, perform criminal background checks, etc.).

Entirely absent from the TOS is any reservation of the right to control drivers' daily conduct, including whether to drive on the platform, when and where to drive on the platform, routes to take, when and under what circumstances to accept a rider.  Indeed, it would be perfectly consistent with the Terms of Service for a driver to simply sign up on the platform and never give a ride to a single rider.  Looking at the Terms of Service, then, as the *Ayala* case suggests, it is clear that the TOS themselves establish that no employment relationship exists here.  And, as is further discussed below, the course of conduct between Lyft and Plaintiffs only reinforces this fact.

## 2.    The Secondary Factors Also Weigh Against Employee Status.

The "secondary factors" also favor independent contractor status, and Lyft will address them in the order prescribed by *Borello*.

### (a)    Whether the one performing services is engaged in a distinct occupation or business.

"If a worker is engaged in a distinct occupation of business, then that would suggest that the worker is an independent contractor rather than an employee." *Harris v. Vector Mktg. Corp.*, 656 F.Supp.2d 1128, 1138 (N.D. Cal. 2009) (that the plaintiff's relationship "was nonexclusive, and she in fact solicited for other insurance companies during her appointment" supported independent contractor

---

[19] Second Kirtikar Decl., Ex. A at 7; Ex. B at 7; Ex. C at 12; Ex. D at 11; Ex. E at 12; Ex. F at 11.

[20] Second Kirtikar Decl., Ex. A at 2; Ex. B at 2; Ex. C at 2-3; Ex. D at 2-3; Ex. E at2-3; Ex. F at2-3.

[21] Second Kirtikar Decl., Ex. A at 3-4; Ex. B at 3-4; Ex. C at 6-8; Ex. D at 5-7; Ex. E at 5-8; Ex. F at 5-7.

status).  Here, Cotter and Maciel were not providing services to Lyft or to Lyft "customers."  Instead, Cotter and Maciel were engaged on their own as they operated through the platform.  As is described above, Cotter and Maciel determined who their clients—the riders—would be by deciding in their sole discretion which ride requests to accept and which to decline.  (Maciel Depo., 78:23-79:4 172:6-14, 175:1-4; Cotter Depo., 132:14-17, 149:22-150:2, 188:25-189:20).[22]  Moreover, Cotter and Maciel determined which hours to work and which neighborhoods to drive in.  It is through their own choices about where and when to operate their own vehicles and make themselves available to provide rides to individuals through the Lyft platform that determined whether efforts of Cotter and Maciel were a profitable endeavor for them.  Notably, Cotter and Maciel were never prohibited from accessing the Lyft platform as drivers while simultaneously engaging in tasks for any other business venture they might have chosen to engage in.  At no point did Lyft prohibit Cotter or Maciel, or any other driver accessing the Lyft platform, from simultaneously accessing platforms for other online transportation communities such as Sidecar or Uber.  (Kirtikar Depo. at 118:17-22).  That Lyft permitted Plaintiffs to do so is significant.  *See Harris*, 656 F.Supp.2d at 1138.  If they were employees, they would have had a duty of loyalty not to engage in a competing business.  *See Fowler v. Varian*, 196 Cal. App. 3d 34, 41 (1987); *see also Yellow Cab*, 721 F.2d at 374-78 (ability to work for other clients without purported employer's knowledge a factor in determining that no employment relationship existed).

**(b)    Whether the work is usually done under the direction of the principal or by a specialist without supervision.**

This factor strongly favors independent contractor status.  Plaintiffs acted with virtually no supervision from Lyft.  (Cotter Depo., 150:8-25; Maciel Depo. at 106:3-13).  In fact, once Cotter and Maciel started accessing the platform as drivers, the only evaluations of their performance came from the individuals in the ride-sharing community to whom they provided rides.  (*Id.*; Maciel Depo., 115:24-116:2; Kirtikar Depo. at 55:8-17).  Lyft employees did not do ride-alongs with Cotter and Maciel and did not monitor or set the hours that each accessed the platform.  (Cotter Depo., 150:8-25; Maciel Depo. at 106:3-13).  Indeed, both Cotter and Maciel testified that they could simply log off the platform at their sole discretion and that they also determined which rides to accept and which to

---

[22] See Second Kirtikar Decl., Ex. A at 1-2; Ex. B at 1; Ex. C at 2; Ex. D at 2; Ex. E at 2; Ex. F at 2.

