Matthew D. Carlson (State Bar No. 273242)
Carlson Legal Services
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 817-1470
Email: mcarlson@carlsonlegalservices.com

Shannon Liss-Riordan (*Pro Hac Vice*)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone: (617) 994-5800
Email: sliss@llrlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| PATRICK COTTER and ALEJANDRA MACIEL, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>Lyft, Inc.,<br><br>    Defendant. | **Case No.: 3:13-cv-04065-VC**<br><br>**Hon. Vince Chhabria**<br><br>**REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY / OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing date: January 29, 2015<br>Time: 10:00 a.m.<br>Courtroom: 4 |

# TABLE OF CONTENTS

I.   SUMMARY OF THE PARTIES' EVIDENCE ................................................. 1

II.  REPLY ARGUMENT ................................................................................. 2

   A.   Lyft's Evidence Does Not Contradict Plaintiffs' Evidence that They Provided Services for Lyft. ................................................................. 3

   B.   The Undisputed Evidence Shows that Plaintiffs Were Lyft Employees. ................... 3

   C.   Lyft Offers No Evidence to Dispute That Plaintiffs Were Lyft Employees Under the Common Law Test of Employment. ........................... 3

      1.   Lyft Does Not Dispute that It Retains the *Right* to Control Drivers' Work. ........ 4

      2.   The Undisputed Facts Show that Drivers' Relationships With Lyft Bear the "Secondary Indicia" of an Employment Relationship. ...................... 13

   D.   Lyft Offers No Evidence that Would Allow a Reasonable Finder of Fact to Decide Plaintiffs Were Independent Contractors Under the IWC Test of Employment. ........................................................................... 18

   E.   Plaintiffs' Evidence Is Admissible. ......................................................... 19

   F.   If the Court Is Inclined to Deny Plaintiffs' Motion, It Should also Deny Lyft's Motion. ......................................................................................... 20

III. CONCLUSION .......................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Alexander v. FedEx Ground Package Sys., Inc.*,
   765 F.3d 981 (9th Cir. 2014) ...........................................................9, 11, 15

*Anand v. BP W. Coast Products LLC*,
   484 F. Supp. 2d 1086 (C.D. Cal. 2007) .................................................. 19

*Arena v. Delux Transp. Serv., Inc.*,
   3 F. Supp. 3d 1 (E.D.N.Y. 2014) ............................................................ 11

*Arnold v. Mut. of Omaha Ins. Co.*,
   202 Cal. App. 4th 580 (2011) ................................................................. 10

*Ayala v. Antelope Valley Newspapers, Inc.*,
   59 Cal. 4th 522 (2014) .....................................................................4, 5, 15

*Beaumont-Jacques v. Farmers Grp., Inc.*,
   217 Cal. App. 4th 1138 (2013) ............................................................... 10

*Bowerman v. Field Asset Serv., Inc.*, No.,
   2014 WL 4676611 (N.D. Cal. Sept. 17, 2014) ........................................ 10

*Crooks v. Glens Falls Indem. Co.*,
   124 Cal. App. 2d 113 (1954) ..................................................................... 4

*Donovan v. Sureway Cleaners*,
   656 F.2d 1368 (9th Cir. 1981) ................................................................ 16

*Dynamex Operations W., Inc. v. Superior Court*,
   2014 WL 5173038 (Cal. Ct. App. Oct. 15, 2014). ................................... 18

*Estrada v. FedEx Ground Package Sys., Inc.*,
   154 Cal. App. 4th 1 (2007). .................................................................... 16

*Gonzalez v. Workers' Comp. Appeals Bd.*,
   46 Cal. App. 4th 1584 (1996) ................................................................. 15

*Greenaway v. Workmen's Comp. Appeals Bd.*,
   269 Cal. App. 2d 49 (Ct. App. 1969) ........................................................ 4

*Guitierrez v. Carter Bros. Sec. Servs., LLC*,
   2014 WL 5487793 (E.D. Cal. Oct. 29, 2014) ............................................ 4

*Harris v. Vector Mktg. Corp.*,
   656 F. Supp. 2d 1128 (N.D. Cal. 2009) .................................................. 14

*Hennighan v. Insphere Ins. Solutions, Inc.*,
   2014 WL 1600034 (N.D. Cal. Apr. 21, 2014) ..............................11, 15, 17

*JKH Enterprises, Inc. v. Dep't of Indus. Relations*,
   142 Cal. App. 4th 1046 (2006) .............................................................9, 13

*Kubinec v. Top Cab Dispatch, Inc.*,
  2014 WL 3817016 (Mass. Super. Ct. June 25, 2014) ...................................... 17

*Maljack Prods., Inc. v. GoodTimes Home Video Corp.*,
  81 F.3d 881 (9th Cir. 1996) .............................................................................. 19

*Martinez v. Combs*,
  49 Cal. 4th 35 (2010)................................................................................... 3, 18

*Narayan v. EGL, Inc.*,
  616 F.3d 895 (9th Cir. 2010). ...................................................................... 2, 15

*Prime Ins. Syndicate, Inc. v. Damaso*,
  471 F. Supp. 2d 1087 (D. Nev. 2007).............................................................. 20

*Rabanal v. Rideshare Port Mgmt. LLC*,
  2013 WL 6020340 (Cal. App. 2 Dist. Nov. 14, 2013) ........................... 10, 15, 16

*Rosales v. El Rancho Farms*,
  2011 WL 6153276 (E.D. Cal. Dec. 12, 2011) .................................................. 11

*Ruiz v. Affinity Logistics Corp.*,
  887 F. Supp. 2d 1034 (S.D. Cal. 2012) ................................................. 14, 17, 18

*Ruiz v. Affinity Logistics Corp.*,
  754 F.3d 1093 (9th Cir. 2014) .......................................................................... 14

*S.G. Borello & Sons, Inc. v. Department of Industrial Relations*,
  48 Cal. 3d 341 (1989)..................................................................................... 4, 6

*Sahinovic v. Consol. Delivery & Logistics, Inc.*,
  2004 WL 5833528 (N.D. Cal. Sept. 14, 2004) ................................................. 20

*Saleem v. Corp. Transp. Grp. Ltd.*,
  2014 WL 4626075 (S.D.N.Y. Sept. 16, 2014) .................................................. 11

