# EXHIBIT B1

# In The Matter Of:

*Patrick Cotter, et al. v.*
*Lyft, Inc.*

*Evan Goldin*
*May 12, 2014*

*195 State Street • Boston, MA 02109*
*Nationwide - Worldwide*
*888.825.3376 - 617.399.0130*
*www.court-reporting.com*



O'BRIEN & LEVINE
Court Reporting Services
Making Your Case

Original File Evan Goldin 5-12-14.txt
**Min-U-Script® with Word Index**

Page 5

```
 1                    EXHIBITS
 2                EVAN GOLDIN - VOLUME 1
 3  Number           Description                      Page
 4  Exhibit 23   Amended notice of deposition
 5               - 3 pages                              10
 6  Exhibit 24   Email dated June 19, 2013, to Evan
 7               Goldin from Emily Castor, and
 8               email dated June 19, 2013, to Emily
 9               Castor from Evan Goldin - 1 page       19
10  Exhibit 25   Lyft driver FAQs - 4 page              21
11  Exhibit 26   Email string, first of which is an
12               email dated May 30, 2013, to Komal
13               Kirtikar from Chris Sholley - 4 pages  45
14  Exhibit 27   Email dated May 14, 2013, to Komal
15               Kirtikar from Evan Goldin - 1 page     49
16  Exhibit 28   Document headed, "Lyft - Your
17               Quickass Guide for a Bombass Ride"
18               - 4 pages                              81
```

Page 6

1   PROCEEDINGS; MONDAY, MAY 12, 2014; 10:00 A.M.
2
3   EVAN GOLDIN,
4   having been first duly sworn, testified as follows:
5   **THE WITNESS:** I do.
6
7   **EXAMINATION**
8   BY MR. CARLSON
9   Q. Good morning, Mr. Goldin. My name is
10  Matthew Carlson. I'm an attorney for the plaintiffs
11  in this action entitled, "Patrick Cotter and
12  Alejandra Maciel, on behalf of themselves and all
13  others similarly situated versus Lyft, Inc. and Does
14  1 through 10, inclusive." I am going to ask you
15  some questions about the subject matter of this
16  case. Do you understand that?
17  A. Yes.
18  Q. Could you please state your name for the
19  record.
20  A. Evan Goldin.
21  Q. Can you spell that for me, please?
22  A. E-V-A-N G-O-L-D-I-N.
23  Q. Mr. Goldin, have you ever had your
24  deposition taken?

Page 7

1   A. Yes.
2   Q. On what sort of matter was that?
3   A. **Worker's compensation.**
4   Q. And approximately when did that occur?
5   A. **2003.**
6   Q. Was it in connection with Lyft or a
7   different entity?
8   A. **Different entity.**
9   Q. I am going to give you a series of ground
10  rules. Your attorneys have probably filled you in
11  on this, but at any time you don't understand one of
12  my questions, please say so, and I'll repeat it or
13  rephrase it; do you understand?
14  A. Yes.
15  Q. All of your answers must be in words
16  because the court reporter cannot take down
17  nonverbal responses such as a nod or an "uh-huh."
18  Do you understand?
19  A. Yes.
20  Q. Please wait until I finish each one of my
21  questions before answering, and I will wait until
22  you finish your answer before I ask another
23  question; do you understand that?
24  A. Yes.

Page 8

1   Q. If you need a break, just ask for one and
2   we will take one. I would ask that you not ask for
3   a break while a question is pending. Do you
4   understand that?
5   A. Yes.
6   Q. Your deposition is being transcribed by the
7   court reporter and everything said here will be
8   recorded; do you understand?
9   A. Yes.
10  Q. All testimony given here today is under
11  oath and under the penalty of perjury as if you were
12  in a court of law. Do you understand?
13  A. Yes.
14  Q. If I ask a question and you give an answer
15  to that question, I will assume that you understood
16  the question. Do you understand that?
17  A. I do.
18  Q. Did you meet with your attorney or
19  attorneys before this deposition?
20  A. Yes.
21  Q. When did that occur?
22  A. **Last Wednesday.**
23  Q. Was anyone else present during that meeting
24  besides you and your attorneys?

