# EXHIBIT 1

Matthew D. Carlson (State Bar No. 273242)
CARLSON LEGAL SERVICES
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (510) 239-4710
Email: mcarlson@carlsonlegalservices.com

Shannon Liss-Riordan (*Pro Hac Vice*)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone: (617) 994-5800
Email: sliss@llrlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK COTTER, ALEJANDRA MACIEL, and JEFFREY KNUDTSON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LYFT, INC.,<br><br>Defendant. | **Case No.: 3:13-cv-04065-VC**<br><br>**Hon. Vince Chhabria**<br><br>**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEFING RE: PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Hearing date: March 24, 2016<br>Time: 10:00 a.m.<br>Courtroom: 4 |

Plaintiffs Patrick Cotter, Alejandra Maciel, and Jeffrey Knudtson hereby submit the following responses to the Court's questions posed in its February 11, 2016 Order.

1. <u>If counsel for the plaintiffs are awarded the $3.675 million they are requesting in fees and costs, how much money will each proposed class member be eligible to recover, on average? Please provide a figure for the proposed class members overall, and then break it down into the two groups of class members created by the settlement agreement – those who drove more than 30 hours per week and those who drove less.</u>

Under the assumptions that (1) Plaintiffs are awarded 30 percent of the gross settlement fund in attorneys' fees and costs, or $3.675 million, (2) notice and administration costs will amount to $120,000, and (3) all potential class members submit a claim, the distribution of funds to class members is estimated as follows:

Pursuant to the "two band" system set forth in the settlement agreement, drivers who have driven more than 30 hours per week in at least 50 percent of the weeks they gave at least one ride with Lyft (the "full time" band) will receive an average of $676.19. All other drivers, those in the "standard band," will receive an average of $53.02. All told, class members will be eligible to recover, on average, $56.14.

These averages, however, do not paint a full picture of the settlement distribution. The reality is that the vast majority of individuals who have worked as drivers in California have done so for very few hours in total. More than ███ class members have driven for less than 30 hours *in total* during the class period. More than ███ class members, or more than ██ percent of the proposed class, have driven less than 60 hours *in total* during the class period. And the average number of hours driven in total by class members in the "standard band" – which comprises 99.5% of the class – is less than █ hours of total driving time (approximately ███ of full time work). Given that the more than ███ class members who worked less than 30 hours total will receive less than $20 and the more than ███ class members who worked less than 60 hours total will receive less than $36, and given that these groups represent the vast majority of the class, an <u>enormous</u> number of low value claims <u>dramatically</u> reduces the

average payout.[1]

On the other end of the spectrum, those drivers who have driven the most hours, and driven the most consistently (and who likely had the strongest claims, had this case proceeded in litigation) will receive more significant settlement shares. The class members who drove for at least 1,000 hours (and such that they drove at least 30 hours per week for 50 of the weeks in which they drove) will receive, on average, more than $1,000.

A chart showing the estimated settlement distribution range, showing the total number of hours driven by class members and their estimated settlement distribution, has been filed under seal separately and is attached to the Declaration of Shannon Liss-Riordan in Support of Plaintiffs' Administrative Motion to File Documents Under Seal, **Exhibit 3**.

Also, it is important to note that, depending on what proportion of class members choose to submit claims to participate in the settlement (either electronically or by mail, as discussed further *infra*), the payment amounts for those drivers who do submit claims may be much greater than these estimates.

Thus, although Plaintiffs understand the Court's query regarding the impact on the amount of attorneys' fees awarded on the average payment for class members, these figures demonstrate that the precise amount of the fee here has a very minimal impact on the amount of payments to be made to class members. For example, if Plaintiffs were awarded one-third of the settlement fund in fees and costs (which is more than they are requesting), payouts to class members would, on average, decrease by $2.44. If Plaintiffs were awarded 25 percent of the settlement fund in fees and costs, the average payout would increase, on average, by $3.65.[2]

---

[1]    Lyft has requested that Plaintiffs redact the numbers indicated here and throughout this supplemental brief because it contends that these figures are highly confidential.

[2]    As will be discussed further in Plaintiffs' Motion for Fees and Costs, "Ninth Circuit precedent requires courts to award class counsel fees based on the total benefits being made available to class members," *Brawner v. Bank of Am. Nat'l Ass'n*, No. 3:14-CV-02702-LB, 2016 WL 161295, *5 (N.D. Cal. Jan. 14, 2016), including the benefits of non-monetary relief. *See also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049 (9th Cir. 2002) ("Incidental or non-monetary benefits conferred by the litigation are a relevant circumstance" in (cont'd)

**2.** <u>How many of the proposed class members are in the group of people who drove more than 30 hours per week, and how many are in the group of people who drove less?</u>

As shown in Exhibit 3, the current estimate of the number of individuals in the "full time" band is ███, and the estimated number in the standard band is ███████. However, as noted above, more than ██████ of those in the standard band drove less than 60 hours, total, and more than █████ of those in the standard band drove less than 30 hours, total.

**3.** <u>On average, how many total hours did the proposed class members in each group drive during the class period?</u>

As shown in Exhibit 3, drivers in the standard band have driven, on average, approximately █████ hours. Drivers in the full time band have driven, on average, approximately ██████ hours.

