TEAGUE P. PATERSON, SBN 226659
COSTA KERESTENZIS, SBN 186125
SUSAN K. GAREA, SBN 260407
**BEESON, TAYER & BODINE, APC**
483 Ninth Street, 2nd Floor
Oakland, CA  94607
Telephone:  (510) 625-9700
Facsimile:  (510) 625-8275
Email:   tpaterson@beesontayer.com
          ckerestenzis@beesontayer.com
          sgarea@beesontayer.com

Attorneys for Objectors Angelica Rose Ferdinand,
Helen Hebert, Leigh-Ann Johnson, Amir Kashanian,
Kelsey Tilander, Teamsters Joint Councils Nos. 7 and 42

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK COTTER, ALEJANDRA MACIEL, and JEFFREY KNUDTSON, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> LYFT, INC., <br><br> Defendant. | Case No. 3:13-cv-04065-VC <br><br> **OBJECTIONS TO PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENT** |

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ................................................................................... 1

II. STANDING TO RAISE OBJECTIONS .............................................. 2

III. STANDARD OF REVIEW .................................................................. 2

IV. SUMMARY OF OBJECTIONS ........................................................... 3

V. OBJECTIONS ...................................................................................... 5

  A. **The Proposed Settlement's Economic Terms are Inadequate** ......... 5

    *1. Overtime and Minimum Wage* .................................................. 6

    *2. The PAGA Claims* ..................................................................... 7

      (a) *Plaintiffs' Calculation of PAGA Liability is Unsubstantiated, Inadequate and Unfair to the Class and the State of California* .......... 7

      (b) *Plaintiffs Lack Standing and this Court is Without Jurisdiction to Issue a Judgment on the PAGA Claims* ................................ 11

  B. **The Plaintiffs Fail to Consider the Consequences and Costs of Lyft's Continued Misclassification of its Drivers** ....................... 13

    *1. Increased Costs to Individual Workers* ................................... 13

    *2. Increased Costs Borne by the Public* ....................................... 16

    *3. By Leaving in Place the Drivers' Misclassification, the Settlement is Retrograde* ............................................. 16

  C. **The Proposed Settlement's Prospective Relief is Inadequate** ........ 18

  D. **In Discounting Their Claims, Plaintiffs Give too Much Credence to Lyft's Purported Arbitration and Class Waiver Provisions** ......... 20

    *1. Arbitration Does Not, in Itself, Justify Significant Discounting of Liability* ............................................ 21

    *2. Enforceability of Lyft's "Class Waiver" is Doubtful* ............. 22

    *3. Lyft Has Waived Arbitration With Respect to the Class* ......... 23

  E. **Plaintiffs' Amendment of Their Complaint for Settlement Purposes is Improper** ........................................................... 24

  F. **Plaintiffs Have Not Established They are Representative of the Class** ...... 24

VI. CONCLUSION .................................................................................... 25

**TABLE OF AUTHORITIES**

**Cases**                                                                 **Page(s)**

*Achal v. Gate Gourmet, Inc.,*
   114 F.Supp.3d 781 (N.D. Cal. 2015) ............................................................ 10, 11

*Aguirre v. Genesis Logistics,*
   No. CV-12-00687, 2015 WL 3755239 (C.D. Cal., June 16, 2015) .................................. 9

*American Pipe & Construction v. Utah,*
   414 U.S. 538 (1974).............................................................................. 24

*Arias v. Superior Court,*
   46 Cal.4th 969 (Cal. 2009)...................................................................... 11

*Armendariz v. Found. Health Psychcare Servs., Inc.,*
   24 Cal.4th 83 (Cal. 2000)....................................................................... 21

*Baumann v. Chase Inv. Services Corp.,*
   747 F.3d 1117 (9th Cir. 2014).................................................................... 12

*Cardenas v. McLane Foodservices, Inc.,*
   796 F. Supp. 2d 1246 (C.D. Cal. 2011) ........................................................... 9

*CLS Transp. Los Angeles, LLC v. Iskanian,*
   135 S.Ct. 1155 (2015)......................................................................... 3, 8

*Cobarruviaz v. Maplebear, Inc.,*
   No. 15-CV-00697, 2015 WL 6694112 (N.D. Cal. Nov. 3, 2015) ..................................... 22

*Edwards v. First American Corp.,*
   289 F.R.D. 296 (C.D. Cal. Nov. 30, 2012) ...................................................... 23, 24

*Elliott v. KB Home North Carolina, Inc.,*
   231 N.C.App. 332 (N.C. Ct. App. 2013) .......................................................... 24

*Gattuso v. Harte-Hanks Shoppers, Inc.,*
   42 Cal.4th 554 (Cal. 2007)....................................................................... 6

*Green v. Obergfell,*
   121 F.2d 46 (D.C. Cir. 1941) ..................................................................... 1

*Guifu Li v. A Perfect Day Franchise, Inc.,*
   No. 5:10-CV-01189, 2012 WL 2236752 (N.D. Cal. June 15, 2012).................................... 9

*Hernandez v. DMSI Staffing, LLC*,
   79 F.Supp.3d 1054 (N.D. Cal. 2015) ............................................................................. 8

*Hibbs-Rines v. Seagate Techs. LLC*,
   No. CV-08-05430, 2009 WL 513496 (N.D. Cal. Mar. 2, 2009) ...................................... 10

*Hutchinson v. Fry's Electronics, Inc.*,
   2015 Wage & Hour Cas.2d (BNA) 174626 (Cal. Ct. App., Jan. 15, 2015) ....................... 8

*In re Cendant Corp. Derivative Action Litigation*,
   232 F.Supp.2d 327 (D.N.J. 2002) ................................................................................. 5

*In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*,
   55 F.3d 768 (3d Cir. 1995) ........................................................................................... 3

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. M 07-1827 SI, 2011 WL 1753784 (N.D. Cal. May 9, 2011) ................................... 23

*International Ass'n of Heat and Frost Insulators and Asbestos Workers, etc. v. United Contractors Ass'n, Inc. of Pittsburgh, Pa.*,
   483 F.2d 384 (3d Cir. 1973) ....................................................................................... 20

*Iskanian v. CLS Transp. L.A., LLC*,
   59 Cal.4th 348 (Cal. 2014) ............................................................................. 3, 8, 10, 11

*Levin v. Caviar, Inc.*,
   No. 15-cv-01285 (N.D. Cal.) ....................................................................................... 22

*Lhotka v. Geographic Expeditions, Inc.*,
   181 Cal.App.4th 816 (Cal. Ct. App. 2010) ................................................................... 21

*Loewen v. Lyft, Inc.*,
   No. 15-CV-01159, 2015 WL 5440729 (N.D. Cal. Sept. 15, 2015) ................................. 21

*Luckey v. Superior Court*,
   228 Cal.App.4th 81 (Cal. Ct. App. 2014) ...................................................................... 3

*Murphy Oil v. NLRB*,
   808 F.3d 1013 (5th Cir. 2015) ............................................................................... 22, 23

*Navarro Sav. Ass'n v. Lee*,
   446 U.S. 458 (1980) .................................................................................................... 12

*Nelson v. Southern California Gas Company*,
   No. B238845, 2013 WL 2358670 (Cal. Ct. App., May 30, 2013) .................................. 10

*Newman v. Stein*,
   464 F.2d 689 (2d Cir. 1972) ........................................................................................ 2

*Ortiz v. CVS Caremark Corporation,*
  No. C-12-05859, 2014 WL 1117614 (N.D. Cal., Mar. 19, 2014)................................ 9, 10

*Payne v. Menard,*
  No. 2:15-cv-317 (N.D. Ind. Feb. 18, 2016)
  (attached hereto).............................................................................................. 23

*Plaisted v. Dress Barn, Inc.,*
  No. 2:12-CV-01679, 2012 WL 4356158 (C.D. Cal., Sept. 20, 2012) ........................... 10

*Rix v. Lockheed Martin Corp.,*
  No. 09CV2063, 2012 WL 13724 (S.D. Cal., Jan. 4, 2012) ....................................... 10

*Sanchez v. Valencia Holding Co., LLC,*
  61 Cal.4th 899 (Cal. 2015)................................................................................. 21

*Smith v. Cardinal Logistics Management Corp.,*
  No. 07-2104 SC, 2008 WL 4156364 (N.D. Cal., Sept. 5, 2008) ................................. 17

*Stafford v. Dollar Tree Stores, Inc.,*
  No. 2:13-CV-1187, 2014 WL 6633396 (E.D. Cal. Nov. 21, 2014)............................... 11

*Staton v. Boeing Co.,*
  327 F.3d 938, 960 (9th Cir. 2003)......................................................................... 3

*Stoddart v. Express Services, Inc.,*
  No. 2:12-CV-01054, 2015 WL 5522142 (E.D. Cal. Sept. 16, 2015)............................. 8

*Taylor v. Local No. 7, International Union of Journeymen Horseshoers,*
  353 F.2d 593 (4th Cir. 1965)............................................................................... 20

*Totten v. Kellogg Brown & Root, LLC,*
  __ F.Supp.3d. __, No. EDCV141766, 2016 WL 316019 (C.D. Cal., Jan. 22, 2016)
  (attached hereto)........................................................................................ 22, 23

