KEKER & VAN NEST LLP
RACHAEL E. MENY - # 178514
rmeny@kvn.com
R. JAMES SLAUGHTER - # 192813
rslaughter@kvn.com
SIMONA A. AGNOLUCCI - # 246943
sagnolucci@kvn.com
MICHELLE YBARRA - # 260697
mybarra@kvn.com
ALEXANDER DRYER - # 291625
adryer@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
THOMAS M. MCINERNEY - # 162055
tmm@ogletreedeakins.com
Steuart Tower, Suite 1300
One Market Plaza
San Francisco, CA  94105
Telephone:    415 442 4810
Facsimile:    415 442 4870

Attorneys for Defendant LYFT, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK COTTER and ALEJANDRA MACIEL, JEFFREY KNUDTSON on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LYFT, INC.,<br><br>Defendant. | Case No. 3:13-cv-04065-VC<br><br>**LYFT, INC.'S BRIEF REGARDING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Judge:       Hon. Vince Chhabria<br><br>Date Filed:  September 3, 2013<br>Trial Date:  None Set |

Defendant Lyft, Inc. ("Lyft") hereby responds to the Court's February 11, 2016 Order Requesting Further Briefing and Continuing Hearing on Motion for Preliminary Approval of Class Action Settlement. The Supplemental Preliminary Approval Brief filed by Named Plaintiffs Patrick Cotter, Alejandra Maciel, and Jeffrey Knudtson, D.E. 177, adequately addressed most of the factual and legal issues relevant to the Court's preliminary approval of the Parties' Class Action Settlement Agreement. Lyft thus submits this response solely to provide additional background information that may be of use to the Court and to expand on the Named Plaintiffs' responses to two of the specific questions the Court raised in its February 11, 2016 Order.

I.   **BACKGROUND INFORMATION**

When the Parties first followed the Court's direction and entered into discussions to explore whether a "third way" existed to resolve this case, the prospect of a settlement appeared remote. As the Court observed in its March 11, 2015 Order Denying Cross-Motions for Summary Judgment, "[t]he test the California courts have developed over the 20th Century for classifying workers isn't very helpful in addressing this 21st Century problem." D.E. 94 at 19. Given this legal background, the distance between the Parties' respective positions was significant. For its part, Lyft believed—and continues to believe—that the Named Plaintiffs' claims run headlong into multiple strong defenses.[1] As for the Named Plaintiffs, they believed strongly in the legal merit of their claims.

Over months of discussions, however, and with the guidance and assistance of the Honorable Donna M. Ryu at numerous mediation sessions, the Parties were able to identify and then codify the compromise embodied in the Settlement Agreement. While the Agreement provides for payments to resolve past claims, the heart of the compromise is a set of

---

[1] While Lyft acknowledges that this filing is not the appropriate avenue to raise merits arguments, it notes briefly that this case cannot proceed as a class action and that, even if it did, Named Plaintiffs would not prevail. First, a class cannot be certified because this case does not meet the requirements of Rule 23, including because individualized issues of proof will predominate. Second, even if a class could be certified, the weight of the evidence (including the sworn testimony of Named Plaintiffs) shows that drivers are not employees. Indeed, because of numerous facts—like the fact that drivers control when and how they use the Lyft platform—they properly are classified as independent contractors. Third, even if drivers were found to be employees, Lyft would have no liability as to multiple claims for relief, both because Named Plaintiffs misunderstand Lyft's practices and because Lyft exceeded many of the requirements to which it would be subject as an employer.

modifications to Lyft's Terms of Service.  The exact details of those modifications are described at length in the Settlement Agreement, Named Plaintiffs' Preliminary Approval Brief, D.E. 169, and Supplemental Preliminary Approval Brief, D.E. 177, but an explanation of the modifications' significance to the Parties is important.  From Lyft's perspective, the modifications preserve the flexibility that is vital to those who drive on the Lyft platform by making clear that they can continue to earn income on their terms, driving when, where, and for as long—or as short—as they want.  Given the practices of most drivers, Lyft simply would not be able to offer such flexibility to employees, as explained below.  And from the Named Plaintiffs' perspective, as their Supplemental Preliminary Approval Brief makes clear, the modifications "address[] one of the primary legal bases for this lawsuit" and "will provide a real, day to day benefit for drivers." D.E. 177 at 13.

