1  Shannon Liss-Riordan (*Pro Hac Vice*)
   sliss@llrlaw.com
2  LICHTEN & LISS-RIORDAN, P.C.
3  729 Boylston Street, Suite 2000
   Boston, MA 02116
4  Telephone: (617) 994-5800

5
   Matthew D. Carlson (State Bar No. 273242)
6  mcarlson@llrlaw.com
   LICHTEN & LISS-RIORDAN, P.C.
7  466 Geary St., Suite 201
   San Francisco, California 94102
8  Telephone: (617) 994-5800

9
   Attorneys for Plaintiffs COTTER, MACIEL, and KNUDTSON
10

11

12                    **UNITED STATES DISTRICT COURT**

13                    **NORTHERN DISTRICT OF CALIFORNIA**

14

15  PATRICK COTTER, ALEJANDRA MACIEL,          Case No.: 3:13-cv-04065-VC
16  and JEFFREY KNUDTSON, on behalf of
    themselves and all others similarly situated,   **Hon. Vince Chhabria**
17
                                                 **NOTICE OF MOTION AND MOTION**
18                     Plaintiffs,               **AND MEMORANDUM OF POINTS**
                                                 **AND AUTHORITIES IN SUPPORT**
19                                               **OF PLAINTIFFS' MOTION FOR**
              v.                                 **PRELIMINARY APPROVAL OF**
20                                               **REVISED CLASS ACTION**
21  LYFT, INC.,                                  **SETTLEMENT**

22                     Defendant.
                                                 Hearing date: June 2, 2016
23                                               Time: 10:00 a.m.
                                                 Courtroom: 4
24

25

26

27

28

# TABLE OF CONTENTS

PAGE

I.      INTRODUCTION .................................................................................................. 1

II.     RELEVANT FACTS ............................................................................................. 2

   A.      THE COURT'S APRIL 7th PRELIMINARY APPROVAL ORDER ...................... 2

   B.      THE REVISED SETTLEMENT AGREEMENT ................................................... 3

      1.      Revised Monetary Payment ................................................................................ 3

      2.      Revised PAGA Allocation ................................................................................. 4

      3.      Revised Plan of Allocation ................................................................................ 5

      4.      Non-Monetary Terms ........................................................................................ 6

      5.      Distribution of Funds ........................................................................................ 8

      6.      The Release ....................................................................................................... 9

   C.      THE REVISED CLASS NOTICE ....................................................................... 9

   D.      PLAINTIFFS' EVALUATION OF THE RISKS OF FURTHER LITIGATION ... 10

      1.      The Risk of a Ruling Regarding Lyft's Arbitration Provisions Being Successfully Challenged on Appeal .................................................................. 10

      2.      The Risk of a Class Certification Order Being Successfully Challenged on Appeal .............................................................................................................. 12

      3.      The Risks of Obtaining a Verdict at Trial ........................................................ 12

   E.      PLAINTIFFS' VALUATION OF THEIR CLAIMS ............................................. 14

III.    LEGAL STANDARD .......................................................................................... 15

IV.     DISCUSSION ...................................................................................................... 17

   A.      CERTIFICATION OF THE SETTLEMENT CLASS IS APPROPRIATE ............ 17

   B.      THE REVISED PROPOSED CLASS NOTICE IS ADEQUATE ......................... 17

   B.      THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT .... 18

      1.      The Monetary and Non-Monetary Terms of the Settlement Are Within the Range of Possible Approval. ............................................................................. 18

      2.      The Settlement Is the Product of Years of Litigation, Substantial Discovery, and Multiple Mediation Sessions Under the Guidance of Judge Ryu. .................... 21

      3.      The Settlement Has No Obvious Deficiencies. ................................................. 21

      4.      The Settlement Does Not Unfairly Grant Preferential Treatment to Any Class Members. ......................................................................................................... 24

V.      CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**PAGE**

## <u>Cases</u>

*Acosta v. Trans Union, LLC*
243 F.R.D. 377 (C.D. Cal. 2007)...................................................................................... 25

*Barnes v. The Equinox Grp., Inc.*
2013 WL 3988804 (N.D. Cal. Aug. 2, 2013) .................................................................. 28

*Belke v. Merrill Lynch, Pierce, Fenner & Smith*
693 F.2d 1023, 1025 (11th Cir. 1982) ............................................................................ 11

*Bond. v. Ferguson Enterprises, Inc.*
2011 WL 284962 (E.D. Cal. Jan. 25, 2011) ................................................................... 27

*Brawner v. Bank of Am. Nat'l Ass'n*
2016 WL 161295 (N.D. Cal. Jan. 14, 2016).................................................................... 29

*Chu v. Wells Fargo Investments, LLC.*
No. C 2011 WL 672645 (N.D.Cal. Feb. 16, 2011) ........................................................... 5

*Churchill Village, L.L.C. v. General Elec. Co.*
361 F.3d 566 (9th Cir. 2004) .......................................................................................... 18

*Covillo v. Specialtys Cafe*
2014 WL 954516 (N.D. Cal. Mar. 6, 2014) .................................................................... 31

*Cox v. Ocean View Hotel Corp.*
533 F.3d 1114 (9th Cir. 2008) ........................................................................................ 12

*Cruz v. Sky Chefs, Inc.*
2014 WL 7247065 (N.D. Cal. Dec. 19, 2014)................................................................... 5

*Custom LED, LLC v. eBay, Inc*
2013 WL 6114379 (N.D. Cal. Nov. 20, 2013) ................................................................ 27

*Davis v. Four Seasons Hotel Ltd.*
2011 WL 4590393 (D. Haw. Sept. 30, 2011) ................................................................. 13

*Deaver v. Compass Bank*
2015 WL 4999953 (N.D. Cal. Aug. 21, 2015) ......................................................... passim

*Dudum v. Carter's Retail, Inc.*
2015 WL 5185933 (N.D. Cal. Sept. 4, 2015) ................................................................. 17

*Edwards v. First Am. Corp.*
289 F.R.D. 296 (C.D. Cal. 2012)...........................................................................13

*Ellis v. Naval Air Rework Facility*
87 F.R.D. 15 (N.D. Cal. 1980) ..............................................................................20

*Fimby-Christensen v. 24 Hour Fitness USA, Inc.*
2013 WL 6158040 (N.D. Cal. Nov. 22, 2013) ......................................................11

*Fisher v. A.G. Becker Paribas Inc.*
791 F.2d 691 (9th Cir. 1986) .................................................................................11

*Franco v. Ruiz Food Products, Inc.*
2012 WL 5941801 (E.D. Cal. Nov. 27, 2012)..........................................................5

*Garner v. State Farm Mut. Auto. Ins. Co.*
2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) .......................................................19

*Hanlon v. Chrysler Corp.*
150 F.3d 1011 (9th Cir. 1988) ...............................................................................19

*Harris v. Vector Mktg. Corp.*
2011 WL 1627973 (N.D.Cal. Apr. 29, 2011).................................................25, 26

*Harris v. Vector Mktg. Corp.*
2011 U.S. Dist. LEXIS 48878 (N.D. Cal. Apr. 29, 2011) .....................................18

*Hendricks v. StarKist Co*
2015 WL 4498083 (N.D. Cal. July 23, 2015) .......................................................30

*Hopson v. Hanesbrands, Inc.*
2009 WL 928133 (N.D.Cal. Apr. 3, 2009).............................................................31

*In re High-Tech Employee Antitrust Litig.*
2015 WL 5159441 (N.D. Cal. Sept. 2, 2015) ........................................................23

*In re LDK Solar Sec. Litig.*
2010 WL 3001384 (N.D.Cal. July 29, 2010) ........................................................24

*In re Linerboard Antitrust Litig.*
296 F.Supp.2d 568 (E.D.Pa.2003).........................................................................24

*In re Mego Fin. Corp. Sec. Litig.*
213 F.3d 454 (9th Cir.2000)..................................................................................31

*In re Netflix Privacy Litig.*
2013 U.S. Dist. LEXIS 37286 (N.D. Cal. Mar. 18, 2013) ....................................19

*In re Omnivision Techs., Inc.*
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) .......................................................... 23

*In re Tableware Antitrust Litig.*
   484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007), ................................................ 2

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
   2011 WL 1753784 (N.D. Cal. May 9, 2011) ................................................... 12

*In re Titanium Dioxide Antitrust Litig.*
   962 F. Supp. 2d 840 (D. Md. 2013) .............................................................. 12