DEFENDANT LYFT, INC.'S MEM. OF P&A ISO MSJ AND OPPOSITION TO PLAINTIFFS' MSJ

1    decline.  (Maciel Depo., 78:23-79:4 172:6-14, 175:1-4; Cotter Depo., 132:14-17, 149:22-150:2, 188:25-

2    189:20).  Moreover, the passenger ratings were given exclusively by riders, not Lyft.  (*Id.*; Maciel

3    Depo., 115:24-116:2; Kirtikar Depo. at 55:8-17).

4                    **(c)       Whether the principal or the worker supplies the**
                               **instrumentalities, tools, and the place of work for the person**
5                               **doing the work.**

6                This factor strongly supports a finding that Plaintiffs are independent contractors.  Plaintiffs

7    supplied their own cars, clearly the most important instrumentality in providing a driving service.

8    (Maciel Depo., 31:8-16, 46:6-12, 51:1-7; Cotter Depo., 72:1-74:19).  Plaintiffs also supplied their own

9    smartphones on which to access the Lyft platform.  (Maciel Depo., 97:19-24 and Cotter Depo., 53:10-

10   18).  Where, as here the company "'did not furnish the majority of the tools and instrumentalities' nor

11   'a place to work,' this fact weighs in favor of finding an independent-contractor relationship."

12   *Hennigan*, 2014 WL 1600034, at *13 (factor favored independent contractor status when the plaintiff

13   was, among other things "responsible for providing his own equipment, including his car, cell phone,

14   and laptop."); *Rabanal*, 2013 WL 6020340, at *7 (factor favored independent contractor status when

15   plaintiffs "owned their own Blackberries and GPS, supplied their own clothing, and owned and leased

16   their own vans…"); *Saleem*, 2014 WL 4626075 at *12 ("substantial investments" included buying or

17   renting cars, maintaining the cars, buying gasoline and procuring insurance).  Similarly, in *Alexander*,

18   the Ninth Circuit found that this factor favored independent contractor status because the FedEx drivers

19   supplied their own vehicles even though FedEx controlled the manner in which the drivers got other

20   required equipment, "the drivers' scanners are not readily available from anywhere else" and "the vast

21   majority of drivers get their other equipment from FedEx."  *Alexander*, 2014 WL 4211107, at *13.

22                   **(d)       The length of time for which the services are to be performed.**

23               Plaintiffs' contractual relationship with Lyft was for an indefinite period.  (Cotter Depo., Ex. 2;

24   Maciel, Depo., Ex. 1).  That either party could terminate the relationship does not support the finding of

25   an employment relationship.  Rather, when "'the right to terminate their arrangement was a mutual

26   one[,]… these circumstances show an association, rather than the relation of employer and employee.'"

27   *Beaumont-Jacques*, 217 Cal.App.4th at 1147 (citation omitted); *see also Hennigan*, 2014 WL 1600034,

28   at *14 ("A mutual termination clause is evidence of an independent-contractor relationship… Since

                                                                  21                          Case No. 3:13-cv-04065-VC

there was a mutual termination clause here, this factor weighs in favor of [the defendant].”); *Varisco v. Gateway Sci. and Eng'g*, 166 Cal.App.4th 1099, 1107 (2008) (“An independent contractor agreement can properly include an at-will clause giving the parties the right to terminate the agreement.  Such a clause does not, in and of itself, change the independent contractor relationship into an employee-employer relationship.”); *Saleem*, 2014 WL 4626075 at \*14 (“drivers could terminate the agreements at will, a fact that courts have found favors a finding of independent contractor status” and “were free to take extended breaks from driving whenever they wished, were never under any obligation to book into the dispatch system at a particular time, and were free to work for competitor car services.”).