*Soremekun v. Thrifty Payless, Inc.*,
  509 F.3d 978 (9th Cir. 2007) ........................................................................... 20

*State Comp. Ins. Fund v. Brown*,
  32 Cal. App. 4th 188 (1995) ............................................................................ 17

*Toyota Motor Sales U.S.A., Inc. v. Superior Court*,
  220 Cal. App. 3d 864 (Ct. App. 1990) ............................................................... 9

*Yellow Cab Coop., Inc. v. Workers' Comp. Appeals Bd.*, 226 Cal. App. 3d 1288  (Ct. App.
  1991)......................................................................................3, 10, 12, 13, 17

*Yellow Taxi Co. of Minneapolis v. NLRB*,
  721 F.2d 366 (D.C. Cir. 1983)......................................................................... 11

**Statutes**

Cal. Bus. & Prof. Code § 17200 ................................................................. 18

Cal. Lab. Code § 1194 ............................................................................... 18

Cal. Lab. Code § 226 ................................................................................. 18

Cal. Lab. Code § 2802 ............................................................................... 18

Cal. Lab. Code § 351 ................................................................................. 18

**Rules**

Fed. R. Evid. 801 ...................................................................................... 20

Fed. R. Evid. 901 ...................................................................................... 20

## I.   SUMMARY OF THE PARTIES' EVIDENCE

Plaintiffs' Motion for Summary Judgment as to Liability requests a ruling that, as a matter of law, Defendant Lyft, Inc. ("Lyft") misclassified Plaintiffs as independent contractors instead of employees. In support of their Motion, Plaintiffs offer the following evidence:

Lyft retains the *right* to control numerous aspects of its Drivers' work, including:

(1) *whether and when* Drivers are permitted to work for Lyft, pursuant to Lyft's right to terminate their relationship at any time, Lyft's ability to shut down the Lyft Platform at its discretion, Lyft's "Passenger Rating," pursuant to which Drivers are deactivated for falling below what Lyft considers its "community standard," and Lyft's "Hours System" and supply and demand models (Plfs.' Mot. S.J. at pp. 2-6) (citing evidence);

(2) *how* Drivers are required to perform their work, pursuant to Lyft's Driver Guide, Rules of the Road, FAQs, and other policies that restrict Drivers' ability to choose how to perform their work, which is consistent with ensuring that Lyft can maintain and promote the integrity of its "brand" (*id. at* pp. 6-11) (citing evidence); and

(3) *who* Drivers are permitted to pick up per Lyft's "Cancellation Rating," pursuant to which Lyft deactivates Drivers who cancel rides after accepting them, and per Lyft's "Acceptance Rating," pursuant to which Drivers are punished for declining a ride (*id.* at p. 11) (citing evidence).

Plaintiffs also offer undisputed evidence that a Driver's job function is indistinct from Lyft's business: Lyft's sole source of income is Riders' payments for Drivers' service, Lyft cannot survive without its Drivers' service, and Lyft actively participates in the cultivation of its Rider market. (*Id.* at p. 12, pp. 6-11 (citing evidence)). Further, the California Public Utilities Commission ("CPUC") determined that Lyft is a transportation company, (*id.* at p. 11 (citing evidence), and Lyft *admits* that it is a "transportation model." (Supplemental Decl. of Matthew D. Carlson ("Carlson Supp. Decl.") at **Exhibit UUU**.)

Additionally, Plaintiffs offer undisputed evidence that Drivers are not required to have

any special skill above and beyond that required to obtain a driver's license. (Plfs.' Mot. S.J. at p. 12 (citing evidence).) It is also uncontroverted that Lyft provides Drivers with the instrumentalities necessary to perform their work, including, *inter alia*, the Lyft Platform, without which individuals cannot drive for Lyft. (*Id* (citing evidence).) Plaintiffs' undisputed evidence also shows that Drivers are paid pursuant to Lyft's non-negotiable formula on a weekly basis. (*Id.* at pp. 12-13 (citing evidence).) Lastly, there is no dispute that Lyft supervises Drivers *constantly* while they are driving (*id.* at p. 13 (citing evidence)), and that Lyft "discourages" Drivers from driving for competitors and retains the right to terminate Drivers who do so. (*Id.* at p. 14 (citing evidence).)

Lyft does not dispute a *single* fact set forth in Plaintiffs' Motion. Instead, Lyft primarily offers evidence that Plaintiffs were not, in some circumstances, *actually* subject to Lyft's control over their work. (Def.'s Mot. S.J. at pp. 4-9.) As discussed below, Lyft's *actual* exercise of control over Plaintiffs' work is immaterial; rather, Lyft's *right* to exercise that control is the relevant inquiry.

Accordingly, Lyft fails to carry its burden on its cross-Motion for Summary Judgment, and also fails to rebut Plaintiffs' evidence in support of their Motion. Summary judgment as to liability should, therefore, be granted to Plaintiffs.

## II.       REPLY ARGUMENT

When a plaintiff contends he or she was misclassified as an independent contractor, the plaintiff must show that he or she provided services for the putative employer, after which the burden shifts to the putative employer to prove that plaintiff was an independent contractor. *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010).

Summary judgment as to liability in Plaintiffs' favor is appropriate if there is no genuine issue as to any material fact and that Plaintiffs show they are entitled to a judgment as a matter of law. *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1075 (9th Cir.2011); Fed.R.Civ.P. 56(a).

**A.     Lyft's Evidence Does Not Contradict Plaintiffs' Evidence that They Provided Services for Lyft.**

Lyft argues that because its Terms of Service ("TOS") states that Lyft is "not a transportation company," Lyft rides are a service provided only for Riders, not Lyft itself. This is essentially the same superficial argument advanced and rejected in *Yellow Cab Coop., Inc. v. Workers' Comp. Appeals Bd.*, 226 Cal. App. 3d 1288 (Ct. App. 1991). The *Yellow Cab* court dismissed Yellow Cab's contention that it was in the business of "merely leasing vehicles" because the argument was undermined by the facts that (1) the company could not survive without its drivers, (2) it cultivated the passenger market by instructing drivers in "service" and "courtesy," by requiring drivers to keep their vehicles clean, and by marking their drivers' vehicles with distinctive painting, and (3) it processed requests for service through its dispatch system. *Id.* at 1293, 1297.