1           (The following pages, 32 through 35, were
2       deemed confidential by counsel.)
3   BY MR. CARLSON
4       Q.   Has Lyft ever considered using the
5   reliability rate to assign hours?
6       MR. McINERNEY:  Objection.  Calls for
7   speculation.  Also, I'd like to designate this
8   portion as confidential under the protective order.
9           If you can answer --
10      THE WITNESS:  Yes.  But it was never put into
11  practice.
12  BY MR. CARLSON
13      Q.   Is Lyft still considering using the
14  reliability rate to assign hours at some point in
15  the future?
16      A.   No.
17      Q.   Has the reliability rate been eliminated
18  from Lyft's -- from the metrics list Lyft keeps?
19      A.   Yes.
20      Q.   When did that happen?
21      A.   Within the last six months, I believe.
22      Q.   So this web page that was printed on
23  February 21, 2014, Exhibit 25, that refers to the
24  reliability rating, would you say the reliability

Evan Goldin - May 12, 2014
Confidential Excerpts

34

```
 1       MR. CARLSON:  An email that reflects the date,
 2  or if you can provide the date in a different
 3  fashion.
 4       THE WITNESS:  Can you clarify what "elimination"
 5  means?
 6  BY MR. CARLSON
 7       Q.   When Lyft stopped tracking the reliability
 8  rate for its drivers.
 9       A.   Okay.
10       Q.   So your answer is still the same, within
11  the last six months?
12       A.   To clarify, there's a difference between
13  tracking and reporting.
14       Q.   Okay.  What is tracking, as you understand
15  it?
16       A.   Being able to calculate a statistic.
17       Q.   Does Lyft still track reliability rate?
18       A.   Yes.
19       Q.   And is that for its own internal
20  understanding of the market?
21       A.   Yes.
22       Q.   And what does "reporting" mean?
23       A.   Sharing it with the drivers.
24       Q.   Okay.  So correct me if I'm wrong, Lyft
```

1  stopped reporting it to the drivers within the last
2  six months?
3      A.   Yes.
4      Q.   But it continues to track it?
5      A.   We continue to be able to calculate a
6  reliability rating, but we do not.
7      Q.   Do not?
8      A.   Calculate a reliability rating.
9      Q.   Okay.  So you are still able to calculate
10 it, but you do not do it anymore?
11     A.   That's correct.
12          (End of confidential testimony.)
13          (Nothing omitted nor deleted.  See
14           Volume 1.)

```
 1            (The following pages, 39 through 40, were
 2            deemed confidential by counsel.)
 3   BY MR. CARLSON
 4       Q.   Lyft follows the real time supply and
 5   demand of drivers and passengers?
 6       A.   Yes --
 7       MR. McINERNEY:  Objection.  I do want to
 8   designate this as confidential.
 9            So you can go ahead and answer if you're
10   able.
11       THE WITNESS:  Can you repeat the original
12   question?
13       MR. CARLSON:  Can you repeat?
14            (Record read.)
15       THE WITNESS:  It depends on how many drivers we
16   think may be needed for that hour and how many
17   drivers have reserved the hour, along with the other
18   example I stated.
19   BY MR. CARLSON
20       Q.   So if there are enough drivers that have
21   reserved the hour to meet your projection of the
22   number of drivers that you need, in that scenario
23   would I be unable to drive at 6:00 o'clock today?
24       A.   It depends on the degree and the numbers.
```

1  Q. I'm sorry. The degree of what?
2  A. Oversupply.
3  Q. Is that something you determine in advance?
4  A. Yes.
5  Q. So let me reask the question.
6     If you determine in advance that you need a
7  certain number of drivers on the road to meet
8  demand, and that number of drivers has been met,
9  enough drivers have had their hours approved during
10 that hour to meet the demand, again, would I be
11 unable to drive during that hour?
12 A. It still depends, but it's possible.
13 Q. Okay. How does the passenger rating affect
14 a driver's ability to have an hour assigned?
15 A. In the same way as acceptance rating. It's
16 used as a tie-breaking factor.
17 Q. Does that mean the higher an individual's
18 passenger rating, the more likely it is he or she
19 is -- will be assigned a particular hour?
20 A. Only a week in advance, yes.
21        (End of confidential testimony.)
22        (Nothing omitted nor deleted.  See
23         Volume 1.)
24