**4.** <u>If this case went to trial as a class action and the plaintiffs prevailed fully on their claim for reimbursement of expenses, how much would each class member be eligible to recover for that claim, on average, assuming use of the Internal Revenue Service's standard mileage reimbursement rate?</u> *See O'Connor v. Uber Techs., Inc.*, No. 13-CV-03826-EMC, 2015 WL 8292006, at *18 (N.D. Cal. Dec. 9, 2015). <u>Please provide a figure for the proposed class members overall, and then break it down into the two groups.</u>

Based on data recently provided by Lyft,[3] Plaintiffs estimate that the total damages for failure to reimburse drivers for mileage costs, at the current IRS rate, would be approximately

_____

assessing the results achieved by a settlement); *Laguna v. Coverall N. Am., Inc.*, No. 3:09-CV-02131-JM BGS, 2012 WL 607622, at *1-2 (S.D. Cal. Feb. 23, 2012) (approving *reversionary* claims-made class settlement in a case alleging independent contractor misclassification, which resulted in award of less than $60,000 in total to class members, and nearly $1,000,000 in attorneys' fees, based on purported non-monetary benefits, none of which included reclassifying workers as employees), *aff'd*, 753 F.3d 918 (9th Cir. 2014), *but see* 772 F.3d 608 (9th Cir. 2014) (opinion vacated due to settlement agreement); *Morris v. Eversley*, 343 F.Supp.2d 234, 246–47 (S.D.N.Y.2004) (stating "the degree of monetary success (or lack thereof) is only one factor to be considered" and refusing to reduce attorneys' fees based on "limited monetary value" of recovery, where a "significant victory" with "non-monetary value" was obtained).

[3]     Lyft does not keep complete records of drivers' miles driven, and therefore the mileage data that it has provided is an approximation. The absence of such complete records is why the parties used hours, as a proxy for miles driven, as the basis for their distribution formula.

$███████[4] Accordingly, if this case were successful, and judgment were entered on behalf of a class of all Lyft drivers in California, class members would receive, on average, approximately $██ for this claim. However, it is important to note that approximately two-thirds of overall miles driven are attributable to class members in the "standard band," *i.e.* those who may have faced greater challenge prevailing on their claims, and therefore the above figure vastly overstates the likely value of this claim.[5]

While the value of a potential judgment here is obviously larger than the settlement, "[a] proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."); *Balderas v. Massage Envy Franchising, LLC*, Case No. 12–cv–06327 NC, 2014 WL 3610945, *5 (N.D.Cal., July 21, 2014) (approving settlement where gross settlement amount "represents roughly eight percent of the maximum recovery")

---

[4]     At the time of settlement negotiations, based on information provided by Lyft at the time, Plaintiffs estimated that the value of this claim was approximately $██████, and, thus, Plaintiffs estimated that the agreed upon settlement constituted close to 20 percent of the value of this claim, and more than 17 percent of all claims that Plaintiffs believed they had a chance to recover under. *See* Dkt. No. 169-2 at ¶¶ 29-73. However, the settlement provides that it covers claims up to the time of preliminary approval. During these few months since the agreement was negotiated, Lyft has grown substantially (far beyond what Plaintiffs would have predicted at the time they were negotiating). Plaintiffs have included here the updated estimated mileage data that Lyft has recently provided to them, which is reflected by this valuation. Based on these revised numbers, the monetary value of the settlement is now slightly under ten percent of this claim, and slightly under eight percent of the potential value of all claims that Plaintiffs believed they had a chance to recover under. *See id.*

[5]     Lyft has made clear that it would argue that the IRS rate does not apply to drivers' mileage reimbursement claims. Although Plaintiffs disagree with this assertion, if Lyft were to prevail on this argument, the average damages amount would be significantly reduced (or the reimbursement damages may not be certifiable).

1  (final approval granted March 5, 2015 (Dkt. No. 78)).[6]

2  5.   <u>In identifying the risks the plaintiffs would face in continuing to litigate the case, the</u>
3       <u>motion for preliminary approval places significant weight on Lyft's arbitration provision.</u>
        <u>But at different points in this case, counsel for Lyft has stated on the record that Lyft was</u>
4       <u>waiving its right to assert its arbitration provision. How do these statements affect the</u>
        <u>likelihood that Lyft could assert its arbitration provision to defeat class certification? *Cf.*</u>
5       <u>*In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 1753784, at</u>
6       <u>*3-4 (N.D. Cal. May 9, 2011).</u>

7        Lyft waived the right to arbitrate the claims of named Plaintiffs Cotter and Maciel by

8  asking the Court to resolve their claims on a motion for summary judgment. *See Transamerica*

9  *Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 45 F.3d 437 (9th Cir. 1994). Lyft's counsel

10 has admitted as much. *See* Declaration of Shannon Liss-Riordan, filed herewith, **Exhibit A**

11 (summary judgment hearing transcript) at 55:3-18.  Lyft, however, has maintained that while it

12 had waived the right to arbitrate Cotter and Maciel's claims, it had *not* waived its right to

13 arbitrate claims against all putative class members. *See* Exh. A at 55:3-18 ("THE COURT: Why

14 have you not raised that issue thus the right to assert the you've now been in litigation on far? I

15 mean, have you waived arbitration provision because this case for well over a year? MR.