*United Mine Workers of America v. Gibbs,*
  383 U.S. 715 (1966)......................................................................................... 12

*Urbino v. Orkin Services of California, Inc.,*
  726 F.3d 1118 (9th Cir. 2013) ............................................................................ 12

*Wert v. U.S. Bancorp,*
  No. 13-CV-31302014, 2014 WL 2860287 (S.D. Cal. June 23, 2014)............................ 8

*USS-POSCO Industries v. Contra Costa County Bldg. & Const. Trades Council, AFL-CIO,*
  31 F.3d 800 (9th Cir. 1994)................................................................................ 20

*Yellow Cab Cooperative v. Workers Compensation Appeals Board,*
   226 Cal.App.3d 1288 (Cal.Ct.App. 1991) ............................................................... 17

*Zenelaj v. Handybook Inc.,*
   82 F. Supp. 3d 968 (N.D. Cal. 2015) ..................................................................... 22

**Statutes**

*United States*

9 U.S.C. § 2 ............................................................................................................. 22

15 U.S.C. § 17 .......................................................................................................... 20

29 U.S.C. § 152(3) .................................................................................................... 15

29 U.S.C. § 203(g) ................................................................................................. 5, 13

29 U.S.C. § 2601(3) .................................................................................................. 15

*California*

Private Attorney Generals Act of 2004, Labor Code §§ 2699, et seq. ........................ passim

Labor Code § 226 ................................................................................................. 5, 8, 9

Labor Code § 512 ..................................................................................................... 14

Labor Code § 2699.3 .............................................................................................. 2, 11

Labor Code § 2750 ................................................................................................... 16

Labor Code § 2750.5 ............................................................................................. 5, 16

Labor Code § 2750.8 ............................................................................................. 5, 16

Labor Code § 2802 ..................................................................................................... 6

Labor Code § 3351 ................................................................................................... 17

Labor Code § 3353 ................................................................................................... 17

Labor Code § 3357 ................................................................................................... 17

Unemployment Insurance Code § 601 ..................................................................... 5, 15

Unemployment Insurance Code § 606.5 .................................................................... 15

Unemployment Insurance Code § 656 ........................................................................ 15

**Rules**

Federal R. of Civ. Procedure No. 23 ........................................................................... 2

Federal R. of Civ. Procedure No. 24 ........................................................................... 1

**Administrative**

California DLSE Opinion No. 1988.08.12 ................................................................... 6

California DLSE Opinion No. 1990.07.23 ............................................................... 6, 9

U.S. Department of Labor Administrator's Interpretation No.2015–1, 2015 WL 4449086,
  Industrial Welfare Commission Wage Order No. 9 ............................................... 16

U.S. Department of Labor, Wage and Hour Division, Administrator's Interpretation
  No. 2015-1 (July 15, 2015) .................................................................................... 13

**Secondary**

Adolph M. Koven and Susan M. Smith, "Just Cause: The Seven Tests,"
  BNA 2006 (3d Edition) .......................................................................................... 19

Alon Y. Mass, David S. Goldfarb, & Ojas Shah, "Taxi Cab Syndrome: A Review
  of the Extensive Genitourinary Pathology Experienced by Taxicab Drivers and
  What We Can Do to Help," 16 Reviews in Urology 99-104 (2014) ....................... 14

Barbara Jean Burgel, Marion Gillen, & Mary Castle White, "Health and
  Safety Strategies of Urban Taxi Drivers," 89 J. Urban Health 717-722 (2012) ..... 14

Elkouri & Elkouri, "How Arbitration Works" BNA 2012 (7th Ed.) ........................... 19

Francoise Carre, "(In)dependent Contractor Misclassification,"
  Economic Policy Institute (June 8, 2015) ......................................................... 15, 16

Ian Ayers, Frederick E. Vars, & Nasser Zakariya, "To Insure Prejudice:
  Racial Disparities in Taxicab Tipping," 114 Yale L.J. 1613, 1627 (2005) .............. 14

Rebecca Smith & Sarah Leberstein, "Rights on Demand: Ensuring Workplace
  Standards and Workplace Security in the On-Demand Economy,"
  National Employment Law Project (Sept. 2015) ............................................... 14, 15

Sarah A. Donovan, David H. Bradley, Jon O. Shimabukuro,
  Cong. Research Serv., R44365, "What Does the Gig Economy Mean for Workers?" ............. 15, 16

# I. **INTRODUCTION**

Angelica Rose Ferdinand, Helen Hebert, Leigh-Ann Johnson, Amir Kashanian, and Kelsey Tilander ("Objecting Class Members") and the Teamsters Joint Councils No. 7 and No. 42 ("Teamsters") (together, "Objectors") submit these objections to the proposed class action settlement submitted for the Court's preliminary approval.  The Objectors will also move for permission to intervene for purposes of the class settlement proceedings and the claims forwarded under the California Labor Code Private Attorney Generals Act ("PAGA") pursuant to Federal Rule of Civil Procedure ("FRCP") 24. The Objectors have a strong interest in this litigation and in the eventual terms of any class settlement, particularly with respect to the issue of Lyft drivers' continued misclassification as independent contractors and the "prospective relief" proposed by Plaintiffs.  The individual objectors are members of the putative settlement class whose rights will be affected by an approval of the class settlement.

The Teamsters Joint Councils 7 and 42 together represent 300,000 California workers within a range of industries, including the transportation industry.  The Joint Councils have the Teamsters' recognized jurisdiction over the representation of employees involved in transportation in California.[1] California Teamsters have been deeply involved in political and public affairs related to the issue of misclassification in the transportation industry, and instrumental in the State's legislative response to the recurring problem of misclassification.  Further, the Teamsters are actively involved in organizing and representing workers employed or engaged by Lyft and other transportation network "gig economy" employers.  In that regard, the Teamsters have particular interest in ensuring the Court is fully informed of the problematic "prospective relief" afforded by the terms of the proposed settlement, including the conflicts with federal law and state public policy, and the ramifications of a judicial endorsement of the calculated restructuring of the employment relationship in a manner that deprives Lyft drivers of rights guaranteed by state and federal law.

The judgment sought by Plaintiffs and Lyft also threatens to interfere with the Teamsters' current representation of Lyft drivers and the developing labor relations involving transportation network companies such as Lyft.  As exemplified by the unfair labor practice charge currently pending before the National Labor Relations Board, the proposed settlement conflicts with and

---

[1] See, e.g. *Green v. Obergfell* 121 F.2d 46, 66 (D.C. Cir. 1941).

interferes with the processes and procedures related to such labor relations.  For the reasons stated below, the proposed settlement is also inadequate in terms of monetary relief to the class and the PAGA penalties obtained on behalf of the State of California, a claim over which Objectors question the Court's jurisdiction and Plaintiffs' standing to assert them in light of Plaintiffs' acceptance of non-employee status.

## II. <u>STANDING TO RAISE OBJECTIONS</u>

The Objecting Class Members are each members of the putative class and therefore have standing to raise objections in this proceeding pursuant to Federal Rule of Civil Procedure 23(e), which specifies the procedures applicable "to a proposed settlement, voluntary dismissal, or compromise."  Subpart (5) provides: "Any class member may object to the proposal if it requires court approval under this subdivision (e)."  The proposed class settlement is such a "proposal" and therefore the submission of these objections is authorized.  The Objecting Class Members are also "Aggrieved Employees" within the meaning of PAGA, Labor Code section 2699.3.

The Objecting Class Members have designated Joint Council No. 7, with respect to Northern California operations, and Joint Council No. 42, with respect to Southern California, as their personal representatives for purpose of this litigation and with respect to the negotiation of the terms and conditions of their employment.  The proposed settlement provides that Class Members may submit objections through authorized representatives.  PAGA section 2699.3 also permits submission of claims through a "representative."  Federal labor law permits both employees and independent contractors to designate a labor organization to represent them with respect to their terms and conditions of employment, as the Objecting Class Members have done.  Therefore, the Teamsters have standing to submit these objections on behalf of the Objecting Class Members.

## III. <u>STANDARD OF REVIEW</u>

The Court's role "is to reach an objective, educated estimate of the complexity and probable success of full litigation, together with all other factors relevant to a fair evaluation of the wisdom of the proposed compromise."  *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir. 1972), cert. denied, 409 U.S. 1039 (1972).  In doing so, the Court "has the fiduciary responsibility of ensuring that the settlement is fair and not a product of collusion, and that the class members' interests were represented adequately."  *Id.*  "It is the settlement taken as a whole, rather than the individual

component parts, that must be examined for overall fairness," and "[t]he settlement must stand or fall in its entirety." *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003). The standard is heightened when reviewing pre-certification class settlements, as summarized by the Third Circuit:

> We have already noted the special difficulties the court encounters with its duties under Rule 23(e) in approving settlements where negotiations occur before the court has certified the class. Because of such difficulties, many courts have required the parties to make a higher showing of fairness to sustain these settlements. *See, e.g., Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 33 (3d Cir.1971) ("[W]hen the settlement is not negotiated by a court designated class representative the court must be doubly careful in evaluating the fairness of the settlement to the plaintiff's class."); *General Motors Interchange*, 594 F.2d at 1125 (attributing a need for heightened scrutiny of the settlement to the potential for collusive settlement); *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982) (higher showing of fairness required in pre-certification settlements, and special focus on assuring adequate representation and the absence of collusion); *Malchman v. Davis*, 706 F.2d 426, 434 (2d Cir.1983); *Mars Steel v. Continental Ill. Nat'l Bank & Trust*, 834 F.2d 677, 681 (7th Cir.1987); *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323 (2d Cir.1990); 2 Newberg & Conte § 11.23; MCL 2d § 30.42 (citing the informational deficiencies faced by the court and counsel in pre-certification settlements). We affirm the need for courts to be even more scrupulous than usual in approving settlements where no class has yet been formally certified.