While the Settlement Agreement before the Court is an important step forward in addressing the uniquely "21st Century problem" this case presents, it is only a first step.  Lyft is well aware that important work remains.  This case has made clear, however, that such work simply cannot be done in the courtroom in one case; as the Court observed, had the claims at issue here been tried, the jury would have been "handed a square peg and asked to choose between two round holes." D.E. 94 at 19.  Indeed, as the Court suggested, "perhaps Lyft drivers should be considered a new category of worker altogether, requiring a different set of protections"—an outcome that obviously requires "legislative intervention." *Id.*

Lyft is committed to pursuing the reforms necessary to ensure drivers who use its platform and all those participating in the new economy receive the protections they deserve.  Thus, in addition to reaching the hard-fought Settlement Agreement in this case, it also is pursuing change through the political process.  For example, even as the Parties were finalizing the Settlement Agreement, Lyft joined with 40 diverse companies, labor advocates, non-profits, and others to announce a set of principles for the changing American workforce that are designed to meet the twin goals of preserving flexibility while also providing greater economic security.[2]

---

[2] *See* Letter signed by Byron Auguste et al., "Common Ground for Independent Workers: Principles for Delivering a Stable and Flexible Safety Net for All Types of Work" (Nov. 9, 2015), https://medium.com/the-wtf-economy/common-ground-for-independent-workers-83f3fbcf548f ("Principles Letter").

The response to these principles has been impressive.[3]  Lyft thus is optimistic that the group behind the principles will be able to develop its initial list of policy ideas—chief among them, the idea of "portable" worker benefits and protections that independent contractors can take from job to job—into concrete reform proposals.  To be sure, as the letter announcing the principles noted, significant questions remain: "Who should contribute financially (and how much)?  What type of organization (or organizations) should administer these benefits and protections?  What type of legislative or regulatory action is required to create or enable this model while allowing for experimentation and flexibility?"  Principles Letter at § 3.  Resolving these questions will take time, but Lyft has established itself as a key stakeholder in the process.

In the meantime, of course, Lyft is continuing to offer and expand the array of benefits it provides independent-contractor drivers to support their entrepreneurial use of the Lyft platform.  For example, through Lyft, drivers can choose to take advantage of (or not) cell phone discounts, affordable car rental rates, gas cards and rewards programs, instant payouts, access to investment and financial services, and free tools to file taxes and evaluate health care options.  Lyft plans to continue experimenting with new programs that support its community.

## II.     RESPONSES TO COURT'S SPECIFIC QUESTIONS

Lyft's responses to the specific questions the Court raised in its February 11, 2016 Order are set forth below.

### A.     Questions 1–6 and 9

As noted above, Lyft believes that the Named Plaintiffs' Supplemental Preliminary Approval Brief adequately addressed most of the factual and legal issues relevant to these questions.  D.E. 177.  If the Court would benefit from additional authorities supporting the arguments that Lyft would make if this case were to proceed to class certification and possibly even trial, *see, e.g.*, *id.* at 4 n.5 ("Lyft has made clear that it would argue that the IRS rate does not apply to drivers' mileage reimbursement claims"), Lyft will provide such information.

---

[3] *See generally, e.g.*, Rachel Emma Silverman, *On-Demand Workers Need "Portable Benefits," Tech and Labor Leaders Say*, Wall St. J. (Nov. 10, 2015), http://on.wsj.com/1WQwzeh; Lydia DePillis, *Tech Companies, Labor Advocates, and Think Tankers of All Stripes Call for Sweeping Reforms to the Social Safety Net*, Wash. Post (Nov. 12, 2015), http://wpo.st/HMvL1.

However, Lyft did not understand the Court's February 11, 2016 Order as calling for merits-focused arguments of only marginal relevance to the issue of preliminary approval.