*In re Toys R Us–Del., Inc.–Fair & Accurate Credit Transactions Act (FACTA) Litig.*
   295 F.R.D. 438 (C.D.Cal.2014) ................................................................... 24

*Kingsbury v. U.S. Greenfiber, LLC*
   2012 WL 2775022 (C.D. Cal. June 29, 2012) ................................................ 13

*Knight v. Red Door Salons, Inc.*
   2009 WL 248367 (N.D. Cal. Feb. 2, 2009) .................................................... 29

*Laguna v. Coverall N. Am., Inc.*
   2012 WL 607622 (S.D. Cal. Feb. 23, 2012) ................................................... 29

*Laguna v. Coverall N. Am., Inc.,*
   2011 WL 3176469 (S.D. Cal. July 26, 2011) ................................................. 13

*Lundell v. Dell, Inc.*
   2006 WL 3507938 (N.D. Cal. Dec. 5, 2006) .................................................. 22

*Lusby v. GameStop Inc.*
   2015 WL 1501095 (N.D. Cal. Mar. 31, 2015) ........................................... 6, 28

*Lusby v. Gamestop Inc.*
   297 F.R.D. 400 (N.D. Cal. 2013) .................................................................. 6

*Miller v. Ghirardelli Chocolate Co.*
   2015 WL 758094 (N.D. Cal. Feb. 20, 2015) ............................................. 22, 23

*Monterrubio v. Best Buy Stores, L.P.*
   291 F.R.D. 443 (E.D. Cal. 2013) ................................................................. 25

*Moore v. PetSmart, Inc.*
   2015 WL 5439000,  (N.D. Cal. Aug. 4, 2015) ................................................ 5

*Mora v. Harley-Davidson Credit Corp.*
   2012 WL 1189769 (E.D. Cal. Apr. 9, 2012) ................................................. 12

*Morris v. Eversley*
  343 F.Supp.2d 234 (S.D.N.Y.2004) ................................................................. 30

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*
  221 F.R.D. 523 (C.D. Cal. 2004) ........................................................... 17, 19

*Nen Thio v. Genji, LLC*
  14 F. Supp. 3d 1324 (N.D. Cal. 2014) ............................................................. 27

*O'Connor v. Uber Techs., Inc.*
  311 F.R.D. 547 (N.D. Cal. 2015) ...................................................................... 13

*O'Connor v. Uber Techs., Inc.*
  2015 WL 5138097 (N.D. Cal. Sept. 1, 2015) ................................................... 14

*Pablo v. ServiceMaster Glob. Holdings Inc.*
  2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) ................................................... 12

*Reed v. 1–800 Contacts, Inc.*
  2014 WL 29011 (S.D.Cal. Jan. 2, 2014) ......................................................... 24

*Saleh v. Titan Corp.*
  353 F. Supp. 2d 1087 (S.D. Cal. 2004) ........................................................... 13

*Schiller v. David's Bridal, Inc.*
  2012 WL 2117001 (E.D. Cal. June 11, 2012) .................................................... 5

*Shepardson v. Adecco USA, Inc.*
  2016 WL 1322994 (N.D. Cal. Apr. 5, 2016) ..................................................... 11

*Singer v. Becton Dickinson & Co.*
  2010 WL 2196104 (S.D. Cal. June 1, 2010) ..................................................... 25

*St. Agnes Med. Ctr. v. PacifiCare of Cal.*
  82 P.3d 727 (2003) ........................................................................................... 12

*Staton v. Boeing Co.*
  327 F.3d 938 (9th Cir.2003) ............................................................................ 18

*Stovall-Gusman v. W.W. Grainger, Inc.*
  2014 WL 5492729 (N.D. Cal. Oct. 30, 2014) .................................................. 24

*Tijero v. Aaron Bros., Inc.*
  2013 WL 60464 (N.D. Cal. Jan. 2, 2013) ......................................................... 30

*Villegas v. J.P. Morgan Chase & Co.*
  2012 WL 5878390 (N.D. Cal. Nov. 21, 2012) .................................................. 26

*Vinh Nguyen v. Radient Pharm. Corp.*
   2014 WL 1802293 (C.D.Cal. May 6, 2014) ........................................................ 30

*Vizcaino v. Microsoft Corp.*
   290 F.3d 1043 (9th Cir. 2002) ...................................................................... 25, 29

*Willner v. Manpower Inc.*
   2015 WL 3863625 (N.D. Cal. June 22, 2015) ...................................................... 29

**TO DEFENDANT AND ITS ATTORNEYS OF RECORD: PLEASE TAKE**

**NOTICE** that on Thursday, June 2, 2016, at 10:00 a.m., or as soon thereafter as the matter can be heard before the Honorable Vince Chhabria, in Courtroom 4, 17th Floor, U.S. District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA, 94102, Plaintiffs will and hereby do move the Court pursuant to Federal Rule of Civil Procedure 23 for an Order:

(1)     preliminarily approving the Settlement Agreement between Plaintiffs and Lyft, Inc., dated May 11, 2016, on the grounds that its terms are sufficiently fair, reasonable, and adequate for notice to be issued to the class;

(2)     certifying the proposed settlement class for settlement purposes only, pursuant to Federal Rule of Civil Procedure 23(c);

(3)     approving the form and content of the proposed class notice and notice plan;

(4)     appointing Lichten & Liss-Riordan, P.C. to represent the class as class counsel;

(5)     appointing Garden City Group as Settlement Administrator;

(6)     scheduling a hearing regarding final approval of the proposed settlement, Class Counsel's request for attorneys' fees and costs, and enhancement payments to the named Plaintiffs; and

(7)     granting such other and further relief as may be appropriate.

This Motion is based on this Notice of Motion and Motion; the Memorandum of Points and Authorities below; the Declaration of Shannon Liss-Riordan filed concurrently herewith; all supporting exhibits filed herewith; all other pleadings and papers filed in this action; and any argument or evidence that may be presented at the hearing in this matter.

## I.    INTRODUCTION

Pursuant to Federal Rule of Procedure Rule 23, Plaintiffs Patrick Cotter, Alejandra Maciel, and Jeffrey Knudtson move this court for an order preliminarily approving a revised class action settlement agreement ("Settlement" or "Agreement") entered into by Plaintiffs and Defendant Lyft, Inc.

Following this Court's April 7, 2016, preliminary approval Order ("the Order"), the parties engaged in a fifth mediation session with Magistrate Judge Donna Ryu. *See* Dkt. No. 203. This mediation resulted in the revised agreement attached hereto as Exhibit 1, which provides for $27 million dollars in monetary relief, none of which will revert to Lyft.  As the Court directed in its Order, this payment represents roughly 17% of the maximum damages of the expense reimbursement claim.  This revised agreement also includes an unprecedented PAGA allocation of $1 million, and a doubling of the payment for drivers who drove at least 30 hours a week in at least half of the weeks they drove with Lyft.[1]

The parties' agreement also provides for the same non-monetary relief previously negotiated by the parties, with some additions.  The most significant of these non-monetary terms requires Lyft to change its Terms of Service to: (1) remove Lyft's current at-will termination provision and replace it with a provision that allows Lyft to deactivate drivers only for specific delineated reasons and after notice and an opportunity to cure period is provided; (2) provide all drivers with an optional pre-arbitration dispute resolution program; and (3) provide that Lyft will pay for arbitration fees and costs unique to arbitration for claims brought by a driver against Lyft related to a driver's deactivation, pay-related issues, or alleged employment relationship with Lyft.  The practical result of these negotiated-for provisions is that fewer drivers will be subject to deactivation in the first place, and drivers who are threatened with

---

[1]    Because the revised agreement was reached after little further work was performed by Plaintiffs' counsel following the initial agreement, Plaintiffs are not seeking an increase in fees and costs as a result of the revised settlement, and the settlement provides that Plaintiffs will not seek more than this amount.  Thus, the settlement will result in $14.75 million more for the class than the original agreement.

1   deactivation, or who have been deactivated, will have a realistic means of getting back on the

2   Lyft platform.

3       Additionally, as a result of further negotiations following the Order, Lyft has agreed

4   ensure that the optional pre-arbitration dispute resolution program will be extended to all drivers,

5   including deactivated drivers.  It has also agreed to eliminate as a ground for deactivation

6   "creat[ing] liability for [Lyft] or caus[ing] [Lyft] to become subject to regulation as a

7   transportation carrier or provider of taxi service."