        **(e)**        **The method of payment, whether by the time or by the job.**

This factor also favors independent contractor status.  Both Cotter and Maciel state that they were paid by the job, that is, by the ride.  (Maciel Depo., 136:4-137:12; 173:6-17; Cotter Depo., 136:6-21; 137:19-138:6; 167:2-5; 187:11-12).   “‘Where the worker is paid by the hour, it typically suggests and employment relationship; where the worker is paid by the job, it points to independent contractor.’” *Hennigan*, 2014 WL 1600034, at \*13; *Rabanal*, 2013 WL 6020340, at \*10 (payment by fare, while not dispositive, “underscore[d] plaintiffs' status as independent contractors”).  Moreover, the fact that amount of the payments to Plaintiffs were entirely within the discretion of the riders militates strongly against an employment relationship, because it creates an opportunity for profit or loss on the part of the driver, based on the driver's skill and ability to impress riders.  *See Borello*, 48 Cal. 3d at 355.

        **(f)**        **Whether or not the work is part of the regular business of the principal.**

Lyft is a technology company that operates a mobile application-based platform that facilitates transactions between third parties offering rides and individuals seeking rides.[23]  By contrast, Cotter and Maciel were drivers, an entirely different business and occupation.  As is stated above, Lyft does not own  or lease vehicles that are used to provide rides to individuals in the ridesharing community.  Plaintiffs also admit that they supplied the instrumentalities (vehicles and smart phones) that allowed them to contract with riders in the ridesharing community.  Other courts have recognized this distinction in the principal business drivers and brokers in analogous situations.  In *Kubinec v. Top Cab*

---

[23] See Second Kirtikar Decl., Ex. A at 1; Ex. B at 1; Ex. C at 2; Ex. D at 1; Ex. E at 1; Ex. F at 1.

DEFENDANT LYFT, INC.'S MEM. OF P&A ISO MSJ AND OPPOSITION TO PLAINTIFFS' MSJ

*Dispatch, Inc.*, Case No. SUCV-201203082BLS1, 2014 WL 3817016 at *11 (Super. Ct. Mass. June 25, 2014), the Massachusetts Superior Court held that a defendant taxi cab company was not a passenger ride service, but was instead a referral service. Similarly, the California Court of Appeal has stated that the business of drivers can be considered a, "tangential aspect of the provision of brokering services." *See State Comp. Ins. Fund v. Brown*, 32 Cal. App. 4th 188, 203 (1995). The California DLSE has also reached the same conclusion. *See* Lyft RJN, Ex. A at 3. Accordingly, Lyft and the Plaintiffs are not in the same line of business.

**(g)      Whether or not the parties believe they are creating the relationship of employer-employee.**

While mere labels do not establish an independent contractor relationship, "'a lawful agreement between the parties expressly stating that the relationship created is that of independent contractor should not be lightly disregarded…'" *Hennigan*, 2014 WL 1600034, at *13 (citing *Missions Ins. Co. v. Workers' Comp. Appeals Bd.*, 123 Cal.App.3d 211, 226 (1981)); *Arnold*, 202 Cal.App.4th at 589-90 (factor supporting independent contractor status where both the plaintiff and the company "believed, at the time of her appointment, they were creating an independent contractor relationship and not an employee relationship."); *Rabanal*, 2013 WL 6020340, at *9. Here, the applicable contract – to which Plaintiffs agreed – states unambiguously that the relationship is that of independent contractor which comports with the Plaintiffs own beliefs about the fact that they were not in an employer-employee relationship with Lyft.

**B.      Plaintiffs' Claims Fail As A Matter Of Law Because They Were Not Employees.**

All claims Plaintiffs assert in the complaint are dependent entirely upon a finding that they were employees. The "First Claim" asserts violations of Business & Professional Code § 17200 based on alleged violations of Cal. Lab. Code § 351. *See* Third Am. Compl. at 20-21; *Prachasaisoradej v. Ralph's Grocery Co.*, 42 Cal.4th 217, 244 (2007). Cal. Lab. Code § 351 pertains solely to gratuities due to employees. Cal. Lab. Code §§ 350-351. The "Second Claim" for conversion is also based on the alleged Cal. Lab. Code § 351 violations, which again, only applies to employees. *See* Third Am. Compl. at 21. The "Third Claim" alleges violations of Cal. Lab. Code § 1194, Cal. Lab. Code § 1197, Cal. Lab. Code § 1197.1 and Wage Order No. 9 related to Lyft's alleged failure to pay minimum wage

to Plaintiffs and the putative class.  *Id.* at 22.  Again, minimum wage obligations exist only as to a

company's employees.  *See* Cal. Lab. Code § 1194, Cal. Lab. Code § 1197, Cal. Lab. Code § 1197.1

and Wage Order No. 9.  Plaintiff's "Fourth Claim" asserts claims under the Business & Professional