Like Yellow Cab, Lyft's sole source of income is generated by rides provided by Drivers. Like Yellow Cab, Lyft participates in the cultivation of the passenger market by, for example, telling its Drivers, in detail, how to interact with the public and by requiring Drivers to place Lyft's distinctive "mustache" trade dress on their vehicles. Requests for rides are processed through the Lyft Platform. Lyft's "mission" is the "service of rides," it admits it is a "transportation model," and the CPUC identifies Lyft as a "transportation company." Accordingly, there is no genuine dispute that Plaintiffs provided services for Lyft.

**B.     The Undisputed Evidence Shows that Plaintiffs Were Lyft Employees.**

In a wage and hour action, an employer-employee relationship may exist pursuant to either the common law definition of employment, or the California Industrial Welfare Commission ("IWC") definition of employment. *Martinez v. Combs*, 49 Cal. 4th 35, 69 (2010). Under either test, the uncontroverted evidence shows Plaintiffs were Lyft employees.

**C.     Lyft Offers No Evidence to Dispute That Plaintiffs Were Lyft Employees Under the Common Law Test of Employment.**

Under the common law, "[t]he principal test of an employment relationship is whether

the person to whom service is rendered has the *right* to control the manner and means of accomplishing the result desired." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 531-32 (2014) (emphasis added) (*citing S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341, 350 (1989)). Additionally, courts consider certain "secondary indicia" of an employment relationship, described below and in the parties' previous briefing. *Id.*

### 1.   Lyft Does Not Dispute that It Retains the *Right* to Control Drivers' Work.

Lyft devotes much of its briefing to its *actual* exercise of control, or lack thereof, over Plaintiffs' work. However, as Lyft acknowledges (but then disregards), what matters under the common law test of employment is "how much control the hirer retains the *right* to exercise." *Ayala*, 59 Cal. 4th at 533 (emphasis in original) (*see* Def's Mot. S.J.. at p. 12). The putative employer's *actual* exercise of control is immaterial. *Guitierrez v. Carter Bros. Sec. Servs., LLC*, 2014 WL 5487793, at *4 (E.D. Cal. Oct. 29, 2014) ("[W]hen evaluating the employer's right to control, **what matters is how much control the hiring entity retains the right to exercise, *not* how much control that entity *actually* exercises**.") (*citing Ayala*, 59 Cal. 4th at 533) (emphasis added); *Greenaway v. Workmen's Comp. Appeals Bd.*, 269 Cal. App. 2d 49, 57 (Ct. App. 1969) ("While the controller does not always exercise his right to act, the power to act is complete. *It is not the fact of actual interference and control, but the right to interfere that makes the difference between an independent contractor and an employee*.") (emphasis added); *Crooks v. Glens Falls Indem. Co*., 124 Cal. App. 2d 113, 121 (1954) ("An employee is subject to control...when the employer has the right to control, whether or not such control is being exercised at the moment.") (emphasis added).

Here, Lyft offers evidence that it did not *in fact* exercise control over when Plaintiffs worked, whom they picked up, and where they drove (Def's Mot. S.J. at 4-9). This overlooks the uncontroverted evidence that Lyft retains the *right* to control these, and other, aspects of Drivers' work:

//

a.   *Lyft does not dispute that it retained the right to control whether and when Drivers work for Lyft.*

Lyft does not dispute that it retains the right to control whether Drivers work pursuant to its ability to terminate its relationship with Drivers at any time, for any or no reason, and without explanation, per its TOS. Rather, Lyft attempts to discount the importance of its TOS's termination provision by relying on two appellate court decisions from 2011 and 2013 despite a 2014 decision from the California Supreme Court that states, "[p]erhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.'" *Ayala*, 59 Cal. 4th at 531. Indeed, there is a mutual ability to terminate or quit at will in *all* employment relationships. What *Ayala* emphasized is that a putative employer's ability to terminate at will and at its discretion ensures that workers will do their jobs the way the employer wants, thereby vesting complete control with the employer. This is precisely how Lyft operates – it requires its Drivers to provide Lyft rides in a certain manner, and if a Driver does not provide rides in this manner, Lyft may elect to terminate the relationship, and in many exercises that right. In fact, Plaintiff Cotter was terminated because he used a substitute vehicle, which violated Lyft's "rules."

Nor does Lyft dispute that it has the ability to unilaterally shut down the Lyft Platform, thus preventing Drivers from working for Lyft. Rather, Lyft "explains" that this right is necessary to perform "regular maintenance" on the Lyft Platform. Lyft's "explanation" is beside the point – its ability to shut down the Platform at its discretion gives it the unilateral right to prevent Drivers from working.

Lyft also does not dispute that Drivers are terminated for having a Passenger Rating that falls below Lyft's "community standard," which Lyft may adjust as it sees fit. (*See* Exh. I, Kirtikar dep. at 82:7-84:17.) Rather, Lyft contends that its Passenger Rating is a mere "tool[] for ensuring that drivers and riders have the best experience possible." That may be Lyft's intent, but a company's ability to terminate its workers based on complaints from passengers is

strong evidence of an employment relationship. *Yellow Cab*, 226 Cal. App. 3d at 1298. In fact, Plaintiff Maciel was terminated based on passenger complaints and a resulting Passenger Rating that fell below Lyft's "community standard."

Further, Lyft does not argue that its Hours System and supply and demand models do not work as described, or argue that it does not retain the right to use its Acceptance and Reliability Ratings to determine which Drivers receive priority for hours during which the supply of Drivers meets or exceeds the demand from Riders.[1] Lyft does not dispute that Drivers may be precluded from working for Lyft *at all* as a result. While Plaintiffs were typically able to drive when they wanted, they were only able to do so because they were fortunate – they apparently wanted to work during hours in which Lyft Drivers were not in oversupply. At any time, however, Plaintiffs were subject to Lyft's ability to prevent them from driving during particular hours pursuant to its supply and demand analysis. Indeed, Plaintiff Cotter testified that he was unable to drive during certain hours. (*See* Exh. C, Cotter dep. at 160:13-161:20.)