16 McINERNEY: We have, *with respect to Mr. Cotter and Ms. Maciel*.") (emphasis added).

17       While Plaintiffs appreciate that the Court appeared inclined to believe (prior to any

18

19 _____
   [6]      *See also Hopson v. Hanesbrands Inc.*, No. CV-08-0844 EDL, 2009 WL 928133, at *8
20 (N.D. Cal. Apr. 3, 2009) citing *In re Cendant Corp. Derivative Action Litig.*, 232 F.Supp.2d 327,
   336 (D.N.J.2002) ("The settlement … represents less than two percent of that amount," but
21 "may be justifiable … given … significant defenses that increase the risks of litigation."); *In re*
   *Toys R Us–Del., Inc.–Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438,
22 453–54 (C.D.Cal.2014) (granting final approval of a settlement providing for payment reflecting
   3% of possible recovery ($391.5 million settlement with exposure up to $13.05 billion)); *Reed v.*
23 *1–800 Contacts, Inc.*, No. 12–CV–02359 JM BGS, 2014 WL 29011, at *6 (S.D.Cal. Jan. 2,
   2014) (granting final approval where settlement represented 1.7% of possible recovery (net
24 settlement fund of $8,288,719.16, resolving claims worth potentially $499,420,000)); *In re LDK*
   *Solar Sec. Litig.*, No. C 07–5182 WHA, 2010 WL 3001384, at *2 (N.D.Cal. July 29, 2010)
25 (granting final approval where settlement was 5% of estimated damages); *In re Linerboard*
26 *Antitrust Litig.*, 296 F.Supp.2d 568, 581 & n.5 (E.D.Pa.2003) (gathering cases where courts
   approved settlements achieving single-digit percentages of potential recoveries).
27

28

briefing on the issue) that Lyft may have waived its right to arbitrate the claims of all putative class members, thus precluding an argument that arbitration provisions would be a bar to class certification (or, alternatively, precluding a motion to compel arbitration of class members' claims following class certification), most courts appear to have held that a defendant is not able to waive its right to arbitrate claims against putative class members based on its pre-class certification conduct (either through words or actions) because putative class members are not parties to the action before a class is certified. *See e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 1753784, at *3-4 (N.D. Cal. May 9, 2011).

In *TFT-LCD*, while Judge Illston considered the issue a "close call" because of defendants' failure to raise arbitration in Rule 12(b)(6) responses to plaintiffs' complaints and, more importantly, in opposition to a motion for class certification, she ultimately held that these acts inconsistent with the right to arbitrate were insufficient to find waiver of the right to compel arbitration with putative class members because defendants simply did not have that right prior to class certification. *Id.*

With two exceptions, discussed below, other federal court opinions are in accord. *Mora v. Harley-Davidson Credit Corp.*, No. 1:08-CV-01453-AWI, 2012 WL 1189769, at *14-15 (E.D. Cal. Apr. 9, 2012) *report and recommendation adopted*, No. 1:08-CV-1453 AWI BAM, 2012 WL 3245518 (E.D. Cal. Aug. 7, 2012) (no waiver of right to arbitrate claims against unnamed class members because defendant did "not have a right to compel arbitration against unnamed Class members prior to class certification."); *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 853 (D. Md. 2013) ("In the context of a class action, however, the Defendants could not have waived their rights to enforce the contractual clauses at issue until the class composition was final."); *Davis v. Four Seasons Hotel Ltd.*, No. CIV. 08-00525 HG-BMK, 2011 WL 4590393, at *4 (D. Haw. Sept. 30, 2011) (declining to find that defendant had waived right to compel arbitration of putative class members' claims by "extensively litigating" the case prior to class certification); *see also Laguna v. Coverall N. Am., Inc.*, No. 09CV2131-JM BGS, 2011 WL 3176469, at *8 (S.D. Cal. July 26, 2011) ("Defendants cannot move to compel

arbitration against putative class members prior to certification of a class."); *Saleh v. Titan Corp.*, 353 F. Supp. 2d 1087, 1094 (S.D. Cal. 2004) (district court had no authority to enjoin case filed by putative class members prior to class certification).

Two cases to the contrary, *Edwards v. First Am. Corp.*, 289 F.R.D. 296 (C.D. Cal. 2012) and *Kingsbury v. U.S. Greenfiber, LLC*, No. CV08-00151-AHM AGRX, 2012 WL 2775022 (C.D. Cal. June 29, 2012), only found a waiver of the right to compel putative class members to arbitration after the defendants repeatedly failed to raise the arbitration issue *at the class certification stage* (something which has not yet occurred in this case). In *Edwards*, the court found that defendants had waived their right to arbitrate claims of putative class members due to its pre-class certification conduct because they had engaged in "gamesmanship" by litigating the case for five years without asserting "their intention[] to arbitrate" the claims of putative class members, including in two motions to dismiss, in their initial answer, *in opposition to two class certification motions*, on appeal to the Ninth Circuit, and in a petition to the Supreme Court for certiorari. *Edwards*, 289 F.R.D. at 307-08. *Id.* The *Kingsbury* court reached the same conclusion, reasoning that defendant had waived its right to compel arbitration of unnamed class members' claims because it had failed to raise arbitration in connection with *four motions for class certification* and, even after it gained the argument that the arbitration provision was enforceable following the Supreme Court's decision in *Concepcion*, waited four months to demand arbitration of newly certified class members. *Kingsbury*, 2012 WL 2775022, at *5-6.