*In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 805 (3d Cir. 1995). Further, "[t]he interests of unnamed precertification class members are present... and the courts cannot permit their respect for the litigants' rights to agree on how to resolve their dispute to outweigh the court's responsibility to protect the rights of absent class members." *Luckey v. Superior Court*, 228 Cal.App.4th 81, 105 (Cal. Ct. App. 2014). The proposed settlement fails to withstand this heightened scrutiny.

## IV.  SUMMARY OF OBJECTIONS

The three named Plaintiffs in this action seek to consummate a $12.25 million class settlement with Defendant Lyft. The settlement will waive and release the claims of approximately 100,000 class members. In exchange for modest payments to individual drivers, the settlement leaves, approves, and authorizes the ongoing and continuing violation of California and federal labor law, namely, the misclassification of drivers who are regularly engaged to drive Lyft's customers, while seeking judicial approval of illegal waivers of drivers' statutory rights.

The class is varied and contains no subclasses, including drivers who have driven for Lyft once, and those for whom it has been their primary, full-time occupation. The extent to which

Plaintiffs' experience is typical or representative of the entire class is unclear and not addressed by their papers. Two of the Plaintiffs, Cotter and Maciel, worked as Lyft drivers for only a short period of time, four months and six weeks respectively. (See Order Denying Cross-Motions for Summary Judgment at 7, Doc. 94 (Mar. 11, 2015).) Only after the settlement was reached and the FAC drafted was Plaintiff Knudtson added as a party to this suit. Plaintiff Knudtson has driven for Lyft from October 2013 to the present and regularly drives over 40 hours in a week and over 8 hours a day. (See Class Action Settlement Agreement and Release at 79, 83, 91, Doc. 169-1 (Jan. 26, 2016) ("Settlement Agreement").) Unlike the other two Plaintiffs, Mr. Knudtson was not deposed and did not participate in discovery. It is clear that Mr. Knudtson was added very late in the proceedings, following settlement, for the sole purpose of lending typicality with respect to the more valuable and stronger claims the Plaintiffs seek to waive and release.

Plaintiffs have not properly calculated the value of the class's claims, have not considered the ongoing economic – and public cost – of Lyft's misclassification scheme, and have gratuitously discounted the class's claims without sufficient justification or explanation. Plaintiffs have also agreed to largely meaningless "prospective relief," a form of "relief" that continues to deprive Lyft drivers of their labor rights and to their entitlement to be compensated in accordance with California law. The discounting is exacerbated by Plaintiffs' eleventh hour dramatic expansion of the scope of their claims to include all manner of California Labor Code violations. To facilitate settlement, Plaintiffs filed a proposed Fifth Amended Complaint ("FAC") dated January 26, 2016. Plaintiffs have provided no evidence or averment that the additional claims set forth in the proposed FAC are typical of their experience. Further, their papers appear to indicate that the additional claims were not considered with respect to the negotiation of the proposed settlement because (1) the FAC is dated subsequent to the negotiation and (2) many of the additional claims have not been included or considered in Plaintiffs' exposure calculation, that is, the assessment of Lyft's potential liability. Without accounting for the additional claims added by the FAC, Plaintiffs nevertheless, seek through this approval process to eliminate all of Lyft's liability for its driver misclassification scheme. In addition, without satisfying the standing requirement, Plaintiffs ask the Court to release Lyft of its PAGA liability to the State while apportioning a mere 1% of the settlement for that purpose.

1   It is not possible to fully evaluate the fairness of the settlement because of the lack of

2   transparency which is, itself, unfair to the putative class. Substantial and significant data has been

3   redacted, making it difficult for Objectors and class members to assess the adequacy of the proposed

4   settlement.  (*See* Plaintiffs' Administrative Motion to File Documents Under Seal, Doc. 178.)

5   For the reasons described below, the Court should decline to preliminarily approve the

6   proposed class settlement.

## V.  OBJECTIONS

7   The proponents of a class action settlement must demonstrate that the factors used to analyze

8   such settlements weigh in their favor.  *In re Cendant Corp., Derivative Action Litigation*, 232

9   F.Supp.2d 327 (D.N.J. 2002).  Other than arguing that a standard highly deferential to their opinion

10  should prevail, Plaintiffs provide little to support a finding that their proposed settlement is entitled to

11  preliminarily approval or that they have adequately represented the entire class.

### A.  The Proposed Settlement's Economic Terms Are Inadequate

Plaintiffs state that "[b]ased on extensive data provided by Lyft" they "have calculated that

Lyft's likely exposure to damages and penalties is just over $70,000,000." (Declaration of Liss-

Riordan in Support of Preliminary Approval ("Liss-Riordan Decl."), at paras. 29-73).  Upon

inspection, there is little evidence of the basis or reasoning behind Plaintiffs' damages or "exposure"

calculation.  Plaintiffs' calculation of the monetary value of their claims is as follows:

- Mileage and cell phone reimbursement: $64 million (Liss-Riordan Decl., at ¶ 34);

- Taking of Gratuities: $250,000 (*Id.*, at ¶ 34);

- Daily or weekly overtime pay: $900,000 (Id., at ¶ 40);

- PAGA penalties: No fact-based calculation provided (Liss-Riordan Decl., at para 40);

- Minimum Wage Violations: No liability (*Id.*, at para 40); and

- Inaccurate Wage Statements: No Liability (Id., at para 40).

These calculations are inadequate and unsupported, as neither the Preliminary Approval motion nor

its supporting declarations provide data or quantitative analysis with which Plaintiffs' assessment can

be evaluated.  There are various indications that these liability assessments are inadequate.

///

///

### 1. *Overtime and Minimum Wage*

Objectors question whether $900,000 captures the extent of overtime worked and the proper rate at which it should be paid. The Plaintiffs do not provide data as to how they computed "hours worked" for purposes of overtime liability or the rate applied. Plaintiffs fail to indicate whether they, themselves, worked overtime, or the proportion of the class that did so. Because the only Plaintiff that may have worked overtime was added post-settlement via the FAC offered "for settlement purposes only" it appears this and other claims associated with full-time drivers were not adequately represented in negotiation. Indeed, Plaintiffs' calculations do not reflect the Objecting Class Members' experience. Objecting Class Members have worked full time for Lyft and, at times, more than full time. They have not received the overtime pay to which they are entitled. Further, Plaintiffs have failed to provide calculation of an appropriate overtime rate. To the extent Lyft drivers are paid a piece rate, they are entitled to overtime pay at a rate equal their week's pay divided by hours worked in tasks central to the piece rate multiplied by 1.5 (*See* Cal. DLSE Opinion No. 1990.07.23 and 1988.08.12 (describing overtime calculation for commission and piece rate employees).) Given the size of the class, the unsupported claim of overtime liability does not appear fair or credible.

Valuing minimum wage liability at zero is likewise inadequate. Objecting Class Members note that on various occasions they have not received the applicable minimum wage for their hours worked. For example, Objectors have each had the following experiences on multiple occasions: (1) lengthy drives to pick up a Lyft customer only to take that customer on a very short trip, such that the total work time[2] divided by the piece rate results in less than a minimum wage, and (2) traffic conditions that result in longer-in-time rides such that the piece rate does not result in payment of the minimum wage. Moreover, Lyft's commission (which can equal 20% of the ride share fee) is deducted from a driver's piece rate thereby increasing the incidents of failure to pay minimum wage. Plaintiffs do not address the impact of expenses and costs otherwise reimbursable under Labor Code section 2802 with respect to payment of the minimum wage. (*Gattuso v. Harte-Hanks Shoppers, Inc.* 42 Cal.4th 554, 573 (Cal. 2007) (Minimum wage calculated following apportionment of expenses).) Objectors suggest Plaintiffs' assessment the minimum wage and overtime claims are inadequate.

///

---

[2] Lyft designates time driving to a pick-up as "Period 2" and time spent driving the passenger as "Period 3" time.

## 2. *The PAGA Claims*

Plaintiffs' assessment of PAGA liability has not been substantiated and has been inappropriately discounted on the basis of inapplicable legal theories. In addition, by abandoning their claim to employee status, Plaintiffs lack standing under PAGA on behalf of the State and are incapable of entering into a binding contract with respect to PAGA liability. Rather than approve a settlement that involves PAGA claims, this Court should decline jurisdiction over the PAGA claims.