To be clear, Lyft is not adopting the Named Plaintiffs' Brief.[4]  However, it believes that the Named Plaintiffs have accurately and fairly described the law and the Parties' respective positions that led to the Settlement Agreement.

### B.     Question 7

> This lawsuit seeks to have Lyft drivers declared "employees" rather than "independent contractors" under California law.  It appears the proposed settlement would move the drivers closer to independent contractor status.  If that is correct, is this aspect of the settlement agreement contrary to the original goal of the lawsuit?  Is there case law discussing whether a court may approve a settlement agreement that might be deemed contrary to the original goal of the lawsuit?

Lyft cannot speak to the original goal of this lawsuit, and it believes that Named Plaintiffs fully addressed the relevant case law regarding court approval of the Settlement Agreement.  In particular, Plaintiffs detailed the many misclassification cases that have settled with no change in employee classification.  *See* D.E. 177 at 13–16.  Additionally, however Lyft notes that the Settlement Agreement is entirely consistent with drivers' preferences as to their relationship with Lyft.

As an initial matter, Lyft's corporate employees, both at its San Francisco headquarters and in cities across the state (and the nation), regularly interact with drivers using the Lyft platform.  Drivers consistently say that they value their independent contractor status and the freedom it affords them.  Lyft is well aware that such anecdotal evidence is often of limited utility, however.

To better understand and explain drivers' perspectives, in advance of anticipated class-certification briefing in this case, Lyft retained an independent expert to design and conduct a

---

[4] Lyft notes in particular (but without limitation) that it does not know the details of and thus cannot address the substance of the alleged communications between drivers and counsel for the Named Plaintiffs.  *See* D.E. 177 at 10–12.  Lyft further notes that it cannot agree, absent additional information, with the Named Plaintiffs' representations as to which actions allegedly taken by Lyft, *see id.*, necessarily would entitle drivers to a pre-termination notice and opportunity to cure.  That said, Lyft agrees with Named Plaintiffs' broader point: under the Settlement Agreement, all such disputes, including disputes about the right to pre-termination notice, would be subject to arbitration paid for by Lyft (after an initial filing fee).

survey of a random sample of drivers on the Lyft platform in California.  The survey received over 3,100 responses, and 82% of respondents agreed or strongly agreed that they "like being an independent contractor."  *See* Agnolucci Declaration, ¶¶ 2–4.

Examining the results of the survey in more detail helps explain why.  The survey revealed, for example, that 53% of respondents had driven with another sharing-economy service in addition to Lyft, including competing rideshare services.  Of the 83% of these respondents who drove on another platform during the same week that they drove on the Lyft platform, 88% drove on another platform during the very same day, 75% drove on another platform during the very same hour, and 49% were available on more than one platform *during the very same time*.  Additionally, 51% of respondents had done other non–sharing-economy work for pay on the same day or week that they were driving on the Lyft platform.  Of those respondents, 58% had done such other work on a full-time basis, and 60% classified their status at the other work as an employee.  Of all survey respondents, 47% identified "[m]y schedule for other work" as a primary factor in determine when to drive for Lyft, and 99% percent of respondents agreed that they "like to choose when [to] work."  *See* Agnolucci Declaration, ¶¶ 5–14.

As the survey results make clear, most drivers see Lyft as offering an opportunity for side-work and side-income, in addition to their primary job, or as one of an array of competing sharing-economy platforms they can alternate between on an hour-by-hour or even minute-by-minute basis to take advantage of different opportunities and rates of pay.  The data regarding the purported class of drivers at issue here is consistent with this perspective.  As the Named Plaintiffs' Supplemental Preliminary Approval Brief explains, many of the drivers in this purported class drove for limited amounts of time.  *See* D.E. 177 at 1–3.