8       These terms and the revised agreement as a whole is within the range of approval

9   necessary to justify sending notice to class members and scheduling final approval proceedings,

10  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007), and the parties

11  believe that the revisions to the agreement, particularly the monetary revision, satisfy the

12  concerns expressed by the Court in its original preliminary approval order.[2]

13              **II.      RELEVANT FACTS**[3]

14  **A.    THE COURT'S APRIL 7th PRELIMINARY APPROVAL ORDER**

15      On April 7, 2016, the Court issued an Order requiring the parties to revisit aspects of

16  their settlement and related papers, Dkt. No. 200, which Plaintiffs summarize as follows:

17      First, the Order required that any revised settlement agreement provide for "roughly" 17

---

[2]    The Court's primary concern regarding the settlement was the monetary amount of
$12.25 million.  At the hearing held on March 24, 2016, Plaintiffs explained to the Court that
the parties had originally negotiated the agreement based upon data that Lyft had provided in
June 2015, when their mediation sessions began.  However, the negotiations extended until
November, and even after a term sheet was arrived at (including an agreement on the monetary
terms), the parties spent several additional months negotiating the paperwork to submit to the
Court in support of preliminary approval.  By the time the parties appeared before the Court for
the preliminary approval hearing on March 24, 2016, the mileage data from which Plaintiffs had
originally negotiated the agreement had significantly increased.  This revised agreement
accounts for the increased mileage through March 28, 2016, among other updated data.

[3]    For the Court's convenience and in the interests of proceeding directly to discussion of
the parties' revised settlement agreement, Plaintiffs incorporate by reference their previous
discussion of this case's litigation history. Dkt. No. 169 at pp. 2-4.

percent of the maximum value of the class's reimbursement claim as of March 24, 2016.  Dkt. No. 200 at p. 20.

Second, the Order required that any settlement allocate a larger amount of money to the State in light of the Court's stated concerns regarding the prior PAGA allocation.  *Id.* at pp. 20-21.

Third, the Order required that "full time" drivers receive payments that exceeded payments to other drivers by "orders of magnitude."  *Id.* at p. 17.

Fourth, the Order suggested that "the parties may need to alter the language of the proposed notice to the class, because the proposed notice as currently drafted suggests the release is broader than actually set forth in the settlement agreement."  *Id.* at p. 10 n. 2.

Fifth, the Order required Plaintiffs to explain in further detail how they valued their claims.  *Id.* at p. 21.

The Order also rejected the Teamsters' argument that the settlement agreement must result in the reclassification of drivers.  *Id.* at p. 2.

**B.    THE REVISED SETTLEMENT AGREEMENT**

On April 12, 2016, the parties returned to mediation with Judge Ryu to assess whether they could reach a revised settlement agreement that may be approved by the Court. With Judge Ryu's assistance, the parties reached a revised settlement including the following terms:

**1.    Revised Monetary Payment**

Lyft has provided information to Plaintiffs showing that the maximum value of the class's reimbursement claim (using the standard IRS fixed mileage reimbursement rate for the miles driven from accepting a ride request to dropping off the passenger) was approximately $156 million as of March 28, 2016.[4]  This maximum value assumes, of course, that the *entire*

---

[4]    As noted in Plaintiffs' previously filed supplemental brief, Lyft contended that the IRS standard mileage reimbursement rate (currently 54 cents per mile) would over-reimburse drivers because it includes not only variable costs attributable to driving for Lyft, such as the costs of gas and maintenance, but also fixed costs, such as the costs of insurance and depreciation, that Lyft contends drivers would incur anyway.  Accordingly, Lyft took the position that, even if Plaintiffs prevailed, they would not be entitled to reimbursement at the standard IRS rate.  Lyft

class, including the more than 50% of drivers who have driven less than 30 hours total in their history with Lyft, would prevail at trial.  Applying the 17 percent figure that the Court set forth as an acceptable settlement amount, the settlement amount would come to $26.5 million.  The revised settlement provides that Lyft will pay $27 million, none of which can revert to Lyft. Exh. 1 at ¶ 34.[5]

### 2. Revised PAGA Allocation

In the revised agreement, the parties have agreed to allocate $1 million to Plaintiffs' PAGA claim (which means that California's Labor & Workforce Development Agency (LWDA) will receive $750,000), or approximately 3.7% of the gross settlement. Exh. 1 at ¶24(ee). This amount is, to Plaintiffs' knowledge, unprecedented (other than the $1 million PAGA allocation included in the recently filed Uber settlement)[6]. Indeed, a significant number of courts have approved settlements containing PAGA allocations of merely $10,000 (or less), regardless of the settlement value and regardless of the valuation (if any) of the PAGA claim. *See Cruz v. Sky Chefs, Inc.*, No. C-12-02705 DMR, 2014 WL 7247065, *3 (N.D. Cal. Dec. 19, 2014) (approving PAGA settlement payment of $10,000 to the LWDA out of $1,750,000 common-fund settlement) (Ryu, J.); *Chu v. Wells Fargo Investments, LLC*, No. C 2011 WL

---

[5] thus may argue that if any IRS rate applies, it should be only at a lower rate, either the actual rate (to be demonstrated via expert evidence at trial) or the variable rate (currently 24 cents per mile).  The variable rate reimburses only the variable costs attributable to driving for Lyft.  While Plaintiffs do not agree with Lyft's analysis, it is an argument that may have had traction with a jury which, if accepted, could reduce the value of the claim by more than $100 million.

[5] In addition, because Plaintiffs have agreed <u>not</u> to request more than their initially requested fees and costs award of $3.675 million, the net payment to the class will exceed what the Court seemingly anticipated in setting forth the 17 percent figure. Exh. 1 at ¶ 40.  Put another way, when taking into account the additional $4.425 million that is allocated to the class by virtue of class counsel not requesting any fee from the additional amount being added to the settlement, the class will realize the equivalent of 20.5% of the reimbursement claim. *Id.*

[6] The Uber settlement covers more drivers and provides for a payment of up to $100 million (of which up to approximately $93 million is for California drivers), so the proportion of the PAGA penalties in this case is higher than in the Uber case.

672645, *1 (N.D.Cal. Feb. 16, 2011) (approving PAGA settlement payment of $7,500 to the LWDA out of $6.9 million common-fund settlement); *Franco v. Ruiz Food Products, Inc.*, 2012 WL 5941801, *13 (E.D. Cal. Nov. 27, 2012) (approving PAGA settlement payment of $7,500 to the LWDA out of $2.5 million common-fund settlement); *Schiller v. David's Bridal, Inc.*, 2012 WL 2117001, *14 (E.D. Cal. June 11, 2012) (approving PAGA settlement payment of $7,500 to the LWDA out of $518,245 common-fund settlement).

Still other courts have approved settlements that provide for far less than *one* percent allocation to PAGA penalties.  *See Hopson v. Hanesbrands Inc.*, 2009 WL 928133, *9 (N.D. Cal. Apr. 3, 2009) (approving total PAGA allocation that was .49% of $408,420.32 gross settlement); *Moore v. PetSmart, Inc.*, 2015 WL 5439000, *8 (N.D. Cal. Aug. 4, 2015) (approving total PAGA allocation that was .5% of $10,000,000 gross settlement); *Lusby v. Gamestop Inc.*, 297 F.R.D. 400, 407 (N.D. Cal. 2013) (approving total PAGA allocation that was .67% of $750,000 gross settlement), *final approval granted*, *Lusby v. GameStop Inc.*, 2015 WL 1501095, *2 (N.D. Cal. Mar. 31, 2015).

### 3. Revised Plan of Allocation

Under the revised settlement agreement, monetary funds will be distributed to drivers through the same method as in the earlier proposed agreement (*i.e.* to those who have submitted a claim, which is accomplished easily through electronic means, or by mail if requested), with the following revised allocation formula:

From the Net Settlement Fund (the Gross Settlement minus attorneys' fees and costs, administrator costs, and portion of the PAGA allocation that goes to the LWDA), funds will be distributed to drivers pursuant to the same point system as was previously negotiated, which reflects the amount of hours worked by drivers.  Exh. 1 at ¶¶ 45-49.

However, drivers who drove at least 30 hours per week in at least 50 percent of the weeks they drove with Lyft (*i.e.*, drivers who plaintiffs contend can be considered "full time" drivers) will receive a doubling of their points (as compared to the original agreement, which provided these drivers with a 50 percent increase in their points). Exh. 1 at ¶ 47. This increased

credit for this small subset of drivers (now approximately 967 drivers) reflects the relative strength of their claims, as stated by the Court, both in prior hearings, as well as at the hearing on March 24, 2016. *See also* Liss-Riordan Decl., Exh. A (revised class member settlement distribution chart).