Code § 17200 based on alleged violations of the code sections and Wage Order relating to Lyft's

alleged failure to pay minimum wages to its employees.  *See* Third Am. Compl. at 26.  This "Fourth

Claim" is thus facially derivative of the "Third Claim."  The "Fifth Claim" alleges violations of Cal.

Lab. Code § 226 for alleged deficiencies on wage statements.  *Id.* at 24-25.  Cal. Lab. Code § 266 also

solely applies to employees.  Cal. Lab. Code § 266.  The "Sixth Claim" and "Seventh Claim" assert

violations of Cal. Labor Code § 2802 and derivative claims under Business & Professional Code §

17200, respectively, related to Lyft's alleged failure to reimburse its "employees."  *See* Third Am.

Compl. at 25-27.  Again, Cal. Labor Code § 2802 pertains solely to an employer-employee

relationship.  Finally, in their "Eighth Claim," Plaintiffs assert claims under the Private Attorney

Generals Act ("PAGA") alleging additional penalties based on the above claims.  *See* Third Am.

Compl. at 27.  Because no employment relationship existed as a matter of law, all of the claims in

Plaintiffs' Complaint must fail.

### C.    Plaintiffs Did Not Provide Services to Lyft.

Because Plaintiffs provides services only to Lyft riders, not to Lyft itself, they cannot be said to

be Lyft employees.  *Yellow Cab Coop., Inc. v. Workers' Comp. Appeals Bd.*, 226 Cal. App. 3d 1288,

1293 (1991) (to be considered an employee, plaintiff must have been providing a service to the

purported employer).  As the Terms of Service make clear, Lyft is not a transportation company, and

the only transportation services provided on the platform are by drivers to riders.[24]  As such, Plaintiffs

were not Lyft employees regardless of the degree of control exercised by Lyft.  *See Yellow Cab,* 226

Cal. App. 3d. at 1293; *Kubinec*, 2014 WL 3817016, at *10.

### D.    Plaintiffs' Motion for Summary Judgment Fails Because Cotter and Maciel's Evidence Largely Consists of Inadmissible Hearsay.

Plaintiffs have failed to present admissible evidence that supports their motion for summary

judgment.  Inadmissible evidence presented in support of a motion for summary judgment is subject to

---

[24] Second Kirtikar Decl., Ex. A at 1-2; Ex. B at 1; Ex. C at 2; Ex. D at 1-2; Ex. E at1-2; Ex. F at1-2.

DEFENDANT LYFT, INC.'S MEM. OF P&A ISO MSJ AND OPPOSITION TO PLAINTIFFS' MSJ

a timely objection and may be stricken.  Fed. R. Civ. Proc. 56(c)(2); *see FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 484 (9th Cir. 1991).  Declarations in support of summary judgment must be made on personal knowledge, set forth facts that would be admissible evidence and show that the declarant is competent to testify to the matters stated.  Fed. R. Civ. Proc. 56(c)(4).  Plaintiffs' counsel's declaration is insufficient in this regard.  As such, Lyft objects to the introduction of those records pursuant to Federal Rule of Evidence 802 on the grounds that the documents, and Plaintiffs' arguments citing to those documents, constitute inadmissible hearsay or opinions and should not be considered.  *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990).  The exhibits submitted by Plaintiffs that Lyft challenges are exhibits: J-R, V-X, Z-AA, XX-CCC, GGG, and III-SSS.

## IV.    CONCLUSION

For the foregoing reasons, Defendant Lyft, Inc. requests that the Court grant its motion for summary judgment, and deny Plaintiffs' motion.

DATED:  December 22, 2014                OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.


By:  /s/ Thomas M. McInerney
     Thomas M. McInerney
     Christopher M. Ahearn
     Alex Santana
     Attorneys for Defendant
     LYFT, INC.

19860736.1