In short, Lyft's primary argument as to why its Drivers are not employees is that, it claims, they can work whenever they want, and for as much or as little time as they want. As described above, Plaintiffs have offered undisputed evidence that Lyft does retain control over whether and when Drivers can work. In any event, this evidence may well be beside the point because in *Borello*, 48 Cal. 3d at 347, the California Supreme Court ruled that workers were employees regardless of the fact that they chose when and how much to work.

   b. *Lyft does not dispute that it retains the right to control how Drivers perform their work.*

Lyft does not *once* mention, much less dispute, that it controls how Drivers perform

---

[1] Lyft argues that its Acceptance and Reliability Ratings, like its Passenger Rating, are mere "tools for ensuring that drivers and riders have the best experience possible." This is no doubt the reason why Lyft uses these tools, but it is not a valid defense to Plaintiffs' contention that they were misclassified. These metrics are used as "tie-breakers" to determine which Drivers get "preference" when the supply of drivers meets or exceeds demand, and therefore operate as a control on whether and when Drivers can work for Lyft. Moreover, these "tools" are consistent with many employers' use of policies intended to enhance customer service.

their work through its Driver Guide, Rules of the Road, and FAQs. These instructions govern *every aspect* of how Drivers must interact with and present themselves to passengers. Several examples include:

- Drivers are precluded from answering their telephones during a Lyft ride, even with hands-free technology. (Exh. DD.)

- Drivers are prohibited from providing Lyft rides in vehicles that smell like smoke. (Exh. GG.)

- Drivers are required to keep the insides of their vehicles "100% clear." (Exh. LL.)

- Drivers are required to have music playing when a Rider enters the vehicles. (Exh. OO.)

Lyft also does not dispute that when it is informed that a Driver is in violation of these rules, it retains the right to take adverse action against Drivers, and in many cases does so.

In fact, the closest Lyft comes to addressing its Guide, Rules of the Road, and FAQs is contending that it did not dictate Plaintiffs' routes. While Lyft does not require its Drivers to take Lyft-mandated routes, Lyft requires Drivers to either ask a Rider for his or her preferred route, or, if there is no preferred route, use GPS software for navigation. Thus, Lyft takes decision of what route to take on a Lyft ride out of its Drivers hands. Lyft similarly argues that its 60-mile geographical limitation on rides on did not specifically impact Plaintiffs. However, there is no dispute that this distance restriction exists; the actual impact of this control on Plaintiffs is irrelevant.

    c.  *Lyft does not dispute its other controls over the manner and means of its Drivers' work.*

Lyft does not contradict evidence that Drivers are required to use a "non-commercial," year 2000 or newer, four-door vehicle while driving for Lyft. Nor does it dispute that Drivers are prohibited from transporting Riders with any vehicle other than the vehicle registered with Lyft, or that they are unable to hire subcontractors or employees of their own to drive for Lyft. It does not dispute that Drivers cannot accept cash, and cannot accept Lyft rides without using the Lyft Platform.

d.  *Lyft does not dispute that it retains the right to control who drivers are permitted to pick up.*

Lyft makes much of the fact that its TOS permits Drivers to decide which rides to accept, and Plaintiffs' testimony to the same effect. However, Lyft overlooks the undisputed fact that it retains the right to impose (and in many instance does impose) negative *consequences* for declining or canceling a ride request. Specifically, Drivers who do not accept a sufficient number of requests are less likely to be allowed to drive during hours in which there is an oversupply of available Lyft Drivers. Drivers who have a high "Cancellation Rating" are terminated. These negative consequences arising from a Driver's decision not to pick up a potential Rider operate as a restriction on Drivers' work; that Plaintiffs did not *actually* suffer these consequences is irrelevant.

e.  *Lyft does not dispute that its control over the manner and means of its Drivers' work is essential to promoting the Lyft "brand."*

Lyft argues that simply because its TOS does not acknowledge that Lyft uses its control over Drivers to promote the Lyft "brand," it follows that Lyft does not use its control over Drivers to promote the Lyft "brand." This circular argument is undercut by substantial evidence, including both deposition testimony and documentary evidence that Lyft's controls are in place in order to provide a "Perfect Lyft" and to ensure the "best possible [Lyft] experience." (*See* Def.'s Mot. S.J. at p. 7.)

Lyft's attempt to downplay the significance of the relationship between protection of its brand and regulation of its Drivers is unavailing. Lyft's "brand" is essential to existence and its ongoing struggle to maintain a foothold in its industry. Its drivers are the ambassadors of its brand, and the public face of the company. It follows that Lyft must ensure that its Drivers represent the brand Lyft wishes to portray. It can only do so by implementing strict rules regarding how its Drivers act while driving for Lyft. This intuitive premise was acknowledged during depositions, and is further supported by uncontroverted substantial documentary evidence that shows Lyft takes adverse action – up to termination – against Drivers who do not

comply with its "Rules" or FAQs, such as Plaintiff Cotter.

> f.    *Lyft's reliance on its TOS to demonstrate its lack of control over drivers is superficial and undermined by the undisputed evidence.*

Lyft also contends that because its TOS does not explicitly reserve the right for Lyft to control its Drivers' work, it does not control its Drivers' work. (Def.'s Mot. S.J. at p. 11.) California courts have long held that the attempt to conceal employment by formal documents purporting to create other relationships is to be disregarded whenever the parties' actions are inconsistent therewith. *Toyota Motor Sales U.S.A., Inc. v. Superior Court*, 220 Cal. App. 3d 864, 877 (Ct. App. 1990). Plaintiffs' undisputed evidence shows that Lyft has the right to control numerous aspects of the manner and means of its Drivers work, as described herein.

> g.    *Lyft does not dispute that it retains <u>necessary</u> control over Drivers' work.*

Lyft acknowledges that a company need only retain the right to exercise "all *necessary* control" over a worker's means of accomplishing the desired result in order to qualify as an employer. (Def.'s Mot. S.J. at p. 12 (*citing Alexander v FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 991 (9th Cir. 2014) (emphasis in original); *see also JKH Enterprises, Inc. v. Dep't of Indus. Relations*, 142 Cal. App. 4th 1046 (2006) ("By obtaining the clients in need of the service and providing the workers to conduct it, JKH retained all necessary control over the operation as a whole...even in the absence of JKH exercising control over the details of the work...).