In this case, even assuming that *TFT-LCD* and the cases that have employed similar reasoning are wrong, and it *is* legally possible for Lyft's pre-certification conduct to result in waiver of its right to arbitrate putative class members' claims, Plaintiffs were cognizant that they would have had an uphill battle to successfully make (and defend on appeal) the showing necessary to find waiver, especially given the Ninth Circuit's instruction that "any party arguing waiver of arbitration bears a heavy burden of proof." *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986). This case has been litigated for a comparatively short amount of time, and Lyft has maintained that it has a right to arbitrate putative class members' claims by,

for example, raising arbitration as an affirmative defense in each of its answers. Dkt. No. 148 at p. 9; Dkt. No. 60 at p. 10; Dkt. No. 29 at p. 10; Dkt. No. 20 at p. 10. Additionally, Plaintiffs had not yet moved for class certification, and Lyft made it abundantly clear that it would raise its arbitration provisions as a defense to class certification, just as Uber did in connection with the class certification briefing in *O'Connor*. *See TFT-LCD*, 2011 WL 1753784, at *3 ("defendants did not raise the arbitration clauses in their joint opposition to class certification, despite the fact that the existence of such agreements with some members of the putative class but not others is a quintessential individualized issue that bears on the propriety of class certification.").

In sum, Plaintiffs' counsel closely analyzed this issue in considering whether to agree to a resolution of this case. They were well aware of the relevant case law on this point and thoroughly examined Plaintiffs' chances of prevailing, both at the district court level and on appeal. Ultimately, it was counsel's judgment that, in light of the risks posed by Lyft's arbitration provisions (among other hurdles), settlement was appropriate. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation."); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd,* 661 F.2d 939 (9th Cir. 1981) ("the fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight").

6. <u>One form of prospective relief identified by the motion for preliminary approval is the agreement to remove the "at-will termination" provision of the driver Agreement and replace it with a provision permitting Lyft to deactivate drivers only for specific reasons, such as poor ratings from customers, safety concerns, or too many ride cancelations. What is the practical impact of this change? What is the evidence that Lyft previously terminated people for reasons other than those for which Lyft will be permitted to terminate them under the new language?</u>

Lyft's agreement to remove the at-will termination provision in its TOS and replace it with a narrower termination provision is both legally and practically significant. Under the settlement, Lyft's narrower provision will remove Lyft's right to deactivate drivers for any reason at all and instead permit deactivation of drivers for only specific reasons. Additionally,

under the settlement Lyft has agreed to several other corollary provisions that 1.) provide drivers with notice and the right to cure many deactivations before permanent deactivations, including those related to insufficient customer ratings, cancellation thresholds, certain safety issues and other non-material breaches of the TOS and 2.) require Lyft to pay for arbitrations related to deactivations or threatened deactivations (as well as other issues Lyft drivers may have with the company, including all pay-related issues).

Legally, these modifications address one of Plaintiffs' core arguments in this case – that it is a company's *right* to terminate at will, and not the actual exercise of that control, which is "perhaps the strongest evidence" of an employer-employee relationship, because "[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 531, 327 P.3d 165, 171 (2014). This Court has repeatedly emphasized this fundamental principle. *See Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1079 (N.D. Cal. 2015) ("What's more, the Terms of Service not only give Lyft a broad right to terminate drivers for cause, but also the right to bar drivers from the platform 'for any or no reason.' As the California Supreme Court recently explained in *Ayala*, a hirer's ability to discharge a worker without cause is '[p]erhaps the strongest evidence of the right to control.'"). Similarly, at the summary judgment hearing, the Court discounted Lyft's actual practices and instead repeatedly emphasized and focused on Lyft's *right* to terminate drivers for, for example, customer complaints about loud music in a Lyft ride: *E.g.,* "MR. McINERNEY: Your Honor, there is -- I'll just note, there is no evidence of that ever occurring. So the course of conduct – THE COURT: That's not the question. That's not the legal question. The California Supreme Court has made very clear, in the last year, that the question is what rights -- what right does Lyft have to control." Exh. A, summary judgment hearing transcript at 50:16-55:2.

The modified termination provision will also have a significant practical result. As illustrated below, Plaintiffs' counsel have been in contact with numerous drivers over the past

two and a half years, many of whom would have benefited from the negotiated termination provision. The following are some examples:

- Plaintiff Cotter was permanently deactivated for using a substitute vehicle to provide Lyft rides (*i.e.*, not the vehicle identified as his vehicle in Lyft's records) and was not provided any warning or opportunity to cure the issue. Dkt. No. 79-12. Under the negotiated termination provision, Cotter would have had the opportunity to learn the basis of his deactivation and challenge his deactivation in arbitration at the company's expense. Realistically, it may be that instead of proceeding through a costly (to Lyft) arbitration, the parties would reach an agreement resulting in Cotter's reinstatement.

- Plaintiff Maciel was permanently deactivated for insufficient passenger ratings. Dkt. No. 69-12. Under the negotiated termination provision, Maciel would have been given an opportunity to increase her ratings to Lyft's reasonable satisfaction. Just as significantly, if Lyft were to take the position that she was given a reasonable opportunity to cure her passenger rating and failed to do so, she would have the chance to contest the reasonableness of that decision in an arbitration paid for by the company.

- A number of drivers have contacted Plaintiffs' counsel for being deactivated for either picking up passengers on different ride share platforms or recruiting other Lyft drivers to drive for Uber. Liss-Riordan Decl. at ¶ 3. Under the negotiated termination provision, deactivation for these reasons would be generally impermissible and the drivers would be entitled to arbitrate their deactivation at Lyft's expense.

- A number of drivers have contacted Plaintiffs' counsel for being deactivated for "alleged violations of Lyft's community guidelines and Terms of Service" but without being given specific information about what led to the deactivation. Liss-Riordan Decl. at ¶ 4. Under the negotiated termination provision, most, if not all, of these drivers would be permitted to learn the basis for their deactivation and provided with the opportunity to cure any issues or challenge the company's contention that they had violated such guidelines.