(a) *Plaintiffs' Calculation of PAGA Liability is Unsubstantiated, Inadequate and Unfair to the Class and the State of California*

Plaintiffs describe Lyft's PAGA liability as "astronomical" and then note that courts may exercise discretion over PAGA awards, but this does not excuse Plaintiffs' failure to make a calculation. Plaintiffs ascribe a 1/3 quotient to the already-discounted liability described above, *i.e.* one-third of $65,150,000, or $21.7 million (Liss-Riordan Decl., at ¶ 69). Objectors question the appropriateness of Plaintiffs' underlying exposure calculation and, to the extent it is undervalued, so too is their PAGA calculation. Further, it is not clear from where the 1/3 quotient is derived.

In neglecting to provide a calculation to fix the PAGA assessment, Plaintiffs fail to itemize the value of each Labor Code violation for a PAGA penalty is released. This is particularly problematic in light of the January 26, 2016 FAC that expands the Labor Code violations for which Plaintiffs and Lyft seek class-wide waivers, releases and compromises. After reducing their PAGA liability by two-thirds, it is then further reduced by 25% to reflect what drivers would receive under a PAGA award (as the statute requires 75% of a PAGA award to be remitted to the State for the purpose of funding Labor Code standards enforcement), which equals approximately $5.5 million. Yet the "PAGA Payment" under the settlement agreement equals 2.2% of that amount, or $122,250, of which $91,875, or 75% is remitted to the State (See Settlement Agreement at 10, ¶ "dd"). As noted above, in calculating the initial PAGA liability, Plaintiffs had already reduced their calculation by 75% to arrive at their $5.5 million amount "owed to the drivers" And so there is no basis to apply an additional reduction. The PAGA assessment shortchanges the State in terms of its proper and important efforts to enforce the Labor Code, described below, as well as drivers.

Plaintiffs have inappropriately applied deep discounts to the PAGA claims. As discussed below, Plaintiffs have discounted all of their claims as a result of an illegal arbitration class-action

waiver contained in Lyft's "Terms of Use" provisions.  However, even if given effect, such agreements are not applicable to PAGA claims because a "PAGA representative action is . . . a type of *qui tam* action," and the "government entity on whose behalf the plaintiff files suit is always the real party in interest in the suit" and, therefore the arbitration and representative action waiver is inapplicable. *Iskanian v. CLS Transp. L.A., LLC,* 59 Cal.4th 348, 382 (Cal. 2014); *Sakkab v. Luxottica Retail N. Am., Inc.,* 803 F.3d 425, 431 (9th Cir. 2015); *see also Hernandez v. DMSI Staffing, LLC*, 79 F.Supp.3d 1054 (N.D. Cal. 2015) (*Iskanian* holding not preempted by FAA); *Hutchinson v. Fry's Electronics, Inc.* 2015 Wage & Hour Cas.2d (BNA) 174626 (Cal. Ct. App., Jan. 15, 2015) (applying *Iskanian* in face of arbitration provision). Rather than accept settled law, Plaintiffs assert the U.S. Supreme Court has not passed on the question, despite the fact that it has denied certiorari on the issue at each opportunity. See, e.g. *CLS Transp. Los Angeles, LLC v. Iskanian* 135 S.Ct. 1155 (2015). Therefore it is inappropriate to deeply-discount PAGA liability based on a purported class-waiver that is inapplicable to PAGA claims (Liss-Riordin Decl. paras. 71-72.)  In assessing class-wide relief, the PAGA claims may well be the most valuable.

Also of concern is Plaintiffs' assertion that a deep discounting of the PAGA claims is justified by a "potential" argument that PAGA penalties constitute a "double recovery." Plaintiffs' papers do not identify any such potential "double recovery" and the theory itself is legally unsupported.

The "double recovery" theory which Plaintiffs reference has its genesis in *Wert v. U.S. Bancorp*, No. 13-CV-31302014, WL 2860287, at *3 (S.D. Cal. June 23, 2014), a holding since rejected. In *Stoddart v. Express Services, Inc.*, No. 2:12-CV-01054, 2015 WL 5522142, at *9 (E.D. Cal. Sept. 16, 2015), the Eastern District of California summarized:

> The *Wert* decision is non-binding and this court finds it unpersuasive. As another court has observed, section 2699(f) operates as a fallback provision, providing penalties "[f]or all provisions of this code except those for which a civil penalty is specifically provided." *York v. Starbucks Corp.*, No. 08–07919, 2012 WL 10890355, at *7 (C.D.Cal. Nov.1, 2012); see also *Willner v. Manpower Inc.*, 35 F.Supp.3d 1116, 1135 (N.D.Cal.2014) (PAGA penalties and statutory penalties mutually exclusive; PAGA penalties require only a showing of a section 226(a) violation, rather than an injury); *Pelton v. Panda Rest. Grp., Inc.*, No. 10–8458, 2011 WL 2462047, at *2 (C.D.Cal. June 20, 2011) (finding that civil penalties outlined in section 2699(f) applicable with respect to alleged violations of section 226(a)). Here, plaintiff asserts a 226(a) violation, alleging inaccurate wage statements. He may assert claims for both statutory penalties providing individual compensation as well as civil penalties under section 2699(f) on behalf of the LWDA in accordance with plain statutory language, legislative intent, policy behind PAGA, and the relevant case law.

If there is an exception to this rule it is very narrow, limited to claims for wage statements where the applicable Labor Code provision itself includes a specific penalty. (*Guifu Li v. A Perfect Day Franchise, Inc.*, No. 5:10-CV-01189, 2012 WL 2236752, at *17 (N.D. Cal. June 15, 2012); *Aguirre v. Genesis Logistics*, No. SACV 12-00687, 2015 WL 3755239, at *3 (C.D. Cal., June 16, 2015).) Any such exception is inapplicable to Plaintiffs' calculations because Plaintiffs have valued their claim for inaccurate wage statements as worthless. Thus, Plaintiffs appear to discount the PAGA liability for all Labor Code claims based on a questionable legal theory that, at best, applies only to a single claim that Plaintiffs had already inappropriately discounted to zero.

Specifically, the proposed settlement appears to abandon the class' claim for penalties associated with inaccurate or incomplete wage statements under Labor Code section 226 by incorrectly characterizing the drivers' wages. Plaintiffs state Lyft has no liability under this provision because "Drivers are not paid on a piece rate basis" (Liss-Riordan Decl., ¶ 48). In fact, they are, as they are paid per ride. (*See, e.g., Cardenas v. McLane Foodservices, Inc.*, 796 F. Supp. 2d 1246 (C.D. Cal. 2011) (driver piece-rate compensation based on number of cases of product delivered on a route, number of miles driven on a route; number of delivery stops made; finding DLSE Opinion Letters on piece-rate overtime calculation persuasive.); *see also* Cal. DLSE Opinion Nos. 1988.05.04 and 1990.07.23.) Lyft drivers are paid by the ride with, at times, a minimum guarantee, which is a classic form of piece rate. *Id.* (Plaintiffs also suggest that a "good faith" defense is available to Lyft (Liss-Riordan Decl., ¶ 49), but provide no analysis as to the likelihood of such a defense or the high burden Lyft would be required to satisfy.

Plaintiffs also undervalue their PAGA claims based on a "manageability" concern, citing *Ortiz v. CVS Caremark Corporation*, No. C-12-05859, 2014 WL 1117614, at *5 (N.D. Cal., Mar. 19, 2014), (Plaintiffs' Memorandum of Law in Support of Preliminary Approval ("Plaintiffs' Memo."), at p. 7). However, the *Ortiz* holding was not as broad or decisive as Plaintiffs argue. Rather, *Ortiz* merely held that the breadth of the class *in that case* made the PAGA claims un-maneagable, not that PAGA claims generally are unmanageable. To the extent a federal court dismisses a PAGA claim for the non-dipositive reason of manageability, the recourse is to re-file in state court, which is obligated to adjudicate the claim, because dismissal for manageability is not a dismissal on the merits.

Other federal courts, including courts in the same District as *Ortiz*, have rejected "unmanageability" arguments applied to PAGA cases. *See, e.g.*, *Plaisted v. Dress Barn, Inc.*, No. 2:12-CV-01679, 2012 WL 4356158, at *2 (C.D. Cal., Sept. 20, 2012) ("To hold that a PAGA action could not be maintained because … claim [would be] unmanageable at trial would obliterate this purpose, as every PAGA action in some way requires some individualized assessment…."); *Hibbs-Rines v. Seagate Techs. LLC*, No. C 08-05430, 2009 WL 513496, at *4 (N.D. Cal. Mar. 2, 2009) (the imposition of a manageability requirement—which finds its genesis in Rule 23—*makes little sense in this context*."; emphasis added); *Rix v. Lockheed Martin Corp.*, No. 09CV2063, 2012 WL 13724, at *3 (S.D. Cal., Jan. 4, 2012) ("premature to strike Plaintiff's PAGA claim… given the reasonable possibility that Plaintiff could ultimately seek to litigate a manageable PAGA claim.). The California Court of Appeal has also rejected the "unmanageability" defense in keeping with the intent and purpose of the statute. *Nelson v. Southern California Gas Company*, No. B238845, 2013 WL 2358670, at *18 (Cal. Ct. App., May 30, 2013) ("The parties have not identified any California cases specifically considering whether the trial court may deny a representative PAGA claim on the ground that individual questions would make the litigation unmanageable.").