Lyft sees no way it could offer any of these drivers—who work intermittently and only as they themselves see fit—the panoply of benefits reserved for employees without requiring them to make a more significant commitment to driving on the Lyft platform.  Such a commitment likely would require giving up the ability to work with competitors, among other limitations that Lyft does not impose on the drivers.  Unsurprisingly, Lyft drivers recognize the tradeoff reclassification would entail and thus most favor the status quo.  In addition to the 82% of

respondents who agreed or strongly agreed that they "like being an independent contractor," 97% of respondents agreed or strongly agreed with the statement that "I enjoy being my own boss." *See* Agnolucci Declaration, ¶¶ 4, 15.

### C.    Question 8

> Are there other companies in the so-called "sharing economy" that classify their workers as employees? If so, are there any factors specific to Lyft's business model that preclude it from classifying drivers as employees, or from providing drivers with some of the protections employees receive under California law?

While Lyft is not familiar with the labor practices of all companies in the "sharing economy," it is aware that certain companies have made the business decision to classify at least some workers as employees rather than independent contractors. For example, Lyft is informed and believes that Munchery, a prepared-food delivery service, has classified or reclassified at least some workers as employees.

Lyft cannot speculate as to what motivated other companies to make the decisions they did, but there are significant differences between its type of ridesharing platform and other sharing-economy companies. Indeed, the term "sharing economy" has no specific definition, and there are more differences among so-called "sharing economy" companies than similarities. These differences mean that the facts regarding how one company has decided to classify workers are not relevant to—and cannot properly be applied to—a platform like Lyft.

One important difference between Lyft and other types of companies (including non–sharing-economy companies that historically have used employees rather than independent contractors) is that Lyft does not require its drivers to commit to pre-arranged schedules that are akin to shift work. Lyft's ridesharing platform requires no set schedule and instead allows drivers to enter "driver" mode in its application when and where they please—for however long (or short) they please. Lyft's ridesharing platform also does not require an individual driver to complete a predetermined number of rides once he begins accepting requests. In a given afternoon, a driver can give a single ride or 15 rides, signing in and out of the platform as he sees fit, without affecting passengers' experiences in any way. This makes Lyft's ridesharing platform more akin to casual carpooling or even offering a ride to a friend than to working a traditional job

in a conventional employment situation.[5]  Indeed, the Lyft platform increasingly has begun offering services to enable carpool-like use of its platform; with Lyft Line and Destination Filter, a driver can leave home in the morning, enter her work address in the Lyft application, and receive ride requests only from passengers heading in the same direction.

With no driver commitments and minimal supervision required, ridesharing companies such as Lyft have no reason to require an employer-employee relationship.  As a result, Lyft has been able to attract drivers who maintain significant other obligations, such as a full-time, primary job.  If Lyft were forced to classify drivers as employees, and thus demand a greater commitment from drivers, it believes that many would stop driving on the platform altogether.  In such a situation, Lyft would face the prospect of not being able to meet passenger demand.

### III.     CONCLUSION

For the reasons set forth above, and based on the additional factual and legal information provided in the Named Plaintiffs' Preliminary Approval and Supplemental Preliminary Approval Briefs, Lyft respectfully requests that the Court grant preliminary approval of the Parties' Class Action Settlement Agreement.

Respectfully submitted,

Dated:  March 17, 2016                               KEKER & VAN NEST LLP

By:   */s/ Rachael E. Meny*
　　　RACHAEL E. MENY
　　　R. JAMES SLAUGHTER
　　　SIMONA A. AGNOLUCCI
　　　MICHELLE YBARRA
　　　ALEXANDER DRYER

　　　THOMAS M. MCINERNEY
　　　OGLETREE, DEAKINS, NASH, SMOAK
　　　& STEWART, P.C.

Attorneys for Defendant LYFT, INC.

---

[5] Additionally, Lyft notes that even many of those in traditional transportation industries, such as the taxicab industry, work on an independent-contractor model.  Taxi drivers can be either employees *or* independent contractors, depending upon the requirements that are imposed on them.  *See* California Employment Development Department, *Information Sheet: Taxicab Industry* (Nov. 2009), http://www.edd.ca.gov/pdf_pub_ctr/de231tc.pdf