Additionally, and unchanged from the original settlement, drivers who drove for Lyft in the time period during which payments for rides were voluntary and during which Lyft took an "administrative fee" from such payments, including amounts beyond the suggested payment amounts (January 14, 2013-December 23, 2013), and who therefore may have additional damages under Plaintiffs' gratuity claim, are allocated a modest 20 percent increase in points. Exh. 1 at ¶ 46(c).

Finally, the settlement provides that any modifications to this points system by the Court—by, for example, providing a larger premium to frequent drivers—will not affect the settlement's enforceability or provide the parties with a right to terminate the settlement. Exh. 1 at ¶ 31.

### 4.    Non-Monetary Terms

The Settlement maintains the previously bargained-for non-monetary terms, as well as some additional protections negotiated in and after the parties' April 12, 2016, mediation:

(1) Lyft will no longer be able to deactivate drivers at will, for any reason, and instead will only be able to deactivate drivers for specific, delineated reasons and/or after providing notice and an opportunity to cure.  Drivers will be able to contend that a deactivation for any other reason constitutes breach of contract by Lyft and, as described below, will have a realistic avenue to challenge any such breaches by Lyft.  This limitation on Lyft's ability to deactivate drivers at will, and corresponding agreement to deactivate drivers for only specific reasons or after notice and an opportunity to cure, provides a significant protection to Lyft drivers that they do not currently have.  Indeed, this is a protection that most employees do not have, unless they are union members working under a collective bargaining agreement which prohibits termination except for violations of company policy.

(2) Drivers who are subject to deactivation for: (i) insufficient passenger ratings, (ii) excessive cancellations, (iii) safety reasons, or (iv) no longer qualifying to provide rides or to operate their vehicles, will be given notice and opportunity to cure the issues prior to permanent termination of the agreement.

(3) For any drivers who want to challenge their deactivation, or threat of deactivation, as not being justified under the Terms of Service, Lyft will pay all arbitration-specific fees for the drivers to arbitrate these claims before a neutral arbitrator.

(4) Lyft will also pay all arbitration-specific fees for any claims brought by drivers relating to driver compensation or relating to an alleged employment relationship.[7]

(5) Lyft will implement a pre-arbitration negotiation process (which drivers will have the option to participate in), which will provide drivers with the opportunity to resolve minor disputes with Lyft without having to invoke the arbitration process.

(6) Lyft will provide additional information about potential passengers to drivers prior to drivers accepting any ride request, such as passenger ratings, estimated time to passenger pickup, and more detailed passenger profile information, to assist drivers in making the decision as to whether to accept or decline the ride request.  Because, under the Terms of Service, Lyft will no longer be able to deactivate drivers for any reason in Lyft's discretion, and will not be able to deactivate drivers for declining ride requests, drivers will be able to reject ride requests without fear of deactivation.

(7) Lyft will create a "favorite" driver option pursuant to which drivers who are

_____

[7]     As Lyft's current contract requires arbitration cost-splitting between drivers and Lyft, this agreement by Lyft to pay arbitration fees will provide drivers with a realistic opportunity to challenge their deactivation, or threat of deactivation, as well as vindicate their rights concerning the most common areas of pay disputes that drivers have with the company, without potentially having to pay significant private arbitration-related fees.  Plaintiffs described in their original motion for preliminary approval the value of this term (as workers bringing claims under arbitration agreements that classify them as independent contractors have faced challenges in getting respondent companies to pay for arbitration, challenges that themselves create a deterrent against workers bringing such challenges in arbitration). Dkt. No. 169 at p. 21; Dkt. No. 169-2 at ¶¶ 24-28; Exhs. A-D.

designated by Riders as a "favorite" are entitled to certain benefits.  This new feature will provide additional benefits to drivers who provide the best Lyft rides.[8]

In addition, as a result of the parties' recent negotiations, Lyft has made two additional non-monetary concessions, including:

(8) Lyft will extend the optional pre-arbitration process to all drivers, whether they have already been deactivated or not;[9] and

(9) Lyft has agreed to remove from its Terms of Service the provision that permits deactivation for drivers who "create liability for us or cause us to become subject to regulation as a transportation carrier or provider of taxi service." Exh. 1 at Exh. C (summary of non-monetary terms of settlement).

### 5. Distribution of Funds

The process for the distribution of funds is unchanged from the parties' original agreement. Settlement payments will be made by direct payment via an electronic transfer of funds if possible, or by check if necessary or by request. Exh. 1 at ¶¶ 50-52. To obtain a payment, class members will be able to make a claim electronically, or send in a simple form, through which they can confirm that their electronic payment information on file with Lyft is up to date (or update the information, or request to receive a payment by check). Exh. 1 at ¶¶ 43-44; 24(f).[10]

---

[8]       Lyft is currently exploring several forms this feature could take, including allowing passengers to mark a driver as a favorite through a post-ride review (such as on the bottom of a receipt), with drivers who have received a certain number of favorite driver "points" being eligible for cash or non-cash bonuses.

[9]       This addition addresses the question in the Court's order as to "why Lyft could not make th[e] pre-arbitration dispute resolution process available in every instance where Lyft has terminated, or has decided to terminate, a driver for breach of contract."  p. 11 n.3.  Under the original settlement, the provision covered all types of disputes, not just an enumerated list.  It now also covers all drivers, even those who are no longer on the platform.

[10]      Approximately one month prior to the Final Approval hearing, a reminder will be sent to class members who have not yet submitted claims. Exh. 1 at ¶ 63. The Administrator will also make additional efforts to locate and encourage the filing of claims by class members who have

This settlement is non-reversionary. Exh. 1 at ¶ 35. No funds from the settlement, including unclaimed funds, will revert to Lyft; the full amount of the Net Settlement Fund, other than a small portion that may go to *cy pres*, will be paid to drivers. *Id.*

### 6.      The Release

In exchange for these monetary and non-monetary concessions, Lyft drivers who have given at least one ride in California will release all wage-related claims arising from their alleged misclassification as independent contractors up to the date of preliminary approval. Exh. 1 at ¶¶ 69-73; 24(h), (y). **Drivers will not release any claims against Lyft that arise following the date of preliminary approval, and nothing about the settlement agreement prohibits future challenges to Lyft's classification system.** *Id.* Except for the named plaintiffs, the release does not provide for release of claims unrelated to this core allegation. *Id.*

## C.      THE REVISED CLASS NOTICE

In light of the Court's comments in its Order, n. 2, the parties have clarified in the proposed notice that the settlement releases only claims reasonably related to the claims asserted in this case up to the date of preliminary approval and that future claims are in no way barred by the settlement agreement. Exh. 1 at Exh. B (class notice); Exh. C (summary notice).

As previously agreed, notice will be distributed to class members via email, with follow-

_____

not yet submitted claims whose settlement shares are likely to be greater than $200 (for instance, by mailing notice in addition to emailing notice). Exh. 1 at ¶ 63.

Following the initial distribution of funds, the Settlement Administrator will make reasonable, good faith efforts to distribute payments to Class Members who have not successfully received payment (either because their electronic payment information is no longer valid or they did not cash the check sent to them). Exh. 1 at ¶ 59. After 180 days, there will be a second distribution of all unclaimed funds to those class members whose residual shares would likely be at least $50. Exh. 1 at ¶¶ 50, 79. If, following the second distribution, there are any remaining funds that have not been able to be distributed (i.e., electronic payment information is out of date and the administrator is not able to, with reasonable attempts, locate the class member to obtain updated information, or checks continue to remain uncashed), such funds will be distributed  to the Legal Aid Society – The Employment Law Center, which the parties agree has a direct and substantial nexus to the interests of the class. Exh. 1 at ¶ 79.

up mailed notice for class members for whom email is undeliverable. Exh. 1 at ¶¶ 58-59.

## D.     PLAINTIFFS' EVALUATION OF THE RISKS OF FURTHER LITIGATION

### 1.     The Risk of a Ruling Regarding Lyft's Arbitration Provisions Being Successfully Challenged on Appeal

Plaintiffs' assessment of the risk posed by Lyft's arbitration provisions has changed, to a degree, in light of the Order, in which the Court questioned whether Lyft waived its right to arbitrate all class members' claims, or that the arbitration provision was unenforceable under *D.R. Horton, Inc.*, 357 N.L.R.B. No. 184 (Jan. 3, 2012). *See* Liss-Riordan Decl. at ¶ 36.