However, Lyft fails to analyze this principle. The amount of *necessary* control Lyft must exercise over its Drivers to accomplish its "mission" of "providing rides" is minimal: like JKH, Lyft need only obtain Drivers to drive and Riders that need transportation. By its own admission and argument, this is what Lyft does: "the Lyft Platform provides a means to enable persons who seek transportation to certain destinations ("Riders") to be matched with persons driving to or through those destinations ("Drivers"). (Def.'s Mot. S.J. at p. 3.) Setting aside the substantial evidence of Lyft's right to control the details of Drivers' work, its right to exercise

*necessary* control over that work is sufficient to find Plaintiffs were employees as a matter of law.

> h.     *Lyft's authority regarding its "control" argument is distinguishable.*

Lyft ignores entirely *Yellow Cab Coop., Inc. v. Workers' Comp. Appeals Bd.*, 226 Cal. App. 3d 1288 (Ct. App. 1991), described in detail in Plaintiffs' opening papers, and which provides the closest comparison to this case (*see* § II(C)(1)(i), *infra*). Instead, Lyft cites to cases that are distinguishable:

- *Beaumont-Jacques v. Farmers Grp., Inc.*, 217 Cal. App. 4th 1138, 1145 (2013): employer did not retain the right to control the means by which the worker performed and accomplished her duties as a district manager. Here, Lyft retains the right to control nearly every aspect of how its Drivers perform their work through its Rules and FAQs.

- *Arnold v. Mut. of Omaha Ins. Co.*, 202 Cal. App. 4th 580, 589 (2011): plaintiff used own judgment in determining whom she would solicit for business, and the time, place, and manner in which she would solicit. Her performance was not evaluated except for a "minimal performance requirement," and she was required to pay a fee for defendant's workspace and telephone service. Here, Lyft Drivers cannot solicit Lyft Riders, the manner of their work is dictated by Lyft's Rules and FAQs, their performance is evaluated after every ride, and they do not have to pay Lyft to use the Lyft Platform.

- *Rabanal v. Rideshare Port Mgmt. LLC*, 2013 WL 6020340 (Cal. App. 2 Dist. Nov. 14, 2013): drivers independently determined how to perform their jobs (*i.e.* by modifying their routes and order of their routes) and decided when they wanted to work. They could ask another driver to fill in for a fare already accepted from dispatch. Here, Lyft Drivers are subject to Lyft's controls over when they can work, are constrained by Lyft's Rules and FAQs with respect to how they work, and cannot decline or cancel rides without negative consequence. Nor are they permitted to choose their own routes, or use a substitute driver.

- *Bowerman v. Field Asset Serv., Inc.*, No., 2014 WL 4676611, at *4-5 (N.D. Cal. Sept. 17, 2014): plaintiffs owned an independent business entity that negotiated a contract with defendant, with approximately 36 employees, 15 subcontractors, and a number of day laborers. They were able to accept or decline work without consequence, and defendant did not have the right to control how they worked. Here, Lyft Drivers are subject to a non-negotiable TOS, are punished for declining rides, are terminated for canceling rides, are subject to tight controls

over the manner and means of their work. Drivers are not permitted to hire employees or subcontractors to assist with their work for Lyft.

- *Yellow Taxi Co. of Minneapolis v. NLRB*, 721 F.2d 366, 374-78 (D.C. Cir. 1983): drivers were not subject performance standards, could work at any time without restriction, could reject calls without consequence, and could cultivate business. Here, Lyft terminates Drivers who do not meet performance standards, regulates when Drivers can drive, takes adverse action against Drivers who decline or cancel rides, and prohibits Drivers from cultivating business by requiring them to pick up Riders through the Lyft Platform.

*Hennighan v. Insphere Ins. Solutions, Inc.*, 2014 WL 1600034, at *8 (N.D. Cal. Apr. 21, 2014) does not aid Lyft because that court specifically noted "the parties [] presented little evidence about what pure *rights* [defendant] ha[d] over its sales agents." (Emphasis added.)

In addition, Lyft's reliance on New York district court cases is misplaced, as New York law focuses on the degree of control *actually* exercised. *Saleem v. Corp. Transp. Grp. Ltd.*, 2014 WL 4626075, at *8 (S.D.N.Y. Sept. 16, 2014) ("the critical inquiry in determining whether an employment relationship exists [under the New York Labor Law] pertains to the degree of control *exercised* by the purported employer over the results produced or the means used to achieve the results") (emphasis added); *Arena v. Delux Transp. Serv., Inc.*, 3 F. Supp. 3d 1, 10-11 (E.D.N.Y. 2014) (same). Lyft's reliance on *Rosales v. El Rancho Farms*, 2011 WL 6153276, at *14-16 (E.D. Cal. Dec. 12, 2011) is also misplaced because it analyzed a "joint employment" theory, not misclassification, and did not consider the extent of the defendant's right to control the manner and means of plaintiffs' work.

Lastly, Lyft asserts that Plaintiffs rely on *Alexander* to support their "control" argument. They do not. In any event, the FedEx drivers share facts in common with Plaintiffs, in that that FedEx limited when drivers could work, assessed whether its drivers met FedEx's "standards," and required drivers to identify their vehicles as FedEx vehicles. *Id.* at 983. Further, while *Alexander* provides a useful discussion of the common law test of employment, it does not set forth a *minimum* amount of control necessary for workers to prevail in a case like this.

*//*

i.      *Lyft ignores the most factually analagous case to this one,* Yellow Cab.

Lyft does not *once* discuss or attempt to distinguish Plaintiffs' primary authority on the issue of "control," *Yellow Cab*, *supra*. In *Yellow* Cab, a California court of appeal reached the conclusion that a Yellow Cab driver was misclassified as independent contractor instead of an employee. *Yellow Cab*, 226 Cal. App. 3d at 1298. The factual similarities with respect to the control exercised by Yellow Cab and Lyft are striking:

- Yellow Cab drivers were instructed on matters of behavior toward the public and keeping their cabs clean;

- Yellow Cab drivers were given "general rules of good driving behavior";

- Yellow Cab drivers were subject to adverse action for refusing a call from dispatch, which was "apparently designed to coerce drivers into accepting assignments";

- If Yellow Cab drivers violated the "rules" they "could be 'written up'";

- Yellow Cab drivers' leases could be terminated based on write-ups or complaints by passengers;

- Yellow Cab controlled drivers' hours by assigning shifts so that it could lease each cab to more than one driver in one day; and

- Yellow Cab prevented drivers from driving for competitors.