- A number of drivers have contacted Plaintiffs' counsel for being deactivated allegedly for low passenger ratings but without having been given warning. Liss-Riordan Decl. at ¶ 5. Under the negotiated termination provision, these drivers would have received warnings prior to such deactivation and opportunity to boost their rating before deactivation.

- A driver contacted Plaintiffs' counsel after he was permanently deactivated because of "friendliness" (or lack thereof). Liss-Riordan Decl. at ¶ 6. Under the negotiated termination provision, this deactivation would be impermissible (unless the driver's actions violated a specific

TOS provision, in which case he would be given notice and an opportunity to cure the issue prior to permanent deactivation). Additionally, if deactivated, the driver would be able to arbitrate his breach of contract case at Lyft's expense.

- Another driver contacted Plaintiffs' counsel when the driver was told that offering his business card to a passenger would result in "permanent deactivation if the passenger were to report it." Liss-Riordan Decl. at ¶ 7. Under the negotiated termination provision, Lyft would be prohibited from deactivating the driver on this basis without first providing notice and an opportunity to cure the issue.

- Another driver who contacted Plaintiffs' counsel was permanently deactivated due to "passenger feedback." Liss-Riordan Decl. at ¶ 8. Under the negotiated termination provision, this driver would have the chance to arbitrate his or her deactivation at Lyft's expense, learn what the "passenger feedback" was, and challenge Lyft's apparent use of discretion in deactivating him.

- Another driver contacted Plaintiffs' counsel when the driver was permanently deactivated for low passenger ratings, which she suspected were caused by a sequence of low ratings by men who had unsuccessfully made advances towards her during Lyft rides. Liss-Riordan Decl. at ¶ 9. Under the negotiated termination provision, this driver would have the opportunity to present her side of the story to Lyft (i.e. "cure" her low passenger ratings).

- Another driver contacted Plaintiffs' counsel after the driver was deactivated for what he was told was a "management decision." Liss-Riordan Decl. at ¶ 10. Under the negotiated termination provision, this driver would generally be entitled to an explanation for his deactivation, an opportunity to cure any issues if necessary, and the ability to arbitrate a breach of contract claim against Lyft if appropriate.

- A number of drivers have contacted Plaintiffs' counsel regarding disputes over compensation. Liss-Riordan Decl. at ¶ 11. Under the negotiated termination provision, each of these drivers would have the right to have claims concerning their pay-related arbitrated at Lyft's expense.

- Lyft has warned its drivers that they are subject to permanent deactivation for not accepting ride requests. Liss-Riordan Decl., **Exhibit B** at p. 4. Not accepting a ride request is distinct from canceling a ride request; a driver declines to accept a ride request when he or she rejects a pick up request from a passenger. A driver cancels a ride request occurs when he or she cancels a Lyft ride *after* initially accepting it. Thus, not accepting a ride request is akin to declining a job, which all independent contractors should have the right to do without repercussion. Canceling a ride request is akin to taking a job, then quitting it without performing. Under the negotiated

termination provision, drivers now have the absolute right to not accept
ride requests without fear of negative consequence.

- 

Even for those deactivations that Lyft claimed were for reasons spelled out in its

contracts with its drivers, the drivers (not surprisingly) frequently have a different point of view

regarding whether their deactivation was justified.  The settlement provision that would require

Lyft to provide notice and an opportunity for drivers to cure the alleged deficiencies – and the

ability to challenge a deactivation before a neutral arbitrator, at the company's expense – is thus

a significant benefit for drivers.  Indeed, such protection (essentially a for-cause termination

provision, enforceable through neutral arbitration at the company's expense) is a protection that

most employees do not have.  For-cause termination provisions are more typical in unionized

settings.  And even for workers in a union protected by a collective bargaining agreement,

typically the union has to split the cost of arbitration.  Here, the drivers will have the benefit of

arbitration – for deactivation-related and other disciplinary issues, as well as any pay-related

issues they maybe have – and all at the company's expense (other than an initial filing fee).

In sum, the modification to the at-will termination provision, and related provisions that provide drivers with the right to cure potential breaches of contract and the right to arbitrate deactivations or threatened deactivations at the company's expense addresses one of the primary legal bases for this lawsuit, and also will provide a real, day to day benefit for drivers.

7.   This lawsuit seeks to have Lyft drivers declared "employees" rather than "independent contractors" under California law. It appears the proposed settlement would move the drivers closer to independent contractor status. If that is correct, is this aspect of the settlement agreement contrary to the original goal of the lawsuit? Is there case law discussing whether a court may approve a settlement agreement that might be deemed contrary to the original goal of the lawsuit?

The Court is correct the settlement agreement moves Lyft drivers closer to independent contractor status under the California test of employment, due to Lyft's elimination of the at will termination provision in its TOS. While Plaintiffs' preference was to have drivers reclassified as employees, this "third way," which the Court encouraged the parties to explore, short of an all-or-nothing jury trial, is reflective of the multiple hurdles Plaintiffs recognized they would have faced in this case, as discussed in their preliminary approval motion.

It is not uncommon in wage and hour settlement agreements for defendants to make compromise payments for past alleged violations, make some changes to their practices going forward that do not include all changed the plaintiffs had requested, and take their chances going forward as to whether those changes are sufficient to withstand future potential challenges.