This argument is particularly unavailing because, while Plaintiffs claim that concerns of manageability justify discounting PAGA liability, they are simultaneously seeking approval of an amended complaint that enlarges the labor code violations for which PAGA penalties are available.

Plaintiffs have proven incapable of adequately representing both the class and the State of California with respect to the PAGA claims. As noted, in *Iskanian*, 59 Cal.4[th] at 382, the California Supreme Court has recognized that PAGA representative claims are "a type of *qui tam* action" *and* "[t]he purpose of PAGA is not to recover damages or restitution, but to create a means of 'deputizing' citizens as private attorneys general to enforce the Labor Code." *Achal v. Gate Gourmet, Inc.*, 114 F.Supp.3d 781, 807 (N.D. Cal. 2015) ( "In bringing an action under PAGA, the aggrieved employee acts as the proxy or agent of state labor law enforcement agencies, representing the same legal right and interest as those agencies, in a proceeding designed to protect the public, *not to benefit private parties*."). Simply, "PAGA plaintiffs do not assert the rights of third party employees, but instead represent the interests of the state labor law enforcement agency … [which] is

1    therefore always the real party in interest in the suit." (*Iskanian*, 59 Cal.4th at 382, 173 Cal.Rptr.3d

2    289; *Achal v. Gate Gourmet, Inc.*, 114 F.Supp.3d 781, 807 (N.D. Cal. 2015).)

3         For these reasons, by failing to adequately calculate PAGA liability, and then discounting it

4    based on "what the drivers would receive" (and then discounting it a second time for that same

5    reason), Plaintiffs have failed to adequately represent the interests of the class and the state. In

6    conclusion, the PAGA damages or exposure calculation provided by Plaintiffs is inadequate and

7    devoid of supporting facts, presented without sufficiently specific calculation, and lacks legal

8    analysis. The reasons for discounting the PAGA claims are legally insufficient.

9         (b)   *Plaintiffs Lack Standing and this Court is Without Jurisdiction to Issue a Judgment on the PAGA Claims*

10        As the Court noted in its request for additional briefing, in forwarding the proposed settlement

11   Plaintiffs have abandoned the claim that they are employees of Lyft.  Accordingly, Plaintiffs cannot

12   assert or compromise PAGA claims.  Labor Code section 2699.3 strictly limits those who can bring

13   PAGA claims to "aggrieved employees."  The provision is strictly construed as a matter of statutory

14   standing and any purported settlement agreement executed by a non-employees is ineffective to

15   dispose of PAGA claims (*see* Labor Code sections 2699(c) (defining "aggrieved employee" as "any

16   person who was employed by the alleged violator and against whom one or more of the alleged

17   violations was committed"); 2699.3(b)&(c) (conferring standing on "aggrieved employee"); *Arias v.

18   Superior Court* (2009) 46 Cal.4th 969, 986 (discussing PAGA's requirements).)  As noted by the

19   Eastern District of California: "[I]n light of the number of potential aggrieved employees, judicial

20   economy favors deferring the representative portion of the PAGA claim until plaintiff's status as an

21   aggrieved employee with the right to bring this action is established. (*Stafford v. Dollar Tree Stores,

22   Inc.*, No. 2:13-CV-1187, (E.D. Cal. Nov. 21, 2014) WL 6633396, at *4).)  Therefore, Plaintiffs - who

23   no longer claim to be employees – cannot execute an agreement to collect penalties on behalf of

24   themselves and all other "aggrieved employees" if they themselves are not "aggrieved employees."

25        The gratuitous addition of PAGA claims for purposes of settlement, combined with the

26   relinquishment of employee status, arouses great concern about the proposed settlement.

27        It is unclear that the Court has jurisdiction over the PAGA claims for an independent reason.

28   The Class Action Fairness Act, under which the Plaintiffs sought jurisdiction, does not confer

---

1   jurisdiction over PAGA claims, *Baumann v. Chase Inv. Services Corp.*, 747 F.3d 1117, 1124 (9th

2   Cir. 2014) cert. denied, 135 S.Ct. 870 (2014), and "the State [of California], as the real party in

3   interest, is not a 'citizen' for diversity purposes," *Urbino v. Orkin Services of California, Inc.*, 726

4   F.3d 1118, 1122-23 (9th Cir. 2013)  (thereby defeating diversity jurisdiction of PAGA claim); citing

5   *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 461 (1980) (courts "must disregard nominal or formal

6   parties and rest jurisdiction only upon the citizenship of real parties to the controversy.")

7          Consequently, the only basis for federal jurisdiction is pendent jurisdiction, which has not

8   been plead, and it is far from clear, in light of the proposed settlement, that the PAGA claims and the

9   Labor Code claims constitute a "single case."  *United Mine Workers of America v. Gibbs*, 383 U.S.

10   715, 725 (1966) (pendant jurisdiction requires "entire action before the court comprises but one

11   constitutional 'case.'").  As held in *Gibbs*, the power to exercise pendent jurisdiction "is a doctrine of

12   discretion, not of plaintiff's right" and "need not be exercised in every case in which it is found to

13   exist."  Further, "[i]ts justification lies in considerations of judicial economy, convenience and

14   fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction

15   over state claims, even though bound to apply state law to them."

16          Because Plaintiffs' chief concern in compromising their claims is Lyft's arbitration provision,

17   and because that concern is inapplicable to PAGA claims, it appears that the PAGA claims and the

18   Labor Code claims are not "one case."  If Plaintiffs were ordered by this Court to proceed to

19   arbitration, the PAGA claims would remain but this court would lack a jurisdiction to adjudicate

20   them.  Further, unlike the class, Lyft has waived its right to compel arbitration against Plaintiffs, and

21   so the Class' primary means of obtaining monetary recovery may well be through the effective and

22   assiduous prosecution of the PAGA claims in court (and through that mechanism, achieve a judicial

23   determination of employee status on a group-wide basis that has estoppel effect).

24          There are significant reasons why the Court should decline jurisdiction – if indeed it has

25   jurisdiction – over Plaintiffs' PAGA claims. Objectors suggest that Plaintiffs' compromise of PAGA

26   claims for $122,250 is inadequate.

27   ///

28   ///

///

**B. The Plaintiffs Fail to Consider the Consequences and Costs of Lyft's Continued Misclassification of its Drivers**

As noted, the state and its citizens are the real parties in interest to a PAGA claim. Although the Teamsters respectfully acknowledge that the named Plaintiffs and their counsel have expended time, effort and expense in litigating their case to this point, the Teamsters Union has spent considerable time, effort, and expenditures in efforts to reverse misclassification and to organize workers in the "gig" or "sharing" economy. The State, too has expended time, effort and money in that regard. Given the significant and profound impact of a settlement that leaves in place and authorizes the continued misclassification of a large workforce, the Court and Plaintiffs should consider the economic impact of misclassification on the California economy, including depletion of tax base and the exclusion of misclassified workers from state and federal safety nets such as minimum wage, unemployment insurance, medical and sick leave, social security, and many others.

Objectors suggest the Court should look askance at a settlement that undermines the policies of the state of California and the legislative efforts of the Teamsters, Change to Win, the AFL-CIO, and their affiliated unions, and many other worker advocate organizations. Objectors are also concerned that, while the settlement eliminates Lyft's total liability associated with its misclassification, it also authorizes through a Court order additional barriers to resolution of the misclassification claim, namely the "prospective relief" provisions that amend Lyft's Terms of Use and allow for Lyft drivers continued misclassification as independent contractors.

*1. Increased Costs to Individual Workers*

Workers who are misclassified as independent contractors suffer many economic disadvantages that those classified as employees do not face. Federal and state laws provide specific protections and benefits for employees that are unavailable to workers classified as independent contractors. Only those classified as employees are entitled to receive payment for minimum wages and overtime under state and federal law. *See, e.g.*, 29 U.S.C. § 203(g); U.S. Department of Labor, Wage and Hour Division, Administrator's Interpretation No. 2015-1 (July 15, 2015) (explaining the broad "economic realities" test used to determine employee status under the Fair Labor Standards Act). By agreeing to a settlement that accepts Lyft's characterization of drivers as independent

1   contractors, drivers will remain unprotected by these statutes and have their ability to challenge their
2   misclassification significantly undermined.

3       California law requires employers to provide daily rest and meal breaks to employees, Cal.
4   Labor Code § 512(a); IWC Wage Order 9, which is inapplicable to independent contractors. Not
5   only is there an economic value to the required rest and meal breaks, but breaks are necessary for
6   health and safety in an occupation where the sedentary nature of drivers' work and long shifts leave
7   them prone to a variety of medical disorders.[3]  A medical study of San Francisco taxicab drivers
8   identified restroom breaks and breaks to defuse or manage stressful situations as important to drivers'
9   health and safety.[4]  The misclassification of Lyft drivers is not only a threat to driver's health and
10  safety, but also the public's.