Plaintiffs are mindful, however, that the Ninth Circuit has not definitively weighed in on either of these arguments and in fact has expressed skepticism about the *D.R. Horton* argument. *See Richards v. Ernst & Young LLP*, 744 F.3d 1072, 1075 n. 3 (9th Cir.2013) (noting that "two courts of appeals, and the overwhelming majority of the district courts, to have considered the issue have determined that they should not defer to the NLRB's decision in *D.R. Horton* on the ground that it conflicts with the explicit pronouncements of the Supreme Court concerning the policies undergirding the [FAA].").[11]  Liss-Riordan Decl. at ¶ 37.

Similarly, the issue of whether a defendant can waive its right to arbitrate claims of unnamed class members before class certification has not been decided by the Ninth Circuit,[12]

---

[11]     Other courts in this district have also expressed skepticism about the *D.R. Horton* argument.  *See Fimby-Christensen v. 24 Hour Fitness USA, Inc.*, 2013 WL 6158040, at *4 (N.D. Cal. Nov. 22, 2013) ("No courts in this District have followed *Horton*; however, numerous federal courts, including courts in this District, have explicitly rejected it"); *Shepardson v. Adecco USA, Inc.*, 2016 WL 1322994, at *4 (N.D. Cal. Apr. 5, 2016) ("Most federal and state courts have not adopted the reasoning behind *Horton*.")

[12]     Among other things, Lyft would argue that it has not waived its right to arbitrate the claims of unnamed class members because the rule generally is that "waiver of the right to arbitration is *disfavored*" and, because of this, "'any party arguing waiver of arbitration bears a heavy burden of proof.'"  *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986) (quoting *Belke v. Merrill Lynch, Pierce, Fenner & Smith*, 693 F.2d 1023, 1025 (11th Cir. 1982)). The key to any waiver analysis is prejudice, *see id.*; *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1124 (9th Cir. 2008).  Under California's test, which likely would govern the waiver analysis in this case, *see Cox*, 533 F.3d at 1124 & n.7, "[p]rejudice typically is found only where the . . . conduct [of the party seeking arbitration] has substantially undermined th[e] important public policy [favoring arbitration] or substantially impaired the other side's ability to take

and district courts have declined to find waiver in nearly identical circumstances.  *See Pablo v. ServiceMaster Glob. Holdings Inc.*, 2011 WL 3476473, *2 (N.D. Cal. Aug. 9, 2011) (declining to find waiver of arbitration as to unnamed class members despite summary judgment motions as to named plaintiffs); *Mora v. Harley-Davidson Credit Corp.*, 2012 WL 1189769, at *15 (E.D. Cal. Apr. 9, 2012), *report and recommendation adopted*, No. 1:08-CV-1453 AWI BAM, 2012 WL 3245518 (E.D. Cal. Aug. 7, 2012) (same). Additionally, a number of district courts have held that it is not legally possible for pre-class certification conduct to result in waiver of the right to arbitrate against putative class members because they are not yet parties to the case.[13] Other district courts that have found waiver did so after defendants failed to address the arbitration clause even in response to a motion for class certification.[14]  *See also* Liss-Riordan Decl. at ¶ 39. Thus, although Plaintiffs now appreciate that this Court might have found that Lyft had waived its right to arbitrate, Lyft still believes it would have prevailed on this argument

---

advantage of the benefits and efficiencies of arbitration."  *St. Agnes Med. Ctr. v. PacifiCare of Cal.*, 82 P.3d 727, 738 (2003).  Thus "waiver generally does not occur where the arbitrable issues have not been litigated to judgment." *Id.*  at 736.

[13]     *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 1753784, at *3-4 (N.D. Cal. May 9, 2011); *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 853 (D. Md. 2013) ("In the context of a class action, however, the Defendants could not have waived their rights to enforce the contractual clauses at issue until the class composition was final."); *Davis v. Four Seasons Hotel Ltd.*, 2011 WL 4590393, *4 (D. Haw. Sept. 30, 2011) (declining to find that defendant had waived right to compel arbitration of putative class members' claims by "extensively litigating" the case prior to class certification); *see also Laguna v. Coverall N. Am., Inc.*, 2011 WL 3176469, *8 (S.D. Cal. July 26, 2011) ("Defendants cannot move to compel arbitration against putative class members prior to certification of a class."); *Saleh v. Titan Corp.*, 353 F. Supp. 2d 1087, 1094 (S.D. Cal. 2004) (district court had no authority to enjoin case filed by putative class members prior to class certification).

[14]     *Edwards v. First Am. Corp.*, 289 F.R.D. 296 (C.D. Cal. 2012) (finding a waiver of the right to compel putative class members to arbitration after the defendants repeatedly failed to raise the arbitration issue *at the class certification stage* (something which has not yet occurred in this case)); *Kingsbury v. U.S. Greenfiber, LLC*, 2012 WL 2775022 (C.D. Cal. June 29, 2012) (defendant had waived its right to compel arbitration of unnamed class members' claims because it had failed to raise arbitration in connection with *four motions for class certification*).

1    and intended to litigate it heavily. Liss-Riordan Decl. at ¶¶ 38, 40.

2          Further, in their April 12, 2016, negotiations, Plaintiffs had to take into account the fact

3    that on April 5, 2016, the Ninth Circuit granted Rule 23(f) review of Judge Chen's decision in

4    *O'Connor v. Uber Techs., Inc.*, 311 F.R.D. 547 (N.D. Cal. 2015) in which he declined to limit

5    the class based on Uber's arbitration clause. Ninth Cir. No. 15-80220, Dkt. No. 9, Apr. 5, 2016.

6    Plaintiffs have no doubt that Lyft would similarly request Rule 23(f) review of any order in this

7    case in Plaintiffs' favor certifying a class notwithstanding Lyft's arbitration clause, and the

8    outcome of such an appeal would have been uncertain.[15] Liss-Riordan Decl. at ¶ 41.

9          **2.      The Risk of a Class Certification Order Being Successfully Challenged on**
            **Appeal**

10         Plaintiffs' assessment of the risk of not having a class certified by this Court has also

11   changed, to a degree, in light of the Order, in which the Court suggested that it may well have

12   certified a class (or sub-classes) in this case.[16]  Liss-Riordan Decl at ¶ 45. However, the Ninth

13   Circuit's grant of Uber's Rule 23(f) petition also encompassed Judge Chen's decision to certify

14   an expense reimbursement class. Ninth Cir. No. 15-80220, Dkt. No. 9, Apr. 5, 2016.  Thus, Lyft

15   would undoubtedly request immediate review of class certification of each of Plaintiffs' claims,

16   including the reimbursement claim, the outcome of which would not have been certain. Liss-

17   Riordan Decl. at ¶ 46.

18         **3.      The Risks of Obtaining a Verdict at Trial**

19         Assuming Plaintiffs were successful in obtaining class certification, including

---

[15]    Of course, representative PAGA claims cannot be waived through arbitration clauses.
However, as discussed regarding the valuation of Plaintiffs' claims, the pursuit of PAGA
penalties are subject to other unique risks.

[16]    Plaintiffs were also without the benefit of this information at the time of their original
negotiations prior to reaching the initial settlement agreement. Further, at the time the parties
reached their original agreement in this case as to the monetary value of the settlement
(November 2015), Judge Chen had also initially denied certification of the reimbursement claim
in the Uber litigation. *O'Connor v. Uber Techs., Inc.*, 2015 WL 5138097 (N.D. Cal. Sept. 1,
2015). (Judge Chen subsequently certified the reimbursement claim on December 9, 2015.
*O'Connor*, 311 F.R.D. 547.)

overcoming Lyft's arbitration provisions, and assuming Plaintiffs could withstand a challenge to both issues on appeal, Plaintiffs still might not succeed in prevailing on behalf of all class members.  Plaintiffs still would have faced the hurdles of convincing every member of a jury that they were misclassified, then also prevailing on their substantive claims, and then also proving damages and applicable penalties, all of which Lyft would vigorously contest. Liss-Riordan Decl. at ¶¶ 48-52. Even drivers with arguably the strongest claims, what the parties have designated as "full-time" drivers – which amount to just 967 class members out of 163,441 – would need to convince a jury that they were misclassified in the face of Lyft's argument that they look like independent contractors because they had the option to choose when they would work. *Id.* The vast majority of the proposed class (more than 162,000 class members) worked extremely limited hours, and most worked no more than even 30 hours in total driving for Lyft, and thus faced an even more difficult path to prevailing at trial before a jury. *See* Liss-Riordan Decl., Exh. A. While Plaintiffs strongly believe in their claims, and this Court recognized that many of the *Borello* factors favor Plaintiffs, *see* Dkt. No. 94, Plaintiffs recognize the reality of the potential challenge in convincing lay jurors that the drivers are employees, notwithstanding the flexibility of drivers' schedules and the very small number of hours worked by most Lyft drivers. Liss-Riordan Decl. at ¶¶ 48-52. Despite Plaintiffs' attempt in this case to have the Court rule on Lyft drivers' employment status as a legal issue, the Court denied Plaintiffs' motion for summary judgment, *see id.*, and ruled that this question would need to go to a jury.[17]  Thus, Plaintiffs faced a real risk that all Lyft drivers – full time, part time, or barely any time – could walk away from a trial with nothing. *Id.*

In light of these uncertainties and risks, Plaintiffs negotiated what they believe to be a substantial settlement that fairly and adequately compensates the class for their claims. Liss-Riordan Decl. at ¶ 53.