In light of these facts, the Court found that Yellow "had an obvious interest in the driver's performance *as drivers*. To protect that interest, it treated them as employees." *Id.*

Here,

- Lyft Drivers are instructed on matters of behavior toward the public and keeping their vehicles clean (Plfs.' Mot. S.J. at pp. 6-9 (citing evidence));

- Lyft Drivers are given rules of good driving behavior (Lyft's Guide, Rules of the Road, and FAQs) (*id.*);

- Lyft Drivers are subject to adverse action if they decline a ride or cancel a ride after it is initially accepted (Plfs.' Mot. S.J. at p. 11 (citing evidence));

- Lyft takes adverse action against drivers who violate its "rules" or FAQs (Plfs.' Mot. S.J. at pp. 13-14) (citing evidence));

- Drivers are terminated when their "Passenger Rating" – assigned to Drivers on a

scale of one through five stars by Riders following each ride – falls below Lyft's "community standard" (Plfs.' Mot. S.J. at p. 3 (citing evidence);

- Lyft controls Drivers' hours through its "Hours System" and its supply and demand models, which ensures there are not too many Drivers on the road at one time; (Plfs.' Mot. S.J. at pp. 3-6 (citing evidence)); and

- Lyft discourages, and retains the right to terminate, Drivers who work for competitors (Plfs.' Mot. SJ. At pp. 14-15 (citing evidence)).

Further, Lyft imposes even more significant controls on its Drivers than Yellow Cab did on its drivers. Its "Rules of the Road" and FAQs govern Drivers behavior down to remarkably minute details, whereas Yellow Cab set forth only "general" rules. Lyft also requires Drivers to use Lyft-approved vehicles that do not resemble "commercial" vehicles and which must have four doors. Drivers cannot use substitute vehicles and cannot hire their own employees or subcontractors to drive for Lyft. They cannot pick and choose the routes that they wish to take while transporting Riders.

In sum, like Yellow Cab, Lyft has an interest in its Drivers' performance – specifically, maintenance of the Lyft brand. And to protect that interest, it controls its Drivers' work and, therefore, treats its Drivers as employees.

## 2. The Undisputed Facts Show that Drivers' Relationships With Lyft Bear the "Secondary Indicia" of an Employment Relationship.

### a. The undisputed facts show that Drivers are not engaged in a business distinct from Lyft's business while working for Lyft.

Lyft argues that Plaintiffs "were engaged on their own" while working for Lyft because they "were not providing services to Lyft or to Lyft 'customers.'" (Def.'s Mot. S.J. at pp. 19-20.) This conclusory argument fails because, as described above, Lyft could not exist without Drivers' service. *See JKH Enterprises, Inc.*, 142 Cal. App. 4th at 1054 (individuals are not engaged in a "distinct business" when their work is "the basis for" the putative employer's business). Lyft's argument that Riders are not Lyft's customers is also wrong – Riders pay Lyft, which remits a portion of that payment to Drivers. Moreover, Lyft prohibits Drivers from hiring employees or subcontractors to drive for Lyft and from using multiple vehicles to drive for Lyft,

and therefore Drivers cannot grow their Lyft "business." Drivers are also precluded from growing their Lyft business because they can only accept rides through the Lyft Platform. *Cf. Ruiz*, 754 F.3d at 1103-04.

Additionally, *while working for Lyft*, Drivers are effectively precluded from working for competitors, or any business, because they are subject to adverse action if they do not accept all ride requests. Though Lyft contends that Drivers are not precluded from "simultaneously" using the Lyft Platform and similar applications offered by competitors Uber and Sidecar (though it does admit to "discouraging" it), Lyft Drivers cannot, as a practical matter, provide a ride for a Lyft Rider and a rider for another car service at the same time. The fact that Plaintiffs were free to do as they pleased while *not* working for Lyft is immaterial. *Ruiz v. Affinity Logistics Corp.*, 887 F. Supp. 2d 1034, 1044 (S.D. Cal. 2012) *rev'd and remanded on other grounds*, 754 F.3d 1093 (9th Cir. 2014). These facts also distinguish this case from *Harris v. Vector Mktg. Corp.*, 656 F. Supp. 2d 1128 (N.D. Cal. 2009), as the plaintiff there was able to maintain full time jobs at the same time she performed services for defendant. *Id.* at 1139. Accordingly, the uncontroverted facts show that this factor weighs in Plaintiffs' favor.

> b.   *The undisputed facts show that Drivers' were supervised at all times and that their work is not work ordinarily performed by a "specialist."*

Lyft incorrectly claims its Drivers have "virtually no supervision." (Def.'s Mot. S.J. at p. 20.) To the contrary, Lyft informs its Drivers that it is "is always monitoring" them, and Lyft implements strict behavioral controls on Drivers per its Rules and FAQs. Lyft also deactivates Drivers who do not meet its "community standard," a metric that is assessed after *every* ride.

Lyft also disregards the fact that Lyft Drivers are required only to have a driver's license and pass a background check. Lyft has no minimum education requirements, nor does it require Drivers to take special driving classes. In other words, Lyft Drivers' sole job function is mere driving, which is not work performed by a "specialist." *Ruiz*, 754 F.3d at 1104. Accordingly, the undisputed facts show that this factor also weighs in Plaintiffs' favor.

     c.     *The undisputed facts show that Drivers are not required to have any skill except the ability to drive in order to work for Lyft*

Lyft fails to analyze this factor, which is "is often of almost conclusive weight." *Ayala*, 59 Cal. 4th at 539. There is no dispute that the only skill required of Lyft Drivers is the ability to drive, and therefore this factor weighs in Plaintiffs' favor. *Narayan*, 616 F.3d at 903.

     d.     *The undisputed facts show that Lyft provides Drivers with the instrumentalities essential to perform their work.*

Lyft argues that this factor weighs in its favor because Drivers supply their own vehicles. However, the Lyft Platform – provided by Lyft – is equally essential. Lyft also furnishes its Drivers with extra automobile insurance, a pink mustache, a phone mount, a phone charger, all of which are *required* in order to drive for Lyft.