One such example is *Laguna v. Coverall N. Am., Inc.*, No. 09CV2131 JM (RBB), 2009 WL 5125606, *1 (S.D. Cal. Dec. 18, 2009), an independent contractor misclassification case in which the plaintiffs alleged that Coverall had wrongfully failed to classify cleaning workers as employees.  The parties' settlement agreement provided that Coverall would not reclassify the workers as employees, but would instead provide them with certain alleged non-monetary benefits, primarily a conditional "assignment" of customer accounts from Coverall to the workers.  *Laguna*, 2012 WL 607622, at *1-2, *aff'd*, 753 F.3d 918 (9th Cir. 2014), *but see* 772 F.3d 608 (9th Cir. 2014) (opinion vacated due to settlement).  This settlement (a reversionary claims-made settlement) provided that Coverall would pay $475 to only those workers who

submitted claim forms within a 30-day period (despite the fact that their alleged damages would have been in the tens of thousands of dollars apiece), and the remainder of the unclaimed settlement proceeds would revert to the defendant. *Id.* Although less than $60,000 was slated to be paid out to class members under this settlement, the attorneys' fees were close to $1,000,000, and there was a heated dispute over whether the non-monetary terms provided any real benefit for class members, the settlement was approved over this objection, and the Ninth Circuit affirmed. *Id.*

Another example is *Reid v. SuperShuttle Int'l, Inc.*, No. 08-CV-4854 JG VVP, 2012 WL 3288816, at *1 (E.D.N.Y. Aug. 10, 2012), a case in which franchisees claimed they should have been classified as employees. The parties' settlement provided for a monetary fund, but did not convert franchisees to employees. Instead, defendant implemented a "Franchise Resale Opportunity Program" and limited its previously unrestricted right to terminate franchisees. Liss-Riordan Decl., **Exhibit C** at ¶ 3.2. The court approved the settlement. *Id.*

Similarly, in *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010), the court approved a settlement of claims brought by distributors who alleged they were misclassified as independent contractors. The settlement provided for a monetary fund and did not convert the distributors to employees. Rather, the agreement recited "confirmations of independence" guaranteed to distributors going forward. Liss-Riordan Decl., **Exhibit D** at ¶ 2.

Indeed, the vast majority of settlements of independent contractor misclassification cases involve a monetary payment, <u>no</u> reclassification, and <u>no</u> terms to improve the conditions of workers. The most notable recent example of this type of settlement is the one resolving litigation in California against FedEx Ground for misclassifying its drivers as independent contractors. Liss-Riordan Decl., **Exhibit E** (*Alexander* settlement agreement); **Exhibit F** (*Alexander* preliminary approval order). That litigation spanned more than a decade and ultimately resulted in a number of appellate decisions holding the drivers to be employees. *See Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 984 (9th Cir. 2014) (California); *Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 4, 64 Cal. Rptr. 3d 327, 331

(2007) (California); *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1037 (9th Cir. 2014) (Oregon); *Craig v. FedEx Ground Package Sys., Inc.*, 300 Kan. 788, 828, 335 P.3d 66, 92 (2014) (Kansas). When the California litigation ultimately resolved last year – after an appellate determination that the drivers were employees (and no issue raised whatsoever that an arbitration clause could preclude the maintenance of a class action) – there was no provision in the settlement actually making the drivers employees.[7]  Instead, the drivers remained contractors, and the agreement did not require FedEx to provide any additional protections for its drivers.[8]  This is indeed the most common scenario in resolution of class cases involving independent contractor misclassification.[9]

---

[7]  Notably, according to the preliminary and final approval motions and supporting papers in *Alexander*, the settlement in that case represented approximately 40-55% of the plaintiffs' estimate of their actual damages. Dkt. No. 149 at ¶ 19; Dkt. No. 204 at p. 13. Thus, in a case that spanned more than a decade, where it was decided on appeal that the class members were employees as a matter of law, there was a certified class, there was no arbitration agreement at issue, and there was no provision for non-monetary relief in the settlement, class members still received less than half their actual damages in settlement.  By comparison, the settlement here provides just under about 20 percent of the percentage recovery in *Alexander*, and with significant non-monetary relief.

[8]  In order to avoid future claims against it, FedEx on its own converted to an "ISP" system whereby each contractor had at least three routes and was required to employ drivers to drive those routes.  This change, however, was not part of the negotiated agreement and did not convert the drivers actually contracting with FedEx to its employee.

[9]  For more examples, *see Campbell v. First Inv'rs Corp.*, No. 11-CV-0548 BEN WMC, 2012 WL 5373423, *1 (S.D. Cal. Oct. 29, 2012); *Badia v. HomeDeliveryLink, Inc.*, No. 2:12-CV-07097, 2015 WL 5666077, *1 (D.N.J. Sept. 25, 2015); *In re Penthouse Executive Club Comp. Litig.*, No. 10 CIV. 1145 KMW, 2014 WL 185628, *2 (S.D.N.Y. Jan. 14, 2014); *Encarnacion v. J.W. Lee, Inc.*, No. 14-CIV-61927, 2015 WL 6437686, *1 (S.D. Fla. Oct. 22, 2015); *Brandon et al. v. 3PD, Inc.*, C.A. No. 13-3745 (N.D. Ill. Jan. 26, 2016) (Dkt. No. 151); *Martins et al. v. 3PD, Inc.*, C.A. No. 11-11313 (D. Mass. Dec. 2, 2015) (Dkt. No. 201); *Swinney et al. v. AMComm Telecommunications, Inc.*, C.A. No. 12-12925 (E.D. Mich. Feb. 23, 2015) (Dkt. No. 147); *Mansingh et al. v. Exel Direct, Inc.*, C.A. No. 12-11661 (D. Mass. May 7, 2014) (Dkt. No. 46); *Lee et al. v. GAB Telecom, Inc.*, C.A. No. 12-14104 (E.D. Mich. Apr. 17, 2014) (Dkt. No. 113); *Sanchez et a. v. Lasership, Inc.*, C.A. No. 12-246 (E.D. Va. Apr. 8, 2014) (Dkt. No. 176); *Rocha et al. v. Empire Today, LLC*, C.A. No. 11-12271 (D. Mass. November 13, 2013) (Dkt. No. 34).