11      Federal, state, and local civil rights laws protect only those workers considered employees
12  from discrimination on the job.[5]  These protections are particularly important in a work environment
13  where passengers rate individual drivers after every ride and those who fall below a certain star rating
14  are terminated from driving for Lyft. Order Denying Cross Motions for Summary Judgment, Doc.
15  94, at 4. As at least one empirical study has indicated, there is significant customer preference for
16  white drivers over those of other races, demonstrated by the fact that taxicab passengers of all races
17  tip white drivers substantially more than black drivers or drivers of other races.[6]  Unlike the
18  traditional taxicab industry where a customer's discrimination may result in the loss or reduction of a
19  tip, for drivers operating under the Lyft platform, the consequences of customer discrimination may
20  be lower "star" ratings, which could lead to a driver's complete termination from the Lyft system.
21  Order Denying Cross Motions for Summary Judgment, Doc. 94, at 4. The waiver of employee status
22  means that drivers will have no recourse to challenge their termination through Title VII or the Fair
23  Employment and Housing Act.

---

[3] Alon Y. Mass, David S. Goldfarb, & Ojas Shah, "Taxi Cab Syndrome: A Review of the Extensive Genitourinary
Pathology Experienced by Taxicab Drivers and What We Can Do to Help," 16 Reviews in Urology 99-104 (2014).
[4] Barbara Jean Burgel, Marion Gillen, & Mary Castle White, "Health and Safety Strategies of Urban Taxi Drivers," 89 J.
Urban Health 717-722 (2012).
[5] Rebecca Smith & Sarah Leberstein, "Rights on Demand: Ensuring Workplace Standards and Workplace Security in the
On-Demand Economy," National Employment Law Project (Sept. 2015) available at
http://www.nelp.org/content/uploads/Rights-On-Demand-Report.pdf.
[6] Ian Ayers, Frederick E. Vars, & Nasser Zakariya, "To Insure Prejudice: Racial Disparities in Taxicab Tipping," 114
Yale L.J. 1613, 1627 (2005).

Eligibility for unemployment compensation also is based on employee status, and is unavailable to independent contractors.[7] Likewise, eligibility for benefits under the Family and Medical Leave Act and the California Family Rights Act is based on employee status and is not available for independent contractors.[8] Conceding independent contractor status means that Lyft drivers will be unprotected if they need time to care for a family member or their own medical needs or if they lose their job through no fault of their own.

The National Labor Relations Act excludes workers classified as independent contractors from the protection of the Act. 29 U.S.C. § 152(3). Exclusion from the organizing protections of the NLRA removes a primary means for workers to discuss wages, working conditions, and other terms and conditions of employment with others who work for the same company. For those who work for application-based transportation network services such as Lyft, organization may be one of the only ways to communicate with fellow workers and improve working conditions because these workers are geographically dispersed and isolated from one another.[9]

Employment status also provides access to many benefits such as health insurance, retirement plans, disability insurance policies, and paid vacations. These benefits may not be available to independent contractors, or may only be available in a subsidized or financially advantageous form to those workers with formal employment status.[10]

The waiver of employee status also increases costs for individual workers, shifting them from the employer to the individual employee. In a traditional employer-employee relationship, the employer is responsible for payroll taxes, while these taxes are the responsibility of a self-employed independent contractor.[11] The employer's portion of Social Security and Medicare taxes, which must be paid by a self-employed independent contractor, is 15.3% of gross wages.[12]

///

---

[7] Sarah A. Donovan, David H. Bradley, Jon O. Shimabukuro, Cong. Research Serv., R44365, "What Does the Gig Economy Mean for Workers?" (Feb. 5, 2016; Cal. Unemp. Ins. Code §§ 601; 606.5 656).

[8] 29 U.S.C. § 2601(3); Cal. Code Regs. tit. 2, § 11087(d)(2) (2016); Sarah A. Donovan, David H. Bradley, Jon O. Shimabukuro, Cong. Research Serv., R44365, "What Does the Gig Economy Mean for Workers?" (Feb. 5, 2016).

[9] Rebecca Smith & Sarah Leberstein, "Rights on Demand: Ensuring Workplace Standards and Workplace Security in the On-Demand Economy," National Employment Law Project (Sept. 2015) available at http://www.nelp.org/content/uploads/Rights-On-Demand-Report.pdf.

[10] *See* Donovan, Bradley, and Shimabukuro, at n.8.

[11] *Id.*

[12] Francoise Carre, "(In)dependent Contractor Misclassification," Economic Policy Institute (June 8, 2015) available at http://www.epi.org/publication/independent-contractor-misclassification.

---

**OBJECTIONS TO PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENT**
Case No. 3:13-cv-04065-VC

### 2. *Increased Costs Borne by the Public*

Because the payment of taxes and funding of other public benefits is based on employee status, the designation of drivers as independent contractors also places significant costs on the public treasury. According to one study, if 15% of employers engage in misclassification of approximately 3.4 million workers, the result is a loss of $3.5 billion (in 2014 dollars) in income tax, Social Security and Medicare taxes, and unemployment tax.[13]

Payment for unemployment benefits is financed by employer contributions.[14] Not only does misclassification result in lower funding of the unemployment compensation system by misclassifying employers, but in the event misclassified workers become properly classified, they become entitled to receive benefits from the system, at the expense of the state, even though their employer never contributed.[15] The same result may occur with workers' compensation payments. Even though independent contractors are not covered by workers' compensation statutes, if an injured worker challenges misclassification and is eligible, s/he receives benefits from the California Uninsured Employers Benefit Trust Fund even if the employer has never paid for workers' compensation insurance, a further drain on the public finances and the taxpayers.

### 3. *By Leaving in Place the Drivers' Misclassification, the Settlement is Retrograde*

Misclassification places a dual burden on the public, on the employees misclassified, and on the tax base that supports misclassified employees. The settlement considers none of these costs, nor the obligation to represent the State's interests with respect to the PAGA claims. For these reasons it is the stated policy of California that a contract of employment exists where "one engages another. . . to do something for the benefit of the employer or a third person." (Labor Code section 2750). California's efforts to combat misclassification are significant. For example, in response to rampant misclassification among California's port drivers, California recently enacted Labor Code section 2750.8, which grants amnesty for penalties and liability to drayage companies that re-classify their independent contractor drivers as employees. California also recently enacted Labor Code 2750.5, which empowers the Labor Commissioner to impose steep penalties for willful misclassification.

---

[13] *Id.* at n. 12; *see also* Department of Labor Administrator's Interpretation No.2015–1, 2015 WL 4449086, at *1 (July 15, 2015) (noting as a public policy matter that "[m]isclassification also results in lower tax revenues for government and an uneven playing field for employers who properly classify their workers").

[14] Donovan, Bradley, and Shimabukuro at n.8.

[15] Carre, at n. 12.

1    In California, the term "employee" is legislatively defined under Labor Code section 3351 as

2    "every person in the service of an employer under any appointment or contract of hire or

3    apprenticeship, express or implied, oral or written, whether lawfully or unlawfully employed," and

4    section 3357 imposes a presumption of employee status with respect to "[a]ny person rendering

5    service for another, other than as an independent contractor." Section 3353 defines the term

6    "independent contractor" narrowly, as a person who renders service for a specified recompense for a

7    specified result, under the control of his principal as to the result of his work only and not as to the

8    means by which such result is accomplished." Here, in prior motions, Plaintiffs have presented

9    ample evidence on which a trier of fact may conclude drivers are employees under California law due

10   to the extent of control Lyft imposes as to the means by which drivers must complete their rides.

11   Even where there is an absence of control over work details, in California an employer-employee

12   relationship is found if (1) the principal retains pervasive control over the operation as a whole, (2)

13   the worker's duties are an integral part of the operation, and (3) the nature of the work makes detailed

14   control unnecessary. *Yellow Cab Cooperative v. Workers Compensation Appeals Board,* 226

15   Cal.App.3d 1288 (Cal.Ct.App. 1991).

16       The proposed settlement, its global release, its imposition of continued misclassification, and

17   its establishment of processes that hinder the resolution of misclassification through judicial and

18   administrative enforcement are all reasons to deny the proposed settlement. As explained in *Smith v.*

19   *Cardinal Logistics Management Corp.,* No. 07-2104 SC, 2008 WL 4156364 (N.D. Cal., Sept. 5,

20   2008), the Court "must be mindful" of the fact that "the protections conferred by [the Labor Law]

21   have a public purpose beyond the private interests of the workers themselves." Undoubtedly this is

     also the case with respect to PAGA claims.

22       For these reasons, the settlement is retrograde, because multiple TNC and app-based

23   individual service companies have been moving away from improper misclassification and have

24   properly classified their employees. The following app-based  service delivery companies have

25   reclassified or classified their on-demand app-based service providers as employees: Managed by Q,

26   Zirtual, Eden, Instacart, Shyp, Munchery, Honor, Lux, Sprig, Bridg, Charriot, Honor, Alfred.

27       Plaintiffs cite the FedEx Ground case as an example of employee misclassification litigation

28   with a settlement outcome that did not include workers' reclassification as employees as support for

---

1    their position that bargaining away reclassification is appropriate here. (Plaintiffs' Supplemental

2    Briefing, Doc. 177, at 14-15). However, obtaining judgments on the issue of employee status in fact

3    lead to the use of employee-drivers, as acknowledged by Plaintiffs.