---

[17]    Similarly, despite Plaintiffs' urging in *O'Connor*, Judge Chen held that the employment status question in that case would go to a jury and would not be decided by the Court as a legal matter. While Plaintiffs relish the prospect of a trial on this issue, they also recognize the real risk in persuading a lay jury that drivers are employees, despite their flexibility.

E.     **PLAINTIFFS' VALUATION OF THEIR CLAIMS**

Plaintiffs acknowledge the Court's request that they provide additional reasoning for their valuation of their claims and direct the Court's attention to the Declaration of Shannon Liss-Riordan, at ¶¶ 2 to 34. Counsel's declaration addresses the value of each of the claims asserted in the proposed Fifth Amended Complaint, taking into account issues relating to liability and potentially recoverable damages, *assuming that a jury finds that **all** drivers have been found to be misclassified. Id.* As described in Counsel's declaration, Plaintiffs' monetary valuations are based on data provided by Lyft in connection with the parties' mediations, including recent mileage data. *Id.* Additionally, while Plaintiffs acknowledge that reasonable minds may disagree regarding their likelihood of success on certain claims, the relevant portions of the declaration set forth an informed, reasoned opinion concerning the strength the claims asserted in this case, under the circumstances of <u>this</u> case, and the Court should give due weight to Counsel's analysis. *Id.*

All told, the monetary value of the settlement is 17.3% of the reimbursement claim, above the "roughly 17 percent" benchmark set by the Court. *Id.*; *see also* Order at 20.[18] However, because Plaintiffs' counsel has agreed to request only 30% of the <u>original</u> settlement value for their fees and costs, class members are realizing an effective increased percentage of recovery of more than 20 percent the reimbursement claim. *Id.*

As discussed further herein, each of these percentage valuations, none of which account for the non-monetary value of the settlement, are within or above percentage recoveries approved by courts in the Ninth Circuit.

---

[18]     The Court's focus on a top-line benchmark percentage of 17% somewhat obscures that different drivers likely are in different positions as to what a reasonable litigation-uncertainty discount for their claims should be.  For example, the small number of "full time" or "frequent drivers" may have an argument that he or she should receive a litigation-uncertainty discount of less than 83% percent—and the settlement agreement in fact provides for a smaller discount by doubling the points allocated to those frequent drivers.  In contrast, the vast number of drivers who have driven only a handful of times arguably should receive a greater litigation-uncertainty discount.

### III.    LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 23(e), "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class actions. *Dudum v. Carter's Retail, Inc.*, 2015 WL 5185933, *2 (N.D. Cal. Sept. 4, 2015), *citing Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir.1992).

"Approval under 23(e) involves a two-step process in which the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004) *citing* Manual for Complex Litig., Third, § 30.41 (1995)).

At the preliminary approval stage, where the parties have reached a settlement agreement prior to class certification, the Court "must peruse the proposed compromise to ratify both the propriety of class certification for settlement purposes and the fairness of the settlement." *Deaver v. Compass Bank*, 2015 WL 4999953, *4 (N.D. Cal. Aug. 21, 2015) *citing Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir.2003). The purpose of the Court's preliminary evaluation of the proposed Settlement is to determine whether it is within "the range of reasonableness," and thus whether notice to the Settlement Class of the terms and conditions of the settlement, and the scheduling of a formal fairness hearing, are worthwhile. At the preliminary approval stage, the Court may grant preliminary approval of a settlement and direct notice to the class if the settlement: (1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval. *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 U.S. Dist. LEXIS 48878, *23-24 (N.D. Cal. Apr. 29, 2011) (citing cases and treatises).

The approval of a proposed settlement of a class action is at the discretion of the trial court. *Churchill Village, L.L.C. v. General Elec. Co.*, 361 F.3d 566, 575 (9th Cir. 2004*)*. In

exercising that discretion, however, courts in the Ninth Circuit recognize certain fundamental principles:

First, courts must give "proper deference" to the settlement agreement, because "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1988) (quotations omitted). In conducting this evaluation, "It is neither for the court to reach any ultimate conclusions regarding the merits of the dispute, nor to second guess the settlement terms." *Zepeda*, 2015 WL 6746913, *4, citing *Officers for Justice*, 688 F.2d at 625 (the Court should not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements").

Second, the fairness and reasonableness of a settlement agreement is presumed where, as here, "that agreement was the product of non-collusive, arms' length negotiations conducted by capable and experienced counsel." *In re Netflix Privacy Litig.*, 2013 U.S. Dist. LEXIS 37286, *11 (N.D. Cal. Mar. 18, 2013). This is particularly so when the agreement was reached with the assistance of a capable mediator. *Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832, *9 (N.D. Cal. Apr. 22, 2010) ("the Court may presume that through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of recovery").

Third, "'great weight' should be given to the recommendation of counsel, who are most closely acquainted with the facts underlying the litigation." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981) ("the fact that experienced

counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight").

Fourth, as a matter of sound policy, settlements of disputed claims are encouraged and a settlement approval hearing should "not be turned into a trial or rehearsal for trial on the merits." *Officers for Justice*, 688 F.2d at 625.

## IV.   DISCUSSION

## A.   CERTIFICATION OF THE SETTLEMENT CLASS IS APPROPRIATE

Plaintiffs incorporate by reference their discussion of the propriety of certifying the proposed settlement class in their initial Motion for Preliminary Approval, and for the reasons discussed therein, submit that certification for settlement purposes is appropriate in this case.[19] Dkt. No. 169 at pp. 15-22.

## B.   THE REVISED PROPOSED CLASS NOTICE IS ADEQUATE

For any class certified under Rule 23(b)(3), class members must be afforded the best notice practicable under the circumstances, which includes individual notice to all members who can be identified through reasonable effort. *Deaver*, 2015 WL 4999953, *10.[20]

Here, the parties' proposed Class Notice satisfies each of the above requirements and should be approved by the Court. Exh. 1 at Exh. B (class notice); Exh. C (summary notice). While the parties' original proposed notice was based on the Federal Judicial Center's Illustrative Forms of Class Action Notices, in light of the Court's comments in the Order, p. 10

---

[19]     Plaintiffs' counsel Matthew D. Carlson is now employed by Lichten & Liss-Riordan, P.C. Therefore, Plaintiffs request appointment of only Lichten & Liss-Riordan as class counsel.

[20]     The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3). *Id*. citing Fed.R.Civ.P. 23(c)(2)(B). "Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Id*. citing *Churchill*, 361 F.3d at 575 (internal quotation marks omitted).

n. 2, the parties have clarified in the proposed notice that the settlement releases only claims reasonably related to the claims asserted in this case up to the date of preliminary approval, and that future claims are in no way barred by the settlement agreement. *Id.*

**B.      THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT.**

Preliminary approval of a settlement and notice to the class is appropriate if it: (1) falls within the range of possible approval; (2) is the product of serious, informed, noncollusive negotiations; (3) has no obvious deficiencies; and (4) does not improperly grant preferential treatment to class representatives or segments of the class. *Deaver*, 2015 WL 4999953, *6; *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007). At this stage, "the settlement need only be *potentially* fair, as the Court will make a final determination of its adequacy at the hearing on Final Approval, after such time as any party has had a chance to object and/or opt out." *Id.*

**1.      The Monetary and Non-Monetary Terms of the Settlement Are Within the Range of Possible Approval.**

The Court must determine whether the proposed settlement falls within the range of possible approval. To evaluate the range of possible approval criterion, which focuses on substantive fairness and adequacy, courts primarily consider plaintiff's expected recovery balanced against the value of the settlement offer, in light of the risks of further litigation. *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080. "When determining the value of a settlement, courts consider both the monetary and nonmonetary benefits that the settlement confers." *Miller v. Ghirardelli Chocolate Co.*, 2015 WL 758094, *5 (N.D. Cal. Feb. 20, 2015).