Lyft's authority on this point is, therefore, distinguishable. In *Hennighan* and *Rabanal*, plaintiffs were not provided with *any* "necessary instrumentalities of his job." *Hennighan*, 2014 WL 1600034, at *13; *Rabanal*, 2013 WL 6020340, at *7. The *Rabanal* court also specifically noted that drivers paid for their own insurance. Lyft's reliance on *Alexander*, 765 F.3d at 995, undermines its position, as that court stated "numerous California cases find employee status even though the employee provides his own vehicle or tools." *See also* Plfs.' Mot. S.J. at pp. 22-23 (citing cases) Accordingly, this factor supports a finding that Plaintiffs were Lyft employees.

     e.     *The undisputed facts show that Drivers' work for Lyft is not for a predetermined, finite duration.*

Lyft's analysis of this factor focuses on the significance of its right to terminate its relationship with Drivers at will. While Lyft improperly discounts the significance of this fact, it also misses relevant inquiry, which is whether the relationship exists for a finite duration. *Gonzalez v. Workers' Comp. Appeals Bd.*, 46 Cal. App. 4th 1584, 1594 (1996) (a "true independent contractor relationship" exists for a "finite time of service."). Because Lyft acknowledges "Plaintiffs' contractual relationship with Lyft was for an indefinite period."

1

2

(Def.'s Mot. S.J. at p. 21), there is no dispute that this factor weighs in Plaintiffs' favor.

3

   f.   *The undisputed facts show that Drivers are paid by Lyft on a weekly basis pursuant to Lyft's non-negotiable formula.*

4

5

Lyft argues that because its Drivers are purportedly "paid by the ride," this factor

6

weighs in its favor. In fact, Lyft Drivers are *not* paid by the ride. As discussed in *Rabanal*, pay

7

"by the ride" suggests that a driver is paid when he or she collects money from passengers at

8

the conclusion of the ride. *Rabanal*, 2013 WL 6020340, at *2. In contrast, where drivers are

9

paid by formula – even when that formula includes payments based on the number of rides

10

provided – this factor weighs in favor of employee status. *Estrada v. FedEx Ground Package*

11

*Sys., Inc.*, 154 Cal. App. 4th 1,7 (2007).

12

Here, Drivers are paid pursuant to Lyft's non-negotiable formula on a weekly basis.

13

Drivers do not collect money from Riders; Riders instead pay Lyft, which pays Drivers on a

14

weekly basis via direct deposit. And while Drivers' payments may vary based on their ability to

15

"impress" Riders, their payments were, at all relevant times, primarily dictated by Lyft's

16

"suggested donation," which is based on the time and distance of a ride. (Carlson Supp. Decl.,

17

**Exhibit VVV**.) Pursuant to that formula, Drivers' payments typically vary only modestly from

18

that figure. (Carlson Supp. Decl., **Exhibits WWW**, **XXX** (records of payments made to

19

Plaintiffs) (*see* "donation" versus "recommended" columns).) Moreover, Lyft can change the

20

percentage of the total payment remitted to Drivers at its discretion, *see* Exh. J at p. 2, and

21

Drivers cannot increase their profits by hiring employees to drive for Lyft. This pay method,

22

governed primarily by Lyft, is not the sort of exposure to profit or loss that suggests an

23

independent contractor relationship. *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1372 (9th

24

Cir. 1981) (where business sets "the major factors determining profit" and where workers "are

25

economically dependent upon" that business, this factor weighs in favor of employment status).

26

   g.   *The undisputed facts show Drivers' work is a regular part of Lyft's business.*

27

28

Drivers are considered a "regular part of the principal's business" when a company

cannot be in business without them. *Ruiz*, 754 F.3d at 1105 ("Without drivers, Affinity could not be in the home delivery business.") As described above, Lyft cannot be in business without its Drivers, as its income is exclusively derived from rides provided by Lyft Drivers. Lyft admits that it is a "transportation model," and a 2013 decision from the CPUC found that is, in fact, a "transportation company."

Nonetheless, Lyft likens itself to the defendants in *Kubinec v. Top Cab Dispatch, Inc.*, 2014 WL 3817016 (Mass. Super. Ct. June 25, 2014) and *State Comp. Ins. Fund v. Brown*, 32 Cal. App. 4th 188 (1995), wherein the companies at issue were characterized as mere "brokers" of services. However, in *Kubinec*, Top Cab generated no revenue from passenger rides. *Kubinec*, 2014 WL 3817016, at *11. In *Brown*, the court did not know the "exact nature" of the defendant, a freight brokering company. *Brown*, 32 Cal. App. 4th at 196. There was no evidence in *Brown* that the company survived exclusively on revenues generated by its drivers, that the company cultivated the market of those who needed freight shipped, or that the company instructed its drivers on how to interact with the public. *Cf. Yellow Cab*, *supra*.

Additionally, the Labor Commissioner's July 19, 2012 opinion that Lyft competitor Uber is "engaged in technology and not in the transportation industry" is inapposite because in that case, the Uber driver, *admitted* that Uber is not a transportation carrier, and that it merely provided the software which connects drivers with parties seeking transportation. (Def.'s RJN, Exh. 7, p. 2.).[2]

> h.   *The parties' subjective beliefs regarding their relationship should be ignored in light of the actual nature of their relationship.*

Lyft's own district court authority acknowledges that when the parties act inconsistently with an independent contractor relationship, "mere labels" are immaterial. *Hennighan*, 2014 WL 1600034, at *14. Moreover, the Ninth Circuit's more recent decision in *Ruiz* emphasizes

---

[2] This opinion, resulting from a *pro se* complaint, was not appealed and deserves no deference with respect to the issues presented in this Motion. The Labor Commissioner has not, in any respect, announced a policy decision that all so-called "ridesharing" companies are not employers of their drivers.

"the label that parties place on their employment relationship 'is not dispositive and will be ignored if their actual conduct establishes a different relationship.'" *Ruiz*, 754 F.3d at 1101. The parties' undisputed *actual* conduct here establishes an employer-employee relationship.

**D.   Lyft Offers No Evidence that Would Allow a Reasonable Finder of Fact to Decide Plaintiffs Were Independent Contractors Under the IWC Test of Employment.**

Lyft does not address Plaintiffs' argument that they were alternatively engaged in an "employment relationship" pursuant to the three definitions of "employment" set forth by the IWC: "(a) to exercise control over the wages, hours or working conditions, or (b) to suffer or permit to work, or (c) to engage, thereby creating a common law employment relationship." *Martinez*, 49 Cal. 4th at 64 (2010).