Thus, there is substantial precedent for approval of class settlements that do not obtain all of the originally stated goals sought in the lawsuit,[10] and Plaintiffs are not aware of *any* case in which a settlement was not approved because the settlement did not do so.[11] By definition, a settlement is a compromise, and does not achieve complete victory for either party. Nonetheless, Plaintiffs here submit that they have far surpassed the results obtained in the cases cited above by negotiating the non-monetary terms of this settlement. Such non-monetary relief, though difficult to quantify, dramatically increases the value of the settlement, especially where non-monetary relief will save individuals from losing their jobs, as is the case here. *Officers for Justice*, 688 F.2d at 628 ("where monetary relief is but one form of the relief requested by plaintiffs," the settlement as a whole, "rather than the individual component parts…must be examined for overall fairness."); *Vizcaino*, 290 F.3d at 1049 ("Incidental or non-monetary benefits conferred by the litigation are a relevant circumstance" in assessing the results achieved by a settlement); *In re Clark Oil & Refining Corp. Antitrust Litig.*, 422 F.Supp. 503, 511 (E.D.Wis.1976) ("Although…nonmonetary provisions are not susceptible of valuation in conventional terms, the Court is convinced that they confer real and substantial benefits.")

Given the circumstances of this case, Plaintiffs made a reasoned judgment (supported by their counsel's more than a decade experience litigating such cases) that it would be preferable to accept this settlement, which would make some notable and important improvements to the working conditions of Lyft drivers, and some compensation on a classwide basis for the damages claimed in this case, than to face the risk that a class could not be certified or would be gutted given Lyft's arbitration clause, as well as other risks of prevailing at trial and winning on appeal. *See Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 528; *Ellis*, 87 F.R.D. at 18, *supra*.

---

[10]    Short of a judicial ruling ordering a company to reclassify independent contractors as employees (which in this case would require Plaintiffs to surpass all of the hurdles discussed in their Motion), it is rare for reclassification to occur as a result of a settlement of a lawsuit.

[11]    Of course, whether Lyft's revised business model is legally sustainable and defensible going forward may well remain a question for another day, should Lyft continue to classify its drivers as independent contractors.

8.  <u>Are there other companies in the so-called "sharing economy" that classify their workers as employees? If so, are there any factors specific to Lyft's business model that preclude it from classifying drivers as employees, or from providing drivers with some of the protections employees receive under California law?</u>

While there are other companies in the so-called "sharing economy" that have chosen to classify their workers as employees, the reality appears to be that the companies that have done so have decided not to take the risk of facing a legal challenge such as this one in court, or that have decided not to continue fighting such claims. Plaintiffs defer to Lyft on the question of why Lyft believes its business model precludes it from classifying drivers as employees. As noted above and in their preliminary approval motion, Plaintiffs weighed their advantages and risks in this case and determined that this proposed settlement provided acceptable benefits to class members, both non-monetary and monetary, to justify their agreement to resolve this case short of reclassification for Lyft drivers.

9.  <u>If the settlement agreement is preliminarily approved, why should drivers have to submit claim forms?</u>

Courts in the Northern District of California routinely approve the use of a claims process when the agreement also provides that there will <u>not</u> be a reversion of funds to the defendant. *E.g.*, Exh. F (*Alexander* preliminary approval order at ¶ 7); *IL Fornaio (Am.) Corp. v. Lazzari Fuel Co., LLC*, No. C 13-05197 WHA, 2014 WL 6845197, at *5 (N.D. Cal. Dec. 4, 2014); *Stuart v. Radioshack Corp.*, No. C-07-4499 EMC, 2010 WL 3155645, at *2 (N.D. Cal. Aug. 9, 2010); *Covillo v. Specialtys Cafe*, No. C-11-00594 DMR, 2013 WL 5781574, at *4, 7 (N.D. Cal. Oct. 25, 2013); *Burden v. SelectQuote Ins. Servs.*, No. C 10-05966 SBA, 2013 WL 1190634, at *3, 6 (N.D. Cal. Mar. 21, 2013).[12]

---

[12] What does (and should) give courts pause is when a claims process is coupled with a reversion of unclaimed funds to the defendant, which serves little purpose other than to reduce a defendant's total payout. *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 609 (E.D. Cal. 2015); *see also Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 4831157, at *6 (N.D. Cal. Oct. 12, 2011); *Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2012 WL 1156399, at *12 (N.D. Cal. Apr. 6, 2012). However, even that combination has not stopped courts in the Ninth Circuit from approving settlements (even over objection). *See Laguna*, 753 F.3d at 934, *but see* 772 F.3d 608 (opinion vacated due to settlement agreement).