4         The cases cited by Plaintiffs, most involving franchisees, that did not result in reclassification

5    as part of a settlement only stand for the proposition that minimal settlements that abandon injunctive

6    relief or a resolution of the essential issue for a modest payout encourage a "race to the bottom" and

7    added financial burdens on the State and public. Where such settlements are touted for the purposes

8    of seeking approval of additional settlements that essentially abandon the claims forwarded, courts

9    are presented with an "echo-chamber" of increasingly inadequate settlements.

10   **C.   The Proposed Settlement's Prospective Relief is Inadequate**

11        Plaintiffs contend that the "most valuable aspects of this settlement agreement may well be

     the non-monetary components …". (Plaintiffs Memo., at p. 24). While acknowledging that "the
12
     agreement does not require Lyft to reclassify its Drivers as employees" they suggest "it will provide
13
     significant benefits and added protections to Lyft Drivers that they do not currently have [and]
14
     require changes to Lyft's business practices that are more consistent with an independent contractor
15
     relationship." (*Id.*, at p. 13.) Plaintiffs' non-monetary justification of the settlement suffers three
16
     infirmities: (1) The "added protections" are largely illusory; (2) the settlement makes no significant
17
     changes to Lyft's business practices; and (3) drivers are not any left better off. In addition, the
18
     prospective relief seeks Court approval of terms that are intended to continue to deprive drivers of
19
     their federal and state labor rights. The "prospective relief" requires Lyft to:
20
         (1) Specify the reasons for which Lyft may "deactivate" or terminate one of its drivers.
21
         (2) Pay fees and costs that are unique to arbitration for claims brought by Lyft against a driver for
22           employment-based claims brought by a driver against Lyft, including disputes related to
             payments to drivers, or relating to the deactivation or termination of a driver's contract;
23
         (3) Adopt a "favorite driver" option for Lyft users and additional passenger information will be
24           provided to drivers.
25
26   However, under the settlement Lyft retains the right to modify its terms of use, unilaterally, provided

27   such modifications do not undermine the "spirit" of the prospective relief.

28

---

**OBJECTIONS TO PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENT**
Case No. 3:13-cv-04065-VC

1    With respect to the first requirement, the settlement does not limit the scope of reasons that

2 Lyft can deactivate drivers, and the agreement provides no standard for assessing Lyft's

3 reasonableness in adopting any standard, for example, as it lacks a "just cause" provision. Instead,

4 the revised terms of use list a large number of potential reasons for deactivation all of which existed

5 previously, and it is not clear that Lyft currently deactivates drivers for reasons other than the large

6 number of enumerated reasons. To be sure, the revised "Grounds for Termination" provide that Lyft

7 will provide drivers with notice and an opportunity to cure a breach, but states nothing regarding the

8 standard to which Lyft is held in evaluating an effort to cure, other than it must be "to Lyft's

9 satisfaction." This subjective and deferential standard is no different from "at will." (*See* Exh. D to

10 Settlement Agreement, Doc. 169-1.)

11    Plaintiffs claim that, should a driver be unable to cure a breach to Lyft's satisfaction, the

12 settlement provides for an opportunity to challenge the deactivation before a neutral arbitrator – a

13 process it likens to the just cause arbitration mandated in labor union contracts. (Plaintiffs'

14 Supplemental Briefing at 12). Plaintiffs overstate their case as the terms do not contain a "just cause"

15 provision typically found in collective bargaining agreements, which embodies a concept containing

16 many due process considerations and evidentiary burdens on the part of the employer. *See, e.g.*

17 Adolph M. Koven and Susan M. Smith, "Just Cause: The Seven Tests," BNA 2006 (3d Edition);

18 Elkouri & Elkouri, "How Arbitration Works" BNA 2012 (7th Ed.). As drafted, an arbitrator would

19 simply determine if the Terms of Use were breached, a purely factual determination, and would find

     no language in the Terms to authorize her to make any additional inquiry.

20    With respect to the second point – arbitration and arbitration fees – the proposed settlement

21 leaves in place an illegal "class action" waiver provision that deprives drivers of their federal labor

22 rights. Plaintiffs extol the proposed settlement's requirement that Lyft pay for costs of arbitration,

23 but that is already an obligation imposed by California law and so is of no additional value.

24    The impact, effect, or desirability of the "favorite driver" concept is unexplained and may

25 well be a business direction Lyft had intended to adopt, as other TNC ridesharing companies with

26 which Lyft competes utilize this concept, for example, Sidecar.[16]

27

28
_____
[16] See https://www.side.cr/new-feature-time-to-play-favorites/.

Objectors believe the settlement's "prospective relief" is intended to judicially enshrine independent contractor status and is a poor substitute for meaningful negotiation of terms and conditions of employment by the Lyft drivers or their designated representative. The misclassification scheme left in place constitutes a denial of drivers' rights to negotiate on a group basis over terms and conditions because (1) federal labor law permits, but it does not require employers to bargain collectively with independent contractors, and (2) only "labor organizations," as defined, may negotiate on behalf of independent contractors for binding terms without violating federal antitrust rules under the "labor exemption" to the federal anti-trust laws.[17] The settlement provides no framework or rubric for the adjustment or renegotiation of drivers' terms.

Worse still, the Proposed Settlement leaves in place provisions that on their face permit Lyft to terminate or deactivate drivers who wish to engage in protected activity for the purpose of improving their working conditions, including lobbying, advocating or striking, as the revised terms allow termination of drivers who "interfere with or disrupt Services," "create liability," "or cause [Lyft] to become subject to regulation as a transportation carrier or provider of taxi service," or to "cause any third party to engage in the restricted activities." (Settlement Agreement, Exh. D) These provisions are the subject of an unfair labor practice charge filed by the Teamsters with the National Labor Relations Board. (Paterson Declaration at Exh. A.)

The Proposed Settlement further cabins and isolates Lyft drivers, preventing them from realizing their rights normally guaranteed under law and fails to provide class members any significant value.

## D.  In Discounting Their Claims, Plaintiffs Give Too Much Credence to Lyft's Purported Arbitration and Class Waiver Provisions

As stated by Plaintiffs, 75% of the class worked for Lyft following Lyft's adoption of an arbitration provision containing a class action waiver within Lyft's Terms of Use (Plaintiffs Memo., at p. 4). Plaintiffs refer to this as a "major road block" to litigation, citing two commercial arbitration decisions (*Id.*, at p. 5). Plaintiffs then cite a number of federal district court decisions for the

---

[17] Compare *International Ass'n of Heat and Frost Insulators and Asbestos Workers, etc. v. United Contractors Ass'n, Inc. of Pittsburgh, Pa.*, ) 483 F.2d 384, 391 (3d Cir. 1973), and *Taylor v. Local No. 7, International Union of Journeymen Horseshoers*, 353 F.2d 593 (4th Cir. 1965) *with USS-POSCO Industries v. Contra Costa County Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 806 (9th Cir. 1994), and 15 U.S.C. §17.

1   proposition that arbitration provisions are "enforced extensively" in sharing economy cases and

2   thereby significantly discount their claims. Objectors suggest that Plaintiffs overstate this point.

### 1. Arbitration Does Not, in Itself, Justify Significant Discounting of Liability

4   The existence of an enforceable arbitration provision alone is not a basis to discount a

5   plaintiff's claims to such a significant extent. Federal and state legislatures and courts view fair and

6   enforceable arbitration provisions as equivalent to litigation. If an arbitration provision presents an

7   inferior forum to litigating in the courts, it is unenforceable for reasons of unconscionability.

8   *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 124 (Cal. 2000) (arbitration

9   agreement unenforceable where it is "not simply[] an alternative to litigation, but as an inferior forum

10  that works to the [stronger party's] advantage."); *Lhotka v. Geographic Expeditions, Inc.* 181

11  Cal.App.4th 816, 826 (Cal. Ct. App. 2010) (arbitration unconscionable where "clause to impose

12  arbitration [is] not simply as an alternative to litigation, but as an inferior forum that would give

13  [drafter] it an advantage.").

14  Plaintiffs cite a recent decision upholding Lyft's right to compel arbitration under its "terms

15  of use" in a *commercial* dispute, *Loewen v. Lyft, Inc.*, No. 15-CV-01159, 2015 WL 5440729 (N.D.

16  Cal. Sept. 15, 2015), while noting that commercial arbitration rules typically require the disputants to

17  share the considerable cost of the arbitrator's fees. However, *Loewen* entailed a driver's *commercial*

18  claim, and not employment or Labor Code claims, a significant distinction because, as the California

19  Supreme Court recently noted, "[i]n the context of mandatory employment arbitration of unwaivable

20  statutory rights, we have held that arbitration agreements cannot generally require the employee to

21  bear any type of expense that the employee would not be required to bear if he or she were free to

22  bring the action in court." *Sanchez v. Valencia Holding Co., LLC,* 61 Cal.4th 899, 918 (Cal. 2015)

23  (quoting *Armendariz*, 24 Cal.4th at 110–111, and citing cases). Indeed, *Sanchez* reaffirmed this

24  "categorical approach" in light of the "particularly acute" economic pressure on job seekers to sign an

25  employment contract. (*Id.* at 919–920.) Again, reduction of the settlement because of the arbitration

26  provision is improper.