*a.      There Are Substantial Risks Associated With Further Litigation.*

A careful risk/benefit analysis must inform counsel's valuation of a class's claims. *E.g.*, *Lundell v. Dell, Inc.*, 2006 WL 3507938, *3 (N.D. Cal. Dec. 5, 2006) (approving settlement that was "the product of uncertainty and careful risk/benefit analyses on both sides").

As discussed above, there are now at least three substantial risks of further litigation: (1) that Lyft could successfully argue, including on appeal, that it should be permitted to compel individual arbitration of class members' claims; (2) that Lyft could successfully argue, including

on appeal, that Plaintiffs should not be permitted to adjudicated their claims on a classwide basis; and (3) that drivers (including both "full time" and less than "full time" drivers) may not obtain a unanimous jury verdict on the misclassification issue. Plaintiffs' evaluation of the revised settlement agreement has taken into account these risks, and they believe that the revised agreement is fair and reasonable in light of them. Liss-Riordan Decl. at ¶¶ 34-50.

        b.    *The Settlement Provides Substantial Monetary and Non-Monetary Value To Drivers.*

The next step of this analysis is the evaluation of the non-monetary and monetary terms of the settlement agreement. *Miller*, 2015 WL 758094, *5.

With respect to the monetary terms of the settlement, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair." *Officers for Justice*, 688 F.2d at 628. This is due, in large part, to the potential pitfalls of further litigation. *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) ("Plaintiffs here have agreed to accept a smaller certain award rather than seek the full recovery but risk getting nothing."). Thus, the monetary value of the settlement need not meet any particular percentage threshold of the overall potential value of the case. *Id*. Additionally, "finality and speed of recovery" weigh in favor of approval, especially where there is a risk that the Class could receive less by proceeding through litigation. *Deaver*, 2015 WL 8526982, *7.

Here, Plaintiffs have analyzed the potential monetary value of their claims if they were to succeed in proving their misclassification claim.  Based on data provided by Lyft, Plaintiffs have calculated that the $27 million monetary component of the settlement is 17.3 percent of the driving force behind the settlement, the reimbursement claim.[21]

All of these calculations place the monetary value of the settlement well within the range

---

[21]    Moreover, as noted above, because counsel is requesting only 30 percent of the original settlement value, the effective percentage of the recovery for the class is approximately 20.14% of the value of the reimbursement claim.

of possible approval. *See In re High-Tech Employee Antitrust Litig.*, 2015 WL 5159441, *4

(N.D. Cal. Sept. 2, 2015) (approving settlement valued at 14% of available damages)[22]; *see also*

*Balderas v. Massage Envy Franchising, LLC*, 2014 WL 3610945, *5 (N.D.Cal., July 21, 2014)

(approving settlement of reimbursement claims where gross settlement amount "represents

roughly eight percent of the maximum recovery") (final approval granted March 5, 2015 (Dkt.

No. 78)); *Stovall-Gusman v. W.W. Grainger, Inc.*, 2014 WL 5492729, *2 (N.D. Cal. Oct. 30,

2014) (approving settlement of misclassification-based claims that provided for 7.7 percent of

potential recovery) (final approval granted June 17, 2015 (Dkt. No. 54).

   And, significantly, as discussed above, all net settlement funds will be distributed to

drivers; no funds will revert to Lyft. *See, e.g., Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D.

443, 454 (E.D. Cal. 2013) (settlement term prohibiting reversion weighed in favor of

preliminary approval).

   The non-monetary components of the settlement, discussed above, though perhaps not,

in the Court's opinion, "revolutionary," are significant – they will prevent drivers from being

deactivated and losing their ability to earn money on Lyft's platform and, if necessary, provide a

realistic means for drivers who have been deactivated to get back on the platform, among other

benefits. These terms provide practical and on-going benefits to drivers and strongly support

preliminary approval. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049 (9th Cir. 2002)

("Incidental or non-monetary benefits conferred by the litigation are a relevant circumstance.");

---

[22]    Citing *In re Toys R Us–Del., Inc.–Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 453–54 (C.D.Cal.2014) (granting final approval of a settlement providing for consideration reflecting 3% of possible recovery ($391.5 million settlement with exposure up to $13.05 billion)); *Reed v. 1–800 Contacts, Inc.*, 2014 WL 29011, *6 (S.D.Cal. Jan. 2, 2014) (granting final approval where settlement represented 1.7% of possible recovery (net settlement fund of $8,288,719.16, resolving claims worth potentially $499,420,000)); *In re LDK Solar Sec. Litig.*, 2010 WL 3001384, *2 (N.D.Cal. July 29, 2010) (granting final approval where settlement was 5% of estimated damages); *In re Linerboard Antitrust Litig.*, 296 F.Supp.2d 568, 581 & n.5 (E.D.Pa.2003) (gathering cases where courts approved settlements achieving single-digit percentages of potential recoveries).

*Singer v. Becton Dickinson & Co.*, 2010 WL 2196104, *5 (S.D. Cal. June 1, 2010) (non-monetary benefits to the class members weighed in favor of granting final approval).

### 2. The Settlement Is the Product of Years of Litigation, Substantial Discovery, and Multiple Mediation Sessions Under the Guidance of Judge Ryu.

This factor concerns "the means by which the parties arrived at settlement." *Harris v. Vector Mktg. Corp.*, 2011 WL 1627973, *8 (N.D.Cal. Apr. 29, 2011). For the parties "to have brokered a fair settlement, they must have been armed with sufficient information about the case to have been able to reasonably assess its strengths and value." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 396 (C.D. Cal. 2007).

"[T]he use of a mediator and the presence of discovery 'support the conclusion that the Plaintiff was appropriately informed in negotiating a settlement.'" *Deaver*, 2015 WL 4999953, *7, citing *Villegas v. J.P. Morgan Chase & Co.*, 2012 WL 5878390, *6 (N.D. Cal. Nov. 21, 2012); *Harris*, 2011 WL 1627973, *8 (noting that the parties' use of a mediator "further suggests that the parties reached the settlement in a procedurally sound manner and that it was not the result of collusion or bad faith by the parties or counsel").

Here, the parties have exchanged extensive information necessary to make an informed evaluation of the case. *See* Liss-Riordan Decl. at ¶ 33. They have litigated the issue of Lyft's independent contractor defense and have exchanged information necessary to evaluate Plaintiffs' chances of success of an opposed motion for class certification, information relating to Lyft's arbitration provisions, and information needed to evaluate potential damages and penalties. *Id.* All of this information was not only exchanged between parties, but also discussed in depth with Judge Ryu at five settlement conferences over the course of nearly one year. *Id.* Thus, the parties were both armed with ample information to enter into an agreement and did so under the informed guidance of an experienced magistrate judge with familiarity with wage and hour class actions. *Id.*

### 3. The Settlement Has No Obvious Deficiencies.

The Court should also consider "whether there are obvious deficiencies in the Settlement Agreement." *Deaver*, 2015 WL 4999953, *7. Such "obvious deficiencies" may include an

overbroad release, insufficient notice, inadequate form of payment, or a cy pres beneficiary without a sufficient connection to the class and underlying claims. *E.g., Custom LED, LLC v. eBay, Inc*, 2013 WL 6114379, \*7 (N.D. Cal. Nov. 20, 2013). Additionally, an attorneys' fee provision may also be preliminarily evaluated, subject to a motion for fees and final approval. *E.g., Bond v. Ferguson Enterprises, Inc.*, 2011 WL 284962, \*7 (E.D. Cal. Jan. 25, 2011).

Here, Class Members will release only those claims that could arise from their alleged misclassification as independent contractors and will not release <u>any</u> future claims against Lyft (nor could they). *See Nen Thio v. Genji, LLC*, 14 F. Supp. 3d 1324, 1334 (N.D. Cal. 2014) ("while the scope of the release in the proposed settlement is broad, it is acceptable because the claims released are limited to those based upon the facts set forth in the First Amended Complaint.") The parties have also carefully constructed a formula for payments to class members to ensure an equitable distribution of funds, whereby drivers with the strongest claims receive, by far, larger payouts. No unclaimed funds will revert to Lyft; they will be redistributed amongst class members, and, if necessary, given to the parties' agreed upon, and court approved, *cy pres* designee, the Legal Aid Society – Employment Law Center. Additionally, the class notice provides all required information to class members in an easy-to-read format.