In addition to the facts set forth above regarding the common law employment relationship between Lyft and its Drivers, Lyft does not – and cannot – dispute that it "suffer[s] or permit[s]" its Drivers to work. This broad, "employee-centric" test requires only the showing that alleged employer "had the power to either cause [the worker] to work or prevent [the worker] from working." *Futrell v. Payday California, Inc.*, 190 Cal. App. 4th 1419, 1434 (2010).

Here, Lyft retains the power to cause Drivers to work or prevent Drivers from working for Lyft pursuant to the several mechanisms discussed in § II(C)(1)(a), *supra*. Under this definition of employment, Plaintiffs were improperly classified as independent contractors.[3]

---

[3] Each of Plaintiffs' claims fall within the IWC's purview except for their conversion claims. Plaintiffs' claims for minimum wage (Cal. Lab. Code § 1194), reimbursement for mileage costs (Cal. Lab. Code § 2802) fall within the ambit of IWC. *Dynamex Operations W.*, *Inc*. *v*. *Superior Court*, 2014 WL 5173038, at *7-9 (Cal. Ct. App. Oct. 15, 2014). While the *Dynamex* court left open the question of whether plaintiffs' and claims for wage statement penalties (Cal. Lab. Code § 226) and unfair competition claims (Cal. Bus. & Prof. Code § 17200) fall within the IWC's ambit, *id.* at 9, its reasoning suggests that they would. "[T]he scope of the IWC's delegated authority is, and has always been, over wages, hours and working conditions." *Id.* at 6. Here, one of Plaintiff's § 17200 claims is premised Lyft's failure to remit to them the full amount of gratuities paid in violation of Cal. Lab. Code § 351. Non-payment of gratuities falls within the scope "wages, hours, and working conditions." Further, wage statements are essential informational tools for employees, as employers are required to comply with detailed requirements of section § 226. And, because Plaintiffs' remaining § 17200 claims are premised on § 1194 and § 2802, those claims are also within the scope of the IWC's authority.

**E.      Plaintiffs' Evidence Is Admissible.**

Lyft argues that Plaintiffs' Exhibits J-R, V-X, Z-AA, XX-CCC, GGG, and III-SSS are inadmissible. Of these exhibits, all but exhibits J, N, O, W, III, JJJ, RRR, and SSS are documents produced by Lyft during discovery. "Documents produced in response to discovery requests are admissible on a motion for summary judgment since they are self-authenticating and constitute the admissions of a party opponent." *Anand v. BP W. Coast Products LLC*, 484 F. Supp. 2d 1086, n. 11 (C.D. Cal. 2007); *Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n. 12 (9th Cir. 1996) (documents produced by a party in discovery deemed authentic when offered by the party-opponent).

Plaintiff Maciel authenticated Exhibits W and J at her deposition. Lyft attached these documents as Exhibits 15 (Exhibit W) and 17-19 (Exhibit J) to the transcript of her deposition. (Carlson Supp. Decl. at **Exhibit YYY**, excerpts from the transcript of the deposition of Alejandra Maciel at 107:4-19, 115:2-9, 116:23-117:5, 120:15-22.)[4]

Exhibits N and O are resubmitted to the Court, attached to the declaration of Lyft Driver Gary Freedline, filed concurrently. Lyft has also admitted that it made the statements in these Exhibits. (Carlson Supp. Decl. at **Exhibit AAAA**, excerpts from the transcript of the deposition of Komal Kirtikar at 64:6-65:8.)

Plaintiff Cotter authenticated a document including the same information as Exhibit III at his deposition. Lyft attached this document as an Exhibit to the transcript of his deposition. (Carlson Supp. Decl. at **Exhibit BBBB**, excerpts from the transcript of the deposition of Patrick Cotter at 130:12-131:2.) Plaintiffs submit this deposition Exhibit in place of Exhibit III. (Carlson Supp. Decl., **Exhibit CCCC**.).)

Exhibits JJJ and SSS are documents produced by Plaintiffs that contain substantially the

---

[4] Exhibit W is a portion of deposition Exhibit 15 to Plaintiff Maciel's deposition transcript. In an abundance of caution, Plaintiffs now submit the full deposition Exhibit, the relevant portion of which is at pp. 5-6. (Carlson Supp. Decl., **Exhibit ZZZ**.)

same information as documents produced by Lyft. Plaintiffs submit the documents produced by Lyft in place of Exhibits JJJ and SSS. (Carlson Supp. Decl., **Exhibits DDDD** and **EEEE**.)

Exhibit RRR is duplicative of a portion of Exhibit J, and can be disregarded.

Lastly, Lyft does not actually challenge or object to the authenticity of any of these Exhibits. This alone permits the Court to consider them. *Prime Ins. Syndicate, Inc. v. Damaso*, 471 F. Supp. 2d 1087, 1093 (D. Nev. 2007). The Court may also consider these Exhibits pursuant to Fed. R. Evid. 901(b)(4) because the Exhibits' appearance and contents support authentication. *Prime Ins. Syndicate, Inc.*, 471 F. Supp. 2d at 1093. Further, the substance of the Exhibits are statements made *by Lyft*, and are therefore not hearsay. Fed. R. Evid. 801(d)(2).

**F.     If the Court Is Inclined to Deny Plaintiffs' Motion, It Should also Deny Lyft's Motion.**

The "independent contractor" defense to a wage claim is an affirmative defense, and Lyft bears the burden of proving at trial that Plaintiffs were independent contractors. *Sahinovic v. Consol. Delivery & Logistics, Inc.*, 2004 WL 5833528, at *3 (N.D. Cal. Sept. 14, 2004). Accordingly, Lyft must demonstrate in its Motion that no reasonable trier of fact could find that Plaintiffs were not independent contractors. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Should the Court decide Plaintiffs are not entitled to summary judgment, Plaintiffs should nonetheless be permitted to submit their evidence to a finder of fact.

### III.     CONCLUSION

Under both the common law test of employment and pursuant to the IWC definitions of employment, the undisputed evidence shows that Lyft improperly classified Plaintiffs as independent contractors. For the foregoing reasons, Plaintiffs' Motion should be granted.


Dated: January 7, 2015                                    Carlson Legal Services

                                                          By: ____/s/_Matthew D. Carlson_____
                                                              Matthew D. Carlson
                                                              Attorney for Plaintiffs