Here, the parties have agreed to a non-reversionary claims process, pursuant to which the claim form will be distributed electronically or, if requested by a class member, by paper. This claims process is important for two reasons: <u>First</u> it ensures that the Claims Administrator has up-to-date bank account information for each class member on file. This is essential because funds will be distributed to class members electronically if possible, which will dramatically reduce the cost of claims administration compared to the costs of mailing out checks to all class members. Without a claim form, the Claims Administrator would be required to try to electronically disburse funds to every single class member blindly, including class members who have not driven for several years or who may have changed their bank account information since providing it to Lyft. The costs of making unsuccessful payments, canceling the unsuccessful payments, then tracking down class members to obtain accurate bank account information, could far exceed the amount that many class members would receive under the settlement and thus could cannibalize the funds available to all class members.

<u>Second</u>, the claim form allows Class Members to elect to receive payment by mail rather than through an electronic funds transfer. This will allow payment of funds by the method preferable to each class member. While the default mode of distribution is electronic transfer, this option allows class members the flexibility to choose a physical check instead, if so desired.

Each of these justifications supports the claims process to which the parties agreed. *See, e.g. Shames v. Hertz Corp.*, No. 07–CV–2174–MMA WMC, 2012 WL 5392159, at *12 (S.D.Cal. Nov. 5, 2012) ("The actual intent of the claims process is to allow class members the opportunity to choose between several payment options."); *Schulte v. Fifth Third Bank*, 805 F.Supp.2d 560, 590–91 (N.D.Ill.2011) (approving the use of a claim form where additional information was needed in order for the claims administrator to process claims).

Moreover, Plaintiffs note that there is a very low burden on class members to participate in the claim process. Unlike the *Coverall* settlement, which was approved by the district court and upheld by the Ninth Circuit (where class members – many of whom no longer resided in the United States and for whom the defendant did not have updated contact information – were

mailed a single notice and could only recover under the settlement if they returned their forms within 30 days, and the unclaimed funds reverted to the defendant), here, class members will receive a hyperlink via email to the claim form in the Class Notice. By simply clicking on the hyperlink, class members can claim their funds and request to have them deposited directly in their bank account or mailed to them. The settlement also provides for reminders for class members whose claims are greater than $200, as well as additional follow-up for class members with the greatest size claims. *See* Settlement Agreement at ¶ 59.

This email method of distribution of the claim form is particularly appropriate in this case because all Lyft drivers have used their email address to sign up for Lyft, have used their cellular phones, applications, and internet to drive for Lyft (and potentially other sharing economy companies), and are clearly more than tech-savvy enough to follow a hyperlink to fill out the required information. Indeed, this method of communicating with class members (by email) is the method that Lyft has typically used to communicate with class members.

Additionally, the only information that needs to be input into the claim form is the driver's claim identification (which will be provided to each driver), mailing address, preferred method of payment, banking information, and electronic signature certifying that the claim form is accurate. Thus, this claims process is extremely non-burdensome, and there is no reason for the Court to be concerned about its inclusion in this settlement. *See In re Apple iPhone 4 Products Liab. Litig.*, No. 5:10-MD-2188 RMW, 2012 WL 3283432, *3 (N.D. Cal. Aug. 10, 2012) (overruling objection that claims process was "overly burdensome" where class members were required to provide only their name, address and iPhone serial number and to check a box verifying their reception problems in order to file a claim, and could do so by mail or electronically); *see also In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*, No. 8:10ML 02151 JVS, 2013 WL 3224585, at *18 (C.D. Cal. June 17, 2013) ("The requirement that class members download a claim form or request in writing a claim form, complete the form, and mail it back to the settlement administrator is not onerous. Additionally, in lieu of a written claim, class members are given the what [sic] the

Court considers the even less onerous option of submitting an online claim.")  And, again, any funds that are unclaimed will be subsequently distributed to Lyft drivers who have submitted a claim.  Thus, there is no concern here that the claim process is benefitting Lyft by reducing the number of class members who may participate in the settlement.[13]

Given the ease of the claim process and the objectives behind it, the claims process should not give the Court any pause in approving the settlement.  *See Keller v. Nat'l Collegiate Athletic Ass'n (NCAA)*, No. 4:09-CV-1967 CW, 2015 WL 5005901, at *5 (N.D. Cal. Aug. 19, 2015) (overruling objection to claims process because it minimized waste, fraud, and administrative costs, and because it was simple, straightforward, and designed to make submitting a claim as easy as possible).

Plaintiffs are happy to respond to any other questions the Court may have at the preliminary approval hearing.  For the reasons discussed above, and in Plaintiffs' preliminary approval motion, Plaintiffs submit that the Court should grant preliminary approval and allow the notice of the settlement to be distributed to class members.

Dated: March 10, 2016                          LICHTEN & LISS-RIORDAN, P.C.

                                               By: ___/s/_ *Shannon Liss-Riordan*_____
                                                   Shannon Liss-Riordan, *pro hac vice*
                                                   Attorney for Plaintiffs


                                               CARLSON LEGAL SERVICES

                                               By: ___/s/_ *Matthew D. Carlson*_____
                                                   Matthew D. Carlson
                                                   Attorney for Plaintiffs

---

[13]    The vast majority of the class, as described above, worked for an exceedingly short time, and only a very small proportion has claims of any significant size. This method ensures that payments will be made primarily to class members who have more investment in the outcome of this case, and at least enough interest to click on a hyperlink to claim their settlement share. *See Miller v. Ghirardelli Chocolate Co.*, No. C 12-04936 LB, 2014 WL 4978433, at *4 (N.D. Cal. Oct. 2, 2014) (reasoning that claims process was appropriate in part because it "directs available funds to those who most care about the alleged deception and thus are willing to file a claim.")