27  For this reason, a key provision of the "prospective relief" is illusory since it merely requires

28  Lyft to waive drivers' arbitration expenses to the extent they exceed normal litigation costs, which is

already required by California law. *See Armendariz v. Found. Health Psychcare Servs., Inc.*, 24

Cal.4th 83, 110–11 (Cal. 2000) ("when an employer imposes mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process cannot generally require the employee to bear any type of expense that the employee would not be required to bear if he or she were free to bring the action in court."). Although, Plaintiffs contend misclassified plaintiffs have been required to bear half of an arbitrator's fee in other instances, the cited examples did not involve California claims or venues (Liss-Riordan Dec., Exhs. B-D).

### 2. *Enforceability of Lyft's "Class Waiver" is Doubtful*

Turning to the effect of a purported "class waiver," Plaintiffs state they "gave substantial consideration to the impact that Lyft's arbitration provisions could have on this litigation and concluded that the provisions created what may well be enormous hurdles to class certification." (Plaintiffs Memo., at p. 6; *see also* Liss-Riordan Decl., ¶ 8: 12-20, 23 ("In sum, particularly given the risks that arbitration agreements have created for plaintiffs in pursuing class action wage and hour claims, it was and is my belief that this settlement is a fair resolution.").) Of the list of cases cited by Plaintiffs in support of this view, none considered the issue of the unenforceability of the class waiver under the NLRA or Norris-LaGuardia Act. *E.g.*, *Levin v. Caviar, Inc.*, No. 15-cv-01285 (N.D. Cal.), Doc. 43; *Zenelaj v. Handybook Inc.*, 82 F. Supp. 3d 968, 979 (N.D. Cal. 2015)*; Cobarruviaz v. Maplebear, Inc.,* No. 15-CV-00697, 2015 WL 6694112, *8-10 (N.D. Cal. Nov. 3, 2015). That is a significant omission.

As recently held by the Central District of California in *Totten v. Kellogg, Brown & Root*, in the context of employment arbitration, class and representative waivers are unconscionable as they entail a waiver of statutory rights, namely rights guaranteed under the NLRA and Norris-LaGuardia Act. (*Totten v. Kellogg Brown & Root, LLC*, No. EDCV141766, 2016 WL 316019 (C.D. Cal., Jan. 22, 2016).

As described in *Totten*, the class-action waiver contained within the arbitration provision was improper and unenforceable under the Norris-LaGuardia Act and the NLRA, (through application of Section 2 of the Federal Arbitration Act, 9 U.S.C. section 2). The *Totten* decision is lengthy and well-reasoned, and its logic persuasive on this point (a copy of *Totten* is attached hereto). In issuing *Totten,* the court considered and discussed the 5th Circuit's ruling in *Murphy Oil v. NLRB*, 808 F.3d 1013, 1017 (5th Cir. 2015), a decision some California courts have accepted without significant

analysis, but that the *Totten* court found unpersuasive for a number of detailed reasons, including the fact that the 5th Circuit's decision was premised on a "facile pronouncement [that] eviscerates the right of concerted action by eliminating the mechanism that effectuates the right." *See Totten*, at *12; *see also* discussion at *12-*17 (noting other courts that have declined to follow *Murphy Oil*).

Objectors note that Plaintiffs' counsel filed an unfair labor practice charge against Lyft with the NLRB on May 13, 2015, alleging deprivation of rights under section 7 of the NLRA associated with Lyft's Terms of Use. However, the unfair labor practice charge was withdrawn on July 27, 2015, following the dates on which Plaintiffs engaged in settlement sessions with Lyft. (*See* Paterson Decl., Exh. B). This timing is curious, as is the lack of mention of the withdrawal of the charge, as this would certainly be relevant to the Court's inquiry. (*See, e.g., Payne v. Menard*, Order Granting Motion to Stay, Doc. 17, No. 2:15-cv-317 (N.D. Ind. Feb. 18, 2016) (deferring to NLRB processes with respect to issue of enforceability of class waiver) (a copy of the order is attached hereto). For their part, the Teamsters have filed a similar charge that is currently pending (Paterson Decl. Exh. A).

### 3. *Lyft Has Waived Arbitration With Respect to the Class*

Lastly, Objectors turn to the issue of waiver on the part of Lyft as to its arbitration agreements. Because Lyft has litigated, engaged in discovery, and filed dispositive motions, Plaintiffs have a strong argument that Lyft waived its right to compel arbitration. (*See Edwards v. First American Corp.*, 289 F.R.D. 296, 306-08 (C.D. Cal. Nov. 30, 2012). That argument extends to the class, although Plaintiffs claim that Lyft's waiver is applicable only with respect to the named Plaintiffs.[18] (Plaintiffs Memo., at n. 5; Liss-Riordan Decl., ¶ 16.)

In analyzing waiver, Plaintiffs cite *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 1753784, *4 (N.D. Cal. May 9, 2011), and similar cases that purport to hold that a defendant does not need to raise an arbitration agreement until a class is certified. Other courts presented with this argument have declined to extend or adopt the reasoning in *TFT-LCD*, both because of the significant expenditure of judicial resources involved before the arbitration agreement is asserted, and because it allows a party to litigate on the merits and later assert the arbitration

---

[18] The argument curiously leaves out Plaintiff Knudtson, who was added as a plaintiff in the Fifth Amended Complaint after the settlement was negotiated.

agreement if judgment is denied. As noted in *Edwards v. First American Corp.*, 289 F.R.D. at 307, in declining to follow *TFT-LCD* the court noted that the effort to compel arbitration "appear[ed] to be highly calculated—Defendants would obviously prefer that Plaintiff's claims be dismissed on the merits, as any such ruling may be used for the purposes of issue preclusion and precedential effect in subsequent actions. Defendants' conduct thus evinced a conscious decision to continue judicial judgment on the merits." *Id.*; *see also Elliott v. KB Home North Carolina, Inc.* 231 N.C.App. 332, 345 (N.C. Ct. App. 2013) ("we find the reasoning in *Edwards v. First American Corp.* [] more persuasive [*than TFT-LCD*]."). Only when the course of litigation appeared to turn against the defendants' favor in *Edwards* did they assert their right to arbitrate, a tactic that the court considered "gamesmanship." (*Edwards*, 298 F.R.D. at 307.)

Plaintiffs have also not addressed the application of the principles embodied in *American Pipe & Construction v. Utah*, 414 U.S. 538 (1974), with respect to a Defendant who litigates the merits of a class action prior to seeking determination of the class issue. Underlying the tolling rule of *American Pipe* are two policy considerations: protection of the class action device and effectuating the purposes of the statute of limitations. In cases where a decision on the merits is sought prior to class certification, as was the case here, both considerations are undermined.

**E. Plaintiffs' Amendment of Their Complaint for Settlement Purposes is Improper**

As noted in footnote 2 of Plaintiffs Memo., Plaintiffs seek to amend their complaint to include a slew of California Labor Code violations previously unasserted and to add Mr. Knudtson as a plaintiff. The Plaintiffs do not describe how the insertion of the additional claims were included within the Plaintiffs' damages calculation, nor do they state whether these were claims over which the parties negotiated their settlement. However, it appears that these additional claims were not contemplated within the settlement as the amendment date of the complaint, January 26, 2016, falls after the proposed settlement was consummated (*Compare* Plaintiffs Memo., Exhibit E, with Plaintiffs Memo., at p. 4 (settlement agreement in principle was reached in November 2015). Accordingly, inclusion of these claims for settlement and waiver is improper.

**F. Plaintiffs Have Not Established They are Representative of the Class**

As noted above, it is Plaintiffs' burden to establish the adequacy of the settlement and a court must independently review class allegations and stipulations. Plaintiffs have provided little information to

1   justify their appointment as class representatives other than a general statement of having driven for

2   Lyft (Liss-Riordan Declaration at 17).  The only information provided on that point relates to Mr.

3   Cotter, and Plaintiffs concede his claims are of minimal value, with no more than $411 in damages.

4   *See* Plaintiffs Memo., at p. 21.   Plaintiffs provide no evidence of how this scant recovery compares

5   with the class, which is broadly defined.  The modicum of recovery also calls into question the basis

6   for Plaintiffs' amendment of their complaint to include various wage and hour claims, as well as the

7   extent to which Plaintiffs can forward other claims, such as overtime claims or minimum wage

8   claims, on behalf of a class.

## IV.  CONCLUSION

9

10          While the proposed settlement may provide a very modest payout, it is at a significant cost to

the class.  The class will lose important state and federal rights going forward and Lyft will continue

11   to be allowed to misclassify the drivers to its advantage and to the disadvantage of the drivers and

12   public at large.  For the foregoing reasons, Objectors request the Court to deny preliminary approval

13   of the proposed settlement.

14

15

16

17   Dated:  March 15, 2016                              BEESON, TAYER & BODINE, APC

18

19                                                      By:    /s/  Teague P. Paterson
                                                               TEAGUE P. PATERSON
20                                                      Attorneys for INTERVENOR TEAMSTERS
                                                        JOINT COUNCIL 7
21

22

23

24

25

26

27

28