The attorneys' fee provision permits Plaintiffs' counsel to apply for fees and costs not to exceed 30 percent of the <u>original</u> gross settlement fund, or $3.675 million.[23] *Cf. e.g., Lusby v.*

---

[23] Plaintiffs are not asking for increased fees here, recognizing that the increased value of this revised settlement was generated primarily by the Court's Order and recognizing that significant work was not required to negotiate the revisions. Although, under the case law, Plaintiffs may be nevertheless entitled to additional fees tethered to the increased value of the class's recovery, *see, e.g., In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir. 2013), they have made the choice not to seek additional fees now.

Plaintiffs also reiterate that at the time of the original settlement they were without the benefit of the Court's comments and reasoning concerning both Lyft's arbitration clause and the likelihood of class certification. At that time, Plaintiffs reasonably believed that they faced significant risk that the Court would find that it had to compel arbitration of all unnamed class members' claims, as numerous other courts in the Ninth Circuit have done. *See* discussion, *supra*; *see also* Liss-Riordan Decl. at ¶¶ 42-43. And, while Plaintiffs appreciate the Court's comments regarding the *D.R. Horton* argument in opposition to arbitration agreements

*GameStop Inc*., 2015 WL 1501095, *9 (N.D. Cal. Mar. 31, 2015) (finding a one-third fee award appropriate because to the results achieved, the risk of litigation, the skill required and the quality of work, and the contingent nature of the fee and the financial burden carried by the plaintiffs); *Barnes v. The Equinox Grp., Inc*., 2013 WL 3988804, *4 (N.D. Cal. Aug. 2, 2013) (awarding one-third of gross settlement in fees and costs because counsel assumed substantial risk and litigated on a contingency fee-basis); *see also Knight v. Red Door Salons, Inc*., 2009 WL 248367, *6 (N.D. Cal. Feb. 2, 2009) ("fee awards in class actions average around one-third of the recovery").

　　　　Moreover, this modest percentage value does not take into account the value of the non-monetary terms of the agreement, which Plaintiffs expect will have the effect of preventing permanent deactivations – and lost income –  that would have occurred absent this settlement, and which, in the Ninth Circuit, must be considered in evaluating the degree of success of a settlement. *Brawner v. Bank of Am. Nat'l Ass'n*, 2016 WL 161295, *5 (N.D. Cal. Jan. 14, 2016)

---

containing class waivers, Plaintiffs were cognizant at the time they reached the initial agreement of the Ninth Circuit's stated skepticism of this argument in *Richards, supra.* Additionally, Plaintiffs note that, even if this Court and the Ninth Circuit ruled in Plaintiffs' favor on the arbitration issue, the makeup of the United States Supreme Court itself was notably different at the time they reached the original agreement from what it is today. At the time, Plaintiffs were leery of their chances of ultimately prevailing in front of that Court on the arbitration issue, should it have proceeded that far. Liss-Riordan Decl. at ¶¶ 42-43. Thus, Plaintiffs' acceptance of the original settlement was premised on the reasonable fear that the class could be gutted completely by the arbitration clause, precluding the chance to even argue the class's case to a jury, and precluding the chance to recovery anything on behalf of the class. Liss-Riordan Decl. at ¶ 44. As also noted above, at the time of original settlement, Judge Chen had not certified the expense reimbursement claim in the Uber litigation (a claim that was certified the month following the signing of the term sheet in this case). Liss-Riordan Decl. at ¶ 47. Thus, at the time of their original negotiations, $12.25 million, plus non-monetary benefits, appeared to be a reasonable resolution of the claims asserted here, regardless of whether the case was fully valued at $64 million, $126 million, or some other number. Liss-Riordan Decl. at ¶ 44. In the face of real risk of not obtaining any recovery for a class, sometimes a reasonable settlement is simply the most that a defendant is willing to pay. *Id.*

　　　　However, Plaintiffs appreciate that, with the Court's comments regarding the original preliminary approval motion, they were able to obtain enhanced relief through their subsequent negotiations with Lyft.

("Ninth Circuit precedent requires courts to award class counsel fees based on the total benefits being made available to class members," including the benefits of non-monetary relief); *Willner v. Manpower Inc.*, 2015 WL 3863625, *7 (N.D. Cal. June 22, 2015) (noting that a change in policy, even if it cannot be specifically valued, must factor into courts' analysis of the degree of success achieved by a settlement).[24]

### 4. The Settlement Does Not Unfairly Grant Preferential Treatment to Any Class Members.

Lastly, under this factor, the Court assesses whether the allocation of the settlement fund may "unfairly benefit certain class members." *Tijero v. Aaron Bros., Inc.*, 2013 WL 60464, *10 (N.D. Cal. Jan. 2, 2013). "[T]o the extent feasible, the plan should provide class members who suffered greater harm and who have stronger claims a larger share of the distributable settlement amount. *Hendricks v. StarKist Co*, 2015 WL 4498083, *7 (N.D. Cal. July 23, 2015) (citing cases). However, "courts recognize that an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel." *Id*. citing *Vinh Nguyen v. Radient Pharm. Corp.*, 2014 WL 1802293, *5 (C.D.Cal. May 6, 2014).

Here, drivers will receive settlement shares based on the amount of total work they performed driving Lyft passengers, and the small number of drivers who could be fairly characterized as "full time" drivers (more than 30 hours per week for at least 50% of the weeks during which they provided rides to Lyft passengers) will receive double payment in their

---

[24]    *See also Vizcaino*, 290 F.3d at 1049 ("Incidental or non-monetary benefits conferred by the litigation are a relevant circumstance" in assessing the results achieved by a settlement); *Laguna v. Coverall N. Am., Inc.*, 2012 WL 607622, *1-2 (S.D. Cal. Feb. 23, 2012) (approving *reversionary* claims-made class settlement in a case alleging independent contractor misclassification, which resulted in award of less than $60,000 in total to class members, and nearly $1,000,000 in attorneys' fees, based on purported non-monetary benefits, none of which included reclassifying workers as employees), *aff'd*, 753 F.3d 918 (9th Cir. 2014), *but see* 772 F.3d 608 (9th Cir. 2014) (opinion vacated due to settlement agreement); *see also Morris v. Eversley*, 343 F.Supp.2d 234, 246–47 (S.D.N.Y.2004) (stating "the degree of monetary success (or lack thereof) is only one factor to be considered" and refusing to reduce attorneys' fees based on "limited monetary value" of recovery, where a "significant victory" with "non-monetary value" was obtained).

allocated payment, in recognition of what the Court has commented may be their greater likelihood of prevailing on the merits in front of a jury. The small subset of drivers with potential gratuity claims are also awarded a modestly increased payment.

Additionally, under this factor, a court may also preliminarily consider the propriety of agreed upon class representative enhancements, which, like a request for attorneys' fees and costs, is subject to further review on final approval. *Deaver*, 2015 WL 4999953, *8.

As will also be briefed in later filings, the agreed upon enhancements for Cotter, Maciel, and Knudtson, in the amounts of $5,000, $5,000, and $2,500, respectively, are in line with, if not less than, awards in other cases in California district courts. *Lusby*, 2015 WL 1501095, *5 (awarding $7,500 to each of the four class representatives from $750,000 fund); *Covillo v. Specialtys Cafe,* 2014 WL 954516, *8 (N.D. Cal. Mar. 6, 2014) (awarding $8,000 to class representatives from $2,000,000 fund); *see also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir.2000) (approving $5,000 to two plaintiff representatives of 5,400 potential class members in $1.75 million settlement); *Hopson v. Hanesbrands, Inc.*, 2009 WL 928133, *10 (N.D.Cal. Apr. 3, 2009) (approving $5,000 award to one member of 217 member class from $408,420 settlement amount).

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion for Preliminary Approval of the parties' revised settlement agreement, allow the parties to proceed with issuing notice to the Settlement Class, and schedule a date for a Final Approval hearing.

Dated: May 11, 2016                    LICHTEN & LISS-RIORDAN, P.C.


                                       By:  ___/s/  *Shannon Liss-Riordan*_____
                                            Shannon Liss-Riordan, *pro hac vice*
                                            Matthew D. Carlson

                                       Attorneys for Plaintiffs